## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

SERVICE EMPLOYEES
INTERNATIONAL UNION,

     Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD,

     Respondent.

Case No. 23-1309

## PETITION FOR REVIEW

Pursuant to § 10(f) of the National Labor Relations Act, 29 U.S.C. § 160(f), and Federal Rule of Appellate Procedure 15, the Service Employees International Union ("SEIU") hereby petitions the Court for review of the Standard for Determining Joint Employer Status issued by the National Labor Relations Board (NLRB) and published in the Federal Register on October 27, 2023, at Volume 88, pages 73,946 through 74,018. A copy of the Standard for Determining Joint Employer Status is attached to this Petition as Exhibit A.

Respectfully submitted,

s/ *Adam Bellotti*
Leon Dayan (ldayan@bredhoff.com)
Adam Bellotti (abellotti@bredhoff.com)
BREDHOFF & KAISER PLLC
805 15th St. NW, Suite 1000
Washington, DC 20005
202-842-2600

Steven Ury* (steven.ury@seiu.org)
Claire Prestel (claire.prestel@seiu.org)
John D'Elia* (john.d'elia@seiu.org)
Service Employees International Union
1800 Massachusetts Ave. NW
Washington, DC 20036

*Counsel to the Petitioner*

* Petitions for admission to be filed

# CERTIFICATE OF SERVICE

On November 6, 2023, I caused a copy of this Petition to be filed on the following via email and first-class email:

Ruth E. Burdick (Ruth.Burdick@nlrb.gov)
Deputy Associate General Counsel
Appellate and Supreme Court Litigation Branch
National Labor Relations Board
1015 Half Street SE, Washington, DC 20570–0001

Dawn Goldstein (Dawn.Goldstein@nlrb.gov)
Assistant General Counsel
Contempt, Compliance, and Special Litigation Branch
National Labor Relations Board
1015 Half Street SE, Washington, DC 20570–0001

s/ *Adam Bellotti*
Adam Bellotti

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Petitioner Service Employees International Union ("SEIU") hereby makes the following disclosures:

The SEIU is an unincorporated labor organization as defined by the National Labor Relations Act, 29 U.S.C. § 152. It has no parent corporation and no publicly-traded corporation has an ownership interest in it. The SEIU represents over 1.8 million workers throughout the United States and Canada, including many workers whose terms and conditions of employment are determined by more than one employer. The SEIU seeks to safeguard and advance workers' welfare and security, and elevate its members and their families by improving wages, benefits, and working conditions.

s/ *Adam Bellotti*
Adam Bellotti

# EXHIBIT A

## NATIONAL LABOR RELATIONS BOARD

### 29 CFR Part 103

**RIN 3142–AA21**

### Standard for Determining Joint Employer Status

**AGENCY:** National Labor Relations Board.

**ACTION:** Final rule.

**SUMMARY:** The National Labor Relations Board has decided to issue this final rule for the purpose of carrying out the National Labor Relations Act (NLRA or Act) by rescinding and replacing the final rule entitled ''Joint Employer Status Under the National Labor Relations Act,'' which was published on February 26, 2020, and took effect on April 27, 2020. The final rule establishes a new standard for determining whether two employers, as defined in the Act, are joint employers of particular employees within the meaning of the Act. The Board believes that this rule will more explicitly ground the joint-employer standard in established common-law agency principles and provide guidance to parties covered by the Act regarding their rights and responsibilities when more than one statutory employer possesses the authority to control or exercises the power to control particular employees' essential terms and conditions of employment. Under the final rule, an entity may be considered a joint employer of another employer's employees if the two share or codetermine the employees' essential terms and conditions of employment.

**DATES:** Effective December 26, 2023. This rule has been classified as a major rule subject to Congressional review. However, at the conclusion of the congressional review, if the effective date has been changed, the National Labor Relations Board will publish a document in the **Federal Register** to establish the new effective date or to withdraw the rule.

**FOR FURTHER INFORMATION CONTACT:** Roxanne L. Rothschild, Executive Secretary, National Labor Relations Board, 1015 Half Street SE, Washington, DC 20570–0001, (202) 273–1940 (this is not a toll-free number), 1–866–315–6572 (TTY/TDD).

**SUPPLEMENTARY INFORMATION:**

## I. Background

### A. Statutory Background

Section 2(2) of the National Labor Relations Act defines an ''employer'' to include ''any person acting as an agent

of an employer, *directly or indirectly*.'' 29 U.S.C. 152(2) (emphasis added). In turn, the Act provides that the ''term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless [the Act] explicitly states otherwise . . . .'' Id. 152(3). Section 7 of the Act provides that employees shall have the right

to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection and to refrain from any or all such activities.

Id. 157. Section 9(c) of the Act authorizes the Board to process a representation petition when employees wish to be represented for collective bargaining. Id. 159(c). And Section 8(a)(5) makes it an unfair labor practice for an employer to refuse to bargain collectively with the representatives of its employees. Id. 158(a)(5).

The Act does not specifically address situations in which statutory employees are employed jointly by two or more statutory employers (*i.e.*, it is silent as to the definition of ''joint employer''), but, as discussed below, the Board, with court approval, has long applied common-law agency principles to determine when one or more entities share or codetermine the essential terms and conditions of employment of a particular group of employees.

### B. The Development of Joint-Employment Law Under the National Labor Relations Act

As set forth more fully in the Board's September 4, 2022 notice of proposed rulemaking (the NPRM), in *Boire* v. *Greyhound Corp.,* 376 U.S. 473, 481 (1964), a representation case involving the relationship between a company operating a bus terminal and its cleaning contractor, the Supreme Court explained that the question of whether Greyhound ''possessed sufficient control over the work of the employees to qualify as a joint employer'' was ''essentially a factual question'' for the Board to determine.[1] On remand, the Board held that Greyhound and the cleaning contractor were joint employers of the employees at issue because they ''share[d], or codetermine[d], those matters governing essential terms and conditions of employment.'' *Greyhound Corp.,* 153 NLRB 1488, 1495 (1965), enfd. 368 F.2d 778 (5th Cir. 1966). For nearly two decades following the Board's decision

in *Greyhound,* the Board regarded the right to control employees' work and their terms and conditions of employment as determinative in analyzing whether entities were joint employers of particular employees. Board precedent from this time period generally did not require a showing that both putative joint employers actually or directly exercised control.[2] The

---

[1] See *Standard for Determining Joint-Employer Status,* 87 FR 54641 (Sept. 7, 2022).

[2] See, *e.g., Globe Discount City,* 209 NLRB 213, 213–214 & fn. 3 (1974) (finding joint employer based on license agreements, without reference to any exercise of authority); *Lowery Trucking Co.,* 177 NLRB 13, 15 (1969) (finding joint employer based in part on unexercised right to reject other employer's employee), enfd. sub nom. *Ace-Alkire Freight Lines* v. *NLRB,* 431 F.2d 280 (8th Cir. 1970) (observing that ''[w]hile [putative joint employer] never rejected a driver hired by [supplier], it had the right to do so''); *United Mercantile, Inc.,* 171 NLRB 830, 831–832 (1968) (finding joint employer based on license agreements, without reference to any exercise of authority); *Floyd Epperson,* 202 NLRB 23, 23 (1973) (finding joint employer based in part on indirect control over wages and discipline), enfd. 491 F.2d 1390 (6th Cir. 1974); *Buckeye Mart,* 165 NLRB 87, 88 (1967) (finding Buckeye joint employer of employees of Fir Shoe based solely on contractually reserved authority over, inter alia, discharge decisions and rules and regulations governing employee conduct), enfd. 405 F.2d 1211 (6th Cir. 1969); *Jewel Tea Co.,* 162 NLRB 508, 510 (1966) (finding joint employer based on contractually reserved, unexercised power to effectively control hire, discharge, wages, hours, terms, ''and other conditions of employment'' and observing: ''That the licensor has not exercised such power is not material, for an operative legal predicated for establishing a joint-employer relationship is a reserved right in the licensor to exercise such control''); *Value Village,* 161 NLRB 603, 607 (1966) (finding joint employer based on operating agreement and observing ''[s]ince the power to control is present by virtue of the operating agreement, whether or not exercised, we find it unnecessary to consider the actual practice of the parties regarding these matters as evidenced by the record.''); *Spartan Department Stores,* 140 NLRB 608, 608–610 & fn. 1, 4 (1963) (finding joint employer based solely on uniform license agreements); *Taylor's Oak Ridge Corp.,* 74 NLRB 930, 938 (1947) (finding joint employer based solely on contractually reserved authority over numerous essential terms and conditions of employment, and observing: ''That the Employer's power of control may not in fact have been exercised is immaterial, since the right to control, rather than the actual exercise of that right, is the touchstone of the employer-employee relationship.''); *General Motors Corp. (Baltimore, MD),* 60 NLRB 81 (1945) (finding joint employer based on contractually reserved authority, despite testimony that entity exercised no control in practice); *Anderson Boarding & Supply Co.,* 56 NLRB 1204, 1206 (1944) (finding joint employer based on unexercised contractual authority); *Bethlehem-Fairfield Shipyard, Inc.,* 53 NLRB 1428, 1431 (1943) (finding joint employer based on reserved rights to dismiss employees and set wage scales, despite crediting testimony entity actually exercised no control).

Our colleague observes that a number of these cases involve department store licensing relationships. He argues that the Board did not purport to apply general common-law agency principles in these cases but instead applied a distinctive analysis focused on ''whether the department store was in a position to influence the licensee's labor relations policies.'' We disagree. The cases we cite above, including the department store cases, ultimately rest on early post-Taft-Hartley Board decisions that are consistent with the

Board's reliance on reserved or indirect control in joint-employer cases during this period was well within the mainstream of both Board and judicial treatment of such control in the independent contractor context, including in non-labor-law settings, and reviewing courts broadly endorsed the Board's consideration of forms of reserved and indirect control as probative in the joint-employer analysis.[3]

In *NLRB* v. *Browning-Ferris Industries of Pennsylvania, Inc.,* 691 F.2d 1117, 1123 (3d Cir. 1982), enfg. 259 NLRB 148 (1981), the United States Court of Appeals for the Third Circuit endorsed the Board's "share or codetermine" formulation of the joint-employer standard. While later Board decisions continued to adhere to this formulation, they also began imposing new requirements that the Board now believes lacked a clear basis in established common-law agency principles or prior Board or judicial decisions. See *TLI, Inc.,* 271 NLRB 798 (1984); *Laerco Transportation,* 269 NLRB 324 (1984). In particular, these decisions began requiring (1) that a putative joint employer "actually" exercise control, (2) that such control be "direct and immediate," and (3) that such control not be "limited and routine." See, *e.g., AM Property Holding Corp.,* 350 NLRB 998, 999–1003 (2007), enfd. in relevant part sub nom. *Service Employees International Union, Local 32BJ* v. *NLRB,* 647 F.3d 435 (2d Cir. 2011); *Airborne Express,* 338 NLRB 597, 597 (2002); *Flagstaff Medical Center,* 357 NLRB 659, 666–667 (2011).

In 2015, the Board restored and clarified its traditional, common-law based standard for determining whether two employers, as defined in Section 2(2) of the Act, are joint employers of particular employees within the meaning of Section 2(3) of the Act. See *Browning-Ferris Industries of California, Inc., d/b/a BFI Newby Island Recyclery,* 362 NLRB 1599 (2015) (*BFI*). Consistent with established common-law agency principles, and rejecting the control-based restrictions that the Board had previously established without explanation, the Board announced that it would consider evidence of reserved and indirect control over employees' essential terms and conditions of employment when analyzing joint-employer status.

While *BFI* was pending on review before the United States Court of Appeals for the District of Columbia Circuit, and following a change in the Board's composition, a divided Board issued a notice of proposed rulemaking with the goal of establishing a joint-employer standard that departed in significant respects from *BFI*.[4] During the comment period, the District of Columbia Circuit issued its decision in *Browning-Ferris Industries of California, Inc.* v. *NLRB,* 911 F.3d 1195, 1222 (D.C. Cir. 2018), upholding "as fully consistent with the common law the

Board's determination that both reserved authority to control and indirect control can be relevant factors in the joint-employer analysis," and remanding the case to the Board to refine the new standard.[5]

Thereafter, on February 26, 2020, the Board promulgated a final rule that again introduced control-based restrictions that narrowed the joint-employer standard.[6] In light of the District of Columbia Circuit's decision in *BFI* v. *NLRB,* the Board modified the proposed rule to "factor in" evidence of indirect and reserved control over essential terms and conditions of employment, but only to the extent such indirect and/or reserved control "supplements and reinforces" evidence that the entity also possesses or exercises direct and immediate control over essential terms and conditions of employment.[7] The final rule also explained that establishing that an entity "shares or codetermines the essential terms and conditions of another employer's employees" requires showing that the entity "possess[es] and exercise[s] such substantial direct and immediate control over one or more essential terms or conditions of their employment as would warrant finding that the entity meaningfully affects matters relating to the employment

---

[3] See, *e.g., Carrier Corp.* v. *NLRB,* 768 F.2d 778, 781 (6th Cir. 1985) (finding joint employer based in part on entity's consulting about wages and benefits with direct employer and reserved authority to request removal or dismissal of employees); *International Chemical Workers Union Local 483* v. *NLRB,* 561 F.2d 253, 255 (D.C. Cir. 1977) ("Whether Cabot and P & K were joint employers depends upon the amount of actual *and potential* control that Cabot had over the replacement employees. This in turn, to a certain extent, is dependent upon the amount and nature of control that Cabot exercised *and was authorized to exercise* under the contract.") (emphasis added); *Vaughn Bros.,* 94 NLRB 382, 388 (1951) ("Under this [common-law] test an employer relationship exists where the person for whom the services are performed reserves the right, even though not exercised, to control the manner and means by which the result is accomplished."); *Alaska Salmon Industry, Inc. (Seattle Wash),* 81 NLRB 1335, 1338 (1949) ("[A]n employee relationship . . . is found to exist where the person for whom the services are performed reserves the right (even if not exercised) to control the manner and means by which the result is accomplished."); *San Marcos Telephone Co.,* 81 NLRB 314, 317 (1949) ("Under [common-law] doctrine, an employee relationship, rather than that of an independent contractor, exists where the person for whom the services are performed reserves the right (even if not exercised) to control the manner and means by which the result is accomplished."); *Steinberg and Co.,* 78 NLRB 211, 220–221, 223 (1948) ("Under [common-law] doctrine it has been generally recognized that an employer-employee relationship exists where the person for whom the services are performed reserves the right to control the manner and means by which the result is accomplished."), enf. denied 182 F.2d 850 (5th Cir. 1950). See also judicial decisions discussed in Sec. I.D., below.

[4] See *The Standard for Determining Joint Employer Status,* 83 FR 46681 (Sept. 14, 2018). Then-Member McFerran dissented.

final rule's approach. For example, in one early case, the Board held that "an employer-employee relationship is established where the [entity] for whom services are rendered possesses the right of control over such fundamental matters as the employees' day-to-day operations and their basic working conditions." *Franklin Simon & Co.,* 94 NLRB 576, 579 (1951). In that case, the Board found that a department store and its licensee were joint employers because "a substantial right of control over matters fundamental to the employment relationship is retained and exercised by *both* [entities]." Id. (emphasis in original). We find these statements instructive and see no indication that the Board intended such statements to apply solely in the department store context, as our colleague implies. As for *Buckeye Mart,* supra, which our colleague suggests is at odds with the broader principles we argue animated the Board's early decisions, we note that in that case the Board found a department store to jointly employ the employees of one of its licensees but not the other. At most, this case shows that the Board applied the relevant standard to find one joint-employment relationship but not another based on the particular language of the license agreements at issue. It does not call the relevant standard or its underlying principles into question.

[5] The court specifically required that on remand the Board clarify its "articulation and application of the indirect-control element" of the *BFI* joint-employer standard to the extent that the Board had not "distinguish[ed] between indirect control that the common law of agency considers intrinsic to ordinary third-party contracting relationships, and indirect control over the essential terms and conditions of employment." 911 F.3d at 1221–1223. The court further instructed the Board on remand to more explicitly apply the second part of the *BFI* standard ("whether the putative joint employer possesses sufficient control over employees' essential terms and conditions of employment to permit meaningful collective bargaining"), and specifically, to clarify "which terms and conditions are 'essential' to permit 'meaningful collective bargaining,'" and what such bargaining "entails and how it works in this setting." Id. at 1221–1222 (quoting 362 NLRB at 1600). After accepting the court's remand, a newly constituted Board declined to clarify the *BFI* standard in any respect, instead finding that "retroactive application of any clarified variant of [that standard] in this case would be manifestly unjust." *Browning-Ferris Industries of California, Inc.,* 369 NLRB No. 139, slip op. 1 (2020), vacated and remanded, 45 F.4th 38 (D.C. Cir. 2022). As discussed below, and contrary to the view of our dissenting colleague, the instant rule fully explicates the indirect-control element in Section IV and V.

[6] See *Joint Employer Status Under the National Labor Relations Act,* 85 FR 11184 (Feb. 26, 2020).

[7] Id. at 11185–11186, 11194–11198 & 11236. The final rule defined "indirect control" as "indirect control over essential terms and conditions of employment of another employer's employees but not control or influence over setting the objectives, basic ground rules, or expectations for another entity's performance under a contract." Id. at 11236.

relationship with those employees.''[8] In turn, the final rule defined ''substantial direct and immediate control'' to mean ''direct and immediate control that has a regular or continuous consequential effect on an essential term or condition of employment of another employer's employees'' and ''substantial'' to exclude control that is ''only exercised on a sporadic, isolated, or de minimis basis.''[9] The final rule set forth an ''exhaustive'' list of essential terms and conditions of employment comprised of ''wages, benefits, hours of work, hiring, discharge, discipline, supervision, and direction'' and discussed some examples of conduct that would or would not rise to the level of direct and immediate control of each term or condition on the list.[10]

### C. The Notice of Proposed Rulemaking

On September 7, 2022, the Board issued a new joint-employer NPRM. 87 FR 54641, 54663 (September 7, 2022). In the NPRM, the Board detailed recent developments in its joint-employer law. The Board noted that the Board's 2020 final rule (2020 rule) marked the first occasion when the Board addressed joint-employer doctrine through rulemaking. The NPRM stated the Board's preliminary view, subject to comments, that the 2020 rule's embrace of control-based restrictions unnecessarily narrowed the common law and threatened to undermine the goals of Federal labor law. The NPRM invited comments on these issues and on all aspects of the proposed rule, seeking input from employees, employers, and unions regarding their experience in workplaces where multiple entities have authority over the workplace.

The Board set an initial comment period of 60 days with 14 additional days allotted for reply comments. Thereafter, the Board extended these deadlines to allow interested parties to comment for an additional 30 days.[11]

### D. Relevant Common Law Principles

As discussed in more detail below, the Board has concluded, after careful consideration of relevant comments, that the 2020 rule must be rescinded because it is contrary to the common-

law agency principles incorporated into the Act when it was adopted and, accordingly, is not a permissible interpretation of the Act.[12] Although we believe that the Board is required to rescind the 2020 rule, we would do so even if that rule were valid because it fails to fully promote the policies of the Act, as explained below.

First, it is well established—and our dissenting colleague agrees—that the statutory terms ''employer'' and ''employee'' have their common-law meaning, and that the common law accordingly governs the Board's joint-employer analysis. See, *e.g.*, *BFI* v. *NLRB*, 911 F.3d at 1207–1208. In the preamble to the proposed rule, the Board (quoting the District of Columbia Circuit, id. at 1208–1209) acknowledged that ''Congress has tasked the courts, and not the Board, with defining the common-law scope of 'employer' '' and that ''the common-law lines identified by the judiciary'' thus delineate the boundaries of the ''policy expertise that the Board brings to bear'' on the question of whether a business entity is a joint employer of another employer's employees under the Act. 87 FR at 54648. Accordingly, in defining the types of control that will be sufficient to establish joint-employer status under the Act, the Board looks for guidance from the judiciary, including primary articulations of relevant principles by judges applying the common law, as well as secondary compendiums, reports, and restatements of these common law decisions, focusing ''first and foremost [on] the 'established' common-law definitions at the time Congress enacted the National Labor Relations Act in 1935 and the Taft-Hartley Amendments in 1947.'' Id. at 1209 (citations omitted).[13]

After consideration of relevant comments, the Board has concluded that the actual-exercise requirement reflected in the 2020 rule is (as described in relevant detail below) contrary to the common-law agency principles that must govern the joint-employer standard under the Act and that the Board has no statutory authority to adopt such a requirement. The Board has further concluded that the policies of the Act, consistent with the common-law principles governing the Act's interpretation, make it appropriate for the Board to give determinative weight to the existence of a putative joint employer's authority to control essential terms and conditions of employment, whether or not such control is exercised, and without regard to whether any such exercise of control is direct or indirect, such as through an intermediary.[14]

#### 1. Reserved Control

First, as previously set forth in the NPRM,[15] long before the 1935 enactment of the Act, the Supreme Court recognized and applied a common-law rule that ''the relation of master and servant exists whenever the employer *retains the right* to direct the manner in which the business shall be done, as well as the result to be accomplished, or, in other words, 'not only what shall be done, but how it shall be done.' '' *Singer Mfg. Co.* v. *Rahn*, 132 U.S. 518, 523 (1889) (emphasis added) (quoting *Railroad Co.* v. *Hanning*, 82 U.S. 649, 657 (1872)). The Court in *Singer* affirmed the holding below that a worker was an employee[16] of a company because the Court concluded that the company had contractually reserved such control over

---

[8] Id. at 11235.

[9] Id. at 11236.

[10] Id. at 11235–11236.

[11] The NPRM set the deadline for initial comments as November 7, 2022, and comments replying to comments submitted during the initial comment period were due November 21, 2022. 87 FR at 54641. On October 14, 2022, the Board extended the deadlines for submitting initial and reply comments for 30 days, to December 7, 2022, and December 21, 2022, respectively. 87 FR 63465 (October 19, 2022).

[12] Our dissenting colleague suggests that the 2020 rule is defensible, as a discretionary choice, to decline to exert joint-employer jurisdiction over entities who might be statutory employers by virtue of reserved but unexercised control, but who have not actually exercised their authority to control terms and conditions of employment of another entity's employees. Assuming arguendo that the Board could exercise its discretion to decline jurisdiction in this manner, the 2020 rule nowhere presents that rationale as underlying its actual-exercise requirement. Moreover, any such claim is inconsistent with our dissenting colleague's additional assertion, discussed further below, that the current final rule goes ''beyond the boundaries of the common law'' by eliminating the 2020 rule's actual-exercise requirement.

[13] Our dissenting colleague implicitly criticizes us for citing ''a plethora of decisions (including state law cases more than a hundred years old), the majority of which focus on independent contractor, workers' compensation, and tort liability matters.'' We find it entirely appropriate, however, to seek guidance on the meaning of common-law terms in the Act in judicial opinions where common-law issues most frequently arise, written by state judges primarily responsible for applying the common law,

from time periods that shed light on the meaning of those terms when Congress used them.

[14] Contrary to our dissenting colleague, apart from recognizing that the Board must follow common-law agency principles in determining who is an ''employer'' and an ''employee'' under Sec. 2 of the Act, we do not conclude that the common law dictates the specific details of the joint-employer standard we articulate herein. Rather, as discussed in more detail above and below, the final rule reflects our policy choices, within the bounds of the common law, in furtherance of the policy of the United States, as set forth in Sec. 1 of the Act, to encourage the practice and procedure of collective bargaining, including by providing a mechanism by which an entity's rights and obligations under the Act may be accurately aligned with its authority to control employees' essential terms and conditions of employment.

[15] 87 FR at 54648–54650.

[16] As we explained more fully in the NPRM, a ''servant'' is an employee. 87 FR at 54645 fn. 28. See, *e.g.*, 30 C.J.S. *Employer—Employee* sec. 1 (2022) (''The terms 'servant' and 'employee' are interchangeable.''); Horace Gray Wood, *A Treatise on the Law of Master and Servant; Covering the Relation, Duties and Liabilities of Employers and Employees* (1877).

the performance of the work that it ''might, if it saw fit, instruct [the worker] what route to take, or even what speed to drive.'' Id. at 523. In reaching this conclusion, the Court relied solely on the parties' contract and did not discuss whether or in what manner the company had ever actually exercised any control over the terms and conditions under which the worker performed his work. In other words, the Court found a common-law employer-employee relationship based on contractually reserved control without reference to whether or how that control was exercised.[17]

Between the Court's decision in *Singer* and the relevant congressional enactments of the NLRA in 1935 and the Taft-Hartley amendments in 1947, Federal courts of appeals and State high courts consistently followed the Supreme Court in emphasizing the primacy of the right of control over whether or how it was exercised in decisions that turned on the existence of a common-law employer-employee relationship, including in contexts involving more than one potential employer. For example, in 1934, the Supreme Court of Missouri examined whether a worker was an ''employee'' of two companies under a State workers' compensation statute—the terms of which the court construed ''in the sense in which they were understood at common law''—and affirmed that ''the essential question is not what the companies did when the work was being done, but whether they had a right to assert or exercise control.'' [18] And, in

1945, the Court of Appeals for the District of Columbia Circuit explained that, in distinguishing employees from independent contractors, ''it is the right to control, not control or supervision itself, which is most important.'' [19]

[17] See also *Chicago Rock Island & Pac. Ry. Co.* v. *Bond,* 240 U.S. 449, 456 (1916) (worker was not employee of railroad company where contract provided ''company *reserves and holds no control* over [worker] in the doing of such work other than as to the results to be accomplished,'' and Court found company ''did not *retain the right* to direct the manner in which the business should be done, as well as the results to be accomplished, or, in other words, did not *retain control* not only of what should be done, but how it should be done.'') (emphasis added); *Little* v. *Hackett,* 116 U.S. 366, 376 (1886) (''[I]t is this *right to control* the conduct of the agent which is the foundation of the doctrine that the master is to be affected by the acts of his servant.'') (emphasis added) (quoting *Bennet* v. *New Jersey R.R. & Transp. Co.,* 36 N.J.L. 225 (N.J. 1873)).

We are puzzled by our colleague's suggestion that *Singer* somehow fails to support the proposition that contractual authority to control can establish a joint-employer relationship because the company engaged the worker and compensated him for his work. As discussed further below, ordinary contract terms providing generally for engaging workers and setting general price terms are common features of any independent-contractor arrangement, and are, accordingly, not relevant to either the joint-employer analysis or the common-law employer-employee analysis.

[18] *Maltz* v. *Jackoway-Katz Cap Co.,* 82 SW2d 909, 912, 918 (Mo. 1934). See also *McDermott's Case,* 186 NE 231, 232–233 (Mass. 1933) (''One may be a servant though far away from the master, or so

much more skilled than the master that actual direction and control would be folly, for it is the right to control, rather than the exercise of it that is the test.''); *Larson* v. *Independent School Dist No. 11J of King Hill,* 22 P.2d 299, 301 (Idaho 1933) (''It is not necessary that control be exercised, if the right of control exists.''); *Gordon* v. *S.M. Byers Motor Car Co.,* 164 A. 334, 335–336 (Pa. 1932) (''The control of the work reserved in the employer which makes the employee a mere servant . . . means a power of control, not necessarily the exercise of the power.'') (internal quotation and citation omitted); *Brothers* v. *State Industrial Accident Commission,* 12 P.2d 302, 304 (Or. 1932) (''[T]he true test of the relationship of employer and employee is not the actual exercise of control, but the right to exercise control.'') (internal quotation and citation omitted); *Murrays Case,* 154 A. 352, 354 (Me. 1931) (''Authorities are numerous and uniform that the vital test is to be found in the fact that the employer has or not retained power of control or superintendence over the employee or contractor. The test of the relationship is the right to control. It is not the fact of actual interference with the control, but the right to interfere that makes the difference between an independent contractor and a servant or agent. There is no conflict as to this general rule'') (internal quotation and citation omitted); *Van Watermeullen* v. *Industrial Commission,* 174 NE 846, 847–848 (Ill. 1931) (''One of the principal factors which determine whether a worker is an employee or an independent worker is the matter of the right to control the manner of doing the work, not the actual exercise of that right.''); *Norwood Hospital* v. *Brown,* 122 So. 411, 413 (Ala. 1929) (''[T]he ultimate question . . . is not whether the employer actually exercised control, but whether it had a right to control.'').

[19] *Grace* v. *Magruder,* 148 F.2d 679, 681 (D.C. Cir. 1945). See also *Industrial Commission* v. *Meddock,* 180 P.2d 580, 584 (Ariz. 1947) (''It is the right to control rather than the fact that the employer does control that determines the status of the parties, and this right to control is, in turn, tested by those standards applicable to the facts at hand.''); *D.M. Rose & Co.* v. *Snyder,* 206 SW 2d 897, 904 (Tenn. 1947) (internal quotations and citations omitted) (''The[ right of control is the distinguishing mark which differentiates the relation of master and servant from that of employer and independent contractor . . . . Wherever the defendant has had such right of control, irrespective of whether he exercised it or not, he has been held to be the responsible principal or master.''); *Green Valley Coop. Dairy Co.* v. *Industrial Comm'n,* 27 NW 2d 454, 457 (Wis. 1947) (citation omitted) (''It is quite immaterial whether the right to control is exercised by the master so long as he has the right to exercise such control.''); *Bobik* v. *Industrial Comm'n,* 64 NE 2d, 829, (Ohio 1946) (''[I]t is not, however, the actual exercise of the right by interfering with the work but rather the right to control which constitutes the test.''); *Cimorelli* v. *New York Cent. R. Co.,* 148 F.2d 575, 578 (6th Cir. 1945) (''The fact of actual interference or exercise of control by the employer is not material. If the existence of the right or authority to interfere or control appears, the contractor cannot be independent.''); *Dunmire* v. *Fitzgerald,* 37 A.2d 596, 599 (Pa. 1944) (in determining ''who was the controlling master of the borrowed employe[e], . . . . The criterion is not whether the borrowing employer in fact exercised control, but whether he had the right to exercise it.''); *Bush* v. *Wilson & Co.,* 138 P.2d 457, 461 (Kan. 1943) (''[W]hether a person is an employee of another depends upon whether the person who is

Unsurprisingly, early twentieth century secondary authority similarly distills from the cases a common-law rule under which the right of control establishes the existence of the common-law employer-employee relationship, without regard to whether or how such control is exercised. For example, in 1922, an American Law Report (A.L.R.) annotation states as black-letter law that:

*In every case* which turns upon the nature of the relationship between the employer and the person employed, the essential question to be determined is *not whether the former actually exercised control* over the details of the work, *but whether he had a right to exercise that control.*[20]

claimed to be an employer had a right to control the manner in which the work was done. It has been pointed out many times that this means not actually the exercise of control, but does mean the right to control.''); *Ross* v. *Schneider,* 27 SE 2d 154, 157 (Va. 1943) (quoting *Murray's Case,* 154 A. 352, 354 (Me. 1931)) (''Authorities are numerous and uniform that the vital test is to be found in the fact that the employer has or not retained power of control or superintendence over the employee or contractor. 'The test of the relationship is the right to control. It is not the fact of actual interference with the control, but the right to interfere that makes the difference between an independent contractor and a servant or agent.' *Tuttle* v. *Embury-Martin Lumber Co.,* [158 NW 875, 879 (Mich. 1916)].''); *Jones* v. *Goodson,* 121 F.2d 176, 179 (10th Cir. 1941) (''[T]he legal relationship of employer and employee . . . exists when the person for whom services are performed has the right to control and direct . . . the details and means by which [the service] is accomplished. . . . it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so.''); *S.A. Gerrard Co.* v. *Industrial Accident Comm'n,* 110 P.2d 377 (Cal. 1941) (''[T]he right to control, rather than the amount of control which was exercised, is the determinative factor.'').

[20] *General discussion of the nature of the relationship of employer and independent contractor,* 19 A.L.R. 226 at sec. 7 & fn. 1 (1922) (emphasis added) (citations omitted). A 1931 A.L.R. annotation similarly reports that ''[i]t is not the fact of actual interference or exercise of control by the employer which renders one a servant rather than an independent contractor, but the existence of the right or authority to interfere or control.'' *Tests in determining whether one is an independent contractor,* 75 A.L.R. 725 (1931).

Other, earlier secondary authority was also consistent with this view. For example, the second edition of *The American & English Encyclopedia of Law,* published over several years spanning the turn of the century, explains that ''[t]he relation of master and servant exists where the employer has *the right* to select the employee; *the power* to remove and discharge him; and *the right* to direct both what work shall be done and the way and manner in which it shall be done.'' 20 The American & English Encyclopedia of Law 12 *Master and Servant* (2d ed. 1902) (emphasis added) (citations omitted). Likewise, in 1907, the Cyclopedia of Law and Procedure defines ''master,'' inter alia, as ''[o]ne who not only prescribes the end, but directs, *or at any time may direct,* the means and methods of doing the work.'' 26 *Cyclopedia of Law and Procedure* 966 fn. 2 *Master and Servant* (1907) (emphasis added) (citations omitted). The 1925 first edition of *Corpus Juris* echoes the same definitions set forth in the

Continued

And, the first Restatement of Agency, published in 1933, defines "master," and "servant," thus:

(1) A master is a principal who employs another to perform service in his affairs and who controls or *has the right to control* the physical conduct of the other in the performance of the service.

(2) A servant is a person employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled *or is subject to the right of control* by the master.[21]

Finally, the first edition of *American Jurisprudence,* published between 1936 and 1948, states that "the really essential element of the [employer-employee] relationship is *the right of control*—the right of one person, the master, to order and control another, the servant, in the performance of work by the latter, and the right to direct the manner in which the work shall be done," and "[t]he test of the employer-employee relation is *the right of the employer to exercise control* of the details and method of performing the work."[22]

The Board believes, after careful consideration of relevant comments as discussed further below, and based on consultation of this and other judicial authority, that when Congress enacted the NLRA in 1935 and the Taft-Hartley Amendments in 1947, the existence of a putative employer's reserved authority to control the details of the terms and conditions under which work was performed sufficed to establish a common-law employer-employee relationship without regard to whether or in what manner such control was exercised.

From 1947 to today, innumerable judicial decisions and secondary authorities examining the common-law employer-employee relationship have continued to emphasize the primacy of the putative employer's authority to control, without regard to whether or in

what manner that control has been exercised. For example, in 2014, the Supreme Court of California affirmed that "what matters under the common law is not how much control a hirer *exercises,* but how much control the hirer retains the *right* to exercise."[23] As

noted above, the *Restatement (Second) of Agency* relevantly echoes the First Restatement's emphasis on the right of control.[24] *Corpus Juris Secundum* provides that "[a]n employee/servant is a type of agent whose physical conduct is controlled *or is subject to the right to control* by the master; the servant's principal, who controls *or has the right to control* the physical conduct of the servant, is called the master."[25] And, the second edition of *American Jurisprudence* provides that "the principal test of an employment relationship is whether the alleged employer has *the right to control* the manner and means of accomplishing the result desired."[26] Based on its examination of this and other judicial and secondary authority, the Board agrees with the District of Columbia Circuit that "for what it is worth [the common-law rule in 1935 and 1947] is still the common-law rule today."[27] The Board also notes that, as set forth in greater detail above, this view is in keeping with the Board's prior treatment of reserved control in the period following the *Greyhound* decision and before the Board began imposing additional control-related restrictions in *TLI/Laerco* and their progeny.

Finally, because the facts of many cases do not require distinguishing between contractually reserved and actually exercised control, many judicial decisions and other authorities spanning the last century have articulated versions of the common-law test that do *not* expressly include this distinction. But the Board is not aware of any common-law judicial decision or other common-law authority directly supporting the proposition that, given the existence of a putative employer's

---

*Cyclopedia,* and additionally notes state high court common-law authority holding that "*where the master has the right of control, it is not necessary that he actually exercise such control.*" 39 C.J. Master and Servant sec. 1 Definitions 33 fn. 8 (1st ed. 1925) (emphasis added) (quoting *Tucker* v. *Cooper,* 158 P. 181 (Cal. 1916)).

[21] Restatement (First) of Agency sec. 2 (Am. Law Inst. 1933) (emphasis added). See also id. at sec. 220 ("A servant is a person employed to perform a service for another in his affairs and who, with respect to his physical conduct in the performance of the service, is subject to the other's control *or right to control.*") (emphasis added). As noted above, the District of Columbia Circuit observed in *BFI* v. *NLRB,* 911 F.3d at 1211, that "the 'right to control' runs like a *leitmotif* through the Restatement (Second) of Agency," which, though published in 1958, is relevantly similar to the first Restatement.

[22] 35 Am. Jur. *Master and Servant* sec. 3 (1st ed. 1941) (emphasis added).

[23] *Ayala* v. *Antelope Valley Newspapers, Inc.,* 327 P.3d 165, 169, 172 (Cal. 2014); see also, e.g., *Garcia-Celestino* v. *Ruiz Harvesting, Inc.,* 898 F.3d 1110, 1121 (11th Cir. 2018) ("We emphasize that 'it is the *right* to control, not the actual exercise of control that is significant.'"); *Mallory* v. *Brigham Young Univ.,* 332 P.3d 922, 928–929 (Utah 2014) ("If the principal has the right to control the agent's method and manner of performance, that agent is a servant whether or not the right is specifically exercised."); *Shatto* v. *McLeod Regional Medical Center,* 753 SE2d 416, 419, 420 (S.C. 2013) ("While evidence of actual control exerted by a putative employer is evidence of an employment relationship, the critical inquiry is whether there exists the *right and authority* to control and direct the particular work or undertaking."); *Anthony* v. *Okie Dokie Inc.,* 976 A.2d 901, 906 (D.C. 2009) (quoting *Safeway Stores Inc.* v. *Kelly,* 448 A.2d 856, 860 (D.C. 1982)) ("The determinative factor 'is whether the employer has the *right* to control and direct the servant in the performance of his work and the manner in which the work is to be done . . . and not the actual exercise of control or supervision.'"); *Universal Am-Can Ltd. V. WCAB,* 762 A.2d 328, 332–333 (Pa. 2000) ("[I]t is the existence of the *right* to control that is significant, irrespective of whether the control is actually exercised."); *Reed* v. *Glyn,* 724 A.2d 464, 466 (Vt. 1998) ("It is to be observed that actual interference with the work is unnecessary— it is the right to interfere that determines."); *JFC Temps, Inc.* v. *W.C.A.B. (Lindsay),* 620 A.2d 862, 864–865 (Pa. 1996) ("The law governing the "borrowed" employee is well-established. . . . The entity possessing the right to control the manner of the performance of the servant's work is the employer, irrespective of whether the control is actually exercised."); *Harris* v. *Miller,* 438 SE 2d 731, 735 (N.C. 1994) ("The traditional test of liability under the borrowed servant rule [provides that] a servant is the employe (sic) of the person who has the *right* of controlling the manner of his performance of the work, irrespective of whether he actually *exercises* that control or not.") (internal quotation and citation omitted); *Beddia* v. *Goodin,* 957 F.2d 254, 257 (6th Cir. 1992) ("The test is whether the employer retained control, or the right to control, the modes and manner of doing the work contracted for. *It is not necessary that the control ever be exercised.*"); *Ex parte Curry,* 607 S.2d 230, 232 (Ala. 1992) ("In the last analysis, it is the reserved right of control rather than its actual exercise that provides the answer."); *ARA Leisure Services, Inc.* v *NLRB,* 782 F.2d 456, 460 (4th Cir. 1986) ("It is the right to control, rather than the actual exercise of control, that is significant."); *NLRB* v. *Associated Diamond Cabs, Inc.,* 702 F.2d 912, 920 (11th Cir. 1983) ("[I]t is the *right* to control, not the actual exercise of control, that is significant."); *Glenmar Cinestate Inc.* v. *Farrell,* 292 SE2d 366, 369 (Va. 1982) ("It is not the fact of actual interference with the control, but the right to interfere, that makes the difference between an independent contractor and a servant or agent."); *Baird* v. *Sickler,* 433 NE 2d 593, 594–595 (Ohio 1982) ("For the relationship to exist, it is unnecessary that such right of control be exercised; it is sufficient that the right merely exists."); *Seafarers Local 777 (Yellow Cab)* v. *NLRB,* 603 F.2d 862, 874 (D.C. Cir. 1978) (quoting *Williams* v. *U.S.,* 126 F.2d 129, 132 (7th Cir. 1942)) ("'[I]t is the right and not the exercise of control which is the determining element.'"); *Combined Insurance Co. of America* v. *Sinclair,* 584 P.2d 1034, 1042 (Wyo. 1978) ("The base determining factor is whether [putative employer] retained [t]he right of control of

the manner that [putative employee] operated his vehicle and not whether such control was in fact exercised."); *NLRB* v. *Deaton Inc.,* 502 F.2d 1221, 1225 (5th Cir. 1974) ("It is the right and not the exercise of control which is the determining element"); *Dovell* v. *Arundel Supply Corp.,* 361 F.2d 543, 545 (D.C. Cir. 1966) (quoting *Grace* v. *Magruder,* 148 F.2d 679, 681 (D.C. Cir. 1945)) ("[I]t is the right to control, not control or supervision itself, which is most important."); *United Ins. Co. of America* v. *NLRB,* 304 F.2d 86, 89 (7th Cir. 1962) ("[I]t is the right and not the exercise of control which is the determining element."); *Cohen* v. *Best Made Mfg. Co.,* 169 A.2d 10, 11–12 (R.I. 1961) ("The final test is the right of the employer to exercise power of control rather than the actual exercise of such power."); *Fardig* v. *Reynolds,* 348 P.2d 661, 663 (Wash. 1960) ("It is well settled in this state that . . . [it] is not the actual exercise of the right of interference with the work, but the right to control, which constitutes the test.").

[24] See Restatement (Second) of Agency secs. 2, 220 (Am. Law Inst. 1958).

[25] 30 C.J.S. *Employer—Employee* sec. 1 (2022) (emphasis added) (citations omitted).

[26] 27 Am. Jur. 2d. *Employment Relationship* sec. 1 (2022) (emphasis added) (citations omitted).

[27] *BFI* v. *NLRB,* 911 F.3d at 1210 & fn. 6.

contractually reserved authority to control, further evidence of direct and immediate exercise of that control is necessary to establish a common-law employer-employee relationship.

For these reasons, the Board believes that in light of controlling common-law agency principles, it does not have the statutory authority to require a showing of actual exercise of direct and immediate control in order to establish that an entity is a joint employer of another entity's employees. We would not choose to do so, as a matter of policy, in any case.

Our dissenting colleague faults us, in turn, both for seeking authority on relevant common-law principles in sources examining the distinction between employees and independent contractors and for failing to pay sufficient attention to judicial decisions examining joint-employer issues under other federal statutes in light of common-law principles derived from independent-contractor authority. In support of the first criticism, our colleague quotes selectively from *BFI* v. *NLRB,* in which the court rejected a party's contention that the joint-employer and independent-contractor tests were "virtually identical." 911 F.3d at 1213–1215. We recognize, as did the court there, that several of the factors that guide the employee-or-independent-contractor determination, as articulated in primary judicial authority like *Darden* [28] and *Reid* [29] and in secondary compendiums, reports, and restatements of the common law of agency bearing on independent-contractor determinations will "shed no meaningful light" on joint-employer questions, which involve workers who are clearly *some entity's* employees. 911 F.3d at 1214–1215. Nevertheless, we agree with the court that "both tests ultimately probe the existence of a common-law master-servant relationship, [a]nd central to establishing a master-servant relationship—whether for purposes of the independent-contractor inquiry or the joint-employer inquiry—is the nature and extent of a putative master's control." Id. at 1214. The final rule is thus consistent with *NLRB* v. *BFI* in seeking guidance from common law material bearing on the independent-contractor determination to examine, as a threshold matter under Section 103.40(a), whether a common-law employer-employee relationship exists between a putative joint employer and particular employees. [30] Once the party seeking to demonstrate joint-employer status establishes the existence of a threshold common-law employment relationship, the final rule appropriately provides for an examination, under Section 103.40(c), of whether the character and objects of such control. *i.e.,* who may exercise it, when, and how, extends to essential terms and conditions of employment that are the central concern of the joint-employer analysis within the specific context of the NLRA. [31]

Our dissenting colleague faults us for failing to pay sufficient heed to judicial decisions examining joint-employer questions under other statutes, especially Title VII of the Civil Rights Act of 1964, [32] that he claims are materially similar to the NLRA. [33] As a threshold matter, because many of the decisions our colleague cites take independent-contractor authority as the starting point for their analysis of joint-employer questions, these cases support the Board's similar examination of articulations of common-law principles in independent-contractor authority for guidance on the joint-employer analysis under the NLRA. [34]

---

[28] *Nationwide Mutual Insurance Co.* v. *Darden,* 503 U.S. 318, 322–324 (1992).

[29] *Community for Creative Non-Violence* v. *Reid,* 490 U.S. 730, 751 (1989).

[30] Our dissenting colleague argues that judicial precedent distinguishing between independent contractors and employees is "ill-suited to fully resolve joint-employer issues" in part because, he contends, the principal in an independent-contractor relationship "necessarily exercises direct control of at least two things that . . . constitute essential terms and conditions," by engaging the worker and deciding upon the compensation to be paid for the work. This argument proves too much, because an entity that actually determined which particular employees would be hired and actually determined the wage rates of another entity's employees would be a joint employer of those employees for the purposes of the Act under any joint-employer standard, including the 2020 rule. See 85 FR at 11235–11236. Because every contract for the performance of work includes price terms and provides for engaging at least one worker, if such provisions alone were, as our colleague asserts, the equivalent of exercising direct control over hiring and wages—essential terms and conditions of employment under the Act—then no joint-employer standard could distinguish between control sufficient to establish a joint-employer relationship and control *insufficient* to establish a common-law employment relationship when considering only a single principal and a single worker. From this it is clear that, contrary to our colleague's assertion, ordinary contract terms providing generally for engaging workers and setting general price terms do *not* constitute an exercise of direct control over the essential terms and conditions of employment of hiring and wages. As discussed further below, Sec. 103.40(f) expressly incorporates this distinction by providing that evidence of an entity's control over matters that are immaterial to the existence of a common-law employment relationship and that do not bear on the employees' essential terms and conditions of employment is not relevant to the determination of whether an entity is a joint employer. Recognizing this commonsense distinction in no way undermines our examination of independent-contractor authority for guidance on the common-law employment relationship.

[31] See *BFI* v. *NLRB,* 911 F.3d at 1195 ("[E]mployee-or-independent-contractor cases can . . . be instructive in the joint-employer inquiry to the extent that they elaborate on the nature and extent of control necessary to establish a common-law employment relationship. Beyond that, a rigid focus on independent-contractor analysis omits the vital second step in joint-employer cases, which asks, once control over workers is found, *who* is exercising that control, *when,* and *how.*") (emphasis in original).

[32] 42 U.S.C. 2000e *et seq.*

[33] We need not decide whether the statutes our colleague refers to are "materially similar" to the NLRA, because, as discussed below, courts' discussion and application of common-law principles in the cases cited by our colleague fully support the Board's position. We note, however, that these statutes define "employer" and "employee" differently from the Act and examine the relationship in different contexts. For instance, Title VII excludes entities that would clearly be statutory employers under the NLRA by defining "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person," subject to exclusions that also differ from the exclusions provided under Sec. 2 of the Act. Compare 42 U.S.C. 2000e(b) with 29 U.S.C. 152. Moreover, joint-employer questions under Title VII and similar statutes primarily arise in the context of assigning liability for workplace discrimination in violation of employees' individual rights. Under the NLRA, by contrast, such questions arise in an additional forward-looking context: in order to correctly allocate prospective bargaining rights and obligations in support of employees' collective right to bargain. Assuming that Title VII and similar statutes, like the Act, require reference to the content of the common-law terms "employer" and "employee," the necessity under the Act of prospectively defining bargaining obligations may tend to focus the common-law inquiry on questions involving reserved or indirect control more frequently than is likely under primarily backward-looking individual-rights-protecting statutes.

[34] See, *e.g., Felder* v. *U.S. Tennis Assn.,* 27 F.4th 834, 843 (2d Cir. 2022) (relying, inter alia, on *Reid* and Restatement (Second) of Agency § 220); *Garcia-Celestino* v. *Ruiz Harvesting, Inc.,* 843 F.3d 1276, 1286–1287 (11th Cir. 2016) (relying on *Darden* and *Reid*); *Al-Saffy* v. *Vilsack,* 827 F.3d 85 (D.C. Cir. 2016) (relying, inter alia, on "traditional agency law principles" citing *Darden*); *Faush* v. *Tuesday Morning, Inc.,* 808 F.3d 208 (3d Cir. 2015) ("the common-law test outlined in *Darden* governs"); *Plaso* v. *IJKG, LLC,* 553 Fed. Appx. 199, 203–204 (3d Cir. 2015) (considering *Darden* factors).

Some of the decisions our colleague cites are less clearly relevant, because they employ an "economic realities" test, or a hybrid test that incorporates elements of both a common-law control test and an economic-realities test. See, *e.g., Perry* v. *VHS San Antonio, LLC,* 990 F.3d 918, 928–929 (5th Cir. 2021) (applying "hybrid economic realities/common law control test"); *Frey* v. *Hotel Coleman,* 903 F.3d 671, 676 (7th Cir. 2018) (applying "an 'economic realities' test which is, in essence, an application of general principles of agency law to the facts of the case"); *Al-Saffy* v. *Vilsack,* 827 F.3d at 96 (noting one of two recognized "articulations of the test for identifying joint-employer status. . . . speaks in terms of the 'economic realities' of the work relationship"). Of course, as we note elsewhere, the Board is precluded by Supreme Court decisions interpreting the Taft-Hartley amendments from applying an economic-realities test. See, *e.g., NLRB* v. *United Insurance Co. of America,* 390 U.S. 254, 256 (1968). Given that our colleague elsewhere

Continued

Moreover, far from supporting our colleague's claim that the Board has "gone beyond the boundaries of the common law" by eliminating the 2020 rule's actual-exercise requirement, none of the decisions he cites articulates a common-law principle that would preclude finding a joint-employer relationship based on evidence of reserved unexercised control or indirectly exercised control. To the contrary, several of the cited cases affirmatively support the Board's conclusion that the common law permits the finding of a joint-employer relationship based solely upon reserved, unexercised control or upon control exercised indirectly, such as through an intermediary.[35]

To begin, several of the cases our colleague cites articulate a version of the joint-employer analysis that provides that an entity is a common-law employer if it "exercises significant control" over certain terms and conditions of workers' employment.[36] We agree that an entity's actual exercise of control may be *sufficient* to establish an employment relationship, but nothing about this formulation entails or supports our colleague's further contention that the actual exercise of control is *necessary*. As discussed above, the facts of many cases do not require distinguishing between reserved control and actually exercised control, or between control that is exercised directly or indirectly. Where no question of reserved or indirect control is presented, it is unsurprising that judges articulate the test in a manner that does not make such distinctions, and such articulations, absent a specific claim that actual exercise of control is a necessary component of the analysis, have little to say to the specific disagreement between the Board and our dissenting colleague.

Relatedly, our colleague cites *Felder* v. *U.S. Tennis Association* for its statement that, under a common-law analysis drawn from the Supreme Court's decision in *Reid*, "the exercise of control is the guiding indicator." But he fails to acknowledge the *Felder* court's explanation that sharing significant control under common-law principles "means that an entity other than the employee's formal employer *has power to* pay an employee's salary, hire, fire, or otherwise control the employee's daily employment activities, such that we may properly conclude that a constructive employer-employee relationship exists." 27 F.4th 834, 844 (2d Cir. 2022) (emphasis added).[37] Our

colleague further asserts that *Felder* "quoted with approval cases from other circuits requiring proof that the putative joint employer 'exercise[d] significant control.'" However, a closer examination of the cases cited by *Felder* reveals that they similarly support only the proposition that the exercise of control is *sufficient* to establish the relationship, not that the exercise of control is *necessary* to establish the relationship.[38] As we have explained, the final rule is entirely consistent with the proposition that, as these cases hold, a joint-employment relationship exists when two entities exercise significant control over the same employees.[39] Moreover, each of the cases cited in *Felder* that our colleague relies upon— and many others—*also* discussed the requisite control in terms of the putative joint-employer's "right," "ability," "power," or "authority" to control terms and conditions of employment, consistent with the common-law principle consistently articulated in the primary judicial authority discussed

---

[35] expresses his agreement with our view that the Board must apply common-law agency principles in making joint-employer determinations under the Act, we find his observation that *NLRB* v. *Hearst Publications,* 322 U.S. 111 (1944), involved a question of employee-or-independent-contractor status rather than a question of joint-employer status to be something of a non sequitur.

Finally, some of the cases our colleague relies upon are at best attenuated sources of authority on the content of the common law to the extent that they articulate a joint-employer standard ultimately derived from Board decisions—including Board decisions imposing an actual-exercise requirement without reference to any common-law authority. See, *e.g., Nethery* v. *Quality Care Investors, L.P.,* 814 Fed. Appx. 97 (6th Cir. 2020) (applying "share-or-codetermine" standard derived from *NLRB* v. *Browning-Ferris Industries of Pennsylvania, Inc. (NLRB* v. *BFI of Pennsylvania),* 691 F.2d 1117, 1124 (3d Cir. 1982), via *Carrier Corp.* v. *NLRB,* 768 F.2d 778, 781 (6th Cir. 1985)); *Al-Saffy* v. *Vilsack,* 827 F.3d at 96 (noting one of two recognized "articulations of the test for identifying joint-employer status. . . . borrows language from" *NLRB* v. *BFI of Pennsylvania,* above); *Plaso* v. *IJKG, LLC,* 553 Fed. Appx. at 204 (relying in part on *NLRB* v. *BFI of Pennsylvania* for "significant control" formulation); *Whitaker* v. *Milwaukee County,* 772 F.3d 802, 810 (7th Cir. 2014) (discussed further below, noting "joint employer concept derives from labor law," and citing post-*TLI/Laerco* NLRA precedent); *Graves* v. *Lowery,* 117 F.3d 723, 727 (3d Cir. 1997) (drawing guidance from Board "cases which have found joint employment status when two entities exercise significant control over the same employees") (citing *NLRB* v. *BFI of Pennsylvania* and post-*TLI/Laerco* NLRA precedent).

[35] In *Garcia-Celestino* v. *Ruiz Harvesting, Inc.,* for example, the court concluded that, under the common-law standard applicable to the joint-employer question before it—which it derived from Supreme Court independent-contractor precedent— "the proper focus is on the hiring entity's *right to control* the manner and means by which the product is accomplished." 843 F.3d at 1292–1293 (quotation omitted) (emphasis added). After remand to a district court to apply the common-law analysis, the court later emphasized that under the applicable common-law control test "it is the *right* to control, not the actual exercise of control, that is significant." 898 F.3d 1110, 1121 (11th Cir. 2018) (quoting *NLRB* v. *Associated Diamond Cabs,* 702 F.2d 912, 919–920 (11th Cir. 1983)) (emphasis in original). See also discussion of *Butler* v. *Drive Automotive Industries of Am.,* 793 F.3d 404 (4th Cir. 2015) and *EEOC* v. *Global Horizons, Inc.,* 915 F.3d 631 (9th Cir. 2019), infra.

[36] See *Adams* v. *C3 Pipeline Constr. Inc.,* 30 F.4th 943, 961 (10th Cir. 2021) (quoting *Knitter* v. *Corvias Mil. Living, LLC,* 758 F.3d 1214, 1226 (10th Cir. 2014) ("Both entities are employers if they both exercise significant control over the same employees.") (internal quotation and citation omitted); *Plaso* v. *IJKG, LLC,* 553 Fed. Appx. at 204 (3d Cir. 2015) ("a joint employment relationship exists when 'two entities exercise significant control over the same employees.'") (quoting *Graves,* above); *Bristol* v. *Bd. of Cnty. Comm'rs of Cnty. of Clear Creek,* 312 F.3d 1213, 1218 (10th Cir. 2002) ("Courts applying the joint-employer test . . . look to whether both entities 'exercise significant control over the same employees.'") (quoting *Graves,* above).

[37] Significantly, because *Felder* involved a Title VII claim of discriminatory denial of credentials necessary to perform certain work, the alleged discriminatee never performed work for the putative joint employer, and the court's analysis necessarily examined whether the putative joint employer "*would have exerted control* over the terms and conditions of [the employee's] anticipated employment, by, for example, training, supervising, and disciplining [the employee]"—in other words, whether it had the power, though never exercised, to exert the requisite control under appropriate circumstances. Id. at 845. The court concluded that the court below had not erred in dismissing the discriminatee's Title VII claims with respect to the putative joint employer because the alleged discriminatee failed to allege that the putative joint employer "would have significantly controlled the manner and means" of his work so as to establish an employment relationship.

[38] See *Knitter,* above, 758 F.3d at 1226 (quoting *Bristol,* above, 312 F.3d at 1218 ("Under the joint employer test, two entities are considered joint employer . . . if they both 'exercise significant control over the same employees.'")), and *Plaso,* above, 553 Fed. Appx. at 204 (quoting *Graves,* above, 117 F.3d at 727 ("'[A] joint employment relationship exists when 'two entities exercise significant control over the same employees.'")).

[39] As we have noted above, courts focused on particular factual records that do not turn on the precise role of reserved or indirect control have frequently and reasonably refrained from articulating versions of a common-law employer-employee or joint-employer standard that expressly address whether such control can suffice alone to establish the relationship. See, *e.g., BFI* v. *NLRB,* above, 911 F.3d at 1213 ("[B]ecause the Board relied on evidence that Browning-Ferris both had a right to control and had exercised that control, this case does not present the question whether the reserved right to control, divorced from any actual exercise of authority, could alone establish a joint-employer relationship."). In crafting a Final Rule of general prospective applicability, however, our task is different. We must, accordingly, seek guidance from those judicial articulations of common-law standards that *have* expressly addressed the question of whether or how authority to control must be exercised in order to establish the relevant relationship. No number of cases holding only that the direct exercise of control is *sufficient* can rationally establish that the direct exercise of control is *necessary.* Conversely, though, the large body of authority expressly stating that the direct exercise of control is *not* necessary, and, in many cases finding the relevant relationship *without* any direct exercise of control, weighs heavily in favor of our conclusion that the Board may not, consistent with controlling common-law agency principles, impose such a requirement as part of a joint-employer standard.

above, that it is the authority to control that matters, without respect to whether or how such control is exercised.[40]

The single case cited by our colleague that arguably articulates a standard under which the exercise of control would be *necessary* to find a joint-employer relationship, *Whitaker* v. *Milwaukee County,* does not purport to draw this principle from the common law, but rather applies a standard derived from decisions under the NLRA at a time that the Board had, as we have explained above, adopted an actual-exercise requirement that was unsupported by and insupportable under the common law.[41] Thus, *Whitaker* drew its articulation of the standard from *G. Heileman Brewing Co.* v. *NLRB,* which enforced a Board Decision and Order that had adopted, without relevant comment, an administrative law judge's finding that two entities were joint employers under *Laerco* based on their direct negotiation of a contract that set the overall framework of terms and conditions of employment of the employees.[42] Because the Board is not a primary source of authority for the common-law of agency, and did not, in any case purport to draw the control-based restrictions imposed by *Laerco* and related decisions from the common law,

*Whitaker's* statement of the joint-employer standard has little to say regarding the common-law principles applicable to the final rule.[43]

Our dissenting colleague further seeks support from the court's statement in *Butler* v. *Drive Automotive Industries of America* that ''the [joint-employer] doctrine's emphasis on determining which entities *actually exercise control* over an employee is consistent with Supreme Court precedent interpreting Title VII's definitions.'' 793 F.3d 404, 409 (4th Cir. 2015) (emphasis added). In context, though, it is clear that the *Butler* court's discussion of which entity ''actually exercised'' control meant something entirely different from what our colleague means by the phrase. At issue in *Butler* was whether a manufacturer was a joint employer of a worker supplied to it by a temporary employment agency. The court found that the agency discharged the employee after the manufacturer requested that she be replaced. An agency manager also testified that he could not recall an instance when the manufacturer requested that an agency employee be disciplined or discharged and it was not done. Based primarily on this evidence that the manufacturer thus exercised *indirect* control over discipline and tenure of employment of the agency's employees, the court held, as a matter of law, that the manufacturer was a joint-employer of the discharged employee.[44] The court's observation, in this context, that the joint-employer doctrine emphasizes ''which entities actually exercise control'' had nothing

to do with any question involving reserved, *unexercised* control, but rather with the question of whether, despite the appearance that the agency was responsible for the discharge, the manufacturer had *actually,* though indirectly, brought it about. The court observed that the joint-employer test ''specifically aims to pierce the legal formalities of an employment relationship to determine the loci of effective control over an employee . . . . Otherwise, an employer who *exercises actual control* could avoid Title VII liability by hiding behind another entity.'' 793 F.3d at 415. In other words, far from suggesting that reserved, unexercised control can never suffice to establish a joint-employment relationship under the common law, *Butler* tends rather to support the final rule's treatment of indirect control, discussed further below.

Our colleague further claims that ''[n]ot a single circuit has held or even suggested that an entity can be found to be the joint employer of another entity's employees based solely on a never-exercised contractual reservation of right to affect essential terms . . . *i.e.,* conduct other than actually determining (alone or in collaboration with the undisputed employer) employees' essential terms and conditions of employment.'' But the Court of Appeals for the Ninth Circuit did just that in *EEOC* v. *Global Horizons, Inc.,* 915 F.3d 631 (9th Cir. 2019).

*Global Horizons* involved an EEOC Title VII enforcement action against two agricultural employers (the Growers) alleged to be joint employers of certain foreign workers (the Thai workers) supplied to the Growers by a labor contractor, Global Horizons, under the H–2A guest worker program. Global Horizons and the Growers contracted for Global Horizons to pay the workers and provide certain nonwage benefits required under Department of Labor regulations governing the H–2A program in exchange for the Growers' agreement to compensate Global Horizons for the workers' wages and benefits and pay Global Horizons an additional fee for its services. 915 F.3d at 634–635. The workers sought to hold the Growers responsible as joint employers for alleged unlawful discrimination in Global Horizons' provision of nonwage benefits, including housing, meals, and transportation. Id. at 636.

The court analyzed the joint-employer question under a common-law agency test derived from *Darden* and *Clackamas Gastroenterology Associates, P.C.* v. *Wells,* 538 U.S. 440, 448–449 (2003). 915 F.3d at 638–639. The court

---

[40] See *Knitter,* 758 F.3d at 1226 (considering ''*right* to terminate'' employment, and ''*ability* to promulgate work rules and assignments, and set conditions of employment including compensation, benefits, and hours'') (quotations and citations omitted); *Bristol,* 312 F.3d at 1215 (holding putative joint employer ''*lack[ed] the power* to control the hiring, termination, or supervision of [undisputed employer's] employees, or otherwise control the terms and conditions of their employment) (emphasis added); *Plaso,* 553 Fed. Appx. at 204 (considering, inter alia, putative joint employer's ''*authority* to hire and fire employees promulgate work rules and assignments, and set conditions of employment, including compensation, benefits and hours'') (emphasis added); *Graves,* 117 F.3d at 728 (''when an employer *has the right to control* the means and manner of an individual's performance . . . an employer-employee relationship is likely to exist.'') (emphasis added) (citation omitted); see also, *e.g., Adams,* 30 F.4th at 961, (considering ''*right* to terminate'' employment relationship, and ''*ability* to promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours'') (quoting *Knitter,* above); *Perry,* 990 F.3d at 929 (''The *right to control* the employee's conduct is the most important component of determining a joint employer. . . . [including a] focus on the *right* to hire and fire, the *right* to supervise, and the *right* to set the employees' work schedule.'') (citations omitted).

[41] See *Whitaker* v. *Milwaukee County,* 772 F.3d 802, 810 (7th Cir. 2014) (''An entity other than the actual employer may be considered a 'joint employer' '*only if* it exerted significant control over' the employee.'') (emphasis added) (quoting *G. Heileman Brewing Co.* v. *NLRB,* 879 F.2d 1526, 1530 (7th Cir. 1989), enfg. 290 NLRB 991 (1988)).

[42] See *G. Heileman Brewing Co.,* 290 NLRB 991, 999 (1988), enfd. 879 F.2d 1256 (7th Cir. 1989).

[43] In any case, the court in *Whitaker* concluded, relying in part on an EEOC Compliance Manual, that the ultimate question of liability at issue in that case did not turn on the ''technical outcome of the joint employer inquiry,'' but on whether the putative joint employer had ''participated in the alleged discriminatory conduct or failed to take corrective measures within its control'' which the court found it had not. 772 F.3d at 811–812. The court's suggestion that liability might have been found based on the putative joint employer's failure to take corrective measures within its control supports the final rule's treatment of reserved control. For example, under the final rule, but not under the 2020 rule, an entity that had contractually reserved but never exercised a right to veto another entity's disciplinary actions could plausibly be held jointly responsible if it failed to prevent the second entity's issuance of unlawful discriminatory discipline to discourage conduct protected by the Act. Cf. *EEOC* v. *Global Horizons, Inc.,* 915 F.3d 631, 640–641 (9th Cir. 2019) (discussed further below, holding two fruit growers could be liable for discrimination in labor supplier's provision to workers of certain non-wage benefits based on growers' never-exercised authority to control the manner in which benefits were provided).

[44] As discussed further below, we disagree with our colleague and the 2020 rule's characterization of control exercised through an intermediary as direct and immediate rather than as indirect or mediated.

USCA Case #23-1309    Document #2025765    Filed: 11/06/2023    Page 14 of 78

concluded that, while most of the factors it would typically consider in applying the common-law agency test under *Darden* did not apply on the specific facts before it, "the common law's 'principal guidepost'—the element of control—[was] determinative." 915 F.3d at 640–641. Because the Growers were legally obligated, under H–2A regulations, to provide the workers with wages and the nonwage benefits at issue, the court concluded that the Growers "possessed ultimate authority over those matters," and their "power to control the manner in which housing, meals, transportation, and wages were provided to the Thai workers, *even if never exercised,* [was] sufficient to render the Growers joint employers" of those workers. Id. at 641 (emphasis added) (citing *BFI* v. *NLRB,* 911 F.3d 1195 (D.C. Cir. 2018)).[45] *Global Horizons*

is thus consistent with the large body of common-law authority discussed above in strongly supporting the Board's conclusion that the 2020 rule's actual-exercise requirement is inconsistent with the common law governing the Board's joint-employer standard.

### 2. Indirect Control, Including Control Exercised Through an Intermediary

After careful consideration of relevant comments, as discussed in more detail below, the Board has concluded that evidence that an employer has actually exercised control over essential terms and conditions of employment of another employer's employees, whether directly or indirectly, such as through an intermediary, also suffices to establish the existence of a joint-employer relationship. As the District of Columbia Circuit has recognized, "[t]he common law . . . permits consideration of those forms of indirect control that play a relevant part in determining the essential terms and conditions of employment." *BFI* v. *NLRB,* 911 F.3d at 1199–1200. In addition, the District of Columbia Circuit has explained that the definition of "employer" set forth in Section 2(2) of the Act "textually indicates that the statute looks at all probative indicia of employer status, whether exercised 'directly or indirectly' " and therefore that the Act "expressly recognizes that agents acting 'indirectly' on behalf of an employer could also count as employers." Id. at 1216.

Judicial decisions and secondary authorities addressing the common-law employer-employee relationship confirm that indirect control, including control exercised through an intermediary, can establish the existence of an employment relationship. The *Restatement (Second) of Agency* explicitly recognized the significance of indirect control, both in providing that "the control or right to control needed to establish the relation of master and servant may be very attenuated" and in discussing the subservant doctrine, which deals with cases in which one employer's control may be exercised indirectly, while a second entity directly controls employees.[46] As the District of Columbia Circuit explained in *BFI* v. *NLRB,* "the common law has never countenanced the use of intermediaries or controlled third parties to avoid the creation of a master-servant

relationship." [47] Similarly, as discussed in more detail above, the Fourth Circuit has held that an entity was a joint employer of another employer's employees based primarily on the entity's exercise of indirect control over the employees' discipline and discharge by recommending discipline and discharge decisions which were implemented by the employees' direct employer. *Butler,* above, 793 F.3d at 415.[48]

Consistent with these longstanding common-law principles, the Board has concluded, after careful consideration of comments as discussed further below, that evidence showing that a putative joint employer wields indirect control over one or more of the essential terms and conditions of employment of another employer's employees can establish a joint-employer relationship. Ignoring relevant evidence of indirect control over essential terms and conditions of employment would, in the words of the District of Columbia Circuit, "allow manipulated form to flout reality," [49] contrary to the teachings of the common law. Under the final rule, for example, evidence that a putative joint employer communicates work assignments and directives to another entity's managers or exercises detailed ongoing oversight of the specific manner and means of employees' performance of the individual work tasks may demonstrate the type of indirect control over essential terms and conditions of employment that is sufficient to

---

[45] Contrary to our dissenting colleague's suggestion, the court in *Global Horizons* expressly applied a common-law agency test, not a test derived from the definition of "employer" in the H–2A regulation, to the Title VII joint-employer issue. See 915 F.3d at 639. The fact that the Growers' authority derived from regulation, not contract, does not undermine the impact of the court's conclusion that the existence of that authority, even if never exercised, sufficed to render the Growers joint employers. In any case, *Global Horizons* is far from unique: in fact, numerous federal and state high courts have long concluded, in non-NLRA contexts, that an entity was or could be a common-law employer of another employer's employees based solely on the entity's reserved right of control over those employees. See, *e.g., Mallory* v. *Brigham Young University,* 332 P.3d 922, 928–929 (Utah 2014) (city was common-law employer of university's employee performing traffic control, despite absence of evidence of actual exercise of control by city, where city retained right to control the manner in which workers performed city's "nondelegable duty of traffic control" because "[i]f the principal has the right to control the agent's method and manner of performance, the agent is a servant whether or not the right is specifically exercised") (citation omitted); *Dunn* v. *Conemaugh & Black Lick RR,* 267 F.2d 571, 577 (3d Cir. 1959) (railroad was employer of manufacturer's employee based on railroad's right to command employee's performance without reference to any instance of exercise of that right because "the person is the servant of him who has the right to control the manner of performance of the work, regardless of whether or not he actually exercises that right;") (citation omitted); *S.A. Gerrard Co.* v. *Industrial Accident Comm'n,* 110 P.2d 377, 378 (Cal. 1941) (landowner was joint employer of farmer's employee based on contract provision that picking should be done under the supervisions of and in accordance with landowner's direction without reference to whether such direction was ever given because "the right to control, rather than the amount of control which was exercised, is the determinative factor.") (citation omitted).

[46] *Restatement (Second) of Agency* sections 5(2), comments e, f, and illustration 6; 220(1), comment d; 226, comment a (1958).

[47] 911 F.3d at 1217 (citing *Nicholson* v. *Atchison, T. & S. F. Ry. Co.,* 147 P. 1123, 1126 (Kan. 1915) (use of a "branch company" as a "mere instrumentality" "did not break the relation of master and servant existing between the plaintiff and the [putative master]"). The 2020 Rule, and our dissenting colleague, seek to avoid the District of Columbia Circuit's endorsement of considering indirect control exercised through an intermediary as probative of joint-employer status by recharacterizing such control as direct and immediate. But an action taken through an intermediary is, by definition, *mediated,* that is, *not* immediate or direct. We accordingly join the District of Columbia Circuit in characterizing such control as indirect. See 911 F.3d at 1216–1217 ("[C]ommon-law decisions have repeatedly recognized that indirect control over matters commonly determined by an employer can, at a minimum, be weighed in determining one's status as an employer or joint employer, especially insofar as indirect control means control exercised through an intermediary.") (internal quotation and citation omitted).

[48] See also *Al-Saffy,* above, 827 F.3d 85, 97 (District of Columbia Circuit in Title VII context relying in part on evidence that officials working for putative joint-employer had recommended employee's dismissal as evidence supporting reversal of summary judgment on the joint-employer issue).

[49] *NLRB* v. *BFI,* 911 F.3d at 1219.

establish a joint-employer relationship.[50]

Our dissenting colleague contends that the final rule fails adequately to "distinguish evidence of indirect control that bears on workers' essential terms and conditions of employment from evidence that simply documents the routine parameters of company-to-company contracting," as required by the D.C. Circuit in *BFI* v. *NLRB*.[51] To the contrary, Section 103.40(f) of the final rule expressly provides that evidence of an entity's control over matters that are immaterial to the existence of an employment relationship under common-law agency principles and that do not bear on the employees' essential terms and conditions of employment is not relevant to the determination of whether the entity is a joint employer. Pursuant to this provision, the Board will, in individual cases arising under the rule, examine any proffered evidence of indirect control and determine, as necessary, whether that evidence is indicative of a kind of control that is an ordinary incident of company-to-company contracting or is rather indicative of a common-law employment relationship. If the former, the rule provides that the Board will not consider that evidence as probative of the existence of a joint-employer relationship. Specifically, pursuant to Section 103.40(f) and consistent with the court's instruction in *BFI* v. *NLRB,* the Board will not consider any evidence of indirect control that the common law would see as part of an ordinary true independent-contractor relationship as evidence of a common-law employer-employee relationship.[52]

If, on the other hand, such evidence shows that a putative joint employer is actually exercising (or has reserved to itself) a kind of control that the common law takes to be indicative of an employer-employee relationship, the Board will consider such evidence in the course of its joint-employer analysis.[53]

Our colleague also criticizes us for failing exhaustively to define, ex ante, what factual circumstances will evidence indirect control that is relevant to the joint-employer analysis. But, as discussed above, the joint-employer inquiry is essentially factual and requires examining all of the incidents of a particular relationship on a particular record. Small differences in *how* control has been indirectly exercised, *when*, and *over what* will predictably determine whether the exercise of such control in individual cases counts, under the common law, as an ordinary incident of a company-to-company or true independent-contractor relationship or as evidence of the existence of a common-law employer-employee relationship. Because of the innumerable variations in the ways that companies interact with each other, and with each other's employees, it would be impossible for the Board to provide a usefully comprehensive and detailed set of examples of when an entity's exercise of indirect control over another company's employees will count as evidence of a common-law employment relationship. We decline to try to do so as part of this rulemaking.[54] Instead, we expect the contours of the Board's application of this rule in particular scenarios to be defined through the future application of the final rule to specific factual records.[55]

Finally, our colleague claims that courts which have examined the common-law employer-employee relationship in a joint-employer context in decisions under Title VII and similar statutes, discussed above, have applied a significantly more demanding standard than the rule articulates. We disagree. Thus far, our discussion has primarily been concerned with what common-law principles have to say to the role of reserved or indirect control in the joint-employer test. Of course, however, the common-law cases are also concerned with, and provide authority about, the objects of that control. We recognize that "whether [an entity] possess[es] sufficient indicia of control to be an 'employer' is essentially a factual issue," [56] that "factors indicating a joint-employment relationship may vary depending on the case," and that "any relevant factor[ ] may . . . be considered so long as [it is] drawn from the common law of agency." [57] Where courts articulating relevant common-law principles have identified an entity's authority to control specific elements of the working relationship as relevant to the analysis, such articulations are primary authority to which the Board will look in deciding, in individual cases, whether "all of the incidents of the relationship" [58] indicate that the entity is a common-law employer of particular employees.[59] Furthermore, the final rule requires the Board to inquire specifically into whether a putative joint employer possesses the authority to control or exercises the power to control one or more of the employees' essential terms and conditions of employment implicated by the Act's protection of employees' forward-looking collective right to bargain with each employer that can control their terms and conditions of employment. Thus, the final rule both incorporates the common law's broad focus on all of the incidents of the relationship in examining whether an entity is a common-law employer of particular employees and narrows the focus of the Board's inquiry to essential

---

[50] Cf. *Cognizant Technology Solutions U.S. Corp. & Google LLC,* 372 NLRB No. 108, slip op. at 1 (2023) (finding joint-employer relationship based in part on Google's exercise of authority over supervision through intermediary employees of Cognizant, treated as direct and immediate control under the terms of the 2020 rule).

[51] Id. at 1226. The court's discussion and its instruction to the Board to draw this distinction on remand suggests, as we conclude, that it will be possible to determine, in future adjudications on specific factual records, that an entity's exercise of certain kinds of indirect control, such a through an intermediary, would be independently probative of its joint-employer status. See id. at 1219 ("If . . . a company entered into a contract . . . under which that company made all of the decisions about work and working conditions, day in and day out, with [the workers' direct employer's] supervisors reduced to ferrying orders from the company's supervisors to the workers, the Board could sensibly conclude that the company is a joint employer.").

[52] See *BFI* v. *NLRB,* above, 911 F.3d at 1221 (The Board's fleshing out the operation of the joint-employer standard through case-by-case adjudication "depends on the Board's starting with a correct articulation of the governing common-law test. Here, that legal standard is the common-law principle that a joint employer's control—whether

direct or indirect, exercised or reserved—must bear on the essential terms and conditions of employment and not on the routine components of a company-to-company contract.") (internal quotation and citation omitted).

[53] Cf. *Butler,* above, 793 F.3d at 415 (considering testimony from temporary employment agency manager that he could not recall an instance when manufacturer requested an agency employee to be disciplined or terminated and it was not done as evidence that manufacturer was joint employer of agency's employees).

[54] Cf. 85 FR at 11187 (2020 rule omitting previously proposed hypothetical scenarios illustrating specific applications of the Board's joint-employer standard). For similar reasons, we decline to speculate about the application of the final rule to the various hypothetical scenarios proposed by our dissenting colleague.

[55] See *BFI* v. *NLRB,* 911 F.3d at 1221 ("In principle, there is nothing wrong with the Board fleshing out the operation of a legal test that Congress has delegated to the Board to administer through case-by-case adjudication.") (citing *Eastex, Inc.* v. *NLRB,* 437 U.S. 556, 574–575 (1978) ("[T]he nature of the problem, as revealed by unfolding variant situations, requires an evolutionary process for its rational response, not a quick definitive

formula as a comprehensive answer.") (internal quotation and citation omitted)).

[56] *Boire* v. *Greyhound,* 376 U.S. at 481.

[57] *Felder,* above, 27 F.4th at 844 (alternations in original) (internal quotation omitted). See also *NLRB* v. *United Insurance Co.,* above, 390 U.S. at 258 ("What is important is that the total factual context is assessed in light of the pertinent common-law agency principles.").

[58] *NLRB* v. *United Insurance Co.,* above, 390 U.S. at 258.

[59] See, *e.g., Felder,* above 27 F.4th at 838 ("[F]actors drawn from the common law of agency, including control over an employee's hiring, firing, training, promotion, discipline, [and] supervision . . . are relevant to [the joint-employer] inquiry.").

terms and conditions of employment in the context of the specific rights and obligations provided by the plain language of Section 8(a)(5) and 8(d) of the Act.[60]

## II. Summary of Changes to the Proposed Rule

In this section, we provide a summary overview of changes to the proposed rule.

### A. Overview

The final rule, like the proposed rule, recognizes that common-law agency principles define the statutory employer-employee relationship under the Act and affirms the Board's traditional definition of joint employers as two or more common-law employers of the same employees who share or codetermine those matters governing those employees' essential terms and conditions of employment. Consistent with primary judicial statements and secondary authority describing the common-law employer-employee relationship, the final rule, like the proposed rule, provides that a common-law employer of particular employees shares or codetermines those matters governing employees' essential terms and conditions of employment if the employer possesses the authority to control (whether directly, indirectly, or both) or exercises the power to control (whether directly, indirectly, or both) one or more of the employees' essential terms and conditions of employment, regardless of whether the employer exercises such control or the manner in which such control is exercised.

However, as described below and in response to comments, the Board has modified the proposed rule (1) to clarify the definition of "essential terms and conditions of employment," (2) to identify the types of control that are necessary to establish joint-employer status and the types that are irrelevant to the joint-employer inquiry, and (3) to describe the bargaining obligations of joint employers.

### B. Definition of "Essential Terms and Conditions of Employment"

The proposed rule provided an illustrative, rather than exclusive, list of essential terms and conditions of employment. The Board has modified this definition, for the reasons discussed below and in response to comments, to provide an exhaustive list of seven categories of terms or conditions of employment that will be considered "essential" for the purposes of the joint-employer inquiry. These are: (1) wages, benefits, and other compensation; (2) hours of work and scheduling; (3) the assignment of duties to be performed; (4) the supervision of the performance of duties; (5) work rules and directions governing the manner, means, and methods of the performance of duties and the grounds for discipline; (6) the tenure of employment, including hiring and discharge; and (7) working conditions related to the safety and health of employees.

### C. Type of Control Sufficient To Establish Joint-Employer Status

The proposed rule provided that a common-law employer's possession of unexercised authority to control or exercise of the power to control indirectly, such as through an intermediary, one or more terms or conditions of employment would be sufficient to establish status as a joint employer. For the reasons discussed below and in response to comments, the Board has modified this provision to clarify that, in each instance, the relevant object of control must be an *essential* term or condition of employment as defined by the rule. The Board has also reformatted and streamlined this portion of the proposed rule to avoid surplusage.

### D. Type of Control Not Relevant to Joint-Employer Status

The proposed rule provided that evidence of an employer's control over matters that are immaterial to the existence of a common-law employment relationship or control over matters not bearing on employees' essential terms and conditions of employment is not relevant to the joint-employer inquiry. For the reasons discussed below and in response to comments, the Board has modified this provision to make it clear that the provision excludes only evidence that is immaterial to both the common-law employment relationship *and* an employer's control over employees' essential terms and conditions of employment, and that the Board does not presuppose the "employer" status of an entity—such as the principal in a true independent-contractor relationship—that possesses or exercises only such immaterial forms of control.

### E. Bargaining Obligations of Joint Employers

The proposed rule did not specifically address or delineate the bargaining obligations of joint employers in the proposed regulatory text.[61] For the reasons discussed below and in response to comments, the Board has modified the final rule to provide that a joint employer of particular employees must bargain collectively with the representative of those employees with respect to any term or condition of employment that it possesses the authority to control or exercises the power to control (regardless of whether that term or condition is deemed to be an essential term or condition of employment under the rule). However, such entity is not required to bargain with respect to any term or condition of employment that it does not possess the authority to control or exercise the power to control.

## III. Justification for Using Rulemaking, Rather Than Adjudication, To Revise the Joint-Employer Standard

### A. Authority To Engage in Rulemaking

Section 6 of the Act provides that "[t]he Board shall have authority from time to time to make, amend, and rescind, in the manner prescribed by the Administrative Procedure Act, such rules and regulations as may be necessary to carry out the provisions of this Act." 29 U.S.C. 156. See also *NLRB* v. *Bell Aerospace Co.*, 416 U.S. 267, 294 (1974) ("[T]he choice between rulemaking and adjudication lies in the first instance within the Board's discretion."); *NLRB* v. *Wyman-Gordon Co.*, 394 U.S. 759 (1969). In the past, the Board has exercised its discretion to use the authority delegated by Congress to engage in substantive rulemaking. See *American Hospital Assn.* v. *NLRB*, 499 U.S. 606 (1991).

Section 6 authorizes the final rule as necessary to carry out Sections 2, 7, 8, 9, and 10 of the Act, 29 U.S.C. 152, 157, 158, 159, and 160, respectively. Specifically, as set forth above, Section 2(2) of the Act defines "employer," and Section 2(3) defines "employee." Section 7 sets forth employees' rights

---

[60] See 29 U.S.C. 158(a)(5) ("It shall be an unfair labor practice for an employer—to refuse to bargain collectively with the representatives of his employees."); 29 U.S.C. 158(d) ("[T]o bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment.").

[61] The NPRM stated the Board's initial views in supplementary information, subject to comments, that (1) the proposed rule would only require a putative joint employer to bargain over those essential terms and conditions of employment it possesses the authority to control or over which it exercises the power to control, and (2) the Act's purposes are best served when two or more statutory employers that each possess some authority to control or exercise the power to control employees' essential terms and conditions of employment are parties to bargaining over those employees' working conditions. 87 FR at 54645 & fn. 26.

under the Act, including the right to bargain collectively through representatives of employees' own choosing, the right to engage in concerted activities for the purpose of mutual aid or protection, and the right to refrain from these activities. Section 8 of the Act defines unfair labor practices under the Act, and Section 8(a)(5) makes it an unfair labor practice for an employer to refuse to bargain collectively with employees' bargaining representative. Section 9 of the Act describes the Board's responsibilities when conducting representation elections. Section 10 of the Act authorizes the Board to investigate, prevent, and remedy unfair labor practices. The Board's joint-employer doctrine bears on each of these provisions of the Act, and Section 6 permits the Board to promulgate rules carrying out these provisions.

*B. The Preference for Rulemaking Over Adjudication*

In the NPRM, we expressed our preliminary belief that rulemaking in this area of the law is desirable for several reasons. First, the NPRM set forth the Board's preliminary view that the 2020 rule departed from common-law agency principles and threatened to undermine the goals of Federal labor law. Second, the NPRM stated that, in the Board's preliminary view, establishing a definite, readily available standard would assist employers and labor organizations in complying with the Act. Finally, the NPRM expressed the Board's view that because the joint-employer standard has changed several times in the past decade, there was a heightened need to seek public comment and input from a wide variety of interested stakeholders.[62]

After carefully considering nearly 13,000 comments, the Board believes that it is necessary and appropriate to rescind the 2020 rule, which was contrary to the Act insofar as it was inconsistent with the common law of agency. The 2020 rule's approach to defining joint-employer status again incorporated the control-based restrictions that deviated from common-law agency principles between the 1980s and the Board's 2015 decision in *Browning-Ferris.* Not only was this approach inconsistent with relevant court decisions, including the District of Columbia Circuit's 2018 decision in *Browning-Ferris Industries of California, Inc.* v. *NLRB (BFI* v. *NLRB),* 911 F.3d 1195 (D.C. Cir. 2018), as many commenters have persuasively argued, it also undermines the goals of Federal

labor law. Accordingly, we rescind the 2020 rule in its entirety.[63] Although we believe that the Board is required to rescind the 2020 rule, we would do so even if that rule were valid because it fails to fully promote the policies of the Act.

The Board also believes that setting forth a revised joint-employer standard through rulemaking is desirable. The NPRM offered a proposal to restore the Board's focus on whether a putative joint employer possesses the authority to control or exercises the power to control particular employees' essential terms and conditions of employment, consistent with the common law and relevant judicial decisions. The Board received many helpful comments from individuals and entities with considerable legal expertise and relevant experience. Having considered those comments, the Board has refined the proposed rule in several ways, as outlined above in Section II and discussed more fully below in Sections IV and V. We believe the proposed rule, as modified, appropriately defines the essential elements of a joint-employer relationship and will reduce uncertainty and litigation over the basic parameters of joint-employer status.

**IV. Response to Comments**

The Board received almost 13,000 comments from interested organizations, labor unions, trade associations, business owners, United States Senators and Members of Congress, State Attorneys General, academics, and other individuals. The Board has carefully reviewed and considered these comments, as discussed below.

*A. Comments Regarding the Definitions of ''Employer'' and ''Joint Employer'' and Basing These Definitions on Common-Law Agency Principles*

The Board received numerous comments regarding the role of common-law agency principles in the Board's joint-employer analysis and on the development of joint-employer doctrine under the Act. In general, the comments acknowledge the accuracy of the Board's description of the role common-law agency principles have played in determining joint-employer status, as briefly summarized above in Section I.

Some commenters criticize the Board's preliminary view that the

common law of agency is the primary guiding principle in its joint-employer analysis.[64] These commenters argue that because the Taft-Hartley amendments did not specify that the common law limits the joint-employer standard, Congress did not intend such a constraint, and the Board may establish a joint-employer standard guided solely by the policies of the Act. Contrary to these comments, authoritative or relevant judicial decisions establish that common-law agency principles must guide the Board's joint-employer inquiry. See, *e.g., NLRB* v. *Town & Country Electric, Inc.,* 516 U.S. 85, 92–95 (1995) (where Congress uses the term ''employee'' in a statute without clearly defining it, the Court assumes that Congress ''intended to describe the conventional master-servant relationship as understood by common-law agency doctrine''); *BFI* v. *NLRB,* 911 F.3d at 1206 (''[U]nder Supreme Court and circuit precedent, the National Labor Relations Act's test for joint-employer status is determined by the common law of agency.'').[65]

Most commenters confirm that it is appropriate and desirable for the Board to rely on common-law agency principles in defining the terms ''employer'' and ''joint employer'' under the Act.[66] Certain of these commenters note that by acting to overrule the Supreme Court's decision in *NLRB* v. *Hearst Publishing,* 322 U.S. 111 (1944), Congress evinced its intention to make

---

[62] 87 FR at 54644–54645.

[63] As discussed at greater length below, we note that even if we had not decided to promulgate a new standard through rulemaking, we would nevertheless have chosen to rescind the 2020 rule in its entirety because of these infirmities. See Sec. IV.C., J., K., and V, below.

[64] Comments of Los Angeles County Federation of Labor AFL–CIO & Locals 396 and 848 of the International Brotherhood of Teamsters; Professors Sachin S. Pandya, Andrew Elmore, and Kati Griffith.

[65] See also *Clackamas Gastroenterology Associates, P.C.* v. *Wells,* 538 U.S. 440, 448–449 (2003); *Nationwide Mutual Insurance Co.* v. *Darden,* 503 U.S. 318, 322–324 (1992); *Community for Creative Non-Violence* v. *Reid,* 490 U.S. 730, 740, 752 fn. 31 (1989); *Kelley* v. *Southern Pacific Co.,* 419 U.S. 318, 323–324 (1974); *NLRB* v. *United Insurance Co. of America,* 390 U.S. 254, 256–258 (1968).

[66] Comments of American Federation of Labor and Congress of Industrial Organizations (AFL–CIO); Americans for Prosperity Foundation; American Federation of State, County & Municipal Employees (AFSCME); American Hotel & Lodging Association; Center for Law and Social Policy; Communications Workers of America, AFL–CIO (CWA); Congressman Robert C. ''Bobby'' Scott, Chairman of the House of Representatives Committee on Education and Labor, and 52 other Members of Congress (Congressman Scott et al.); Economic Policy Institute (EPI); General Counsel Abruzzo; Independent Bakers Association; Nicholas Crawford; McGann, Ketterman & Rioux; National Federation of Independent Business (NFIB); National Partnership for Women & Families; North Carolina Justice Center; Public Justice Center; Restaurant Law Center and National Restaurant Association; Southern Poverty Law Center (SPLC); TechEquity Collaborative; The Washington Center for Equitable Growth; United States Chamber of Commerce; Washington Legal Foundation; William E. Morris Institute for Justice.

common-law agency principles the cornerstone of the definition of "employee" under the Act.[67] These commenters also emphasized post-Taft-Hartley judicial decisions interpreting the term "employee" in statutes that do not provide more specific definitions using common-law agency principles.[68] Some commenters note that common-law agency principles play an important functional role in the Board's definition of the terms "employer" and "employee," observing that making an agency relationship the first step of the joint-employer analysis ensures that the appropriate entities are included while properly excluding entities who neither possess nor exercise sufficient control over employees' essential terms and conditions of employment.[69] These commenters generally agree with the proposed rule's view that appropriate sources of common-law agency principles include the *Restatement (Second) of Agency* and other compendiums, reports, and restatements, along with judicial decisions applying the common law.[70]

Some commenters urge the Board to clarify what common-law sources it will consult in the final rule. Others ask the Board to limit its consideration to particular sources, arguing that because the common law is vast, amorphous, or vague, failing to impose such a limitation prevents the rule from functioning as self-contained guidance.[71] Other commenters dispute the enduring relevance of the *Restatement (Second) of Agency*.[72] In particular, some of these commenters take the position that because the *Restatement (Second) of Agency* primarily focuses on assigning liability in tort or contract matters, it is inapposite or poorly adapted to resolving questions related to the employment relationship.[73] Some commenters propose instead that the Board solely consult judicial decisions applying common-law principles,[74] or the *Restatement of Employment Law*.[75]

As we preliminarily indicated in the proposed rule, relevant sources of common-law agency principles are not difficult to find. We respond to commenters seeking more definitive guidance that some relevant sources of common-law agency principles include articulations of these principles by common-law judges, compendiums, reports, and restatements of common-law decisions, and early court decisions addressing "master-servant relations."[76] Contrary to those commenters who suggest the common law is too vast or amorphous to give effect to the terms "employer" and "employee" in the final rule, we find it persuasive that the Supreme Court has viewed common-law agency principles as sufficiently familiar and tractable to assist parties in interpreting and complying with other labor and employment statutes that use these terms.[77]

Contrary to some commenters, we adhere to the view preliminarily set forth in the NPRM that the *Restatement (Second) of Agency* (1958) is a particularly persuasive source of common-law agency principles. As we explained in the NPRM, the Supreme Court has acknowledged the persuasiveness of the *Restatement (Second) of Agency* when construing the common-law definition of "employer."[78] So, too, has the District of Columbia Circuit, acknowledging this controlling Supreme Court precedent.[79] Finally, we follow the District of Columbia Circuit in rejecting the view set forth by some commenters that the *Restatement* was developed to address issues of liability for tort matters and breaches of contract and is therefore inapposite.[80] Further, we dispute these

commenters' premise. Many early common-law decisions that helped define the common-law relationship in *The Restatement (Second) of Agency* emerged in cases involving rights and duties under state workers' compensation laws.[81] More importantly, all common-law cases, whether involving tort or contract liability or statutory rights and obligations, focus on whether a common-law agency relationship exists, and control is the touchstone of that inquiry under the common law.

Some commenters argue that by assessing whether an entity possesses the authority to control or indirectly controls essential terms and conditions of employment, the Board's proposed definition of "employer" exceeds common-law boundaries.[82] While we will address commenters' arguments regarding the role reserved and indirect control play in the proposed rule's definition of "joint employer" at length below, at the outset we simply note our agreement with the District of Columbia Circuit's view that these forms of control bear on the common-law employer-employee inquiry, *BFI* v. *NLRB*, 911 F.3d at 1216.[83] Accordingly, we respectfully disagree with those commenters who suggest the proposed rule's definition of "employer" exceeds common-law boundaries.

Finally, some of these commenters argue that the proposed rule's definition of "employer" is inappropriate because direct supervision over an employee is a necessary prerequisite to a finding of an employment relationship for purposes of the Act, citing the Supreme Court's decision in *Allied Chemical & Alkali Workers of America, Local Union No. 1* v. *Pittsburgh Plate Glass Co.*, 404 U.S. 157, 167–168 (1971).[84] Respectfully, we find *Allied Chemical*, which concluded that retired workers were not "employees" because the Act's legislative history and policies

---

[67] See, *e.g.*, comments of American Hotel & Lodging Association.

[68] Comments of NFIB; Washington Legal Foundation.

[69] See, *e.g.*, comments of AFSCME.

[70] See, *e.g.*, comments of General Counsel Abruzzo; Michigan Regional Council of Carpenters and Millwrights.

[71] Comments of Americans for Tax Reform; Coalition for a Democratic Workplace (CDW); Freedom Foundation; International Franchise Association (IFA); McDonald's USA, LLC; Promotional Products Association International (PPAI); Texas Public Policy Foundation.

[72] Comments of Washington Legal Foundation; IFA; U.S. Chamber of Commerce.

[73] Comments of IFA; U.S. Chamber of Commerce.

[74] Comments of Washington Legal Foundation.

[75] Comments of U.S. Chamber of Commerce.

[76] As we explained more fully in the NPRM, the employer-employee relationship under the Act is the common-law employer-employee relationship. Beginning in the late 19th century, American legal commentators began using the terms "master-servant" and "employer-employee" interchangeably. See, *e.g.*, Horace Gray Wood, *A Treatise on the Law of Master and Servant; Covering the Relation, Duties and Liabilities of Employers and Employees* (1877). The *Restatement (Second) of Agency* uses both sets of terms synonymously. We therefore refer elsewhere in the NPRM to "employer-employee" relations and the "employer-employee relationship."

[77] See, *e.g.*, *Clackamas Gastroenterology Associates*, 538 U.S. at 448–449 (Americans with Disabilities Act); *Darden*, 503 U.S. at 322–324 (Employee Retirement Income Security Act of 1974); *Kelley*, 419 U.S. at 323–324 (Federal Employers' Liability Act).

[78] See, *e.g.*, *Clackamas Gastroenterology Associates*, 538 U.S. at 448; *Kelley*, 419 U.S. at 323–324.

[79] See *BFI* v. *NLRB*, 911 F.3d at 1213 ("[C]ontrolling precedent makes the *Restatement (Second) of Agency* a relevant source of traditional common-law agency standards in the National Labor Relations Act context.").

[80] See id.

[81] See, *e.g.*, *Maltz* v. *Jackoway-Katz Cap Co.*, 82 SW2d 909, 912, 918 (Mo. 1934).

[82] Comments of American Hotel & Lodging Association; Bicameral Congressional Signatories; Council on Labor Law Equality (COLLE); Independent Bakers Association; National Lumber & Building Material Dealers Association; National Waste & Recycling Association; North American Meat Institute; Restaurant Law Center and National Restaurant Association; U.S. Chamber of Commerce.

[83] The court also stated that Sec. 2(2) of the Act "textually indicates that the statute looks at all probative indicia of employer status" because it "expressly recognizes that agents acting 'indirectly' on behalf of an employer could also count as employers." 911 F.3d at 1216 (quoting 29 U.S.C. 152(2)).

[84] Comments of Restaurant Law Center and National Restaurant Association; Retail Industry Leaders Association (RILA).

contemplate individuals who are currently "active" in the workplace, inapposite. Nothing in the Court's decision in *Allied Chemical* or subsequent cases applying it suggests that the Court thereby attempted to modify ordinary common-law agency principles or engraft additional "direct supervision" requirements onto the statutory meaning of "employer."

## B. Comments Regarding the Definition of "Joint Employer"

The proposed rule set forth a definition of "joint employer" that, like the definition provided in the 2020 rule, would apply in all contexts under the Act, including both the representation-case and unfair-labor-practice case context. No commenter has suggested that any joint-employer standard the Board adopts should only apply in one context or the other. We therefore find it appropriate to apply the new standard set forth in the final rule in both the representation-case and unfair-labor-practice case contexts.

Our dissenting colleague and several commenters argue that, although the Board is properly guided by common-law agency principles when determining joint-employer status, the proposed rule's definition of "joint employer" exceeds the boundaries of the common law of agency.[85] These commenters generally contend that defining "joint employer" to include entities who possess but do not exercise control over essential terms and conditions of employment or entities who do not exercise direct control over essential terms and conditions of employment is beyond the permissible scope of the common law.[86] As these arguments primarily relate to the treatment of reserved and indirect control in proposed paragraphs (c), (e), and (f), we discuss them in greater detail below. However, as noted above, we agree with the District of Columbia Circuit's view that the common law requires the Board to evaluate "all probative indicia of employer status" in determining whether entities are "employers" or "joint employers" under the Act, including forms of indirect and reserved control.[87]

A group of United States Senators and Members of Congress suggests that by

seeking to define "joint employer" in the manner set forth in the proposed rule, the Board is effectively legislating and thereby usurping the role of Congress.[88] This commenter also mentions that the broader definition of "joint employer" set forth in the Protecting the Right to Organize Act of 2021 (PRO Act), H.R. 842, failed to secure Senate approval.[89] With respect, the standard set forth in the proposed rule and the final rule we announce today represents a faithful attempt to exercise the authority Congress has delegated to the Board in Section 6 of the Act. Further, as discussed previously, we are guided by Supreme Court decisions instructing the Board to consult the common law of agency when interpreting the term "employer" in Section 2(2) of the Act. We do not see the definition of "joint employer" in the PRO Act as relevant to our task, which is to interpret the term "employer" that appears in the current version of the National Labor Relations Act, consistent with the guidance of relevant judicial decisions.

Some commenters specifically argue that the proposed definition of "joint employer" is insufficiently responsive to the District of Columbia Circuit's request that the Board "erect some legal scaffolding"[90] to remain within the boundaries of the common law.[91] Other commenters take the view that the proposed definitions of "employer" and "joint employer" are consistent with the District of Columbia Circuit's view of common-law agency principles and that the proposed rule establishes adequate guideposts to satisfy the court's request.[92] Again, because commenters espousing both views of this issue anchor their rationale in matters that principally relate to paragraphs (c), (e), and (f) of the proposed rule, we deal with these contentions at greater length below.

Other commenters raise industry-specific concerns regarding the proposed definition of "joint employer." Some commenters contend that the proposed, generally applicable

definition of "joint employer" stands in tension with how other sections of the Act treat building and construction industry employers and unions and how the Supreme Court has interpreted those provisions.[93] Specifically, these commenters urge that the Court's decision in *NLRB* v. *Denver Building & Construction Trades Council,* 341 U.S. 675, 689–690 (1951), stands for the proposition that general contractors and subcontractors in the construction industry have separate status and identities that, from the outset, preclude the Board from treating them as joint employers.[94]

We do not read *Denver Building* so broadly. Instead, *Denver Building* held that a construction industry general contractor's overall responsibility for a project or worksite does not itself create an employment relationship between the general contractor and the employees of subcontractors working on the jobsite. See *id.* The proposed definition of "joint employer," which we include in the final rule, requires not only a showing that the putative joint employer has a common-law employment relationship with particular employees, but also a further showing that a putative joint employer "share or codetermine those matters governing employees' essential terms and conditions of employment." As a result, the proposed rule, which focuses on the particular control an entity wields over terms and conditions of employment, is consistent with *Denver Building,* which cautions the Board not to categorically treat all employees of a subcontractor as the employees of a general contractor without more specific evidence of control. We further note that nothing in the relevant provisions of the Act, including Sections 2(2), 8(a)(5), 8(d), and 9(a), suggests that the Board is required—or permitted—to adopt a joint-employer standard in the construction industry that differs from the generally applicable definition. Nor is there any historical precedent for the Board treating the construction industry differently than other industries for joint-employer purposes.[95]

---

[85] Comments of Americans for Prosperity Foundation; Associated Builders and Contractors (ABC); Contractor Management Services, LLC; Independent Bakers Association; Independent Lubricant Manufacturers Association; LeadingAge; The Mackinac Center for Public Policy; National Retail Federation; Taxpayers Protection Alliance.

[86] Comments of Americans for Prosperity Foundation; National Retail Federation; Washington Legal Foundation.

[87] See *BFI* v. *NLRB,* 911 F.3d at 1216.

[88] See comments of Bicameral Congressional Signatories.

[89] See *id.*; see also comments of RILA.

[90] *BFI* v. *NLRB,* 911 F.3d at 1220.

[91] Comments of ABC; Center for Workplace Compliance; IFA; National Association of Convenience Stores; NFIB; National Retail Federation.

[92] Comments of AFL–CIO; Center for American Progress (CAP); General Counsel Abruzzo; National Employment Law Project (NELP); Professors Pandya, Elmore, and Griffith; United Brotherhood of Carpenters & Joiners of America (UBC); U.S. Senate HELP Committee Chair Patty Murray & 21 of her Senate Democratic colleagues (Senator Murray et al.).

[93] Comments of ABC; Associated General Contractors of America (AGC); COLLE; U.S. Chamber of Commerce.

[94] Comments of ABC; AGC; American Road & Transportation Builders Association (ARTBA); National Roofing Contractors Association; U.S. Chamber of Commerce.

[95] Instead, the Board historically treated employers in the construction industry in the same manner as other employers for joint-employer purposes. See, *e.g., Tradesmen International, Inc.,* 351 NLRB 399, 403 & fn. 11 (2007) (adopting administrative law judge's finding that two construction-industry entities were joint

Continued

Some commenters state that, since the 1974 Health Care amendments extended the coverage of the Act to include nonprofit hospitals, the Board has treated hospitals differently than other employers.[96] They urge the Board to do so again in the final rule.[97] In support of the view that hospitals should be entirely excluded from the ambit of the joint-employer rule, these commenters point to the Board's 1989 health care rule, which established eight appropriate bargaining units for acute-care hospitals.[98] The commenters argue that by broadening the definition of ''joint employer,'' the Board risks authorizing a proliferation of bargaining units, contrary to the stated aims of the health care rule.

While we acknowledge the specific concerns raised by these commenters, we are not persuaded to create a hospital-specific exclusion from the joint-employer standard. First, we note that no pre-2020 Board decision involving the joint-employer standard ever created such an exclusion.[99] In

keeping with the preliminary view we expressed in the NPRM, we are of the mind that the common-law agency principles that we apply in defining ''employer'' apply uniformly to all entities that otherwise fall within the Board's jurisdiction. We see no clear basis in the text or structure of the Act for exempting particular groups or types of employers from the final rule, nor do we believe that the Act's policies are best served by such an exemption. That said, we share these commenters' general views that the proper application of the final rule in particular cases will require the Board to consider all relevant evidence regarding the surrounding context.[100] Finally, we reject the suggestion, raised by commenters and our dissenting colleague, that the final rule's definition of ''joint employer'' will cause the proliferation of bargaining units or disrupt the application of the 1989 health care rule, which deals with the unrelated question of which classifications of employees constitute appropriate bargaining units for purposes of filing a representation petition pursuant to Section 9 of the Act.

We similarly decline other commenters' invitation to exempt other kinds of businesses, including cooperative businesses,[101] franchise businesses,[102] and firms and independent contractors operating in the insurance and financial advice industry,[103] from the joint-employer standard we adopt in this final rule.[104] As discussed at greater length in Section VI below, we also decline some commenters' invitation to create an across-the-board exemption for small businesses.[105] One commenter observes that many Federal labor and

employment statutes exempt employers who have less than a minimum number of employees and suggests that this provides support for a similar exemption from the final rule. However, we find further support for our view that the Act requires the Board to apply its joint-employer standard uniformly to all entities otherwise covered by the Board's jurisdiction in the fact that the Act contains no similar minimum-employee threshold to those present in other labor and employment statutes. Instead, we observe that the Board has statutory jurisdiction over those private-sector employers whose activity in interstate commerce exceeds a minimal level.[106]

Finally, one commenter asks the Board to clarify that the proposed rule's definition of ''joint employer'' does not preclude the Board from adopting rebuttable presumptions to guide it in applying the joint-employer standard in the future.[107] For example, this commenter suggests, the Board could treat an entity's possession or exercise of certain forms of control over essential terms and conditions of employment as giving rise to a presumption of joint-employer status.[108] In light of our extensive discussions and guidance below regarding whether particular forms of control are material to the existence of an employment relationship under common-law agency principles, we decline the invitation to make this proposed clarification.

*C. Comments About Definition of ''Share or Codetermine''*

As set forth above, the proposed rule sought to codify the Board's holding, endorsed by the Third Circuit in *NLRB* v. *Browning-Ferris Industries of Pennsylvania, Inc.,* 691 F.2d 1117, 1124 (3d Cir. 1982), enfg. 259 NLRB 148 (1981), that entities are ''joint employers'' if they ''share or codetermine those matters governing essential terms and conditions of employment.'' Nearly all commenters

---

employers); *Ref-Chem Co.,* 169 NLRB 376 (1968) (finding that two entities were joint employers of a craft unit of construction employees performing insulation maintenance work), enf. denied on other grounds 418 F.2d 127 (5th Cir. 1969). See also *Adams & Associates, Inc.* v. *NLRB,* 871 F.3d 358, 378–379 (5th Cir. 2017) (upholding joint-employer finding where prime contractor and subcontractor jointly developed employees' wage structure, consulted with each other on human resources matters, and coordinated on hiring decisions and on-site operations).

[96] See, *e.g.,* comments of American Hospital Association (AHA).

[97] See, *e.g.,* comments of AHA; Federation of American Hospitals; U.S. Chamber of Commerce; Virginia Hospital & Healthcare Association.

Certain of these commenters suggest that the Board's failure to conduct a ''hospital-specific analysis'' violates the APA and is grounds for withdrawing the proposed rule. They also raise concerns regarding the interaction of the proposed rule with Federal healthcare reimbursement formulas or calculations. See, *e.g.,* comments of AHA. Given our discussion of the distinctive concerns of hospitals above, we respectfully disagree with these commenters' view that the Board has not sufficiently considered the effect of the proposed rule on hospitals.

[98] Comments of AHA; U.S. Chamber of Commerce; Virginia Hospital & Healthcare Association (citing 29 CFR 103.30). A few commenters also observe that Sec. 8(d) and 8(g) of the Act set forth distinctive notice requirements before the termination or modification of collective-bargaining agreements and before work stoppages at hospitals. See comments of AHA; U.S. Chamber of Commerce; 29 U.S.C. 158 (d) & (g). These commenters likewise argue that the Board has at times disregarded other generally applicable doctrines for the hospital setting, including solicitation and distribution law. See comments of AHA; U.S. Chamber of Commerce.

[99] Instead, pre-2020 Board decisions applied the same standard when one putative joint employer of particular employees was a hospital. See, *e.g., Flagstaff Medical Center,* 357 NLRB 659, 666–667 (2011) (applying the *TLI/Laerco* test and finding that a hospital contractor was not a joint employer of a hospital's housekeeping employees).

[100] Our dissenting colleague also forecasts that the final rule will negatively affect hospitals and the healthcare sector. In particular, he anticipates that the final rule will make it more difficult for hospitals to rely on firms that supply travel nurses to fill staffing gaps without risking a joint-employer finding. We reject our colleague's characterization of the final rule and emphasize that in determining whether a joint-employer finding is appropriate in any given context, the Board will consider all relevant evidence regarding whether a putative joint employer possesses or exercises the requisite control over one or more essential terms and conditions of particular employees' employment.

[101] Comments of National Grocers Association.

[102] Comments of American Association of Franchisees and Dealers; IFA; Restaurant Law Center and National Restaurant Association.

[103] Comments of National Association of Insurance and Financial Advisors.

[104] Relatedly, we also decline the request of one commenter to explicitly state that the final rule covers the relationship between local unions and national or international unions. See comments of IFA.

[105] Comments of Independent Bakers Association; National Association of Home Builders (NAHB).

[106] See 29 U.S.C. 152(6) & (7); *NLRB* v. *Fainblatt,* 306 U.S. 601, 606–607 (1939). The Board also uses its discretion to decline to exercise its statutory jurisdiction over a subset of smaller employers. See, *e.g., Siemons Mailing Service,* 122 NLRB 81 (1959) (describing Board's discretionary commerce standard). The Board has historically combined the gross revenues of joint employers when applying its discretionary standard. See, *e.g., Central Taxi Service,* 173 NLRB 826, 827 (1968); *Checker Cab Co.,* 141 NLRB 583, 586–587 (1963), enfd. 367 F.2d 692 (6th Cir. 1966); see also *CID–SAM Management Corp.,* 315 NLRB 1256, 1256 (1995). The scope of this rulemaking does not encompass any changes to the Board's precedent governing application of its discretionary commerce standard.

[107] Comments of Professors Pandya, Elmore, and Griffith.

[108] See id.

agree that the basic "share or codetermine" formulation is the appropriate starting point for the Board's joint-employer analysis.[109] As discussed at length below, however, commenters' views regarding what forms of control suffice to establish that entities "share or codetermine" matters governing particular employees' essential terms and conditions of employment diverge significantly.[110]

Paragraph (c) of the proposed rule sought to define the phrase "share or codetermine those matters governing employees' essential terms and conditions of employment" to mean "for an employer to possess the authority to control (whether directly, indirectly, or both), or to exercise the power to control (whether directly, indirectly, or both), one or more of the employees' essential terms and conditions of employment." [111]

One commenter suggests that because the Third Circuit's formulation of the "share or codetermine" standard (and the formulation used in paragraph (c) of the proposed rule) speaks in terms of "matters" governing essential terms and conditions of employment, a putative joint employer must possess the authority to control or exercise control over more than one essential term or condition of employment to meet the standard.[112] We do not find this argument persuasive as an analytical or logical matter. First, we do not construe the word "matters" in the standard to refer to essential terms or conditions of employment themselves, but rather to the workplace issues related to those terms or conditions. Second, we disagree that control over one essential term or condition of employment is necessarily insufficient. For example, as discussed at length below, commenters are unanimous that wages are an essential term or condition of employment. Given the centrality of wages to the employment relationship, it would be difficult to argue that a common-law employer's control over wages, standing alone, is insufficient to create an employment relationship.

A number of commenters challenge the premise that possessing but not exercising the authority to control or exercising indirect control over one or more essential terms and conditions of employment can ever serve as evidence of joint-employer status.[113] Some of these commenters, especially those writing on behalf of small businesses, suggest that forms of reserved control that amount to "contractual fine print" that are never put into action should not result in a joint-employer finding.[114] While others appear to concede that there may be circumstances in which indirect or reserved control is probative of joint-employer status, those commenters emphasize that requiring evidence that an entity actually exercises control is preferable.[115]

Consistent with the preliminary view set forth in our NPRM, we are unpersuaded by comments suggesting that forms of indirect or reserved control can never serve as evidence of joint-employer status. In our view, this argument is undermined by both the weight of common-law authority and relevant judicial decisions, including the District of Columbia Circuit's decision in *BFI* v. *NLRB*. See 911 F.3d at 1213 & 1216 ("[T]he Board's conclusion that an employer's authorized or reserved right to control is relevant evidence of a joint-employer relationship wholly accords with traditional common-law principles of agency," and "indirect control can be a relevant factor in the joint-employer inquiry.").

Moreover, "contractual fine print" bearing on the allocation of authority to control the details of the manner and means by which work is performed, and the terms and conditions of employment of those performing the work, has legal force and effect without respect to whether or not contractually reserved authority to control is ever exercised. By incorporating such contractual allocations of control into the Board's joint-employer analysis, the final rule permits business entities to evaluate and control their potential status as joint employers under the Act, ex ante, based on their freely chosen contractual arrangements. By contrast, a standard that turns on an ex-post analysis of whether and to what extent a party has actually exercised contractually

reserved control impedes contracting parties' ability to reliably determine ahead of time whether or not they will have obligations under the Act related to employees of another employer. This distinction may be particularly important, for example, in successorship situations involving an incumbent union, where questions about bargaining obligations may arise before sufficient time has passed for parties to reliably ascertain whether and to what extent contractually reserved authority to control will be actually exercised.[116]

Another group of commenters suggests that while an entity's indirect or reserved control over essential terms and conditions of employment may be probative, it is not sufficient, standing alone, to confer joint-employer status.[117] These commenters argue that the Board has never held that a single instance of unexercised control was sufficient to create a joint-employer relationship and generally criticize the NPRM's discussion of the Board's precedent in the two decades after *Boire* v. *Greyhound Corp.*, 376 U.S. 473, 481 (1964), issued and before *TLI*, supra, 271

---

[109] See, *e.g.*, comments of CWA; National Women's Law Center; North American Meat Institute; TechEquity Collaborative; Women Employed. Other commenters implicitly approve the formulation, taking it as the starting point for their analysis of the proposed rule.

[110] Comments of American Hotel & Lodging Association; IFA; Leading Age; National Retail Federation; North American Meat Institute; Society for Human Resource Management (SHRM).

[111] 87 FR at 54663.

[112] Comments of Freedom Foundation.

[113] Comments of American Staffing Association; Independent Lubricant Manufacturers Association; QuickChek; RaceTrac, Inc.; Rio Grande Foundation.

[114] Comments of Energy Marketers of America; Independent Lubricant Manufacturers Association; M. M. Fowler, Inc.; One Energy Inc.; Ready Training Online; Reid Stores, Inc. d/b/a Crosby's.

[115] Comments of American Trucking Associations; Americans for Prosperity Foundation; ANB Bank; California Policy Center; Competitive Enterprise Institute; Goldwater Institute; Home Care Association of America; Independent Electrical Contractors; National Black McDonald's Operators Association; RaceTrac, Inc.; Rachel Greszler.

[116] For this reason, we reject our dissenting colleague's suggestion that the final rule will have an adverse effect in successorship situations. In successorship situations where a transaction is structured in such a way that more than one entity in the resulting structure could potentially be considered an employer, the final rule has the distinct advantage of permitting all parties to determine and define their NLRA rights and obligations, ex ante, by contract. Under the 2020 rule, by contrast, the rights and obligations of contracting businesses could not be ascertained at the outset of a business relationship but would instead turn on contingent facts about whether or not one party chose to exercise rights it had reserved to itself by contract.

[117] Comments of ABC; American Hotel & Lodging Association; Center for Workplace Compliance; CDW; COLLE; Competitive Enterprise Institute; Control Transportation Services, Inc.; HR Policy Association; IFA; International Foodservice Distributors Association (IFDA); NATSO & SIGMA; National Asian/Pacific Islander American Chamber of Commerce and Entrepreneurship (National ACE); National Association of Convenience Stores; National Taxpayers Union; National Waste & Recycling Association; New Civil Liberties Alliance & Institute for the American Worker; RILA; Restaurant Law Center and National Restaurant Association; SHRM; The Mackinac Center for Public Policy; U.S. Chamber of Commerce.

One of these commenters draws an analogy to the Board's treatment of primary and secondary indicia of supervisory status in cases involving Sec. 2(11) of the Act, 29 U.S.C. 152(11). Comments of COLLE. The scope of the definition of "supervisor" is an express exception to the definition of "employee" under Sec. 2(3) of the Act. See, *e.g.*, *NLRB* v. *Kentucky River Community Care, Inc.*, 532 U.S. 706, 711 (2001). Unlike the definition of "employee," then, the definition of supervisor turns on questions of statutory interpretation, not common-law agency principles. Accordingly, we find this analogy inapposite.

NLRB 798, and *Laerco*, supra, 269 NLRB 324, were decided.[118]

As set forth more fully in the NPRM, we disagree with these commenters' view of the Board's pre-*TLI/Laerco* precedent. Instead, we view cases from that time period as supportive of the view that the right to control employees' work and terms and conditions of employment is determinative in the joint-employer analysis. Cases decided during the two decades after *Boire* issued did not turn on whether both putative joint employers actually or directly exercised control. For example, in *Jewel Tea Co.,* 162 NLRB 508 (1966), the Board found that an entity's contractually reserved power to set working hours and to reject or terminate workers was sufficient to establish that entity's status as a joint employer. In addition, in *Value Village,* 161 NLRB 603, 607 (1966), the Board found a joint-employment relationship where one entity reserved control over "the manner and method of work performance" and to terminate the contract at will in an operating agreement, emphasizing that "the power to control is present by virtue of the operating agreement." [119]

Some commenters specifically criticize the proposed rule's treatment of reserved control, suggesting that it might be difficult to assess whether forms of reserved control are sufficient to give rise to liability or a bargaining obligation.[120] One commenter notes that reservations of control are often "boilerplate" inclusions in contracts that should not give rise to a joint-

employer finding.[121] Certain of these commenters express concerns that the standard might be susceptible to outcome-driven applications or other unfair results.[122]

Many commenters agree with the NPRM's discussion of how the common law treats forms of reserved control.[123] One of these commenters cites the District of Columbia Circuit's discussion in *BFI* v. *NLRB,* 911 F.3d at 1211, of how "the 'right to control' runs like a *leitmotif* through the *Restatement (Second) of Agency.*" [124] In particular, some commenters cited approvingly to the NPRM's discussion of common-law judicial decisions that treat reserved control as an especially probative indication of an agency relationship.[125] See, *e.g., Dovell* v. *Arundel Supply Corp.,* 361 F.2d 543, 545 (D.C. Cir. 1966) (quoting *Grace* v. *Magruder,* 148 F.2d 679, 681 (D.C. Cir. 1945)) ("[I]t is the right to control, not control or supervision itself, which is most important.").

The final rule also adheres to the view that reserved control is probative and that it is appropriate for the Board to find that joint-employer status is established based on a putative joint employer's reserved control over an essential term or condition of employment. As set forth more fully in the NPRM,[126] the reservation of authority to control essential terms or conditions of employment is an important consideration under common-law agency principles. We agree with the District of Columbia Circuit that common-law sources treat the right to control as central to the joint-employer inquiry and that forms of reserved control can reveal an entity's

right to control essential terms or conditions of employment.[127] As discussed above, incorporating parties' contractual allocations of control into the Board's joint-employer analysis also enhances contracting parties' ability to evaluate and control their statutory obligations with respect to other employers' employees at the inception of their business relationships.

Certain commenters specifically take issue with the proposed rule's view that indirect control can establish joint-employer status.[128] A number of these commenters argue that only direct control can or should be relevant to the joint-employer inquiry.[129] They urge that control exercised through an intermediary should not itself be sufficient to establish status as a joint employer, contending that this aspect of the proposed rule threatens to interfere with parties' reliance on the use of independent contractors or vendors to perform services.[130] One of these commenters observes that courts interpreting the Fair Labor Standards Act have at times treated forms of routine indirect control as immaterial to the existence of a joint-employer relationship and urges the Board to follow suit.[131]

Other commenters, citing sources of common-law agency principles and judicial decisions applying common-law principles, stress that an entity itself need not actually exercise control over particular employees for the Board to

---

[118] Comments of CDW; HR Policy Association; IFA; NATSO & SIGMA; New Civil Liberties Alliance & Institute for the American Worker; RILA; Small Business & Entrepreneurship Council; Tesla, Inc.; U.S. Chamber of Commerce.

[119] Our dissenting colleague criticizes our reliance on *Jewel Tea* and *Value Village* as support for our view that pre-*TLI/Laerco* precedent did not require evidence of a putative joint employer's direct exercise of control, noting that other pre-*TLI/ Laerco* precedent relied on record evidence of actually exercised or direct control. As we note in Sec. I.D. above, however, it is unsurprising that cases where the record establishes that an entity has directly exercised control have not addressed the question of whether reserved or indirect control could *also* independently suffice to establish the relationship. Our colleague cites no pre-*TLI/Laerco* precedent holding that actual exercise of direct control was *necessary,* and no number of cases holding only that the direct exercise of control is *sufficient* can rationally establish that proposition. Conversely, *Jewel Tea, Value Village,* and the many other pre-*TLI/Laerco* decisions cited above in which the Board has expressly stated that control need not be actually exercised, or exercised in any particular way, in order to establish a joint-employer relationship clearly establish that the Board's historic joint-employer standard did not include any such requirement. See also fn. 2, above.

[120] Comments of Home Care Association of America; IFA; U.S. Chamber of Commerce.

[121] Comments of IFA.

[122] Comments of AGC; American Pizza Community; Americans for Prosperity Foundation; Competitive Enterprise Institute; HR Policy Association; IFA; James Bitzonis; National Association of Manufacturers (NAM); NAHB; National Retail Federation; National Roofing Contractors Association; Restaurant Law Center and National Restaurant Association.

[123] Comments of AFL–CIO; Congressman Scott et al.; General Counsel Abruzzo; NELP. A few of these commenters suggest that the Board omit references to "reserved" and "indirect" control in the final rule to eschew any suggestion that the joint-employer analysis requires control to be taxonomized. See comments of AFL–CIO; International Union of Operating Engineers (IUOE). As we hope to make clear in our discussion of the comments we received and the final rule, our intention is for the final rule to reflect the common law's view that control is the touchstone of an agency relationship, regardless of how it is wielded. While this does not require forms of control to be categorized in any particular way, the terminology used is reflective of the language contained in the legal precedent upon which we rely.

[124] Comments of NELP.

[125] Comments of AFL–CIO.

[126] 87 FR at 54648–54650.

[127] *BFI,* 911 F.3d at 1213 ("[T]he Board's conclusion that an employer's authorized or reserved right to control is relevant evidence of a joint-employer relationship wholly accords with traditional common-law principles of agency.").

[128] Comments of American Pizza Community; Americans for Tax Reform; American Trucking Associations; ANB Bank; Connie Cessante; Goldwater Institute; NAHB; National Roofing Contractors Association; One Energy Inc.; Ready Training Online; Reid Stores, Inc. d/b/a Crosby's; Robert Kulik; TechNet.

[129] Comments of Competitive Enterprise Institute; Energy Marketers of America; FreedomWorks Foundations; Home Care Association of America; IFA; National Retail Federation; One Energy Inc.; QuickChek; RaceTrac, Inc.; The Mackinac Center for Public Policy.

[130] Comments of American Hotel & Lodging Association; FMI—The Food Industry Association; International Bancshares Corporation; New Civil Liberties Alliance & Institute for the American Worker; Rio Grande Foundation; SHRM; Small Business & Entrepreneurship Council; U.S. Black Chambers, Inc.; U.S. Chamber of Commerce. Some commenters cite *Computer Associates International, Inc.,* 324 NLRB 285, 286 (1987), for the proposition that Sec. 8(b) of the Act reflects Congress's intention to protect employers' autonomy in their selection of independent contractors. See, *e.g.,* comments of SHRM. A number of individuals raised similar concerns, noting that they fear the proposed rule might harm their prospects of being hired as independent contractors in the future. See, *e.g.,* comments of Monica Cichosz; Gregg Micalizio.

[131] Comments of National Retail Federation.

find that an agency relationship exists.[132] Many commenters approve of the Board's discussion of the *Restatement (Second) of Agency* in the preamble to the proposed rule and cite portions of the *Restatement* contemplating that an agency relationship can be premised on indirect control.[133] Some of these commenters specifically addressed the "subservant" doctrine. See *Restatement (Second) of Agency,* section 5(2), cmts. e, f, and illus. 6; section 220(1), cmt. d; section 226, cmt. a (1958). One of these commenters, citing the District of Columbia Circuit's decision in *BFI* v. *NLRB,* 911 F.3d at 1218, argues that the subservant doctrine demonstrates the common law's recognition of the important role that forms of indirect control can play in an agency relationship.[134]

As noted above, because we agree with the commenters who discuss common-law precedent and the District of Columbia Circuit's statements regarding the role indirect control plays in the joint-employer analysis,[135] we respectfully reject the view of commenters who suggest that evidence of indirect control over essential terms or conditions of employment is insufficient to establish joint-employer status. The final rule adheres to the Board's preliminary view that forms of indirect control may be evidence of joint-employer status. As set forth in the NPRM, we are persuaded by the District of Columbia Circuit's view that the common-law standard requires consideration of indirect control. See *BFI* v. *NLRB,* 911 F.3d at 1216–1217 ("Common law decisions have repeatedly recognized that indirect control over matters commonly determined by an employer can, at a minimum, be weighed in determining one's status as an employer of joint employer, especially insofar as indirect control means control exercised through an intermediary.").[136] We further agree with the views of some commenters that the 2020 rule reintroduced control-based restrictions, notably the requirement of "substantial direct and immediate control," that are contrary to the common-law view of how agency relationships are created. For this reason, independent of our decision to promulgate a new rule, we rescind the 2020 rule because it is inconsistent with common-law agency principles and therefore inconsistent with the National Labor Relations Act. Moreover, we are further persuaded that there is value in codifying the principle that forms of indirect control over one or more essential terms or conditions of employment are probative of joint-employer status in the final rule text, as discussed below.

*D. Comments About the Definition of "Essential Terms and Conditions of Employment"*

Paragraph (d) of the proposed rule defined "essential terms and conditions of employment" to "generally include" but not be limited to "wages, benefits, and other compensation; hours of work and scheduling; hiring and discharge; discipline; workplace health and safety; supervision; assignment; and work rules and directions governing the manner, means, or methods of work performance."[137] In setting forth a nonexhaustive list of essential terms and conditions of employment, the proposed rule relied in part on the Board's 2015 *BFI* decision, which took the same approach.[138] As mentioned above, the phrase "essential terms and conditions of employment" derives from the Third Circuit's formulation of the joint-employer standard in *NLRB* v. *Browning-Ferris Industries of Pennsylvania, Inc.,* 691 F.2d 1117, 1124 (3d Cir. 1982), enfg. 259 NLRB 148 (1981), where the court stated that entities are "joint employers" if they "share or codetermine those matters governing essential terms and conditions of employment."

Although some commenters approve of the proposed rule's use of an open-ended, nonexhaustive list of "essential terms and conditions of employment,"[139] many commenters criticize that aspect of the proposed rule.[140] Notably, the United States Small Business Administration Office of Advocacy, along with many individuals and small business owners, express concerns about how parties covered by the Act will successfully comply with their potential obligations as joint employers without more clarity regarding the scope of "essential terms and conditions of employment."[141] Some commenters suggest that the Board adopt an exhaustive list of essential terms and conditions of employment and make any further refinements to that list in a future rulemaking proceeding.[142]

Another group of commenters propose that the Board modify the proposed rule by explicitly tying the definition of "essential terms and conditions of employment" to the concept of mandatory subjects of bargaining for purposes of Section 8(d) of the Act.[143] These commenters generally also favor a flexible approach to defining the scope of a joint

---

[132] Comments of American Civil Liberties Union (ACLU); AFL–CIO; Congressman Scott et al.; CWA; General Counsel Abruzzo; IUOE; Lawyers' Committee for Civil Rights Under Law; Los Angeles County Federation of Labor AFL–CIO & Locals 396 and 848 of the IBT; NELP; Restaurant Opportunities Centers United; State Attorneys General; The Leadership Conference on Civil and Human Rights; The Strategic Organizing Center; United Electrical, Radio and Machine Workers of America (UE); UNITE HERE International Union; United Steelworkers.

Among these commenters, several suggest that if the Board decides to promulgate a final rule (rather than simply rescind the 2020 rule), the Board should delete references to direct and indirect control in proposed subparagraph (c). See comments of AFL–CIO; IUOE. We address this aspect of these comments in our discussion below.

[133] Comments of CWA; General Counsel Abruzzo; Los Angeles County Federation of Labor AFL–CIO & Locals 396 and 848 of the IBT.

[134] Comments of State Attorneys General.

[135] See *BFI* v. *NLRB,* 911 F.3d at 1216 ("[I]ndirect control can be a relevant factor in the joint-employer inquiry.").

[136] Similarly, as one commenter observed, the Supreme Court's decision in *Boire* v. *Greyhound,* 376 U.S. 473, 481 (1964), made no distinction on the basis of whether an entity wields direct or indirect control. See comments of NELP.

[137] 87 FR at 54663.

[138] Id. at 54643 (citing *BFI,* supra, 362 NLRB at 1613).

[139] Comments of AFL–CIO; Center for Law and Social Policy; International Brotherhood of Teamsters (IBT); Lawyers' Committee for Civil Rights Under Law; Los Angeles County Federation of Labor AFL–CIO & Locals 396 and 848 of the IBT; National Partnership for Women & Families; National Women's Law Center; NELP; Public Justice Center; Restaurant Opportunities Centers United; SPLC; State Attorneys General; TechEquity Collective; The Leadership Conference on Civil and Human Rights; William E. Morris Institute for Justice; Women Employed.

[140] Comments of American Staffing Association; ANB Bank; Asian McDonald's Operators Association; ABC; California Policy Center; Center for Workplace Compliance; CDW; Energy Marketers of America; Freedom Foundation; Goldwater Institute; Home Care Association of America; HR Policy Association; International Bancshares Corporation; IFDA; IFA; LeadingAge; McDonald's USA, LLC; NATSO and SIGMA; National Association of Convenience Stores; NAHB; National Association of Insurance and Financial Advisors; NAM; National Association of Realtors; National Black McDonald's Operators Association; National Retail Federation; National Roofing Contractors Association; New Civil Liberties Alliance & Institute for the American Worker; PPAI; Rachel Greszler; RILA; Subcontracting Concepts, LLC; The Mackinac Center for Public Policy; U.S. Chamber of Commerce.

[141] Comments of Luis Acosta; Escalante Organization; Independent Electrical Contractors; M. M. Fowler, Inc.; One Energy Inc.; QuickChek; RaceTrac, Inc.; Ready Training Online; Reid Stores, Inc. d/b/a Crosby's; SBA Office of Advocacy.

[142] Comments of CDW; IFA; The Mackinac Center for Public Policy.

[143] Comments of General Counsel Abruzzo; IBT; IUOE; Jobs with Justice and Governing for Impact; Los Angeles County Federation of Labor AFL–CIO & Locals 396 and 848 of the IBT; State Attorneys General; UE. One of these commenters cites *Sun-Maid Growers of California* v. *NLRB,* 618 F.2d 56, 59 (9th Cir. 1980) in support of this view. See Los Angeles County Federation of Labor AFL–CIO & Locals 396 and 848 of the IBT.

employer's bargaining obligation.[144] Relatedly, some commenters request that the Board consider amending the proposed rule to incorporate a statement regarding the scope of a joint employer's bargaining obligation that appeared in the NPRM's preamble,[145] while others suggest that the Board should clarify how to allocate bargaining responsibilities between two entities that share or codetermine one or more essential terms and conditions of employment.[146]

One of these commenters observes that the Board should be careful to distinguish control over essential terms and conditions of employment that is material to the existence of a common-law employment relationship from control over matters that the Act requires parties to bargain over.[147] Another commenter acknowledges that an entity's control over certain mandatory subjects of bargaining, like cafeteria prices, see *Ford Motor Co.* v. *NLRB,* 441 U.S. 488, 498 (1979), may control a term of employment to which a bargaining duty attaches but not possess or exercise control over an essential term or condition of employment so as to be regarded as a common-law employer.[148]

We have taken these comments into consideration in revising the final rule's treatment of essential terms and conditions of employment and in adding paragraph (h) to the final rule. The final rule responds to commenters who suggest tying the definition of essential terms and conditions of employment to Section 8(d) of the Act by emphasizing that, once an entity is found to be a joint employer because it possesses the authority to control or exercises the power to control one or more essential terms or conditions of employment identified in the rule, that entity has a statutory duty to bargain over all mandatory subjects of bargaining it possesses the authority to control or exercises the power to control. That duty is common to all employers under the Act. See *Management Training,* 317 NLRB 1355 (1995). The scope of a joint employer's duty to bargain, however, is distinct from the issue of joint-employer status. As in other cases involving the scope of the duty to bargain, if a joint employer contests its duty to bargain over a

particular issue, the Board will assess whether a particular subject of bargaining is mandatory on a case-by-case basis, applying familiar and longstanding precedent. However, the final rule provides the clarity and predictability other commenters sought by specifically enumerating the essential terms and conditions of employment that will, as a threshold matter, give rise to a finding that an entity is a joint employer if that entity possesses the authority to control or exercises the power to control one or more of the listed terms. Moreover, by adding paragraph (h), the final rule likewise responds to those commenters who requested that the Board include a statement of the nature of a joint employer's bargaining obligation in the text of the rule itself.[149]

As mentioned above, the final rule incorporates an exhaustive list of essential terms and conditions of employment. These essential terms and condition of employment are: ''(1) wages, benefits, and other compensation; (2) hours of work and scheduling; (3) the assignment of duties to be performed; (4) the supervision of the performance of duties; (5) work rules and directions governing the manner, means, and methods of the performance of duties and the grounds for discipline; (6) the tenure of employment, including hiring and discharge; and (7) working conditions related to the safety and health of employees.'' [150] Because these essential terms and conditions of employment are substantively the same as those offered as illustrations in the proposed rule, we next address commenters' particular concerns regarding the proposed rule's treatment of specific terms and conditions of employment as ''essential.''

Commenters who addressed the proposed rule's treatment of specific ''essential terms and conditions of employment'' unanimously agree that certain terms and conditions of employment are ''essential'' for purposes of the joint-employer standard. These include wages and benefits,[151]

hours of work,[152] hiring, discipline, and discharge,[153] assignment,[154] and supervision.[155] Many commenters specifically state that, at a minimum, they approve of the list of essential terms and conditions of employment that was used in the 2020 rule, including scheduling, hiring, termination, discipline, assignment of work, and instruction.[156]

A number of commenters and our dissenting colleague contend that workplace health and safety should not be considered an essential term or condition of employment for purposes of the joint-employer standard.[157] These commenters emphasize the role that government regulation plays in setting minimum standards for workplace

---

[144] Comments of Los Angeles County Federation of Labor AFL–CIO & Locals 396 and 848 of the IBT; NELP.

[145] See 87 FR at 54645 fn. 26. Comments of IBT; IUOE; Service Employees International Union (SEIU); U.S. Chamber of Commerce.

[146] Comments of RILA; SHRM.

[147] Comments of UNITE HERE.

[148] See reply comments of AFL–CIO.

[149] See comments of American Staffing Association; RILA; SHRM; Texas Public Policy Foundation. One commenter notes that Board precedent already addresses the contours of a joint employer's bargaining obligation and suggests that this obviates the need for a clearer articulation of the duty in the text of a final rule. Comments of AFL–CIO.

[150] The list of essential terms and conditions of employment is discussed further in Section V.D., below.

[151] Comments of Association of Women's Business Centers; Center for Law and Social Policy; General Counsel Abruzzo; IFA; Lawyers' Committee for Civil Rights Under Law; NAM; National

Women's Law Center; North Carolina Justice Center; Public Justice Center; RILA; SPLC; TechEquity Collective; The Leadership Conference on Civil and Human Rights; William E. Morris Institute for Justice; Women Employed.

[152] Comments of Center for Law and Social Policy; General Counsel Abruzzo; Lawyers' Committee for Civil Rights Under Law; National Partnership for Women & Families; National Women's Law Center; North Carolina Justice Center; Public Justice Center; SPLC; TechEquity Collective; The Leadership Conference on Civil and Human Rights; RILA; William E. Morris Institute for Justice; Women Employed.

[153] Comments of California Policy Center; General Counsel Abruzzo; IBT; NAM.

Our dissenting colleague generally agrees that matters relating to particular employees' hiring and discharge are essential, but he expresses concern that the formulation used in the final rule—''tenure of employment, including hiring and discharge''— is too broad and runs the risk of ''making general contractors in the construction industry joint employers per se.'' With respect, we reject our colleague's characterization. General contractors in the construction industry will be deemed joint employers only if all requirements of the standard are established, including the threshold requirement that they have a common-law employment relationship with particular employees. We use the phrase ''tenure of employment, including hiring and discharge'' to encompass a range of actions that determine or alter individuals' employment status, offering hiring and discharge as examples. As discussed elsewhere, nothing in the final rule intends to treat general contractors in the construction industry—or, indeed, any entities—as joint employers on a per se or categorical basis.

[154] Comments of IBT; NELP.

[155] Comments of General Counsel Abruzzo; IBT.

[156] See, *e.g.,* comments of IFA; NFIB; National Women's Law Center.

[157] Comments of American Association of Port Authorities (AAPA); American Trucking Associations; Association of Women's Business Centers; FMI—The Food Industry Association; Home Care Association of America; IFA; NATSO & SIGMA; National Association of Convenience Stores; NAM; National Retail Federation; New Civil Liberties Alliance & Institute for the American Worker; North American Meat Institute; Rio Grande Foundation; Trucking Industry Stakeholders.

One of these commenters argues that workplace health and safety was not historically regarded as an essential term or condition of employment under the common law and should therefore be omitted. See comments of IFA.

health and safety,[158] especially in certain industries, including the trucking, food and consumer goods, and waste and recycling industries.[159] Other commenters strenuously urge the Board to include workplace health and safety as essential.[160] In fact, one commenter suggests that, in light of the Covid-19 pandemic, the Board should make explicit that workplace health and safety is an essential condition of all in-person employment.[161]

A few commenters express the view that scheduling should not be an essential term or condition of employment for joint-employer purposes.[162] In this regard, some commenters note that determining the hours of operation for a facility should not be treated as comparable to determining hours of work for all individuals who perform services in that facility,[163] while others characterize scheduling as related to "routine" contractual provisions that speak to the timing for completion of a project.[164] Certain commenters note that treating control over scheduling as indicative of a common-law employment relationship may disproportionately affect entities operating in the manufacturing and staffing industries.[165] Other commenters observe that scheduling practices are intertwined with employees' hours of

work and should therefore be considered essential.[166]

Some commenters argue that work rules and directions governing the manner, means, or methods of work performance should not be essential for purposes of the joint-employer standard.[167] These commenters express concern that including work rules and directions potentially sweeps too broadly and risks exposing small business owners to substantial new liability.[168] Similarly, our dissenting colleague expresses concern that including work rules and directions on the list of essential terms and conditions of employment sweeps too broadly, potentially allowing the Board to make a joint-employer finding on the strength of ambiguous language in work rules. He also predicts that including work rules and directions as essential will lead to more frequent joint-employer findings in the staffing, healthcare, and franchise industries. Commenters who favor including work rules and directions on the list of essential terms and conditions of employment generally argue that entities reserving or exercising control over work rules and directions thereby exert considerable influence over the manner and means of particular employees' work.[169]

Several commenters propose additional terms and conditions of employment that the Board should consider essential. A few commenters propose adding practices related to surveillance and monitoring to the list.[170] One comment goes further, suggesting that the Board adopt a rebuttable presumption that an entity is a joint employer if it imposes certain requirements on another entity or that entity's employees (among others, retaining discretion to hire or fire that entity's employees and requiring that entity's employees to enter into noncompete agreements or other restraints on operating a business in the same trade or industry during or after the contract).[171]

As noted above, the Board has determined to include an exhaustive list of essential terms and conditions of employment in the final rule. While commenters broadly agree on the

content of the proposed rule's list, we briefly address commenters' specific concerns about our decision to include scheduling, workplace health and safety, and work rules and directions governing the manner, means, or methods of work performance.

With respect to scheduling, we begin by noting several commenters' approval of the 2020 Rule's inclusion of scheduling along with hours of work as an essential term or condition of employment.[172] We find that Section 2 of the *Restatement (Second) of Agency* provides support for including both "hours of work and scheduling" on the list of essential terms and conditions of employment. We further note that Board law has long treated scheduling as probative of joint-employer status.[173] We are also persuaded by the view set forth by some commenters that scheduling practices are often intertwined with hours of work.

Having carefully considered the valuable input of commenters on the proposed rule's inclusion of workplace health and safety on our list of essential terms and conditions of employment (and the views of our dissenting colleague), we are persuaded to retain this aspect of the proposed rule. We find common-law support for including workplace health and safety as an essential term or condition of employment in references to the importance of an employer's control over "the physical conduct" of an employee "in the performance of the service" to the employer.[174] While many commenters and our dissenting colleague have observed that workplace health and safety is subject to substantive regulation by many federal, state, and local authorities, especially in certain industries, we do not seek to displace or interfere with those regulatory schemes by recognizing that control over workplace health and safety is indicative of a joint-employment relationship. As discussed further below, we do not consider contractual terms that do nothing more than incorporate regulatory requirements, without otherwise reserving authority to control or exercising power to control the performance of work or terms and conditions of employment, indicative of

---

[158] Comments of AAPA; American Trucking Associations; Home Care Association of America; National Association of Convenience Stores. As an example, one commenter notes that health and safety in the trucking industry is pervasively regulated by several other Federal agencies, including "the Department of Labor's Occupational Safety and Health Administration (OSHA) and the Department of Transportation's Federal Motor Carrier Safety Administration (FMCSA)." Comments of American Trucking Associations. Contrary to the suggestion of this commenter, the Board is aware of the expertise these regulators have in setting substantive health and safety standards and does not intend to prescribe any particular health and safety standards in the final rule.

[159] Comments of American Trucking Associations; FMI—The Food Industry Association; National Waste & Recycling Association; Trucking Industry Stakeholders.

[160] Comments of Center for Law and Social Policy; IBT; Lawyers' Committee for Civil Rights Under Law; National Partnership for Women & Families; National Women's Law Center; NELP; North Carolina Justice Center; Public Justice Center; SPLC; TechEquity Collective; The Leadership Conference on Civil and Human Rights; The Strategic Organizing Center; William E. Morris Institute for Justice; Women Employed.

[161] Comments of State Attorneys General.

[162] Comments of American Pizza Community; Association of Women's Business Centers; NAM; SBA Office of Advocacy.

[163] Comments of American Hotel & Lodging Association; FMI—The Food Industry Association; National Retail Federation.

[164] Comments of SBA Office of Advocacy.

[165] Comments of FMI—The Food Industry Association; NAM; Clark Hill PLC.

[166] Comments of General Counsel Abruzzo; IBT; National Women's Law Center.

[167] Comments of Americans for Prosperity Foundation; Americans for Tax Reform; NAM; Rio Grande Foundation.

[168] Comments of Americans for Tax Reform; Rio Grande Foundation.

[169] Comments of General Counsel Abruzzo; NELP.

[170] Comments of Center for Law and Social Policy; Jobs with Justice and Governing for Impact.

[171] Comments of Professors Pandya, Elmore, and Griffith.

[172] See comments of General Counsel Abruzzo; IBT; National Women's Law Center.

[173] See, e.g., *Continental Winding Co.,* 305 NLRB 122, 123 fn. 4 (1991).

[174] *Restatement (Second) of Agency,* sec. 2 (1958). While our colleague does not find our reference to this "general statement" in the *Restatement* persuasive, we believe that "the physical conduct" of an employee "in the performance of the service" to the employer encompasses workplace health and safety.

joint-employer status.[175] Finally, as noted above, many commenters confirmed our preliminary view that the experience of the Covid–19 pandemic demonstrated the importance of treating workplace health and safety as essential.

We also adhere to the view set forth in the proposed rule that work rules and directions governing the manner, means, or methods of work performance are properly included as essential terms and conditions of employment. As with our discussion of scheduling above, we note that many commenters found it appropriate for the Board to follow the 2020 rule's lead in treating work rules and directions as essential. Moreover, we find support for including work rules and directions on the list of essential terms and conditions of employment in Sections 2 and 220 of the *Restatement (Second) of Agency.*[176] In this regard, we agree with the views set forth by some commenters that possessing or exercising control over work rules or directions governing the manner, means, or methods of work performance illuminates the extent of control an employer exercises over the details of the work to be performed.[177]

Finally, in light of the clarification we make regarding the content of a joint employer's bargaining obligation in paragraph (h) of the final rule, we do not find it necessary to add other terms or conditions of employment to the final rule's list of "essential" terms or conditions of employment. However, we believe the final rule is responsive to commenters' insights that bargaining over certain of these subjects, like workplace surveillance, may be very important to employees who organize and seek to bargain collectively. As a result, the final rule recognizes that once an entity is found to be a joint employer on the basis of its control of one or more essential terms or conditions of employment, that entity will be subject to a duty to bargain over all mandatory subjects of employment that it controls.[178]

## E. Comments About Forms of Control Sufficient To Establish Status as a Joint Employer

Proposed paragraph (e) of the proposed rule provided that whether an employer possesses the authority to control or exercises the power to control one or more of the employees' terms and conditions of employment is determined under common-law agency principles. Possessing the authority to control is sufficient to establish status as a joint employer, regardless of whether control is exercised. Exercising the power to control indirectly is sufficient to establish status as a joint employer, regardless of whether the power is exercised directly. Control exercised through an intermediary person or entity is sufficient to establish status as a joint employer.[179]

Some commenters specifically request that the Board modify this paragraph of the proposed rule to specify what quantum or degree of indirect or reserved control will be sufficient to give rise to a joint-employer finding.[180] Many commenters commended the 2020 rule for returning to *TLI/Laerco*'s "substantial direct and immediate control" formulation as the threshold that would give rise to a joint-employer finding and treating "limited and routine" instances of control as irrelevant to the joint-employer inquiry, with some noting the practical benefits of that standard for the construction, franchise, retail, restaurant, and staffing industries.[181] Our dissenting colleague likewise expresses his preference for the 2020 rule's treatment of the forms of control that are sufficient to establish status as a joint employer. Some commenters suggest that Congress, in enacting the Taft-Hartley amendments, implicitly contemplated that only substantial direct and immediate control could suffice to establish a joint-employer relationship.[182] In addition, some of these commenters urge that it is especially important for the Board to ascertain whether an entity will possess or exercise control on a prospective basis as a precondition to imposing a bargaining obligation.[183]

With respect, we disagree with the view of some commenters and our dissenting colleague that only "substantial direct and immediate control" should be relevant to the Board's joint-employer inquiry. As set forth in the NPRM, once it is shown that an entity possesses or exercises relevant control over particular employees, the Board is not aware of any common-law authority standing for the proposition that further evidence of the direct and immediate exercise of that control is necessary to establish a common-law employment relationship. While we acknowledge that some commenters found the 2020 rule's formulation beneficial, because we are bound to apply common-law agency principles, we are not free to maintain a definition of "joint employer" that incorporates the restriction that any relevant control an entity possesses or exercises must be "direct and immediate."[184] Finally, we

---

[175] Contrary to our dissenting colleague's suggestion, if an employer's compliance with health and safety regulations or OSHA standards involves choosing among alternative methods of satisfying its legal obligation, a contract term that merely memorializes the employer's choice regarding how to comply with the regulation would not indicate joint-employer status. To the extent that an employer reserves further authority or discretion over health and safety matters, however, such reserved control (or control exercised pursuant to such a reservation) would bear on the joint-employer inquiry.

[176] Id., sec. 2 & 220.

[177] We reject our dissenting colleague's suggestion that the Board will seize upon ambiguous language in work rules to make a joint-employer finding. Instead, we consider work rules or directions essential because they may be especially clear indicators of a putative joint employer's authority to control or exercise of control over the details of particular employees' work. Cf. *Cognizant Technology Solutions U.S. Corp. & Google LLC,* 372 NLRB No. 108, slip op. at 1 (2023) (finding joint-employer relationship under 2020 rule based in part on entity's maintenance of "'workflow training charts' which govern[ed] the details of employees' performance of specific tasks.").

[178] Contrary to the view of our dissenting colleague, providing an exhaustive list of essential terms and conditions of employment is not intended to address the District of Columbia Circuit's concerns about the forms of indirect control that bear on the joint-employer inquiry, but to instead respond to the court's guidance, on remand, that the Board "explain which terms and conditions are 'essential' to permit 'meaningful collective bargaining,'" and to "clarify what 'meaningful collective bargaining' entails and how it works in this setting." *BFI v. NLRB,* 911 F.3d at 1221–1222 (quoting *BFI,* 362 NLRB at 1600).

[179] 87 FR at 54663.

[180] Comments of American Trucking Associations; COLLE; Competitive Enterprise Institute; Escalante Organization; NAHB; SBA Office of Advocacy; SHRM. Some commenters suggest that the proposed rule is sufficiently vague that it could have negative effects on the residential construction industry, exposing homeowners who control access to job sites, working hours, and many day-to-day conditions of employment to classification as potential joint employers. See comments of NAHB; Restaurant Law Center and National Restaurant Association. Another commenter questions whether a franchisor would be deemed a joint employer by virtue of providing optional tools and resources to a franchisee. See comments of Escalante Organization.

[181] Comments of AGC; American Pizza Community; Americans for Tax Reform; American Staffing Association; California Policy Center; Escalante Organization; Independent Electrical Contractors; IFA; Michael Remick; National Association of Realtors; National Black McDonald's Operators Association; National Demolition Association; National Retail Federation; National Taxpayers Union; New Civil Liberties Alliance & Institute for the American Worker; North American Meat Institute; Restaurant Law Center and National Restaurant Association; RILA; The Mackinac Center for Public Policy; Yum! Brands. One commenter also argues that there must be a showing of regular and continuous control, not merely sporadic and de minimis control. See comments of SHRM. Another commenter likewise suggests that the Board incorporate a de minimis limitation in the final rule. See comments of UNITE HERE.

[182] Comments of American Hotel & Lodging Association; COLLE; RILA.

[183] Comments of RILA; SHRM.

[184] The District of Columbia Circuit has recently emphasized that it "took great pains to inform the Board that the failure to consider reserved or indirect control is inconsistent with the common law of agency." *Sanitary Truck Drivers & Helpers Local 350, International Brotherhood of Teamsters v. NLRB,* 45 F.4th 38, 47 (D.C. Cir. 2022).

hope to satisfy those commenters seeking guidance regarding the quantum or type of control that is sufficient to establish status as a joint employer in the discussion that follows.

Others approve of the proposed rule's explicit recognition that control exercised through an intermediary should be sufficient to establish joint-employer status, offering examples of the role intermediaries play in sharing or codetermining essential terms and conditions of employment in certain industries, including the franchise, staffing, and temporary employment industries.[185] One commenter highlights how the proposed rule, which would find indirect control over workplace health and safety sufficient to establish joint-employer status, could benefit employees with disabilities, who it represents are overrepresentation in temporary employment and often face distinctive health and safety challenges that may require multiple firms to play a role in addressing.[186]

In addition, these commenters emphasize that taking all relevant forms of control, including indirect control, into account is essential to ensuring that bargaining is effective, especially in industries characterized by the widespread use of contracting, including the property services, staffing, and construction industries.[187] Some commenters observe that making indirect control part of the joint-employer inquiry may foster compliance with labor and employment laws and encourage an appropriate sharing of responsibility among multiple firms that codetermine terms and conditions of employment.[188] Some of these commenters charge that by imposing a requirement of "substantial direct and immediate control" over essential terms

and conditions of employment, the 2020 rule effectively rendered forms of indirect control irrelevant to the joint-employer analysis, in contravention of the common-law agency principles that must guide the Board's application of its joint-employer standard.[189] As one of these commenters adds, this error is especially pronounced in light of the District of Columbia Circuit's later statement in *Sanitary Truck Drivers and Helpers Local 350, International Brotherhood of Teamsters* v. *NLRB,* 45 F.4th 38, 46–47 (D.C. Cir. 2022), that the Board was not free to apply an analysis that effectively ignored reserved and indirect control.[190]

Certain commenters who generally agree with the Board's proposed approach to treating indirect control as probative to the joint-employer analysis argue that certain employer actions should, in general, be regarded as amounting to the exercise of indirect control over particular employees.[191] For example, one commenter proposes that the Board state that using surveillance technology amounts to indirect control over the employees being surveilled.[192] Another commenter suggests that certain forms of control that franchisors or user firms exert over the nonwage cost items in franchisees' or supplier firms' budgets are tantamount to indirect control over wages.[193] One commenter offers illustrations of forms of control she regards as material to the existence of a common-law employment relationship. One example includes a contract provision granting a user employer the right to require mandatory overtime by supplied employees.[194] Some suggest that the Board add corresponding examples or hypotheticals to the final

rule to clarify that these forms of control are sufficient.[195]

While we appreciate the views set forth by commenters who illustrate why forms of indirect control are frequently relevant to the joint-employer analysis, we decline the invitation to modify the text of the proposed rule to incorporate these insights.[196] By maintaining the general language of the proposed rule, which provides that control is to be determined by reference to common-law agency principles, we aim to permit the application of the final rule to a diverse arrangement of mechanisms that grant third parties or other intermediaries authority to share or codetermine matters governing particular employees' essential terms and conditions of employment. In this regard, as we apply the final rule to new facts, we will be guided by § 103.40(e)(2) of the final rule, which is consistent with the District of Columbia Circuit's statement that "the common law has never countenanced the use of intermediaries or controlled third parties to avoid the creation of a master-servant relationship." [197]

Another group of comments raises concerns about situations where a putative joint employer in fact possesses the authority to control or exercises the power to control essential terms or conditions of employment only because it is required to do so by law or regulation.[198] Some of these commenters state that the Federal Government possesses reserved and indirect control over certain terms and conditions of employment of the employees of companies it contracts with.[199] For example, one commenter

[185] Comments of Jobs with Justice and Governing for Impact; Public Justice Center; The Leadership Conference on Civil and Human Rights.

[186] Comments of The Leadership Conference on Civil and Human Rights. Other commenters likewise argue that temporary employees frequently receive less safety training and are more vulnerable to retaliation for reporting injuries than their permanent-employee counterparts. See comments of North Carolina Justice Center.

[187] Comments of ACLU; AFL–CIO; BCTGM; Congressman Scott et al.; CWA; Jobs with Justice and Governing for Impact; Lawyers' Committee for Civil Rights Under Law; Los Angeles County Federation of Labor AFL–CIO & Locals 396 and 848 of the IBT; National Women's Law Center; Public Justice Center; Restaurant Opportunities Centers United; SEIU; Signatory Wall and Ceiling Contractors Alliance; TechEquity Collaborative; The Leadership Conference on Civil and Human Rights; The Strategic Organizing Center; UBC; UE; Women Employed.

[188] Comments of Bakery, Confectionary, Tobacco Workers and Grain Millers International Union (BCTGM); General Counsel Abruzzo; Public Justice Center; Richard Eiker; TechEquity Collaborative.

[189] Comments of AFL–CIO; NELP; UNITE HERE. One of these commenters makes the further suggestion that, in situations where one firm dominates another or where parties have an exclusive service relationship, the Board should consider applying a rule of per se joint-employer liability. See comments of NELP.

[190] Comments of AFL–CIO.

[191] Comments of Center for Law and Social Policy; Los Angeles County Federation of Labor AFL–CIO & Locals 396 and 848 of the IBT.

[192] Comments of Center for Law and Social Policy. Other commenters likewise suggest that, at least in certain contexts, surveillance might demonstrate sufficient indirect control over employees' essential terms and conditions of employment to justify a joint-employer finding, but they do not recommend modifying the proposed rule to include this observation. See, *e.g.*, comments of IBT; Jobs with Justice and Governing for Impact; NELP.

[193] Comments of Los Angeles County Federation of Labor AFL–CIO & Locals 396 and 848 of the IBT.

[194] Comments of General Counsel Abruzzo.

[195] See, *e.g.*, comments of CWA; RILA; State Attorneys General; U.S. Chamber of Commerce.

[196] As discussed below, however, we have reformatted § 103.40(e) of the final rule to include two subsections and have streamlined its text to avoid surplusage.

[197] *BFI* v. *NLRB,* 911 F.3d at 1217. Our dissenting colleague questions our decision not to include an extensive list of examples of forms of indirect control that may be relevant to the joint-employer inquiry and asks what other forms of indirect control may be relevant. As set forth in Sec. I.D. above, we will address whether other mechanisms that grant third parties control over particular employees' terms and conditions of employment establish joint-employer status in the course of applying the rule. In so doing, we will be guided by the District of Columbia Circuit's treatment of indirect control and common-law agency principles.

[198] Comments of American Hospital Association; American Trucking Associations; CDW; Federation of American Hospitals; Home Care Association of America; Independent Bakers Association; NAHB; National Retail Federation.

[199] Comments of COLLE; Goldwater Institute; National Small Business Association; SBA Office of Advocacy; Thomas Jefferson Institute for Public Policy. One commenter provides several examples of such contract provisions. See comments of Center for Workplace Compliance.

describes the use of "flow-down" clauses in contracting relationships and how prime contractors are sometimes required to impose obligations under the Service Contract Act, 41 U.S.C. 351 *et seq.,* and similar local and municipal laws setting minimum wage and benefit standards on their subcontractors.[200] Similarly, some commenters suggest that control over essential terms or conditions of employment is less probative of joint-employer status if it is possessed or exercised in the service of setting basic expectations or ground rules for a third-party contractor or contracted service.[201]

In response to these commenters, we note that if a law or regulation actually sets a particular term or condition of employment (like minimum wages, driving time limits for truck drivers, or contractor diversity requirements), an entity that does nothing more than embody or memorialize such legal requirements in its contracts for goods and services, without otherwise reserving the authority to control or exercising the power to control terms or conditions of employment, does not thereby become the employer of particular employees subject to those legal requirements. This is because the embodiment of such legal requirements is not a matter within the entity's discretion subject to collective bargaining.[202] We remind commenters who express concern about the role of entities exempt from the Board's jurisdiction that, under longstanding Board precedent, if a common-law employer of particular employees lacks control over some of those employees' terms and conditions of employment because those terms and conditions are controlled by an exempt entity, that common-law employer is not required to bargain about those terms and conditions of employment.[203] Consistent with this precedent, the final rule provides that a joint employer will be required to bargain over only those mandatory subjects of bargaining that it possesses or exercises the authority to control. Finally, as discussed in more

detail above and below, if an entity possesses or exercises some control over particular employees' terms and conditions of employment, including indirect control, only by the terms of a third-party contract that sets basic expectations or ground rules for the production or delivery of goods or services, without otherwise reserving the authority or exercising the power to control the details of the manner and methods by which the work is performed, the entity does not thereby become an employer of those employees. This is because such control, as a normal incident of a third-party contract, does not establish the common-law employment relationship that is the threshold requirement for finding a joint-employer relationship.[204]

Several commenters raise concerns about the possibility that, in contexts where a public entity contracts with a private entity to render a service or perform a contract, the proposed joint-employer standard risks enmeshing that public entity in the Board's jurisdiction.[205] One commenter, citing the Board's decision in *Management Training Corp.,* 317 NLRB 1355 (1995), argues that the 2020 rule would better ensure the proper application of the joint-employer standard in contracting situations.[206] One commenter expresses particular concern about the implications of a joint-employer relationship between a public charter school and third-party vendors or contractors it uses.[207]

We reject these commenters' views that the proposed rule creates any novel risks for public or private entities who contract with one another. The final rule we adopt requires, as a threshold matter, that each putative joint employer meet the definition of "employer" in Section 2(2) of the Act.[208] Section 2(2) excludes from the definition of "employer" public entities, including, in relevant part, "the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or

political subdivision thereof." [209] While some commenters suggest that public entities possess or exercise control over essential terms and conditions of employment, we note that these facts are insufficient to establish a joint-employment relationship for purposes of the Act because the public entity is excluded from the statutory definition of "employer." Finally, we regard the Board's decision in *Management Training Corp.,* above, as persuasive in addressing some commenters' concerns that applying the joint-employer standard we adopt might cause distinctive problems for government contractors. As one commenter suggests, that case permits the Board to find one entity is an employer for purposes of Section 2(2) even if another, exempt entity also possesses or exercises control over particular employees' essential terms or conditions of employment.[210] We note that reviewing courts have broadly approved of the Board's assertion of jurisdiction over government contractors.[211]

*F. Control Over Matters That Are Immaterial to the Existence of an Employment Relationship Under Common-Law Agency Principles or That Do Not Bear on Essential Terms and Conditions of Employment*

Proposed paragraph (f) provided that "[e]vidence of an employer's control over matters that are immaterial to the existence of an employment relationship under common-law agency principles or control over matters that do not bear on the employees' essential terms and conditions of employment is not relevant to the determination of

---

[200] Comments of American Council of Engineering Companies.

[201] Comments of ARTBA.

[202] Of course, if an employer has discretion over how to comply with a statutory mandate, it must bargain about how to exercise that discretion. See, *e.g., Roseburg Forest Products Co.,* 331 NLRB 999, 1003 (2000) (requiring an employer to bargain with the union over how to satisfy its obligations to keep an employee's medical information confidential under the Americans with Disabilities Act, 42 U.S.C. 12101, *et seq.,* while meeting its duty to furnish requested information to the union under the NLRA).

[203] Cf. *Management Training Corp.,* 317 NLRB 1355 (1995).

[204] For these reasons, we also reject the hypothetical our dissenting colleague puts forward to suggest that the final rule exceeds the boundaries of the common law. Our colleague downplays the importance of the final rule's threshold requirement of a common-law employment relationship and thereby concludes that entities with highly attenuated relationships to particular employees will be deemed joint employers. In applying the final rule, and consistent with the common law, we will perform the required threshold analysis.

[205] Comments of AGC; COLLE; Goldwater Institute; Home Care Association of America.

[206] Comments of COLLE.

[207] Comments of National Alliance for Public Charter Schools.

[208] 29 U.S.C. 152(2).

[209] Id. The Board uses the test approved by the Supreme Court in *NLRB* v. *National Gas Utility District of Hawkins County,* 402 U.S. 600 (1971) to determine whether an entity is a "political subdivision" within the meaning of Sec. 2(2) of the Act and therefore exempt from the Board's jurisdiction.

[210] See reply comments of AFL–CIO (citing *Management Training Corp.,* 317 NLRB at 1358).

[211] See *Teledyne Economic Development* v. *NLRB,* 108 F.3d 56, 59 (4th Cir. 1997) ("By its terms, section 2(2) exempts only government entities or wholly owned government corporations from its coverage—not private entities acting as contractors for the government."). See also *NLRB* v. *YWCA,* 192 F.3d 1111, 1117 (8th Cir. 1999) ("We find ourselves in agreement with the opinions of our sister circuits on the issue of whether or not the Board can assert jurisdiction over an employer without regard to whether or not the employer's control over its ability to collectively bargain is hampered or impeded by the employer's operating agreement with the government."); *Aramark Corp.* v. *NLRB,* 179 F.3d 872, 879 (10th Cir. 1999) ("The Board's consistent view that governmental contractors fall outside section 2(2)'s political subdivision exemption and inside that provision's definition of an employer 'is entitled to great respect.' "); *Pikeville United Methodist Hospital of Kentucky, Inc.* v. *United Steelworkers of America,* 109 F.3d 1146, 1152–1153 (6th Cir. 1997).

whether the employer is a joint employer." [212] As set forth more fully above, the preamble to the proposed rule expressed agreement with the District of Columbia Circuit's view that "routine components of a company-to-company contract" will generally not be material to the existence of an employment relationship under common-law agency principles.[213] The proposed rule cited two examples given by the District of Columbia Circuit as potential kinds of company-to-company contract provisions that will not generally be probative of joint-employer status: a "very generalized cap on contract costs"; or "an advance description of the tasks to be performed under the contract." [214] While noting that the proposed rule did not intend to exhaustively detail the kinds of business arrangements that might bear on the existence of a common-law employment relationship, the Board specifically solicited commenters' input on other kinds of company-to-company contract provisions that might not be material to the existence of an employment relationship under common-law agency principles.[215] Many commenters accepted the Board's invitation to provide these examples, and we have carefully considered the helpful insights commenters shared, as discussed below.

First, some commenters specifically addressed the two examples identified by the District of Columbia Circuit and in the proposed rule. A few commenters appeared to suggest that a generalized cap on contract costs might in certain circumstances be probative of a common-law employment relationship, especially if such a cap is coupled with a cost-plus arrangement or other explicit limitations on employee wages and benefits.[216] But many other commenters generally expressed their agreement with the view set forth in the proposed rule and by the District of Columbia Circuit that generalized caps on contract costs typically resemble other ordinary price or quantity terms that do not have any necessary connection to the existence of a common-law employment relationship.[217]

No commenter expresses any concerns about treating advance descriptions of the tasks to be performed under the contract (including provisions setting forth objectives, ground rules, or

expectations, or providing for oversight) as generally immaterial to the existence of a common-law employment relationship, while several commenters expressly indicate their approval of the proposed rule's discussion of such provisions.[218] One commenter suggests that it is common practice to include a "statement of work" to define a new project and that the Board should regard these types of contract provisions as akin to advance descriptions of the tasks to be performed (and therefore not material to the existence of a common-law employment relationship).[219] A few of these commenters make the further suggestion that the Board modify the text of proposed paragraph (f) to expressly reflect that descriptions of the tasks to be performed are not material to the existence of a common-law employment relationship.[220]

A number of commenters encourage the Board to modify the proposed rule to provide examples of contractual provisions that would not give rise to a finding of joint-employer status or to otherwise illustrate or give examples about how the Board will apply the joint-employer rule.[221] These commenters offer a range of suggested "routine components of a company-to-company contract" [222] to exclude as probative of joint-employer status. These contractual provisions include, among others, those that set forth: the objectives, basic ground rules, and expectations of the relationship; [223] instructions regarding work standards or expectations and about what work to perform, or where and when to perform work; [224] minimum staffing requirements; [225] quality, productivity, timing, and safety terms about providing

a service or completing a project; [226] requirements that deliveries be made during limited windows of time; [227] requirements about monitoring or maintaining brand standards or the design, décor, logo, or image of a business; [228] uniform requirements; [229] generally applicable rules for individuals visiting a facility; [230] general price terms or terms governed by third-party or customer demand; [231] authority to cancel a contract, including at will; [232] requirements that employees undergo background checks or drug tests, comply with equal employment opportunity, nondiscrimination, and antiharassment policies, and satisfy licensure requirements; [233] authority to bar certain individuals from the premises or reject particular employees; [234] terms related to an entity's control over its property, premises, or equipment, including training and safety requirements; [235] provisions related to the nondisclosure or confidentiality of trade secrets, proprietary information, or intellectual property; [236] construction project schedule requirements or safety programs or other site-specific requirements for entities visiting marine terminals, railyards, or other supply

---

[212] 87 FR at 54663.

[213] Id. at 54651 (quoting *BFI* v. *NLRB*, 911 F.3d at 1221).

[214] Id.

[215] Id.

[216] See, e.g., comments of General Counsel Abruzzo; IBT. We address cost-plus contract provisions below.

[217] Comments of RILA.

[218] Comments of Escalante Organization; IFDA; RILA; Tesla, Inc.; The Mackinac Center for Public Policy.

[219] Comments of Tesla, Inc.

[220] Comments of IFDA; The Mackinac Center for Public Policy.

[221] Comments of American Hotel & Lodging Association; American Staffing Association; HR Policy Association; RILA; Tesla, Inc.; U.S. Chamber of Commerce; U.S. Small Business Association; U.S. Black Chambers, Inc.

[222] *BFI* v. *NLRB*, 911 F.3d at 1220.

[223] Comments of American Hotel & Lodging Association; CDW; Contractor Management Services, LLC; International Warehouse Logistics Association; SHRM; Tesla, Inc.; The Mackinac Center for Public Policy.

[224] Comments of American Hotel & Lodging Association (citing *Service Employees International Union, Local 32BJ* v. *NLRB*, 647 F.3d 435, 443 (2d Cir. 2011); *Local 254, SEIU*, 324 NLRB 743, 746–749 (1997)); Independent Lubricant Manufacturers Association; Restaurant Law Center and National Restaurant Association; Tesla, Inc.; U.S. Chamber of Commerce.

[225] Comments of American Hotel & Lodging Association.

[226] Comments of American Hotel & Lodging Association; ARTBA; CDW; Energy Marketers of America; SHRM; Tesla, Inc.

[227] Comments of Control Transportation Services, Inc.; Energy Marketers of America; Michael Remick; M. M. Fowler, Inc.; QuickChek; U.S. Chamber of Commerce. Notably, several of these commenters raise observations regarding the timing of deliveries at retail motor fuel locations, arguing that energy marketers often dictate when fuel can be delivered safely. See, e.g., comments of Energy Marketers of America.

[228] Comments of American Hotel & Lodging Association; Home Care Association of America; IFA; Independent Lubricant Manufacturers Association; M. M. Fowler, Inc.; McDonald's USA, LLC; National Association of Convenience Stores; SHRM; U.S. Chamber of Commerce; Yum! Brands.

[229] Comments of American Hotel & Lodging Association; IFA.

[230] Comments of American Hotel & Lodging Association; CDW; Contractor Management Services, LLC; Home Care Association of America; Restaurant Law Center and National Restaurant Association; SHRM.

[231] Comments of Restaurant Law Center and National Restaurant Association; SHRM.

[232] Comments of RILA; SHRM.

[233] Comments of Center for Workplace Compliance; Home Care Association of America; National Retail Federation; RILA; SHRM; U.S. Chamber of Commerce.

[234] Comments of American Hotel & Lodging Association; Energy Marketers of America; Independent Lubricant Manufacturers Association; National Retail Federation; Tesla, Inc.

[235] Comments of SHRM; Tesla, Inc.; U.S. Chamber of Commerce.

[236] Comments of U.S. Chamber of Commerce.

chain hubs;[237] parties' obligations under law or regulations;[238] provisions requiring hospitals to superintend contract employees as part of their patient-care mission;[239] goals related to diversity, equity, inclusion, and access (DEIA), corporate social responsibility (CSR), or environmental, social, and governance (ESG);[240] cost-plus arrangements;[241] minimum compensation requirements as determined by public contracting rules or regulations, including the Davis-Bacon Act, 40 U.S.C. 3141 *et seq.*[242]

Some commenters helpfully responded to the Board's request for comment on this issue by providing sample or actual contractual language that they argue correspond to some of the categories of company-to-company contract provisions listed above.[243] After reviewing the wide range of contract provisions commenters shared with the Board, we are persuaded that the approach taken in the proposed rule, which did not attempt to categorize company-to-company contract provisions ex ante, is the most prudent path forward.[244] Because the language

used in contract provisions that ostensibly address the same subject matter may vary widely, we believe that case-by-case adjudication applying the joint-employer standard is a better approach. To do otherwise might risk problems of both over- and under-inclusion and overlook important context that might be relevant to the Board's analysis.

In addition to contractual provisions, other commenters suggest that the Board modify the proposed rule to recognize certain business practices as aspects of routine company-to-company dealings that are not material to the existence of a common-law employment relationship. For example, several commenters urge the Board to specify that monitoring a third party's performance for the purposes of quality assurance or auditing for compliance with contractual obligations will not be viewed as probative of joint-employer status.[245] A few others urge the Board to clarify that the mere communication of work assignments, delivery times, or other details necessary to perform work under a contract is not material to the joint-employer inquiry if it is not accompanied by other evidence showing a common-law employment relationship.[246] We decline to modify the proposed rule as suggested by these commenters for largely the same reasons we decline to offer an ex ante categorization of company-to-company contract provisions. Given the diversity of business practices these commenters describe, we believe that case-by-case adjudication applying the joint-employer standard will be the soundest approach.

Another group of commenters urge the Board not to provide specific examples of contractual provisions that are immaterial to the existence of a common-law employment relationship, emphasizing that it is very difficult to assess the effect of such provisions absent consideration of the surrounding context.[247] Others take issue with particular examples of company-to-company contractual provisions that other commenters suggest should not be considered material to the existence of a common-law employment relationship.[248] For example, one

commenter notes that, in its experience, provisions authorizing an entity to remove or reject an employee are sometimes used to retaliate against individuals who engage in union and protected concerted activities.[249] One commenter suggests that the Board modify proposed paragraph (f) to clearly identify that decisions made as an exercise of ''entrepreneurial control'' are generally not probative of the existence of a common-law employment relationship.[250] For the same reasons set forth above, we are not inclined to adopt these commenters' suggestions that we specifically categorize contractual provisions or business practices in the final rule. Instead, we are persuaded that it would be most prudent to consider whether certain contractual provisions or business practices are probative of a common-law employment relationship when applying the final rule.

Additionally, some commenters argue that the Board should treat employment relationships in the construction industry in a distinctive manner for purposes of analyzing what forms of control are material to the existence of a common-law employment relationship.[251] While these commenters acknowledge that multiple firms reserve and exercise control over construction jobsites, citing *Denver Building,* supra, 341 U.S. at 689–690, they explain that this shared control is inherent in the industry and should not be probative of joint-employer status.[252] As discussed above, we agree that the Supreme Court's decision in *Denver Building* precludes treating a general contractor as the employer of a subcontractor's employees solely because the general contractor has overall responsibility for overseeing operations on the jobsite. And, absent evidence that a firm possesses or exercises control over particular employees' essential terms and conditions of employment, that firm would not qualify as a joint employer under the standard adopted in this final rule.[253]

---

[237] Comments of ABC; AGC; ARTBA; Trucking Industry Stakeholders. Several commenters identify AIA Document A201–2017, a standard form document setting forth the general conditions for construction projects, and the Federal Acquisition Regulation and other contracting laws and regulations, as important sources of contract terms that memorialize employers' respective duties and obligations on construction jobsites. See comments of AGC. Others point to TSA requirements, marine terminal operators' rules, and the requirements of the Uniform Intermodal Interchange Agreement (UIIA) as playing a role in defining terms and conditions of employment for employees who work at job sites governed by those rules and agreements. See, *e.g.,* comments of AAPA; Trucking Industry Stakeholders.

[238] Comments of ABC; American Trucking Associations; CDW; Center for Workplace Compliance; Home Care Association of America; IFA; Independent Bakers Association; IFDA; NAHB; National Retail Federation; SBA Office of Advocacy; SHRM; Tesla, Inc.; U.S. Chamber of Commerce.

One of these commenters specifically observes that provisions that do no more than memorialize parties' existing obligations to adhere to legally imposed minimum standards should not be material to the existence of a common-law employment relationship. See comments of CDW.

[239] Comments of AHA; Federation of American Hospitals; U.S. Chamber of Commerce.

[240] Comments of Center for Workplace Compliance; CDW; HR Policy Association; IFA; Retail Industry Leaders Association; Tesla, Inc.; U.S. Chamber of Commerce.

[241] Comments of RILA; SHRM; U.S. Chamber of Commerce. However, as noted above, one commenter identified cost-plus contracting as potentially probative of a user employer's indirect control over the wages of a supplier employee. Comments of General Counsel Abruzzo.

[242] Comments of ABC; ARTBA.

[243] Comments of CDW; U.S. Chamber of Commerce.

[244] See *BFI* v. *NLRB,* 911 F.3d at 1221 (''In principle, there is nothing wrong with the Board

fleshing out the operation of a legal test that Congress has delegated to the Board to administer through case-by-case adjudication.'').

[245] Comments of IFA; RILA; SHRM; U.S. Chamber of Commerce.

[246] Comments of National Home Delivery Association; SHRM.

[247] Comments of AFL–CIO; Los Angeles County Federation of Labor AFL–CIO & Locals 396 and 848 of the IBT; State Attorneys General.

[248] Comments of General Counsel Abruzzo; SEIU.

[249] Comments of SEIU.

[250] Comments of AFL–CIO.

[251] Comments of ABC; AGC.

[252] Comments of ABC; AGC. Our dissenting colleague similarly argues that the final rule risks treating general contractors in the construction industry as joint employers on a per se basis.

[253] For this reason, as mentioned above, we reject our dissenting colleague's suggestion that the final rule will disrupt existing relationships and norms on construction sites. As mentioned above, we believe our colleague errs in downplaying the requirement in the final rule that a party asserting that an entity is a joint employer establish that that entity has a common-law employment relationship with particular employees. We are confident that

Others seek recognition of industry-specific business practices that warrant special consideration. A number of commenters raise concerns about whether the proposed rule pays adequate heed to franchisors' need to protect their brands and their trade or service marks.[254] Some of these commenters note that the 2020 rule acknowledged franchisors' needs to maintain brand-recognition standards by providing that control over brands or trademarks is not probative of joint-employer status. The commenters urge the Board to include a similar acknowledgment in the final rule.[255] Relatedly, a number of commenters argue that the proposed rule risks a conflict with federal trademark law, including the Lanham Act, 15 U.S.C. 1051 *et seq.,* and cognate state laws inasmuch as they require franchisors to retain control over their franchisees to protect their brand standards.[256] A bipartisan group of six United States Senators expresses similar concerns regarding the need to protect franchise brands, noting their support for the Trademark Licensing Protection Act of 2022, S.4976.

We are mindful of franchisors' need to protect their brands and their trade or service marks and of the need to accommodate the NLRA with the Lanham Act and federal trademark law more generally. That said, we view the likelihood of conflict as minimal under the standard adopted in this final rule. Many common steps franchisors take to protect their brands have no connection to essential terms and conditions of employment and therefore are immaterial to the existence of a common-law employment relationship. While we are not inclined to categorically state that all forms of control aimed at protecting a brand are immaterial to the existence of a common-law employment relationship, we stress that many forms of control that franchisors reserve to protect their brands or trade or service marks (like those dealing with logos, store design or décor, or product uniformity) will typically not be indicative of a common-law employment relationship.[257] Further, by making the list of "essential terms and conditions of employment" in the final rule exhaustive, we also aim to respond to the substance of these commenters' concerns by offering clearer guidance to franchisors about the forms of control that the Board will find relevant to a joint-employer inquiry.

Another commenter urges the Board to state that making a payment as part of a contract to provide payroll services is not sufficient to demonstrate control over wages sufficient to support a joint-employer finding.[258] One commenter argues that the proposed rule should clarify that, for joint-employer purposes, motor carriers are the customers, not employees or contractors, of marine terminals.[259] As set forth above, we are not inclined to modify the text of the final rule to specifically address these situations. However, we hope that we have satisfied these commenters' desires for greater clarity regarding their obligations by describing our view of the forms of control that will be relevant to the joint-employer inquiry and by cabining the list of essential terms and conditions of employment that the Board will treat as material to the existence of a common-law employment relationship.

Some commenters argue that because decisions to modify or terminate joint employment relationships are entrepreneurial decisions between businesses, they are not susceptible to decisional bargaining under *First National Maintenance Corp.* v. *NLRB,* 452 U.S. 666 (1981).[260] Other commenters note that a range of other company-to-company contracting practices would not be subject to bargaining under *First National Maintenance* and its progeny and should therefore not be considered probative of joint-employer status.[261]

As discussed above, the Board has determined to modify the final rule to clarify the nature of joint employers' bargaining obligations. The final rule explains that, once an entity is found to be a joint employer because it shares or codetermines matters governing one or more of particular employees' essential terms or conditions of employment, it is obligated to bargain over any mandatory subjects of bargaining it possesses or exercises the authority to control. As some commenters helpfully note, the Supreme Court has held that core entrepreneurial decisions "involving a change in the scope and direction of the enterprise" are not mandatory subjects of bargaining.[262] In applying the final rule, we will adhere to this binding precedent when determining the scope of joint employers' bargaining obligation.

### G. Comments About the "Meaningful Collective Bargaining" Step of the Board's 2015 Browning-Ferris Decision

Several commenters urge the Board to modify the text of the proposed rule to incorporate the "meaningful collective bargaining" step of the Board's 2015 *BFI* decision or to otherwise embrace that portion of the *BFI* analysis.[263] Others, including our dissenting colleague, take the position that the Board's proposal should be withdrawn or modified in some other manner, as the proposed rule fails to cast light on questions the District of Columbia Circuit raised regarding "once control is found, who is exercising that control, when, and how." [264] Some commenters specifically suggest that using a nonexhaustive list of "essential terms and conditions of

---

this threshold requirement will ensure the Board's analysis of whether an entity is a joint employer when it applies the rule is appropriately focused. Further, to the extent that our rule proposed on language in *Denver Building* indicating that a general contractor's "supervision over the subcontractor's work" precludes a joint-employer finding, 341 U.S. at 689–690, we respectfully disagree with his interpretation. *Denver Building* was a case involving Sec. 8(b)(4) of the Act, not the joint-employer standard, and it did not address whether the general contractor possessed or exercised control over particular employees' essential terms and conditions of employment, whether by supervising their work or otherwise. Instead, the case focused on the general contractor's supervision of the project as a whole.

[254] Comments of IFA; McDonald's USA, LLC; Restaurant Law Center and National Restaurant Association; U.S. Chamber of Commerce; Yum! Brands. Our dissenting colleague also expresses concern about how the proposed rule will affect franchise businesses.

[255] Comments of IFA.

[256] Comments of IFA; U.S. Chamber of Commerce; Yum! Brands.

[257] In this regard, we also note that such matters are unlikely to constitute mandatory subjects of bargaining. See *First National Maintenance Corp.* v. *NLRB,* above, 452 U.S. at 676–677 ("Some management decisions, such as choice of advertising and promotion, product type and design, and financing arrangements, have only an indirect and attenuated impact on the employment relationship.").

[258] Comments of Subcontracting Concepts, LLC.

[259] Comments of American Association of Port Authorities.

[260] Comments of RILA; SHRM; Tesla, Inc. These commenters acknowledge the possible need for effects bargaining in these circumstances but urge the Board to require such bargaining to occur on an expedited basis. See id.

Another commenter also cites *Plumbers Local No. 447,* 172 NLRB 128 (1968) ("*Malbaff*") for the proposition that an employer should not have a bargaining obligation under Sec. 8(a)(5) before terminating its relationship with a subcontractor or other business entity, which is not a violation of Sec. 8(a)(3). Comments of COLLE.

[261] Comments of General Counsel Abruzzo.

[262] *First National Maintenance,* 452 U.S. at 677.

[263] Comments of AGC; AHA; American Staffing Association; Americans for Tax Reform; Freedom Foundation; IFA; International Foodservice Distributors Association; NAM; National Retail Federation; National Waste & Recycling Association; Subcontracting Concepts, LLC; Thomas Jefferson Institute for Public Policy; U.S. Chamber of Commerce.

[264] 911 F.3d at 1215. See comments of Americans for Prosperity Foundation; Independent Bakers Association; Modern Economy Project; National Association of Convenience Stores; National Waste & Recycling Association; North American Meat Institute; SHRM; Subcontracting Concepts, LLC; The Thomas Jefferson Institute for Public Policy; U.S. Chamber of Commerce.

employment'' is problematic without a limiting principle akin to the ''meaningful collective bargaining'' step of *BFI* or some other ''guardrails.'' [265]

Similarly, a group of commenters urge the Board to include in the final rule text a statement that encapsulates or describes a joint employer's duty to bargain.[266] Some of these commenters suggest that the Board state that if a putative joint employer does not have at least ''co-control'' over the range of potential outcomes regarding an essential term or condition of employment, it is not required to bargain over that subject.[267] Some of these commenters encourage the Board to modify the rule text to incorporate a principle that appeared in the preamble to the proposed rule about the scope of a joint employer's bargaining obligation.[268] A few commenters ask the Board to clarify that a joint employer does not have a bargaining obligation except as to matters that are divisible and limited to those employees represented by the union.[269]

Other commenters contend that, by making a common-law employment relationship the prerequisite to a joint-employer finding, the proposed rule contains adequate limits, as the Board will not find that entities with insufficient control over essential terms and conditions of employment are joint employers.[270] These commenters take the position that there is no need to incorporate the ''meaningful collective bargaining'' step of *BFI* in the final rule.[271]

After carefully considering the comments raising concerns about the need for a limiting principle to ensure that the appropriate parties are brought within the ambit of the Board's joint-employer standard, we have decided to modify the definition of ''essential terms and conditions of employment'' in the

final rule, as described above. As several commenters observe, limiting the list of essential terms and conditions of employment is responsive to the District of Columbia Circuit's request that the Board incorporate a limiting principle to ensure the joint-employer standard remains within common-law boundaries.[272] By clearly identifying and limiting the list of essential terms and conditions of employment that an entity may be deemed a joint employer if it possesses the authority to control or exercises the power to control, the final rule responds to these criticisms and helps provide clear guidance and a more predictable standard to parties covered by the Act. Moreover, because all of the essential terms and conditions of employment as defined by the final rule involve matters that lie at the core of workplace issues appropriate for collective bargaining, a joint employer's control over any of these matters ensures that there is a basis for meaningful collective bargaining over at least the essential term or condition that is subject to that employer's control.[273]

## H. Comments About Independent-Contractor Precedent

The proposed rule cites certain common-law agency decisions that apply independent-contractor precedent. Some commenters appear to approve of the Board's reliance on these cases and cite independent-contractor precedent in support of their own arguments.[274] Other commenters and our dissenting colleague criticize the proposed rule's reliance on precedent

geared toward distinguishing between statutory employees and independent contractors.[275] These commenters, citing the District of Columbia Circuit's decision in *BFI* v. *NLRB*, 911 F.3d at 1213–1214, argue that the common-law independent-contractor standard and joint-employer standard are different. In particular, these commenters and our dissenting colleague urge that the joint-employer standard requires an analysis of ''*who* is exercising . . . control, *when*, and *how*.'' [276] Other commenters, also citing the District of Columbia Circuit's *BFI* decision, answer that independent-contractor cases ''can still be instructive in the joint-employer inquiry'' to the extent that they speak to the common law's view of employment relationships.[277]

As discussed in more detail above, while we do not quarrel with commenters' and our dissenting colleague's observation that the common-law independent-contractor standard and joint-employer standard are distinct, we do not agree that the differences between the standards preclude us from relying on precedent from the independent-contractor context, inasmuch as that precedent illuminates the common law's view of control, which is common to both inquiries. As a result, while we are mindful of the need to carefully distinguish between independent-contractor and joint-employer precedent, we believe it is appropriate to continue treating independent-contractor cases as relevant where they speak about ''the nature and extent of control necessary to establish a common-law employment relationship.'' [278]

## I. Burden of Establishing Joint-Employer Status

Proposed paragraph (g) provides that the party asserting joint-employer status has the burden of proving, by a preponderance of the evidence, that a putative joint employer satisfies the requirements of proposed paragraphs (a) through (f).[279]

No commenter argues that the Board should allocate the burden differently than suggested in proposed paragraph (g). And no party argues that the Board should omit proposed paragraph (g) from the final rule. Several commenters state that the proposed rule's articulation of the burden of proof does

---

[265] Comments of CDW; COLLE; National Association of Convenience Stores; National Retail Federation; U.S. Chamber of Commerce.

[266] See, *e.g.*, comments of American Staffing Association; SHRM.

[267] Comments of RILA; SHRM.

[268] Comments of American Staffing Association; SEIU; SHRM; U.S. Chamber of Commerce. As mentioned previously, the NPRM provided in supplementary information that the proposed rule would only require a putative joint employer to bargain over those essential terms and conditions of employment it possesses the authority to control or over which it exercises the power to control. 87 FR at 54645 fn. 26.

[269] Comments of RILA; SHRM (citing *Emporium Capwell Co.* v. *Western Addition Community Organization*, 420 U.S. 50, 64 (1975) for the proposition that the process and outcome of collective bargaining cannot lawfully be imposed on employees who have not chosen union representation).

[270] Comments of AFL–CIO; SEIU.

[271] Comments of General Counsel Abruzzo; SEIU.

[272] Comments of National Retail Federation.

[273] We note that the second element of the Board's *Browning-Ferris* analysis, the inquiry into ''whether the putative joint employer possesses sufficient control over employees' essential terms and conditions of employment to permit meaningful collective bargaining,'' is self-imposed. *BFI*, 362 NLRB at 1600; see *BFI* v. *NLRB*, 911 F.3d at 1205 (noting that in *Browning-Ferris*, ''the Board *announced for the first time* that it would subdivide the inquiry . . . '') (emphasis added). It is neither a requirement under the common law or agency nor under the Act. As our dissenting colleague concedes, ''[a]bsent any rule whatsoever, joint-employer status would be determined through case-by-case adjudication applying the common law of agency.'' Accordingly, although we are not required to incorporate the ''meaningful collective bargaining'' step of the Board's 2015 *BFI* decision in our current articulation of the joint-employer standard, we nevertheless find that § 103.40(c) of the final rule, providing for an examination of whether the character and objects of a purported employer's control extend to essential terms and conditions of employment within the specific context of the Act, amply satisfies the District of Columbia Circuit's instructions that the Board, on remand, ''explain which terms and conditions are 'essential' to permit 'meaningful collective bargaining,' '' and what such bargaining ''entails and how it works in this setting.'' Id. at 1221–1222 (quoting *BFI*, 362 NLRB at 1600).

[274] See, *e.g.*, comments of RILA.

[275] Comments of North American Meat Institute.

[276] Id. (quoting *BFI* v. *NLRB*, 911 F.3d at 1215 (emphasis in original)).

[277] Comments of State Attorneys General (quoting *BFI* v. *NLRB*, 911 F.3d at 1215).

[278] *BFI*, 911 F.3d at 1215.

[279] 87 FR 54663.

not provide sufficient guidance as to how a party can successfully carry its burden.[280] Some of them suggest that the Board clarify what kind or amount of evidence a party asserting joint-employer status must put forward to meet its burden.[281]

The final rule incorporates the assignment of the burden of proof from paragraph (g). While some commenters urge the Board to clarify how a party asserting joint-employer status can successfully carry its burden in the rule text itself, we find it unnecessary to do so in light of the final rule's statement that the burden must be satisfied on the basis of a preponderance of the evidence. This familiar evidentiary threshold is embodied in the Act itself,[282] has been endorsed by the Supreme Court in similar administrative proceedings,[283] and should satisfy the commenters' desire for guidance regarding the amount of evidence necessary to carry the burden. While these commenters also express a desire for guidance regarding what kinds or types of evidence will be probative of joint-employer status, because we have addressed this question at length in the preceding discussion, we do not find it necessary to modify the proposed rule's treatment of the burden of proof or otherwise alter the text of the final rule in response to these comments.

*J. Severability*

Proposed paragraph (h) set forth the Board's preliminary view that the provisions of the joint-employer rule should be treated as severable.[284] Proposed paragraph (h) explains that "[i]f any paragraph of this section is held to be unlawful, the remaining paragraphs of this section not deemed unlawful shall remain in effect to the fullest extent permitted by law." [285]

The Board specifically invited commenters to address severability, and

several took the opportunity to do so. No commenter suggests that the Board should not generally treat the provisions of the proposed rule as severable. Several commenters agree with the Board's preliminary view of the severability of the provisions of the proposed rule.[286] One commenter takes the view that proposed paragraphs (a) through (c) are interconnected and cannot be severed from one another but that proposed paragraphs (d), (e), (f), and (g) are fully severable.[287] Another commenter agrees that proposed paragraphs (a), (b), and (c) are logically intertwined and so would not be severable from one another.[288] Another group of commenters suggested that the Board promulgate a separate rescission of the 2020 rule and new rule setting forth a new joint-employer standard.[289]

The final rule includes a severability provision modeled after proposed paragraph (i). Paragraph (i) recites that: the "provisions of this section are intended to be severable" and that "[i]f any paragraph of this section is held to be unlawful, the remaining paragraphs and subparagraphs of this section not deemed unlawful are intended to remain in effect to the fullest extent permitted by law." As explained below, while the Board believes that the final rule in its entirety is consistent with the National Labor Relations Act and promotes its policies, the Board would adopt the separate portions of the final rule independently, were some other portion or portions held to be invalid.

We note that some commenters urge the Board to make clear that the rescission of the 2020 rule and the promulgation of the final rule's joint-employer standard are intended as separate actions and make a specific finding that the Board views these two actions as severable.[290] The Board's intention is that the two actions be treated as separate and severable. In the Board's view, the 2020 rule is contrary to common-law agency principles and therefore inconsistent with the Act. The Board thus believes it is required to rescind the 2020 rule, as it does today.

Even if the 2020 rule were consistent with the Act, the Board would still choose to rescind that rule as failing to fully promote the policies of the Act.

The Board's decision to rescind the 2020 rule is intended to be independent of its promulgation of a new final rule today. If the final rule promulgated here were deemed invalid, the Board would nevertheless adhere to its decision to rescind the 2020 rule. In that event, the Board's view is that the joint-employer standard would revert to the joint-employer standard established in *Browning-Ferris Industries of California, Inc., d/b/a BFI Newby Island Recyclery,* 362 NLRB 1599 (2015), which immediately preceded the 2020 rule, unless and until that standard were revised through adjudication. In *NLRB* v. *Bell Aerospace Co.,* the Supreme Court recognized the Board's authority, in the first instance, to determine whether to engage in policymaking through rulemaking or adjudication.[291] Consistent with this authority, the Board will proceed to determine joint-employer issues through adjudication, rather than rulemaking, should a draft reviewing court (1) find that the draft rule properly rescinds the 2020 rule, but (2) proceeds to invalidate the new joint-employer standard.[292]

*K. Other Policy and Procedural Arguments* [293]

The proposed rule set forth the Board's preliminary view that

---

[280] Comments of SHRM; Tesla, Inc. As discussed below, some of these commenters argue that the proposed rule's failure to more clearly describe how a party can carry its burden means the rule should also fail on the basis of the Administrative Procedure Act (APA), 5 U.S.C. 551 *et seq.* See, *e.g.,* comments of Tesla, Inc. Other commenters approve of the proposed rule's discussion of the burden of proof, noting that the APA requires the Board to assign the burden of proof in the manner proposed. See, *e.g.,* comments of Freedom Foundation; UNITE HERE. We discuss these contentions separately below.

[281] Comments of RILA; SHRM. One commenter makes the related suggestion that the Board clarify that a putative joint employer exercises the requisite level of control if it is in a position to "influence the primary employer's labor policies." Comments of IBT.

[282] 29 U.S.C. 10(c).

[283] *Steadman* v. *SEC,* 450 U.S. 91, 101 (1981).

[284] 87 FR at 54663.

[285] Id.

[286] Comments of AFL–CIO; General Counsel Abruzzo; CWA; SEIU; State Attorneys General; UNITE HERE.

[287] Comments of General Counsel Abruzzo.

[288] Comments of State Attorneys General. This commenter further observes that if paragraphs using the term "essential terms and conditions of employment" were stricken, proposed subparagraph (d) would be unnecessary. Id.

[289] Comments of CWA; SEIU. These commenters also suggest that if the Board is inclined to issue the rescission and the new standard in one document, the Board should make clear that these are separate actions and intended to be severable. Id.

[290] See, *e.g.,* comments of AFL–CIO; CWA; SEIU.

[291] 416 U.S. 267, 294 (1974).

[292] The Board recognizes that there are certain outstanding issues regarding the standard for determining joint employers under the Act following the District of Columbia Circuit's remand, as discussed above at fn. 5. The Board will resolve these issues through adjudication as presented in cases not governed by an applicable rule, including cases that arose before the effective date of the 2020 rule.

[293] Two commenters express concerns regarding the participation of Member Wilcox and Member Prouty in this rulemaking proceeding, suggesting that their submission of comments opposing the 2020 Rule while they were in private practice creates, at a minimum, the appearance of a conflict of interest. See comments of IFA; U.S. Chamber of Commerce. Members Wilcox and Prouty reject this challenge. Relevant precedent regarding decisionmakers' participation in rulemaking proceedings confirms that "an individual should be disqualified from rulemaking only when there has been a clear and convincing showing" that the official "has an unalterably closed mind on matters critical to the disposition of the proceeding." *Air Transportation Ass'n of America, Inc.* v. *NMB,* 663 F.3d 476, 487 (D.C. Cir. 2011) (quoting *C & W Fish Co.* v. *Fox,* 931 F.2d 1556, 1564 (D.C. Cir. 1991)). Members Wilcox and Prouty find that these commenters' general and speculative suggestions fall short of the clear and convincing showing that either Member Wilcox or Member Prouty "has an unalterably closed mind" on matters relevant to this rulemaking proceeding, as the law requires. Id. Further, although the commenters do not specifically argue that the participation of Member

Continued

grounding the joint-employer standard in common-law agency principles would serve the policies and purposes of the Act, including the statement in Section 1 of the Act that one of the key purposes of the Act is to ''encourage the practice and procedure of collective bargaining.'' 29 U.S.C. 151. Several commenters specifically note their approval of the Board's view that the proposed rule will better serve the policies of the Act than did the 2020 rule, with several specifically citing Section 1 of the Act as providing support for the proposed rule.[294] Notably, several commenters writing on behalf of Senators and Members of Congress agree that the proposed rule would further Congressional intent and advance the purposes of the Act.[295] Others argue that the proposed joint-employer standard will advance the Act's purpose of eliminating disruptions to interstate commerce by increasing the possibility that effective collective bargaining will forestall strikes or other labor disputes.[296]

A number of commenters contend that the proposed rule is at odds with the Act because it exceeds the boundaries of the common law.[297] Others argue that the proposed rule threatens to delay employees' remedies because of the need for extensive litigation over joint-employer issues or to otherwise undermine the effective enforcement of other provisions of the Act.[298] A few commenters argue that adopting a broader joint-employer standard increases the risk of enmeshing

entities as primary employers in what would otherwise be secondary labor disputes.[299] Some of these commenters specifically urge that the proposed rule could stand in the way of the effective enforcement of portions of the Act that deal specifically with the building and construction industry.[300]

Some commenters disagree that the Act is intended to encourage the practice and procedure of collective bargaining.[301] Others, including our dissenting colleague, agree that encouraging the practice and procedure of collective bargaining is a central goal of the Act but disagree with the Board's view that the proposed rule is appropriately tailored to serve that goal or that the proposed rule is likely to ''achiev[e] industrial peace by promoting stable collective-bargaining relationships.'' [302] Certain of these commenters observe that the proposed joint-employer standard may make it harder for the Board to make appropriate bargaining-unit determinations or protect bargaining-unit boundaries.[303]

Other commenters observe that because the joint-employer standard will only be applied to entities that are

found to possess or exercise control over employees' essential terms and conditions of employment, there is no serious risk that the proposed rule would have the effect of enmeshing neutral parties in labor disputes.[304] One commenter adds that employees in industries characterized by pervasive contracting are sometimes hesitant to engage in collective action or exercise their Section 7 rights for fear of inadvertently violating the provisions of Section 8(b)(4) of the Act, 29 U.S.C. 158(d)(4).[305]

As we preliminarily expressed in our NPRM, we are persuaded that rescinding the 2020 Rule is a necessary step toward effectuating the policies of the Act. By unduly narrowing the definition of ''joint employer,'' the 2020 Rule undermined the Act's protections for employees who work in settings where multiple firms possess or exercise control over their essential terms or conditions of employment. We believe that, consistent with the common-law agency principles that must guide the Board in this area, it advances the Act's purposes to ensure that, if they choose, all employees have the opportunity to bargain with those entities that possess the authority to control or exercise the power to control the essential conditions of their working lives. In this regard, we view the joint-employer standard adopted in this final rule as an important effort to ensure the uniform enforcement of the Act in all industries. And, as many commenters represent, our revised standard may particularly benefit vulnerable employees who are overrepresented in workplaces where multiple firms possess or exercise control, including immigrants and migrant guestworkers, disabled employees, and Black employees and other employees of color.

We also wish to address comments we received regarding the interaction between the joint-employer standard and the Act's prohibitions on secondary activity. As one commenter mentioned, the 2020 rule may have risked chilling employees' willingness to exercise their statutory rights for fear of inadvertently running afoul of the prohibitions on secondary activity set out in Section 8(b)(4) of the Act.[306] We hope that the standard adopted in the final rule will provide the necessary clarity to ensure that employees do not fear engaging in protected concerted activity or raising workplace concerns with any entities

---

Wilcox or Member Prouty in this rulemaking proceeding would violate Executive Order 13989 (Jan. 20, 2021) (the Biden Ethics Pledge), to the extent their argument about an appearance of a conflict of interest is rooted in the Ethics Pledge, Members Wilcox and Prouty reject it because this rulemaking is not a ''particular matter involving specific parties that is directly and substantially related to'' Member Wilcox or Member Prouty's former employers or former clients within the meaning of the Executive Order. They further note that one commenter shares their view, stating that the instant rulemaking ''lacks even the appearance of a conflict of interest.'' Comments of Congressman Scott, et al.

[294] Comments of AFSCME; CAP; CWA; EPI; General Counsel Abruzzo; Lawyers' Committee for Civil Rights Under Law; Los Angeles County Federation of Labor AFL–CIO & Locals 396 and 848 of the IBT; McGann, Ketterman & Rioux; Michigan Regional Council of Carpenters and Millwrights; National Women's Law Center; NELP; State Attorneys General; UBC; UE.

[295] Comments of Senator Murray et al.; Congressman Scott et al. One of these commenters makes the further observation that the proposed rule would better comport with the United States' obligations under international law. See comments of Congressman Scott et al.

[296] Comments of General Counsel Abruzzo; SEIU.

[297] Comments of RILA; Texas Public Policy Foundation.

[298] Comments of McDonald's USA, LLC; North American Meat Institute; RILA.

[299] Comments of Center for Workplace Compliance; COLLE; Home Care Association of America; National Waste & Recycling Association; RILA. Our dissenting colleague likewise argues that the final rule will undermine the enforcement of Sec. 8(b)(4) of the Act.

[300] Comments of ABC; AGC.

[301] Comments of Competitive Enterprise Institute. This commenter argues that the purpose of the Act is narrower: to encourage collective bargaining, but only in those instances where ''certain substantial obstructions'' to interstate commerce ''have occurred'' already. Id. (quoting 29 U.S.C. 151).

We disagree with this commenter's suggestion that a strike or other labor dispute must have already occurred for the Act's policy favoring collective bargaining to come into play. We find support for the broader view of the Act's purposes in Sec. 7, 8, and 9 of the Act, which, respectively: set forth employees' rights to ''self-organization, to form, join, or assist labor organizations, [and] to bargain collectively through representatives of their own choosing,'' 29 U.S.C. 157; make it an unfair labor practice for an employer to refuse to bargain collectively with representatives designated or selected by employees, id. 158(a)(5), 158(d), & 159(a)(5); and direct the Board to conduct representation elections upon the filing of a petition supported by a substantial number of employees who wish to be represented for the purposes of collective bargaining, id. 159. None of these sections states or implies that a labor dispute or strike is a precondition to any of these rights or duties.

[302] *Auciello Iron Works, Inc.* v. NLRB, 517 U.S. 781, 790 (1996). See comments of CDW; COLLE; HR Policy Association; IFDA; Libertas Institute; National Waste & Recycling Association; RILA; Trucking Industry Stakeholders. Because many of these commenters advance empirical arguments or discuss their experience with bargaining when multiple firms are involved, we discuss these comments at greater length below.

[303] Comments of Home Care Association of America; SHRM.

[304] Comments of General Counsel Abruzzo.

[305] Comments of Los Angeles County Federation of Labor AFL–CIO & Locals 396 and 848 of the IBT; UE.

[306] 29 U.S.C. 158(b)(4).

that possess or exercise control over their essential terms and conditions of employment. Of course, we will continue to vigorously enforce the Act's prohibitions on secondary activity in situations where multiple firms do not share or codetermine those matters governing particular employees' essential terms and conditions of employment.[307]

Certain commenters raise arguments regarding whether the proposed rule meets the requirements of the Constitution or the Administrative Procedure Act (APA), 5 U.S.C. 551 *et seq.* Some commenters suggest that, pursuant to the major-questions doctrine, as summarized in *West Virginia* v. *EPA,* 597 U.S. ___, 2022 U.S. LEXIS 3268 (2022), the Board should "hesitate before concluding that Congress" conferred authority on it to define "joint employer" because of the concept's "economic and political significance."[308]

Other commenters argue that the major-questions doctrine does not present an obstacle to the current rulemaking effort.[309] One commenter notes that, since the earliest days of the Act, the Board has, with Supreme Court and other reviewing courts' approval, applied the Act to cover joint-employment relationships, eliminating any doubt that Congress intended for the ambit of the Act to extend to joint employers.[310]

Based on the Board's long history of analyzing joint-employment relationships and regulating entities it finds to be joint employers, we find that the major-questions doctrine does not foreclose our decision to put forward a new interpretation of the definition of "employer" in Section 2(2) of the Act. Not only has the Board historically defined "joint employer" through case-by-case adjudication, section 6 of the Act provides clear authority to the Board to promulgate rules to "carry out the provisions of [the] Act." 29 U.S.C. 156. We therefore see no constitutional impediment to continuing the Board's decades-long effort to clarify and refine its joint-employer standard.

A group of commenters argue that the proposed rule is arbitrary and capricious because it does not sufficiently analyze why the standard set forth in the 2020 rule was inadequate or because it fails to provide adequate guidance.[311] Some of these commenters, quoting *Motor Vehicle Manufacturers Association of the United States, Inc.* v. *State Farm Automobile Insurance Co.,* 463 U.S. 29, 43 (1983), contend that the Board has either "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[312] Our dissenting colleague similarly criticizes the majority for failing to justify its departure from the 2020 rule and for providing insufficient guidance to regulated parties.

Some commenters suggest that the proposed rule will lead to excessive litigation of joint-employer issues,[313] potentially diminishing the value of proceeding through rulemaking and suggesting that case-by-case adjudication might be a better approach. Some commenters who are generally supportive of the proposed rule's approach to the joint-employer inquiry also express reservations about the proposal to promulgate a new standard through rulemaking.[314]

Some commenters criticize the Board for abandoning the 2020 rule prematurely, arguing that because the Board had not yet had occasion to apply the rule, the Board cannot find fault with it and should not rescind it.[315] A few commenters suggest that the Board should await federal court review of the 2020 rule before rescinding it or consider other alternatives before proceeding further.[316] Certain

---

[307] Contrary to our dissenting colleague, we see little risk of enmeshing neutral employers in labor disputes. When more than one entity jointly employs particular employees, those entities are not neutral, and the prohibitions on secondary activity do not apply, regardless of what joint-employer standard is applied.

[308] Comments of ABC; CDW; COLLE; IFA; Independent Bakers Association; International Warehouse Logistics Association; RILA; U.S. Chamber of Commerce.

Several of these commenters also advance an argument based on the nondelegation doctrine. See comments of COLLE; IFA. One such commenter specifically argues that Sec. 6 of the Act does not delegate sufficiently clear authority to the Board to define "joint employer" for purposes of the Act. See comments of IFA. As discussed in Section III above, we are confident that the Board has authority to "carry out" the many provisions of the Act that are affected by how the Board defines "joint employer" through rulemaking. The Supreme Court has never cast doubt on the breadth of the Board's rulemaking authority. Instead, it has repeatedly endorsed the Board's use of rulemaking as a policymaking tool, including in contexts involving the scope and nature of bargaining obligations. See, *e.g., American Hospital Assn.* v. *NLRB,* 499 U.S. 606 (1991).

[309] Comments of CWA; UNITE HERE; reply comments of AFL–CIO.

[310] Comments of AFL–CIO (citing *Boire* v. *Greyhound Corp.,* 376 U.S. 473, 481 (1964)); *Long Lake Lumber Co.,* 34 NLRB 700, 717 (1941), enfd. *NLRB* v. *Long Lake Lumber Co.,* 138 F.2d 363 (9th Cir. 1943); *Franklin Simon & Co.,* 94 NLRB 576, 579 (1951)).

[311] Comments of ABC; CDW; COLLE; IFA; IFDA; International Bankshares Corporation; National Association of Convenience Stores; North American Meat Institute; Restaurant Law Center and National Restaurant Association; U.S. Chamber of Commerce.

Several commenters make the specific observation that the proposed rule is arbitrary because it does not impose an express requirement that joint-employer status be proven by "substantial evidence." See comments of CDW; RILA; SHRM; Tesla, Inc. As discussed above, we reject the view that the proposed rule failed to impose a "substantial evidence" obligation or was otherwise arbitrary. These commenters, effectively reading discrete subparagraphs of the proposed rule in isolation, suggest that "any evidence" of control will be sufficient to establish status as a joint employer under the proposed rule. However, as discussed more fully above, this view overlooks the proposed rule's allocation of the burden of proof and requirement that a party asserting joint-employer status must demonstrate that an entity is a joint employer by a "preponderance of the evidence."

Another commenter urges that the Board's statements in the preamble to the proposed rule regarding the importance of workplace health and safety during the Covid-19 pandemic are unsupported and therefore render the inclusion of health and safety as an essential term or condition of employment, and implicitly the rule as a whole, arbitrary and capricious. See comments of North American Meat Institute. As addressed extensively in our discussion of essential terms and conditions of employment above and in our discussion of the final rule below, the Board has benefited from the input of stakeholders and organizations that confirmed the Board's preliminary views that workplace health and safety should be treated as an essential term or condition of employment and that the Covid-19 pandemic exacerbated certain employees' health and safety concerns at work. We therefore reject this commenter's view that it was arbitrary or capricious for the Board to take these significant real-world developments into account when considering how to modify its approach to defining "joint employer."

[312] Comments of COLLE; Independent Bakers Association; U.S. Chamber of Commerce.

[313] Comments of American Hospital Association; American Staffing Association; Bicameral Congressional Signatories; Center for Workplace Compliance; HR Policy Association; IFA; International Bancshares Corporation; McDonald's USA, LLC; Modern Economy Project; North American Meat Institute; The Mackinac Center for Public Policy.

[314] Comments of AFL–CIO; IUOE; United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry; United Steelworkers.

[315] Comments of COLLE; Elizabeth Boynton; FreedomWorks Foundation; Goldwater Institute; Job Creators Network Foundation; National Association of Convenience Stores; North American Meat Institute; The Thomas Jefferson Institute for Public Policy; U.S. Chamber of Commerce; Wyoming Bankers Association. We note that in the time since the comment period closed, the Board has applied the 2020 rule. See *Cognizant Technology Solutions U.S. Corp. & Google LLC,* 372 NLRB No. 108 (2023).

[316] Comments of Bicameral Congressional Signatories; Bipartisan Senators; CDW; IFA; Independent Bakers Association; U.S. Chamber of Commerce.

Some commenters suggest that there is no need to promulgate a new joint-employer standard through rulemaking if the Board's goal is to return to the preexisting common-law standard. See, *e.g.,* comments of CDW; IFA. As described above, while we believe the final rule is firmly grounded in common-law agency principles, we see a

Continued

commenters point to reliance interests related to the 2020 rule, with some suggesting that the Board delay the effective date of the final rule to accommodate these concerns.[317] For example, one commenter states that many staffing agencies entered into contracts using the 2020 rule as their guide.[318] Others question whether any material legal or factual change has occurred since the 2020 rule was promulgated that would justify the proposed changes to the joint-employer standard or otherwise suggest that the proposed rule failed to offer a reasoned explanation for a policy change.[319] A significant number of these commenters propose that the Board withdraw the proposed rule entirely and leave the 2020 rule intact.[320] Some of these

<hr>

determinate advantage in replacing the 2020 rule with a new standard that, like it, provides a definite and readily available standard. We note that by modifying the final rule to provide for an exhaustive list of essential terms and conditions of employment, we also introduce a new limiting principle that was not a feature of the Board's joint-employer doctrine, which is responsive to one of these commenter's core concerns regarding the proposed rule. See comments of IFA. Announcing this new limiting principle therefore provides another justification for promulgating a new rule rather than simply rescinding the 2020 rule.

[317] Comments of Costa Enterprises; IFA; McDonald's USA, LLC; New Civil Liberties Alliance & Institute for the American Worker; Restaurant Law Center and National Restaurant Association; Texas Public Policy Foundation; U.S. Chamber of Commerce; Yum! Brands. Certain of these commenters do not specifically identify reliance interests related to the 2020 Rule, but instead more generally suggest they structured their businesses in reliance on Board law prior to *BFI*. See, *e.g.*, comments of Costa Enterprises; McDonald's USA, LLC. With respect to the request to delay the effective date of the final rule, we note that, as some other commenters urge, see, *e.g.*, comments of the U.S. Chamber of Commerce, the rule is subject to Congressional review and that, as a result, the effective date will await the culmination of that process.

[318] See comments of Texas Public Policy Foundation.

[319] Comments of California Policy Center; COLLE; Empire Center for Public Policy; North American Meat Institute; Subcontracting Concepts, LLC; U.S. Chamber of Commerce; Wyoming Bankers Association.

[320] Comments of ABC; AGC; American Hotel & Lodging Association; Americans for Fair Treatment; Americans for Prosperity Foundation; American Staffing Association; ANB Bank; Bicameral Congressional Signatories; CDW; Center for Workplace Compliance; COLLE; Competitive Enterprise Institute; HR Policy Association; Home Care Association of America; IFA; IFDA; Independent Electrical Contractors; Independent Women's Forum; International Bancshares Corporation; International Warehouse Logistics Association; LeadingAge; McDonald's USA, LLC; Modern Economy Project; NAHB; NAM; NATSO & SIGMA; National ACE; National Alliance for Public Charter Schools; National Association of Convenience Stores; National Waste & Recycling Association; NFIB; Pacific Legal Foundation; Restaurant Law Center and National Restaurant Association; RILA; Rio Grande Foundation; Senator James M. Inhofe; Taxpayers Protection Alliance; Texas Public Policy Foundation; The Mackinac

commenters suggest, in the alternative, that the Board solely rescind the 2020 rule.[321]

Other commenters, citing *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), observe that the Board is permitted to advance new interpretations of the Act so long as it demonstrates good reasons for its new policy.[322] One commenter argues that any reliance interests associated with the 2020 rule must be highly attenuated, given that the Rule has not yet been applied and because the NPRM put the public on notice that the Board was considering rescinding and/or replacing the 2020 rule.[323]

First, we reject the argument that it is premature to rescind the 2020 rule or to promulgate a new joint-employer standard. As noted above, so long as the Board sets forth good reasons for its new policy and sets forth a reasoned explanation for the change, Supreme Court precedent permits the Board to offer new interpretations of the Act.[324] We have done so throughout our discussion of our justifications for rescinding the 2020 rule and promulgating a new standard. In addition, as one commenter points out,[325] the APA does not impose any requirement that an agency apply a rule prior to replacing it, provided that the agency otherwise identifies problems with the rule and explains why it resolves the issue in the manner it does. Another commenter notes that the 2020 rule is likewise vulnerable on APA grounds, as its definition of "joint employer" is "not in accordance with law." [326]

Next, while some commenters encourage the Board to await judicial review of the 2020 rule before taking further action, we remain of the view that the 2020 rule introduced control-based restrictions that are inconsistent with common-law agency principles, as reflected in the District of Columbia Circuit's statements in *BFI* v. *NLRB*, 911 F.3d at 1211–1215, and in *Sanitary Truck Drivers*, 45 F.4th at 46–47. For

<hr>

Center for Public Policy; U.S. Chamber of Commerce; Yum! Brands.

[321] Comments of CDW; HR Policy Association; McDonald's USA, LLC; Pacific Legal Foundation.

[322] Comments of State Attorneys General.

[323] Comments of General Counsel Abruzzo.

[324] See *Encino Motorcars, LLC* v. *Navarro*, 579 U.S. 211, 221 (2016); *FCC* v. *Fox Television Stations*, 556 U.S. at 515.

[325] Comments of CWA.

[326] Comments of State Attorneys General (citing 5 U.S.C. 702(2)(A)). Another commenter makes a similar observation, noting that leaving the 2020 rule intact is not an option the Board can properly consider in light of the District of Columbia Circuit's decisions in *BFI* v. *NLRB* and *Sanitary Truck Drivers*. See AFL–CIO reply comments.

this reason, we prefer to proactively rescind the 2020 rule and to articulate a new standard that better comports with the requirements of the common law.

Further, while we recognize that some parties may have relied on the 2020 rule in structuring their business practices, we do not find such reliance interests sufficiently substantial to make us reconsider rescinding the 2020 rule and promulgating a new standard. We agree with the view of one commenter that at least as of the date of the NPRM, any such reliance on the 2020 rule cannot be deemed reasonable, as the Board indicated its preliminary view that rescinding or replacing that standard would be desirable as a policy matter.[327] Moreover, because we think that the final rule accurately aligns employers' statutory obligations with their control of essential terms and conditions of employment of their own common-law employees, we conclude that to the extent that business entities may have structured their contractual relationships under prior, overly restrictive versions of the joint-employer standard, any interest in maintaining such arrangements is not sufficiently substantial or proper as a matter of law.

One commenter charges that the Board is not free to promulgate a standard defining the terms "employer" and "employee," arguing that both the 2020 rule and the proposed rule trench on the federal courts' authority to interpret these terms.[328] We respectfully disagree with this commenter's view of the Board's role in carrying out the provisions of the Act pursuant to Section 6 of the Act. We further note that, apart from this procedural disagreement, the final rule is consistent with the spirit of this commenter's argument, as the final rule seeks to ground the Board's analysis in the common-law agency principles that federal courts have instructed the Board to apply in construing the statutory definitions contained in section 2 of the Act. As explained above, the Board will draw on the Supreme Court's binding, authoritative statements regarding the common law of agency and look to other judicial common-law precedent as primary sources of authority governing the Board's interpretation. Of course, the Board's joint-employer determinations in individual cases are

<hr>

[327] See comments of General Counsel Abruzzo.

[328] Comments of Pacific Legal Foundation. This commenter also appears to suggest that it is unconstitutional for the Board to interpret the Act through rulemaking, though it does not cite any precedent in support of that view. Id.

ultimately reviewable by the federal courts.

Other commenters urge that the proposed rule is overly vague, that it does not meet its stated goal of providing a "definite, readily available standard," [329] or that it does not meet the requirements of fair notice and due process because the proposal is not clear enough that parties can reasonably ascertain to whom it applies.[330] Many of these commenters specifically pointed to the open-ended list of essential terms and conditions of employment as a feature of the proposed rule that renders it impermissibly vague.[331] Some commenters argue that because *BFI* created a vague definition of joint employer, they fear the proposed rule, which codifies key elements of that test regarding the significance of forms of indirect and reserved control, would likewise create ambiguities and uncertainty.[332] Others explain their view that the absence of practical guidance, illustrative examples, hypothetical questions, or other interpretive aids in the proposed rule undermines the proposal's effectiveness and will fail to provide stakeholders with the guidance they need to meet their compliance obligations.[333]

Other commenters take the contrary view, arguing that the flexibility and adaptability of the proposed rule is one of its greatest strengths.[334] Some of these commenters argue that the Board should avoid adopting too rigid a definition of joint employer, noting that changing workplace conditions will require refinement of the standard as it is applied in new factual situations.[335]

We have carefully considered the many comments we received seeking modifications to the proposed rule geared toward ensuring greater clarity and predictability in the Board's joint-employer determinations. As mentioned elsewhere, while we acknowledge some commenters' position that the 2020 rule fostered greater predictability and certainty in the Board's joint-employer determinations, we have determined that rule is not in accordance with the common-law agency principles we are bound to apply in analyzing whether entities are joint employers under the Act. As a result, we cannot maintain that standard. However, we believe that the modifications to the text of the proposed rule, along with the comprehensive responses we offer in response to the helpful input we received during the public-comment process, will facilitate parties covered by the Act in understanding and meeting their compliance obligations and reduce uncertainty and litigation.

Some commenters argue that the Board's proposed standard will create inconsistencies with other regulators' joint-employer standards.[336] As discussed in Section I.D. above, our dissenting colleague contends that federal courts have applied different standards when determining joint-employer status under other statutes that define "employer" in common-law terms. Other commenters observe that joint-employer standards similar to the one set forth in the proposed rule are commonplace in the context of other labor and employment statutes.[337] One commenter describes the Equal Employment Opportunity Commission (EEOC)'s approach to analyzing whether multiple firms jointly employ particular employees as taking forms of indirect and reserved control into account in much the same manner as does the proposed rule.[338] A number of commenters discuss the Department of Labor's approach to defining "joint employer" for purposes of the Fair Labor Standards Act (FLSA), 29 U.S.C. 203 *et seq.*,[339] though several commenters observe that the definition of "employee" under FLSA is broader than the common-law standard used in the NLRA.[340]

Although we agree with the view of several commenters that certain other Federal agencies' joint-employer standards are broadly consistent with the Board's proposed rule, we are guided here by the statutory requirement that the Board's standard be consistent with common-law agency principles and the policies of the National Labor Relations Act.[341] Contrary to our dissenting colleague's suggestion, our standard is rooted in common-law agency principles, not the economic-realities test used to interpret "employer" for purposes of the Fair Labor Standards Act. Cf. *NLRB* v. *United Insurance Co. of America,* 390 U.S. 254, 256 (1968) (discussing limiting impact of Taft-Hartley amendments on the interpretation of the Act).

Other commenters raise concerns regarding the possibility that the proposed joint-employer standard will stand in tension with state-law definitions of "joint employer." One commenter argues that state authorities with responsibility for administering state-law equivalents of the Act make joint-employer determinations on different grounds than those set forth in the proposed rule.[342]

State labor and employment law interpretations of "joint employer" also

[329] 87 FR 54645.

[330] Comments of CDW; California Policy Center; Colorado Bankers Association; Competitive Enterprise Institute; HR Policy Association; IFA; International Bancshares Corporation; National Small Business Administration; PPAI; Reid's, Inc. d/b/a Crosby's; Restaurant Law Center and National Restaurant Association; Tesla, Inc.; Yum! Brands.

[331] See, *e.g.,* comments of Americans for Prosperity Foundation; HR Policy Association; Independent Women's Forum; International Bancshares Corporation; LeadingAge; Libertas Institute; McDonald's USA, LLC; NAM; National Grocers Association; National Roofing Contractors Association; Restaurant Law Center and National Restaurant Association; The Thomas Jefferson Institute for Public Policy; U.S. Chamber of Commerce. Some of these commenters make the further point that the vagueness of the proposed rule will require small businesses to retain counsel or bear other compliance, legal, and administrative costs. See, *e.g.,* comments of Energy Marketers of America; National Lumber & Building Material Dealers Association; The Buckeye Institute; Yankee Institute for Public Policy.

[332] Comments of American Pizza Community; Energy Marketers of America; International Warehouse Logistics Association; National Alliance for Public Charter Schools; NATSO & SIGMA; National Taxpayers Union; PPAI; The Buckeye Institute; Yanxu Yang.

[333] Comments of Asian McDonald's Operators Association; NAHB; National Black McDonald's Operators Association; U.S. Black Chambers, Inc.; U.S. Chamber of Commerce.

[334] Comments of McGann, Ketterman & Rioux.

[335] Comments of McGann, Ketterman & Rioux.

[336] Comments of New Civil Liberties Alliance & Institute for the American Worker.

[337] Comments of National Partnership for Women & Families; The Leadership Conference on Civil and Human Rights.

[338] Comments of AFL–CIO ("[A]ll of the circumstances in the worker's relationship with each business should be considered to determine if either or both should be deemed [their] employer.") (quoting EEOC Notice No. 915.002, *Enforcement Guidance: Applications of EEO Law to Contingent Workers Placed by Temporary Employment Agencies and Other Staffing Firms at Coverage Issues* (Dec. 3, 1997), available at *https:// www.eeoc.gov/laws/guidance/enforcement-guidance-application-eeo-laws-contingent-workers-placed-temporary*).

[339] One commenter cites approvingly to the four-factor joint-employer test the Department of Labor adopted in 2020 and encourages the Board to look to that test for guidance in modifying the proposed rule. See comments of National Demolition Association. We observe that on July 30, 2021, the Department of Labor issued a final rule rescinding the joint-employer standard this commenter references. See *Rescission of Joint Employer Status Under the Fair Labor Standards Act Rule,* 86 FR 40939 (July 30, 2021).

See also comments of National Retail Federation (discussing *Singh* v. *7-Eleven, Inc.,* 2007 U.S. Dist. LEXIS 16677 (N.D. Cal. Mar. 7, 2007), and *Wright* v. *Mountain View Lawn Care, LLC,* 2016 U.S. Dist. LEXIS 31353 (W.D. Va. Mar. 11, 2016), two federal court decisions finding that brand-recognition standards at franchise businesses did not create a joint employment relationship for purposes of the FLSA or Title VII of the Civil Rights Act of 1964, respectively).

[340] Comments of New Civil Liberties Alliance & Institute for the American Worker.

[341] In this regard, we confirm that, contrary to a concern one commenter raises, the final rule solely relates to the definition of "joint employer" under the NLRA. See comments of American Health Care Association & National Center for Assisted Living.

[342] Comments of Modern Economy Project; National Alliance for Public Charter Schools; Subcontracting Concepts, LLC.

vary. Some commenters find parallels to the proposed rule in certain state definitions of "joint employer."[343] One commenter in particular observes that Illinois Department of Labor regulations incorporate similar common-law principles to those set out in the proposed rule.[344] By contrast, one commenter notes that New York State uses a standard for determining joint-employer status for purposes of public-sector labor relations that more closely corresponds to the 2020 rule.[345]

We are not persuaded that these commenters' concerns about the possibility of tension with state-law definitions of "joint employer" provide a sufficient reason to abandon our rulemaking effort. Certain of these commenters appear to suggest the possibility for a state-by-state patchwork of interpretations of the joint-employer standard if state courts apply or interpret the Board's joint-employer standard. We respectfully note that, under principles of federal labor law preemption, the Board has exclusive jurisdiction to administer the Act. See *San Diego Building Trades Council* v. *Garmon,* 359 U.S. 236, 245 (1959) ("When an activity is arguably subject to [section] 7 or [section] 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted."). A group of 18 State Attorneys General argues that it relies on the Board's enforcement of private-sector labor law to protect employees in their States.[346]

*L. Empirical Arguments*

As stated above, one of the goals of the proposed rule is to reduce uncertainty and litigation over questions related to joint-employer status. Some commenters challenge the premise of the proposed rule, predicting that the proposed rule will fuel time-consuming and costly litigation.[347] One of these commenters points to data that it represents shows that after the Board's *BFI* decision in 2015, petitions and

unfair labor practice charges raising joint employer issues increased dramatically at the Board.[348] Some respond to this contention by noting that findings of joint-employer status remained constant during this period.[349]

While we have carefully considered parties' arguments that the 2020 rule fostered predictability and reduced litigation, we nevertheless conclude that we are foreclosed from maintaining the joint-employer standard set forth in that rule because it is not in accordance with the common-law agency principles the Board is bound to apply in making joint-employer determinations. That said, we note one commenter's view that findings of joint-employer status did not markedly increase following the Board's decision in *BFI*. In addition, we hope to have minimized the risk of uncertainty or increased litigation of joint-employer questions by comprehensively addressing the comments we received in response to the proposed rule and by modifying the proposed rule in several respects to enhance its clarity and predictability.

Some commenters argue that the 2020 rule encouraged business cooperation and led to partnerships that benefit small businesses.[350] These commenters take the view that the proposed rule would diminish these beneficial practices or make it harder for companies to communicate or cooperate without risking a finding that they are joint employers.[351] Our dissenting colleague also argues that changing the joint-employer standard will make it more difficult for businesses to cooperate and share resources. In particular, some commenters predict that the Board's proposed joint-employer standard will disincentivize conduct that tends to improve the workplace, like training, safety and health initiatives, and corporate social responsibility programs.[352] Others suggest that the proposed rule will lead to uncertainty about obligations, creating a business climate of risk and increasing costs, especially in the third-party logistics industry.[353] Some commenters predict that the proposed rule could discourage larger companies

from entering into contracts with third parties to perform work.[354] Others specifically note that the proposed rule could make it more difficult for companies to seek temporary employees to address labor shortages or deal with fluctuating seasonal demand for labor.[355]

We have seriously considered commenters' concerns, especially those of individuals and small business owners, regarding how the joint-employer standard we adopt today might influence their business relationships. Insofar as the Act itself requires the Board to conform to common-law agency principles in adopting a joint-employer standard, these concerns seem misdirected. Nevertheless, we hope that the modifications to the proposed rule and clarifications we offer today will alleviate some of these concerns. We also note that the Board's definition of joint employer, which implements common-law agency principles, does not preclude or intend to preclude any particular kinds of business arrangements or relationships.

A number of commenters, including many individuals, argue that the proposed rule would negatively affect the franchise industry.[356] In particular, some individuals express the view that a broader joint-employer standard may inhibit franchisors' abilities to help them develop the skills necessary to manage successful businesses.[357] Others suggest that one benefit of the franchise model is the independence it affords franchisees. They argue that the proposed rule might encourage franchisors to take a more active role in the day-to-day operation of franchise businesses, undermining franchisees'

[343] See, *e.g.,* comments of State Attorneys General.

[344] Comments of State Attorneys General.

[345] Comments of Empire Center for Public Policy.

[346] Comments of State Attorneys General. We note that the signatories of this comment included the Attorneys General of California, Colorado, Connecticut, Delaware, District of Columbia, Illinois, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, and Washington.

[347] Comments of IFA; McDonald's USA, LLC; North American Meat Institute. Our dissenting colleague also anticipates that the final rule will lead to more extensive litigation of joint-employer questions.

[348] Comments of IFA.

[349] See, *e.g.,* reply comments of AFL–CIO.

[350] Comments of CDW; COLLE; International Warehouse Logistics Association; NAHB; National Association of Convenience Stores; NFIB; National Retail Federation.

[351] Comments of CDW; COLLE; NAHB; NAM; National Retail Federation; National Small Business Association; Washington Legal Foundation.

[352] Comments of American Trucking Associations; HR Policy Association; NAM; National Waste & Recycling Association.

[353] Comments of International Warehouse Logistics Association.

[354] Comments of National Lumber & Building Materials Dealers Association; National Small Business Association.

[355] Comments of AHA; National Taxpayers Union. Certain commenters stress that labor shortages have been acute in hospital and healthcare industries since the onset of the Covid-19 pandemic, making reliance on contract labor especially important. See, *e.g.,* comments of AHA.

[356] See, *e.g.,* comments of Americans for Tax Reform; Mauro Alvarez; Kermit Begly; Rachel Greszler; Nichole Holles; Illinois Policy Institute; Jean Johns; Job Creators Network Foundation; Neil Kollen; McDonald's USA, LLC; Daniel Miller; Russell Moss; NATSO & SIGMA; The James Madison Institute; The Mackinac Center for Public Policy; Emily Wiechmann; Yankee Institute for Public Policy. One commenter argues that the franchise business model has expanded access to home care services in the United States and expresses concerns about whether the proposed rule could harm access to home care services. See comments of Home Care Association of America.

[357] See, *e.g.,* comments of Costa Enterprises; Linda Bowin; David Denney; Ali Nekumanesh; Shelley Nilsen.

autonomy and creativity.[358] A number of groups writing on behalf of Black franchisees, franchisees of color, veteran franchisees, and women and LGBTQ franchisees argue that the franchise model has been especially successful in improving their members' lives and economic prospects.[359] They, and other commenters, express concerns about the effect of the proposed rule on franchisees and small business owners of color.[360] Groups representing franchisors, a bipartisan group of United States Senators and Members of Congress, and the United States Small Business Administration Office of Advocacy echo these concerns.[361] A number of commenters cite an economic analysis commissioned by the International Franchise Association that sought to demonstrate the cost of the Board's 2015 *BFI* standard on the franchise business model.[362] Others, including some individuals and

franchisees, make similar arguments, stating that the proposed rule could increase costs for franchise business owners if franchisors engage in "distancing behaviors" and are no longer willing to provide franchisees with training and recruitment materials, employee handbooks, or educational materials on new regulations.[363]

By contrast, other commenters dispute the contention that the proposed rule will negatively affect the franchise business model.[364] Several commenters specifically address the IFA study regarding the costs associated with the 2015 *BFI* standard.[365] One of these commenters disputes the methodology used in preparing the analysis, noting that there were "serious concerns about the survey design and statistical analysis."[366] Another argues that, in 2015 and 2016, following *BFI* and the Department of Labor's promulgation of a broader joint-employer standard, franchise employment grew by 3 percent and 3.5 percent, outpacing growth in other private, nonfarm employment, undermining the argument that the proposed rule would slow job growth in franchise businesses.[367]

We have seriously considered the arguments by commenters advancing different views regarding the accuracy and explanatory force of the IFA study. We do not believe that the study provides an appropriate or sufficient basis to abandon our effort to rescind the 2020 rule and promulgate a new joint-employer standard. There is no suggestion in the Act's text or legislative history that the Board has the authority to depart from common-law agency principles in adopting and applying a joint-employer standard because of its predicted effect on a particular industry or industries, irrespective of statutory policy or Congressional intent.

Other commenters make qualitative empirical arguments regarding the proposed rule's potential positive effect on franchise businesses. These commenters argue that the proposed rule might improve operations at franchise businesses and make franchise businesses better and safer workplaces.[368] Several commenters are employees who work for franchise businesses, and they argue that franchisors exercise significant control over the day-to-day details of their working lives.[369] These comments arguably illuminate how forms of reserved and indirect control can implicate essential terms and conditions of employment, but the final rule is not based on the Board's assessment of the new standard's effect—negative or positive—on franchise businesses, as that consideration has no clear basis in the Act.

A group of commenters argue that the proposed rule will increase compliance and administrative costs for general contractors, subcontractors, and other construction industry employers.[370] Some of these commenters raise concerns that these increased costs will diminish opportunities for growth for vendors or smaller contractors.[371] Several commenters also raise concerns about the possibility that the Board will find that individuals who provide services to other entities as independent contractors are joint employers with those entities.[372] They also argue that the proposed rule risks destabilizing longstanding multiemployer bargaining practices in the construction industry and could potentially create new withdrawal liability in the context of multiemployer defined-benefit pension plans.[373] Certain of these commenters take the view that the 2020 rule did not adversely affect labor peace and implicitly suggest that the proposed rule might lead to an increase in labor

[358] Comments of Escalante Organization; National Taxpayers Union; The Buckeye Institute; Yanxu Yang. We note in particular that some individuals express concerns that instead of being treated as independent business owners, the joint-employer rule will cause larger firms to treat them as employees or micromanage their work. See, *e.g.,* comments of Amber Niblock; Kerry Stone; Tom Webster.

[359] Comments of Association of Women's Business Centers; IFA; National Black McDonald's Operators Association; U.S. Black Chambers, Inc.

[360] Comments of COLLE; IFA; U.S. Black Chambers, Inc.

[361] Comments of Bicameral Congressional Signatories; Bipartisan Senators; IFA; McDonald's USA, LLC; National ACE; National Retail Federation; SBA Office of Advocacy; Yum! Brands. As some of these commenters note, recent Census data shows that 30.8 percent of franchise businesses are minority owned, compared to 18.8 percent of nonfranchised businesses. See, *e.g.,* comments of Bicameral Congressional Signatories. The comments of McDonald's USA, LLC note that "31% of [its] U.S. franchisees are minority-owned businesses, and that 29% are women-owned businesses."

In particular, the SBA Office of Advocacy expresses concern that the proposed rule could violate "a new federal mandate to bolster the ranks of underserved small business federal contractors, including women-owned, Black-owned, Latino-owned, and other minority-owned small businesses." Comments of SBA Office of Advocacy (citing Press Release, The White House, Statements and Releases, FACT SHEET: Biden-Harris Administration Announces Reforms to Increase Equity and Level the Playing Field for Underserved Small Business Owners, (Dec. 2, 2021)). Other commenters echo the SBA Office of Advocacy's concern regarding the possibility of conflicts between the proposed rule and federal contracting law and practice. Comments of CDW; COLLE; National Retail Federation; Thomas Jefferson Institute for Public Policy; U.S. Black Chambers, Inc. One individual commenter expresses a concern that the proposed rule might make it more difficult for small businesses to bid for and win government contracts. See comments of Sherri Smalling.

[362] Comments of Bipartisan Senators; Costa Enterprises; FreedomWorks Foundations; IFA; Libertas Institute; McDonald's USA, LLC; North American Meat Institute; Senator Inhofe; U.S. Black Chambers, Inc.; U.S. Chamber of Commerce.

[363] Comments of Asian McDonald's Operators Association; Escalante Organization; FreedomWorks Foundations; Goldwater Institute; IFA; Job Creators Network Foundation; McDonald's USA, LLC; NFIB; National Black McDonald's Operators Association; National Association of Convenience Stores; National Retail Federation; Restaurant Law Center and National Restaurant Association; SBA Office of Advocacy; The MacKinac Center for Public Policy. See also, *e.g.,* comments of Neil Kellen; Carole Montgomery; Deborah Robart; James Weaver; Yanxu Yang.

[364] Comments of Center for Law and Social Policy; General Counsel Abruzzo.

[365] Comments of EPI; reply comments of AFL–CIO. These commenters cross-reference a set of reply comments submitted by EPI in response to the Board's 2018 joint-employer notice of proposed rulemaking, available at *https://www.regulations.gov/comment/NLRB-2018-0001-29072.*

[366] Comments of EPI.

[367] Comments of CAP.

[368] Comments of Center for Law and Social Policy; Daniel Struckhoff.

[369] Comments of Richard Eiker.

[370] Comments of ABC; AGC; National Demolition Association; Rachel Greszler. Some of these commenters suggest that the rule will require parties to renegotiate or revise contracts, resulting in significant transaction costs. See comments of American Trucking Associations; Rachel Greszler.

[371] Comments of ANB Bank; CDW; Competitive Enterprise Institute; Independent Electrical Contractors; International Warehouse Logistics Association; Job Creators Network Foundation; NFIB; National Taxpayers Union. One commenter suggests that these dynamics may cause consolidation in the grocery market, harming independent grocers and consumers alike. See comments of National Grocers Association.

[372] Comments of Andrea Karns; National Association of Realtors.

[373] Comments of ABC; AGC.

disputes.[374] Our dissenting colleague likewise takes the position that changing the joint-employer standard may adversely affect certain businesses, including by discouraging "efforts to rescue failing businesses" through successorship.

As expressed elsewhere, we are sensitive to commenters' concerns that the joint-employer standard we adopt in this final rule might have unwanted effects on their businesses. In particular, we have thoroughly reviewed submissions from individuals and small business owners raising such concerns. However, we are not persuaded that these concerns reflect considerations that, as a statutory matter, may determine the Board's choice of a joint-employer standard. As we have explained, the Board must adhere to common-law agency principles. These commenters have failed to explain how, consistent with the Act's requirements and statutory policy, the Board could treat their concerns as determinative. In addition, to the extent some of these commenters explain that they prefer the 2020 rule to the proposed rule, we reiterate our view that we are foreclosed from maintaining the 2020 rule because it is inconsistent with common-law agency principles and does not advance the policies of the Act.

Other commenters raise practical objections to the proposed joint-employer standard, urging the Board to consider the potentially harmful effect of enmeshing multiple firms in collective bargaining. These commenters generally argue that bargaining with more than one firm will be cumbersome, unworkable, or otherwise undesirable.[375] Our dissenting colleague similarly argues that bargaining involving multiple firms may be stymied by conflicts among the firms and will be less likely to culminate in workable collective-bargaining agreements. Others, including some individuals, small business owners, and groups that represent the interests of women small business owners and small business

owners of color, express concern that the joint-employer standard will limit opportunities for new business or job creation or otherwise diminish their economic opportunities or harm consumers.[376]

By contrast, certain commenters suggest that a broad joint-employer standard will ensure that the proper parties are present for bargaining and may help smaller entities bear only their share of the liability for conduct that violates the Act.[377] Others note that some commenters' criticisms of the proposed rule would apply to any joint-employer standard, since they principally relate to the dynamics of bargaining that involves more than one firm.[378] In this regard, they contend, the criticisms are not unique to the proposed rule and should not weigh against the Board's rescission of the 2020 rule or promulgation of a new joint-employer standard.

Other commenters argue that ensuring the appropriate entities are recognized as joint employers is essential to deterring practices in certain industries, including staffing, temporary warehouse work, and food processing, that they represent have led to the underpayment of wages, worker misclassification, and unsafe working conditions.[379] Several of these commenters observe that these harmful practices disproportionally affect Black employees, Latinx employees, immigrant employees and migrant guestworkers, women and

LGBTQ employees, and employees of color.[380] A number of organizations also commented on the use of "labor broker" arrangements in the construction industry and how the proposed joint-employer standard might ensure that all entities who possess the authority to control or exercise control over construction industry employees' essential terms and conditions of employment fully comply with their obligations under the Act and other labor and employment statutes.[381]

Specifically, some commenters discuss the "fissuring" of the workplace and note that modern business practices often result in multiple firms sharing control over aspects of employees' terms and conditions of employment, making it important to define the joint-employer standard in a manner that brings all necessary parties to the bargaining table.[382] Certain of these commenters note that an unduly cramped joint-employer standard might hinder the efficacy of the Board's remedial orders by targeting an entity that cannot, by itself, make employees whole or engage in the kind of effective collective bargaining that the Act contemplates.[383] Several individual employees and commenters with experience representing employees in industries characterized by extensive subcontracting represent that a joint-employer standard that brings the proper parties to the bargaining table could help make jobs in those industries safer, especially for Black and immigrant workers and women workers.[384]

[374] Comments of Empire Center for Public Policy.

[375] Comments of AHA; ABC; CDW; COLLE; Federation of American Hospitals; HR Policy Association; IFDA; International Bancshares Corporation; National Waste & Recycling Association; New Jersey Food Council; Rachel Greszler; Restaurant Law Center and National Restaurant Association; U.S. Chamber of Commerce; Wyoming Bankers Association. Some of these commenters liken the proposed rule to government-mandated multiemployer bargaining. Comments of ABC; COLLE; Tesla, Inc. As set forth above, we reject this characterization. Under the final rule, businesses remain free to structure their business operations however they wish. The rule creates no mandate to engage in bargaining on a multifirm basis whatsoever.

[376] See, e.g., comments of Americans for Tax Reform; IFA; Independent Women's Forum; National Grocers Association; North American Meat Institute; Rachel Greszler; Stephen Clark; Yankee Institute for Public Policy.

A few of these commenters express concerns that the proposed rule will adversely affect particular state economies. See, e.g., comments of California Policy Center (California); Goldwater Institute (Arizona); Libertas Institute (Utah); Rio Grande Foundation (New Mexico); The Buckeye Institute (Ohio); Thomas Jefferson Institute for Public Policy (Virginia).

Some commenters, especially individuals and small business owners, argue that the proposed rule is poorly timed in light of larger macroeconomic trends, including inflation, and the lingering effects of the Covid-19 pandemic on supply chains. See, e.g., comments of Daniel Amare; Marlo Andeersen; Hugh Blanchard; Jon Clegg; Harold Heller; Justin Hood; Catherine Parker; Larry Verlinden.

[377] Comments of American Federation of Musicians Local 47; Congressman Scott et al.; General Counsel Abruzzo; National Women's Law Center.

[378] Comments of AFL–CIO; General Counsel Abruzzo.

[379] Comments of ACLU; BCTGM; Center for Law and Social Policy; Southern States Millwright Regional Council, UBC and Central South Carpenters Regional Council, UBC; District Council of New York City & Vicinity of the UBC; NELP; Restaurant Opportunities Centers United; Signatory Wall and Ceiling Contractors Alliance; The Leadership Conference on Civil and Human Rights; UBC; United for Respect.

[380] Comments of ACLU; Lawyers' Committee for Civil Rights Under Law; NELP; National Black Worker Center; National Partnership for Women and Families; NELP; SPLC; TechEquity Collaborative.

[381] Comments of District Council of New York City & Vicinity of the UBC; McGann, Ketterman & Rioux; Signatory Wall and Ceiling Contractors Alliance; Southern States Millwright Regional Council, UBC and Central South Carpenters Regional Council, UBC; UBC.

[382] Comments of American Federation of Musicians Local 47; AFSCME; Asian Pacific American Labor Alliance, AFL–CIO; EPI; Los Angeles County Federation of Labor AFL–CIO & Locals 396 and 848 of the IBT; National Women's Law Center; SEIU; The Strategic Organizing Center; The Washington Center for Equitable Growth; UE; UNITE HERE.

[383] Comments of American Federation of Musicians Local 47; General Counsel Abruzzo; Hawaii Regional Council of Carpenters; Jobs with Justice and Governing for Impact; Los Angeles County Federation of Labor AFL–CIO & Locals 396 and 848 of the IBT; National Women's Law Center; NELP; SEIU; Texas RioGrande Legal Aid, Inc; UNITE HERE.

[384] Comments of NELP; National Women's Law Center; National Black Workers Center; Richard Eiker; SPLC; The Strategic Organizing Center; William E. Morris Institute for Justice; Women Employed. In addition, one commenter notes its long history of successful multiemployer and other

Other commenters argue that the proposed rule would lead to positive economic outcomes for employees. For example, one commenter notes that by ensuring that the proper parties are brought to the bargaining table, unions will be able to bargain effectively, creating a positive "spillover" effect that will raise the floor for wages, benefits, and working conditions.[385] This commenter estimates that the proposed rule "will result in a boost of pay to workers of $1.06 billion annually or $20.4 million per week." [386] Several other commenters likewise argue that the benefits of the proposed rule will have a broad effect on the economy given the high concentration of employees in industries marked by extensive contracting practices.[387]

A number of commenters raise concerns about the specter of litigation and eventual liability if their businesses are deemed joint employers with other entities.[388] Others respond that an overbroad joint-employer standard risks exposing other entities, like lead firms or franchisors, solely because those entities are viewed as having the ability to satisfy a judgment.[389] Some of these commenters suggest that principles of joint liability might suffice to ensure that the Board's make-whole remedies are effective, rendering a joint-employer finding unnecessary in such circumstances.[390]

Contrary to these commenters, while the final rule establishes a joint-employer standard that will apply in unfair-labor-practice cases, it does not purport to assign liability or otherwise depart from well-established principles regarding how to apportion responsibility for unlawful conduct among multiple parties. Likewise, we disagree with commenters who argue that principles of joint liability might foreclose the need for a revised joint-employer standard, as the joint-employer standard serves important functions beyond those related to assigning liability. Similarly, principles of joint liability sometimes come into play in circumstances where there is no dispute that entities are joint employers. One commenter, citing *Capitol EMI Music, Inc.*, 311 NLRB 997, 1000 (1993), notes that the Board imposes certain unfair labor practice liability for the actions of one joint employer on another entity only if that other entity knew of the action and did nothing to protest it.[391] We agree that this longstanding Board precedent discussing how to assign liability to joint employers will continue to guide the Board in making these determinations. Additionally, business entities remain free under this joint-employer standard, as before, to structure their contractual relationships according to their chosen allocation of both authority to control and unfair labor practice liability, including by the use of indemnification clauses.

**V. The Final Rule**

The joint-employer doctrine plays an important role in the administration of the Act. The doctrine determines when an entity that exercises control over particular employees' essential terms and conditions of employment has a duty to bargain with those employees' representative. It also determines such an entity's potential liability for unfair labor practices. The joint-employer analysis set forth in this final rule is based on common-law agency principles as applied in the particular context of the Act. In our considered view, the joint-employer standard that we adopt today removes artificial control-based restrictions with no foundation in the common law that the Board has previously imposed in cases beginning in the mid-1980s discussed above, and in the 2020 rule. By incorporating common-law agency principles, as the Act requires, the final rule appropriately aligns employers' responsibilities with respect to their employees with their authority to control those employees' essential terms

and conditions of employment and so promotes the policy of the United States, as articulated in Section 1 of the Act, to encourage the practice and procedure of collective bargaining and to protect the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection.

*A. Definition of an Employer of Particular Employees*

Section 103.40(a) of the final rule provides that an employer, as defined by Section 2(2) of the Act, is an employer of particular employees, as defined by Section 2(3) of the Act, if the employer has an employment relationship with those employees under common-law agency principles. This provision expressly recognizes the Supreme Court's conclusion that Congress's use of the terms "employer" and "employee" in the NLRA was intended to describe the conventional employer-employee relationship under the common law.[392] Because "Congress has tasked the courts, and not the Board, with defining the common-law scope of 'employer,'" the Board—in evaluating whether a common-law employment relationship exists—looks for guidance from the judiciary, including primary articulations of relevant principles by judges applying the common law, as well as secondary compendiums, reports, and restatements of these common law decisions, focusing "first and foremost [on] the 'established' common-law definitions at the time Congress enacted the National Labor Relations Act in 1935 and the Taft-Hartley Amendments in 1947." [393] By explicitly grounding the Board's joint-employer analysis in common-law agency principles, this provision recognizes that the existence of a common-law employment relationship is a necessary prerequisite to a finding

---

multifirm bargaining as support for the Board's preliminary view that the proposed joint-employer rule would facilitate effective bargaining. See comments of IUOE.

[385] Comments of EPI.

[386] Id. Several other commenters cite approvingly to EPI's economic analysis. See, *e.g.*, comments of National Women's Law Center. Based on its assessment that the Bureau of Labor Statistics Contingent Worker Supplement (CWS) to the Current Population Survey likely underestimates how many workers work for contract firms and temporary help agencies, this commenter offers revised estimates over the total workforce in these settings. See comments of EPI. This commenter likewise offers a revised estimate of the number of franchise employees and employees of contractors or temporary staffing agencies who it represents would benefit from the proposed rule. Id.

[387] Comments of ACLU; General Counsel Abruzzo.

[388] Comments of LeadingAge; National ACE; Trucking Industry Stakeholders.

[389] Comments of James Bitzonis; COLLE.

[390] Comments of COLLE. One commenter also expresses concern that the proposed rule might interfere with single-employer doctrine under the Act. See comments of U.S. Chamber of Commerce. With respect, we note that questions of joint-employer and single-employer status under the Act are distinct. See generally *Radio & Television Broadcast Technicians Local Union 1264* v. *Broadcast Service of Mobile, Inc.*, 380 U.S. 255, 256 (1965) (approving the Board's single-employer analysis based on a four-factor test considering entities' "interrelation of operations, common management, centralized control of labor relations and common ownership").

[391] See reply comments of AFL–CIO.

[392] See *NLRB* v. *Town & Country Electric, Inc.*, 516 U.S. 85, 92–95 (1995) (where Congress has used the term "employee" in a statute without clearly defining it, the Court assumes that Congress "intended to describe the conventional master-servant relationship as understood by common-law agency doctrine"). See also *Clackamas Gastroenterology Associates, P.C.* v. *Wells*, 538 U.S. 440, 448–449 (2003); *Nationwide Mutual Insurance Co.* v. *Darden*, 503 U.S. 318, 322–324 (1992); *Community for Creative Non-Violence* v. *Reid*, 490 U.S. 730, 740, 752 fn. 31 (1989); *Kelley* v. *Southern Pacific Co.*, 419 U.S. 318, 323–324 (1974); *NLRB* v. *United Insurance Co. of America*, 390 U.S. 254, 256–258 (1968). As noted above, many sources refer to the common-law employer-employee relationship using the terms "master" and "servant."

[393] *BFI* v. *NLRB*, 911 F.3d at 1208–1209.

that an entity is a joint employer of particular employees.

*B. Definition of Joint Employers*

Section 103.40(b) provides that, for all purposes under the Act, two or more employers of the same particular employees are joint employers of those employees if the employers share or codetermine those matters governing employees' essential terms and conditions of employment. The provision thus first recognizes, as did the 2020 rule, that joint-employer issues may arise (and the same test will apply) in various contexts under the Act, including both representation and unfair labor practice case contexts.[394] The provision goes on to codify the longstanding core of the joint-employer test, consistent with the formulation of the standard that several Courts of Appeals (notably, the Third Circuit and the District of Columbia Circuit) have endorsed.[395] By providing that a common-law employer of particular employees must also share or codetermine those matters governing the employees' essential terms and conditions of employment in order to be considered a joint employer, the provision recognizes and incorporates the principle from *BFI* that "the existence of a common-law employment relationship is necessary, but not sufficient, to find joint-employer status."[396]

*C. Definition of "share or codetermine"*

Section 103.40(c) of the final rule provides that to "share or codetermine those matters governing employees' essential terms and conditions of employment" means for an employer to possess the authority to control (whether directly, indirectly, or both) or to exercise the power to control (whether directly, indirectly, or both) one or more of the employees' essential terms and conditions of employment. This provision incorporates the view of the Board and the District of Columbia

Circuit in *BFI* that evidence of the authority or reserved right to control, as well as evidence of the exercise of control (whether direct or indirect, including control through an intermediary, as discussed further below) is probative evidence of the type of control over employees' essential terms and conditions of employment that is necessary to establish joint-employer status. After careful consideration of comments, as reflected above, the Board has concluded that this definition of "share or codetermine" is consistent with common-law agency principles and best serves the policy of the United States, embodied in the Act, to encourage the practice and procedure of collective bargaining by ensuring that employees have the ability to negotiate the terms and conditions of their employment, through representatives of their own choosing, with all of their employers that possess the authority to control or exercise the power to control those terms and conditions.

*D. Definition of "essential terms and conditions of employment"*

Section 103.40(d) defines "essential terms and conditions of employment" as (1) wages, benefits, and other compensation; (2) hours of work and scheduling; (3) the assignment of duties to be performed; (4) the supervision of the performance of duties; (5) work rules and directions governing the manner, means, and methods of the performance of duties and the grounds for discipline; (6) the tenure of employment, including hiring and discharge; and (7) working conditions related to the safety and health of employees. The Board has decided, after careful consideration of comments as reflected above, to modify the proposed rule's definition of "essential terms and conditions of employment" by setting forth an exclusive, closed list of terms and conditions of employment that may serve as the objects of control necessary to establish joint-employer status.

Terms and conditions of employment falling in these seven categories are not simply common across employment relationships, they represent the core subjects of collective bargaining contemplated by the Act, as illuminated by the Board's administrative experience. Thus, Section 8(d) of the Act expressly provides that the collective-bargaining obligation encompasses a duty to confer with respect to wages and hours, subjects falling within categories (1) and (2). Categories (3), (4), and (5) similarly include terms involving the assignment, supervision, and detailed control of employees' performance of work

duties—and the grounds for discipline of employees who fail to perform as required—all common across employment relationships and subjects of central concern to employees seeking to improve their terms and conditions of employment through collective bargaining. Terms and conditions in Category (6), addressing the conditions for the formation and dissolution of the employment relationship itself, are clearly essential conditions of employment. Finally, as many commenters have observed, terms setting working conditions related to the safety and health of employees— encompassed in category (7)—are basic to the employment relationship and lie at or near the core of issues about which employees would reasonably seek to bargain. By providing that a common-law employer of particular employees will be considered a joint employer of those employees only if it possesses the authority to control or exercises the power to control one or more terms and conditions of employment falling into one of these seven categories, this provision ensures that such an employer will be in a position to engage in meaningful bargaining over an issue of core concern to the employees involved. This provision thus effectively incorporates the second step of the Board's joint-employer test set forth in *BFI*, above, as described by the District of Columbia Circuit in *BFI* v. *NLRB*, and addresses that court's concern that the Board had failed, in *BFI*, adequately to delineate what terms and conditions are "essential" to make collective bargaining "meaningful."[397]

*E. Control Sufficient To Establish Joint-Employer Status*

Section 103.40(e) provides, consistent with § 103.40(a) and (c), that whether an employer possesses the authority to control or exercises the power to control one or more of the employees' essential terms and conditions of employment is determined under common law-agency principles. Thus, this provision explains that, subject to the terms of the preceding provisions, (1) possessing the authority to control one or more essential terms and conditions of employment is sufficient to establish status as a joint employer regardless of whether the control is exercised; and (2) exercising the power to control indirectly (including through an intermediary) one or more essential terms and conditions of employment is sufficient to establish status as a joint

---

[394] Compare *BFI*, above, 362 NLRB 1599 (considering whether two entities were joint employers for purposes of petition for representation election), and *Browning-Ferris Industries of Pennsylvania, Inc.*, 259 NLRB 148 (1981) (considering whether two entities were joint employers for purposes of liability for employee discharges in violation of section 8(a)(3) of the Act), enfd. 691 F.2d 1117 (1982).

[395] See *BFI* v. *NLRB*, 911 F.3d at 1209 (citing *Dunkin' Donuts Mid-Atlantic Distribution Center* v. *NLRB*, 363 F.3d 437, 440 (D.C. Cir. 2004)); *NLRB* v. *Browning-Ferris Industries of Pennsylvania, Inc.*, 691 F.2d 1117, 1124 (3d Cir. 1982). See also *3750 Orange Place Limited Partnership* v. *NLRB*, 333 F.3d 646, 660 (6th Cir. 2003); *Holyoke Visiting Nurses Assn.* v. *NLRB*, 11 F.3d 302, 306 (1st Cir. 1993).

[396] *BFI*, above, 362 NLRB at 1610.

[397] See *BFI* v. *NLRB*, above, 911 F.3d at 1221–1222.

employer, regardless of whether the control is exercised directly.

As discussed above, the Board has modified this provision from the version set forth in the NPRM by clarifying that, in every case, the object of a common-law employer's control that is relevant to the question of whether it is also a joint employer under the Act must be an essential term and condition of employment as defined in § 103.40(d). In combination with the Board's limitation of "essential" terms and conditions of employment to matters that lie near the core of the collective-bargaining process, this change is intended to address the concerns of commenters (discussed above) that the standard should not require the Board to find a joint-employer relationship based on an entity's attenuated, insubstantial, or unexercised control over matters that—while they may be mandatory subjects of bargaining—are actually peripheral to the employment relationship or to employees' terms and conditions of employment. The version of § 103.40(e) that appears in the final rule is reformatted to include two subsections and has been streamlined to avoid surplusage.

### F. Control Immaterial to Joint-Employer Status

Section 103.40(f) provides that evidence of an entity's control over matters that are immaterial to the existence of an employment relationship under common-law agency principles and that do not bear on the employees essential terms and conditions of employment is not relevant to the determination of whether the employer is a joint employer.[398] As discussed above, many commenters have expressed a concern that the proposed rule could result in the Board finding joint-employer relationships based on kinds of control that are not indicative of a common-law employment relationship or that do not form a proper foundation for collective bargaining or unfair-labor practice liability. Similarly, the District of Columbia Circuit in *BFI* v. *NLRB* criticized the Board's *BFI* decision for failing, in its articulation and application of the indirect-control element of the standard, to distinguish between indirect control that the common law of agency considers intrinsic to ordinary third-party contracting relationships and indirect control over essential terms and

conditions of employment.[399] This provision addresses these concerns by expressly recognizing that some kinds of control, including some of those commonly embodied in a contract for the provision of goods or services by a true independent contractor, are not relevant to the determination of whether the entity possessing such control is a common-law employer of the workers producing or delivering the goods or services, and that an entity's control over matters that do not bear on workers' essential terms and conditions of employment are not relevant to the determination of whether that entity is a joint employer.

### G. Burden of Proof

Section 103.40(g) provides that a party asserting that an employer is a joint employer of particular employees has the burden of establishing, by a preponderance of the evidence, that the entity meets the requirements set forth above. This allocation of the burden of proof is consistent with the 2020 Rule, *BFI,* and pre-*BFI* precedent. See 85 FR 11227; *BFI,* 362 NLRB at 1616.

### H. Bargaining Obligations of a Joint Employer

Section 103.40(h) provides that a joint employer of particular employees must bargain collectively with the representative of those employees with respect to any term and condition of employment that it possesses the authority to control or exercises the power to control, regardless of whether that term and condition is deemed to be an essential term and condition of employment under the definition above, but is not required to bargain with respect to any term and condition of employment that it does not possess the authority to control or exercise the power to control.

As discussed above, some commenters have requested that the Board provide a concise statement of joint employers' bargaining obligations in order to clarify both that a joint employer—like any other employer—must bargain over any mandatory subject of bargaining that is subject to its control, and that a joint employer—again, like any other employer—is not required to bargain about workplace conditions that are not subject to its control. Particularly in light of the Board's determination, discussed above, to adopt a closed list of "essential terms and conditions of employment," as objects of control relevant to the joint-employer determination, the Board has concluded, after careful consideration of

the comments, that it is desirable to expressly provide that a joint employer's bargaining obligations are not limited to those "essential terms and conditions" of employment that it controls, but extend to any ordinary mandatory subject of bargaining that is also subject to its control. Clarifying a joint employer's bargaining obligation in this way further ensures that collective bargaining involving the joint employer will be meaningful, because such bargaining will be able to address not only the core workplace issues the control of which establishes the employer's status as a joint employer but also any other matters subject to the joint employer's control that sufficiently affect the terms and conditions of employees' employment to permit or require collective bargaining under section 8(d) of the Act.[400]

On the other hand, the Board has also concluded that it serves a useful clarifying purpose to expressly provide, consistent with extant Board precedent not affected by the final rule, that where two or more entities each control terms and conditions of employment of particular employees, an employer is not required to bargain over any such terms and conditions which are in no way subject to its own control.[401]

### I. Severability

Section 103.40(i) provides that the provisions and subprovisions of the final rule are intended to be severable, and that if any part of the rule is held to be unlawful, the remainder of the rule is intended to remain in effect to the fullest extent permitted by law. The Board believes, on careful consideration, that the final rule in its entirety flows from and is consistent with common-law principles as we have received them from judicial authority; reflects a permissible exercise of the Board's congressionally delegated authority to interpret the Act; and best effectuates the Board's statutory responsibility to prevent unfair labor practices and to encourage the practice

---

[398] As noted above, the Board has modified this provision from the version set forth in the NPRM for clarity.

[399] 911 F.3d at 1219–1220.

[400] See, *e.g., Ford Motor Co., Chicago Stamping Plant* v. *NLRB,* 441 U.S. 488, 501–503 (1979) (affirming Board's conclusion that manufacturer was required to bargain over in-plant food service and prices because manufacturer contractually reserved right to review and control services and prices directly set by a third-party contractor).

[401] Cf., *e.g., Management Training Corp.,* 317 NLRB 1355, 1358 & fn. 16, 1359 (1995) (holding that an entity that controls sufficient matters relating to the employment relationship to make it a statutory employer may be required to bargain over terms and conditions of employment within its control, but certification of representative does not obligate an employer to bargain concerning mandatory subjects of bargaining controlled exclusively by a distinct entity that is exempt from the Board's statutory jurisdiction).

and procedure of collective bargaining. However, the Board necessarily acknowledges the possibility that a reviewing body might disagree with our conclusion in some respect, and, in that event, the Board desires to preserve so much of the rule as such a body approves. Separately, as noted above, the Board intends the action of rescinding the 2020 Rule in itself to be severable from any of the terms of the final rule, so that if a reviewing body were to disapprove the final rule in its entirety, the Board's action in rescinding the 2020 Rule should still be given effect.

## VI. Response to Dissent

Our dissenting colleague advances several reasons for declining to join the majority in rescinding and replacing the 2020 Rule. We have addressed some of these arguments above. Here, we offer additional responses to several of our colleague's contentions.

First, our dissenting colleague contends that common-law agency principles do not compel the Board to rescind the 2020 Rule, and, further, actually preclude the Final Rule's elimination of the 2020 Rule's actual-exercise requirement.[402] He also criticizes us for seeking relevant common-law principles in authority relating to the distinction between employees and independent contractors, and for failing to pay sufficient attention to judicial articulations of relevant common-law principles in decisions involving joint-employer questions under other federal statutes, including Title VII of the Civil Rights Act of 1964.[403]

To the contrary, as set forth more fully above, both the District of Columbia Circuit's discussion of independent-contractor authority in *BFI* v. *NLRB,* and the approach taken by many other courts examining joint-employer questions in other contexts, fully support the Board's reference to

independent-contractor authority to shed light on the common-law employer-employee relationship and the joint-employer relationship under the Act.[404] To the extent that the other federal cases relied upon by our colleague articulate joint-employer standards drawn from common-law principles, those cases at best support the proposition that an entity's actual exercise of control over appropriate terms and conditions of employment of another employer's employees is *sufficient* to establish that it is a joint-employer—a proposition with which we agree—but not our colleague's further claim that such exercise of control is *necessary* to find a joint-employer relationship. Rather, numerous federal courts of appeals and state high courts have concluded, in non-NLRA contexts, that entities were common-law employers of other employers' employees based solely on the entities' unexercised power or authority to control.[405] These decisions fully support our conclusion that the common law does not require an entity's actual exercise of a reserved authority to control in order to establish a joint-employer relationship. Judicial decisions and secondary authorities

addressing the common-law employer-employee relationship and the joint-employer relationship further confirm that indirect control, including control exercised through an intermediary,[406] can establish the existence of an employment relationship, including a joint-employer relationship.[407]

We note, moreover, that the District of Columbia Circuit not only upheld the Board's recognition of this point in *BFI* v. *NLRB,* but also reprimanded the Board that issued the 2020 rule for neglecting it. In *International Brotherhood of Teamsters* v. *NLRB,* 45 F.4th 38 (D.C. Cir. 2022), in rejecting the Board's decision not to apply the *BFI* standard retroactively, the court reaffirmed its previous holding, noting that it had ''held that '[t]he Board [in *Browning-Ferris I*] . . . correctly determined that the common-law inquiry is not woodenly confined to indicia of direct and immediate control;''' [and that] ''[I]n *Browning-Ferris II*—a decision issued just five months after the Board announced the 2020 Rule—the Board inexplicably overlooked the longstanding role of indirect control in the Board's joint-employer inquiry . . . . Our court's 2018 decision made clear that 'the right-to-control element of the Board's joint-employer standard [discussed in *Browning-Ferris I*] has deep roots in the common law [citation omitted],' and that the common law rule is that 'unexercised control bears on employer status . . . .' Further, we held that 'there is no sound reason that the . . . joint-employer inquiry would give indirect [control] a cold shoulder.' [911 F.3d] at 1218 ('[The] argument that the

---

[402] As noted above and discussed more fully below, while we have concluded that the 2020 rule's actual-exercise requirement is impermissible under the Act as contrary to common law agency principles, and apart from recognizing that the Board must follow common-law agency principles in determining who is an ''employer'' and an ''employee'' under Sec. 2 of the Act, we do not conclude, as our colleague suggests, that the common law dictates the specific details of the final rule's joint-employer standard. Rather, the final rule reflects our policy choices, within the bounds of the common law, in furtherance of the policy of the United States, as set forth in Sec. 1 of the Act, to encourage the practice and procedure of collective bargaining, including by providing a mechanism by which an entity's rights and obligations under the Act may be accurately aligned with its authority to control employees' essential terms and conditions of employment.

[403] 42 U.S.C. 2000e *et seq.*

[404] See Sec. I.D., above, and cases discussed there. See also *BFI* v. *NLRB,* 911 F.3d at 1195 (''[E]mployee-or-independent-contractor cases can . . . be instructive in the joint-employer inquiry to the extent that they elaborate on the nature and extent of control necessary to establish a common-law employment relationship.'').

[405] See, *e.g., EEOC* v. *Global Horizons,* 915 F.3d 631, 640–641 (9th Cir. 2019) (two entities were joint employers with a direct employer based on entities' ''power to control the manner in which [benefits] and wages were provided to the . . . workers, *even if never exercised.*''); *Mallory* v. *Brigham Young University,* 332 P.3d 922, 928–929 (Utah 2014) (city was employer of university's employee because ''[i]f the principal has the right to control the agent's method and manner of performance, the agent is a servant whether or not the right is specifically exercised'') (citation omitted); *Rouse* v. *Pitt County Memorial Hosp., Inc.,* 470 SE 2d 44, 52–53 (N.C. 1996) (attending physicians could be found employers of resident physicians employed by hospital absent evidence of actual exercise of control because ''[w]here the parties have made an explicit agreement regarding the right of control, this agreement will be dispositive;'') (citation omitted); *Dunn* v. *Conemaugh & Black Lick RR,* 267 F.2d 571, 577 (3d Cir. 1959) (railroad was employer of manufacturer's employee based on railroad's right to command employee's performance without reference to any instance of exercise of that right because ''the person is the servant of him who has the right to control the manner of performance of the work, regardless of whether or not he actually exercises that right;'') (citation omitted); *S.A. Gerrard Co.* v. *Industrial Accident Comm'n,* 110 P.2d 377, 378 (Cal. 1941) (landowner was joint employer of farmer's employee based on contract provision that picking should be done according to landowner's direction without reference to whether such direction was ever given because ''the right to control, rather than the amount of control which was exercised, is the determinative factor.'') (citation omitted).

[406] As noted above, we agree with the District of Columbia Circuit's common-sense characterization of control exercised through an intermediary as indirect control, rejecting our colleague and the 2020 Rule's counterintuitive characterization of such control as direct and immediate. See *BFI* v. *NLRB,* 911 F.3d at 1216–1217.

[407] See id. at 1217 (''[T]he common law has never countenanced the use of intermediaries or controlled third parties to avoid the creation of a master-servant relationship.'') (citing *Nicholson* v. *Atchison, T. & S. F. Ry. Co.,* 147 P. 1123, 1126 (Kan. 1915) (use of a ''branch company'' as a ''mere instrumentality'' ''did not break the relation of master and servant existing between the plaintiff and the [putative master]''); *Butler* v. *Drive Automotive Industries of America,* 793 F.3d 404, 415 (4th Cir. 2015) (the joint-employer test ''specifically aims to pierce the legal formalities of an employment relationship to determine the loci of effective control over an employee . . . . Otherwise, an employer who exercises actual control could avoid Title VII liability by hiding behind another entity.''); *Al-Saffy* v. *Vilsack,* 827 F.3d 85 (D.C. Cir. 2016) (relying in part on evidence that officials working for putative joint employer had recommended employee's dismissal as evidence supporting reversal of summary judgment on the joint-employer issue). See also discussion and sources cited in Sec. I.D., above.

common law of agency closes its mind to evidence of indirect control is unsupported by law or logic.''); see id. at 1216 (a 'rigid distinction between direct and indirect control has no anchor in the common law') . . . . [W]e took great pains to inform the Board that the failure to consider reserved or indirect control is inconsistent with the common law of agency.'' [408]

In sum, the Board's careful examination of relevant common-law principles as articulated in a voluminous body of primary judicial authority and secondary compendiums, reports, and restatements of these common-law decisions has persuaded us that the controlling common-law agency principles do not permit the Board to require that an entity that possesses authority to control also exercise that control, or exercise it in any particular way, in order to be found a joint employer under the Act. [409]

Next, our colleague contends that the final rule unjustifiably expands the list of essential terms and conditions of employment. Specifically, our colleague takes issue with our inclusion of three specific terms and conditions of employment in the exhaustive list set forth in Section 103.40(d): ''work rules and directions governing the manner, means, and methods of the performance of duties and the grounds for discipline''; ''the tenure of employment, including hiring and discharge''; and ''working conditions related to the safety and health of employees.''

As discussed more extensively above, [410] we find our colleague's concerns regarding the final rule's treatment of these terms and conditions of employment as essentially unfounded. With respect to ''the tenure of employment, including hiring and discharge,'' our colleague seems to take issue with the form rather than the substance. Indeed, the 2020 rule treated hiring and discharge as essential, making it even more evident that our colleague's quarrel with our formulation is principally semantic. As we indicated previously, the phrase we have chosen to include in the final rule is meant to encompass the range of actions that determine an individual's employment status. We reject the suggestion that our framing of this term of employment is

overbroad. Similarly, our colleague does not seriously contend that an entity's reservation or exercise of control over the manner, means, and methods of the performance of duties or the grounds of discipline are not essential. [411] Instead, he focuses on our description of ''work rules or directions'' that address these aspects of particular employees' performance of work, arguing that ambiguous language in an employee handbook may be used to justify a joint-employer finding. We find this concern misplaced and emphasize that in applying the final rule, we will take a functional approach to assessing whether a putative joint employer who meets the threshold requirement of having a common-law employment relationship with particular employees possesses or exercises the requisite control over essential terms and conditions of employment.

Lastly, we part company with our colleague when it comes to including workplace health and safety as an essential term or condition of employment. In our view, it is appropriate to regard an entity that possesses or exercises control over workplace health and safety as a joint employer. As set forth above, to the extent an entity solely memorializes its compliance with legal obligations pertaining to health and safety, it will not for that reason alone be regarded as a joint employer. However, and contrary to our colleague, we believe that entities that exercise discretion over particular employees' workplace health and safety are properly treated as joint employers. We believe that common-law employers of particular employees that have authority to exercise discretion over those employees' workplace health and safety are properly treated as joint employers because employees' ability to bargain with all of the entities that may exercise such control is central to the Act's protection of employees' collective rights.

Our colleague argues that setting forth an exhaustive list of essential terms and conditions of employment in the final rule nevertheless fails to address the District of Columbia Circuit's concerns in *BFI* about the Board's treatment of forms of indirect control when applying the joint-employer standard. Our colleague misstates our rationale for

closing the list of essential terms and conditions of employment. After carefully considering the views of commenters, we have included an exhaustive list of essential terms and conditions of employment in the final rule to ensure that any required bargaining would be meaningful. By contrast, we incorporate the District of Columbia Circuit's views regarding the forms of indirect control that bear on the joint-employer inquiry in § 103.40(e) and (f) of the final rule. In this regard, the final rule is faithful to the District of Columbia Circuit's guidance regarding the need for a limiting principle to ensure the joint-employer standard remains within common-law boundaries.

The dissent next argues that the majority does not set forth a substantial policy justification for rescinding and replacing the 2020 rule. The dissent argues that because the majority focuses on the common-law shortcomings of the 2020 rule, it pays insufficient heed to commenters' policy-based objections to the final rule.

As noted at the outset, while we are persuaded that the 2020 rule should be rescinded because it is at odds with common-law agency principles, we have stated repeatedly that we would nevertheless rescind the 2020 rule and replace it with the final rule for policy reasons. [412] We reiterate that position here. In our view, the joint-employer standard we adopt today is more consistent with Section 1 of the Act and will better facilitate effective collective bargaining than the standard set forth in the 2020 rule. Our colleague's contention that we have not made a policy-based decision for changing our approach to determining joint-employer status under the Act is therefore unfounded.

In addition, the dissent contends that the majority does not offer a satisfactory response to those commenters who take the view that the final rule will adversely affect employers in particular industries or sectors, including the building and construction industry, the franchise industry, the staffing industry, and the healthcare sector. As discussed more extensively in Section IV.D., above, we are of the view that the Act—by referring generally to ''employers'' and ''employees'' and by effectively incorporating the common-law definition of those terms—requires the Board to apply a uniform joint-employer standard to all entities that fall within

---

[408] 45 F.4th at 42, 44, 46–47.

[409] As noted above, we reject any suggestion that the 2020 rule recognized that an entity's contractually reserved but unexercised control is sufficient to establish a common-law employer-employee relationship but declined, as a discretionary matter, to exercise joint-employer jurisdiction over statutory employers who did not actually exercise such control—a rationale nowhere presented in the text or preamble of the 2020 rule.

[410] See discussion in Sec. IV.D., above.

[411] Indeed, the 2020 rule treated both work directions and discipline as essential. See 85 FR at 11225 & 11236 (citing *Laerco Transportation*, 269 NLRB at 325). See also, *e.g.*, *Cognizant Technology Solutions U.S. Corp. & Google LLC*, 372 NLRB No. 108, slip op. at 1 (2023) (finding joint-employer relationship under 2020 rule based in part on entity's maintenance of '' 'workflow training charts' which govern[ed] the details of employees' performance of specific tasks.'').

[412] Accordingly, as noted above, we reject our colleague's suggestion that we take common-law agency principles to dictate the precise contours of the final rule.

the Board's jurisdiction. For this reason, we have declined several commenters' requests for the Board to exempt certain industries from the coverage of the final rule. However, we are mindful that applying the final rule will require sensitivity to industry-specific norms and practices, and we will take any relevant industry-specific context into consideration when considering whether an entity is a joint employer.

Our dissenting colleague also takes the position that the final rule will frustrate bargaining and undermine the policies of the Act favoring the resolution of labor disputes and the promotion of stable bargaining relationships. In this regard, he offers several hypotheticals that he suggests illustrate the potential for the final rule to be applied in a manner that will frustrate effective collective bargaining by extending joint-employer obligations to entities whose control over terms and conditions of employment is too attenuated to warrant their participation in bargaining.

We respectfully disagree with our dissenting colleague's view of how the final rule will operate. In reciting the standard set forth in the final rule, our colleague elides the threshold significance of § 103.40(a), which requires a party seeking to demonstrate the existence of a joint-employment relationship to make an initial showing that the putative joint employer has a common-law employment relationship with particular employees. Because the application of the final rule will be limited to entities who are common-law employers, many of the hypothetical scenarios our colleague suggests will give rise to a joint-employer finding cannot arise. For example, as noted above, an entity may control a term of employment to which a bargaining duty attaches but not possess or exercise the requisite control over the performance of the work to be regarded as a common-law employer. For example, while the Supreme Court has recognized that an employer has a duty to bargain over in-plant food service and prices,[413] that fact alone will not support a finding that the third-party contractor who supplies the food, and codetermines pricing, is a joint employer. Instead, § 103.40(a) of the final rule establishes a threshold requirement that a putative joint employer must be the common-law employer of particular employees. Absent evidence that an entity is the common-law employer of particular employees, then, there is no basis for a joint-employer finding under the final

rule. Accordingly, there is no risk that the final rule will be applied broadly to encompass entities whose relationship to the performance of the work is clearly too attenuated to support finding that they are common-law employers, as our dissenting colleague fears.

In addition to these hypotheticals concerning the application of the final rule, our colleague makes several predictions about how the final rule will affect particular businesses. Our colleague repeats the contention raised by several commenters (and addressed more fully above) that the possibility of conflict among joint employers will complicate bargaining and lead to worse outcomes for employees. As an initial matter, we question our colleague's suggestion that the final rule will make it more difficult for parties to reach agreements. Instead, we are persuaded that a standard that ensures that those entities who possess or exercise control over particular employees' essential terms and conditions of employment are present for bargaining will help avoid fruitless negotiations. In our view, aligning employers' responsibilities under the Act with their authority to control terms and conditions of employment will lead to better outcomes overall. Ensuring that the necessary parties may all have a seat at the bargaining table will also empower entities who have chosen to contractually retain or exercise control over particular employees' essential terms and conditions of employment to formalize their responsibilities and protect their interests in collective-bargaining agreements they also negotiate and sign.[414] Further, we observe that, even assuming arguendo that our colleague's concern about the potential difficulties associated with joint-employer bargaining were valid, such difficulties would arise under any joint-employer standard, and accordingly do not support specific criticism of the current final rule.

Finally, our dissenting colleague contends that the final rule is arbitrary and capricious under the Administrative Procedure Act for several reasons. First, he argues that the majority has failed to respond to significant points urged by commenters. We reject this characterization and note our extensive discussion of the points urged by commenters in Section IV.D., above. Not only did we respond to commenters' significant arguments, we also made adjustments to the text of the

final rule in response to commenters' valuable input. We are confident that the final rule is stronger and will provide better guidance to regulated parties because of the helpful public input we received and the changes we made in light of commenters' views.

Next, our colleague argues that the final rule "offers no greater certainty or predictability than adjudication, and it will not reduce litigation." As discussed in Section IV.D. above, we are of the view that the final rule would reduce uncertainty by codifying the general principles that will guide the Board in making joint-employer determinations. While the final rule does not purport to anticipate the myriad arrangements under which entities possess or exercise control over particular employees' essential terms and conditions of employment, it offers a framework for analyzing such questions that is rooted in common-law agency principles and ensures greater predictability by offering an exhaustive list of the essential terms and conditions of employment that may give rise to a joint-employer finding and detailing the forms of control that the Board will treat as probative of joint-employer status. In this regard, we respectfully disagree with our colleague's suggestion that "[t]his is precisely how the determinations would be made if there were no rule at all." Finally, to the extent our colleague's criticism amounts to an observation that the final rule will need to be applied on a case-by-case basis moving forward, we observe that the same can be said for the 2020 rule, which also required the Board to apply the joint-employer standard in diverse contexts based on the particular evidence put forward by a party seeking to establish joint-employer status. Moreover, as the District of Columbia Circuit has observed, it is appropriate for the Board to "flesh out the operation of a legal test that Congress has delegated to the Board to administer" on an ongoing, case-by-case basis.[415]

Ultimately, our colleague concludes that the final rule must be arbitrary and capricious because, given his view that common-law agency principles do not compel the Board to rescind and replace the 2020 rule, the final rule is "legally erroneous." As we have discussed in detail above, the great weight of common-law authority supports our conclusion that the 2020 rule is contrary to common-law agency principles in requiring that an entity actually exercise control over another employer's employees in order to be found to be a joint employer. In any case, as we have

---

[413] *Ford Motor Co., Chicago Stamping Plant* v. *NLRB*, 441 U.S. 488, 501–503 (1979).

[414] In this respect, the final rule will help avoid the scenario our colleague describes where courts bind entities later found to be joint employers to collective-bargaining agreements they "neither negotiated nor signed."

[415] *BFI* v. *NLRB*, 911 F.3d at 1221.

also explained above, we would rescind and replace the 2020 rule for policy reasons even if we had not concluded that its actual-exercise requirement were precluded by the Act's incorporation of common-law agency principles. We accordingly respectfully disagree with our colleague's contention that the final rule is arbitrary and capricious under the Administrative Procedure Act.

## VII. Dissenting View of Member Kaplan

My colleagues have accomplished something truly remarkable. They have come up with a standard for determining joint-employer status that is potentially even more catastrophic to the statutory goal of facilitating effective collective bargaining, as well as more potentially harmful to our economy, than the Board's previous standard in *Browning-Ferris Industries.*[416] As the dissent noted in *Browning-Ferris,* the joint-employer standard the Board adopted in that decision not only "affect[ed] multiple doctrines central to the Act" but had "potentially massive economic implications." [417] The final rule the majority issues today, concerningly, goes beyond *BFI* in several ways. *BFI* went no further than to assert that the "direct and immediate control" standard of pre-*BFI* precedent is not compelled by the National Labor Relations Act (NLRA or the Act); the majority now claims that it is statutorily impermissible.[418] *BFI* held that contractually reserved but unexercised control and indirect control are probative of joint-employer status; [419] the majority now makes them dispositive of that status. *BFI* recognized that "of course," the "existence, extent, and object of a putative joint employer's control . . . all may present material issues" in a joint-employer determination; [420] the majority removes the term "extent." Under their final rule, joint-employer status is established if control *exists* (even if only potentially or indirectly) and if the *object* of control is an essential term and condition of employment of another entity's employees, regardless of the *extent* of that control. Put differently, the final rule eliminates the second step of the *BFI* standard, which required the Board to determine whether the extent of a putative joint-employer's control over the terms and conditions of employment of another business's employees was sufficient to "to permit meaningful collective bargaining." [421]

As explained below, the majority's final rule effects an unprecedented and unwarranted expansion of the Board's joint-employer doctrine. The majority misapprehends common-law agency principles in holding that those principles *compel* the Board to rescind its 2020 Rule on Joint Employer Status Under the National Labor Relations Act (the 2020 Rule) [422] and replace it with a joint-employer standard not seen anywhere else in the law. My colleagues dispense with any requirement that a company has actually exercised any control whatsoever (much less substantial control) over the essential terms and conditions of another company's employees. Under the final rule, an entity's mere possession of a never-exercised contractual reservation of right to control a single essential term and condition of employment of another business's employees makes that entity a joint employer of those employees. So does its "indirect" control of an essential term and condition, a term my colleagues fail to define or otherwise cabin. As I will show, these standards (in the words of the United States Court of Appeals for the District of Columbia Circuit) "oversho[o]t the common-law mark." [423]

My colleagues claim that their final rule effectuates "the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce . . . by encouraging the practice and procedure of collective bargaining," [424] but in reality it will frustrate national labor policy by placing at the bargaining table a second "employer" that has never exercised any control over the employment terms of another entity's employees. Indeed, it may place many more than just two such "employers" at the bargaining table. To borrow a hypothetical from the *BFI* dissent, suppose CleanCo is in the business of supplying maintenance employees to clients to clean their offices. Suppose further that CleanCo supplies employees to one hundred clients, and that each CleanCo-client contract contains a provision that gives the client the right to prohibit, on health and safety grounds, CleanCo's employees from using particular cleaning supplies. Because the clients possess a contractually reserved authority to control "working conditions related to the safety and health of employees"—an essential employment term newly invented by my colleagues—each of those one hundred clients would be a joint employer of CleanCo's employees. Now, suppose a union wins an election in an employer-wide unit of CleanCo's maintenance employees. Because all one hundred clients jointly employ those employees, all one hundred would be compelled to participate in collective bargaining. As the dissenters in *BFI* put it, "no bargaining table is big enough to seat all of the entities that will be potential joint employers under the majority's new standards." [425]

My colleagues repeatedly insist that their approach—specifically, eliminating the requirement of proof that an entity has actually exercised control over another entity's employees before it can be deemed their joint employer—is the only permissible one under the common law and the Act. In response to commenters who point out the significant negative effects that an expanded joint-employer standard will have on businesses in wide variety of sectors, they repeatedly say that it cannot be helped because their approach is statutorily compelled. Accordingly, they provide no substantive response to these commenters' weighty objections. Moreover, because my colleagues insist that their hands are tied and fail to acknowledge that common-law agency principles, and therefore the Act, permit the 2020 Rule, they fail to engage in any real policy-based choice between competing alternatives. Consequently, the final rule must stand or fall on the majority's assertion that their position is compelled by the common law and hence the only permissible construction of the Act. It falls. Indeed, not only is their position—*i.e.,* that the actual-exercise requirement is impermissible—not compelled by the common law, it results in a final rule that exceeds the limits of the common law, as I will show. In any event, the courts have made clear that the Board may adopt a joint-employer standard under the NLRA that does not extend to the outermost limits of the common law. Even accepting for argument's sake that

---

[416] *Browning-Ferris Industries of California, Inc., d/b/a BFI Newby Island Recyclery,* 362 NLRB 1599 (2015) (*BFI*).

[417] Id. at 1647 (Members Miscimarra and Johnson, dissenting).

[418] Id. at 1609 (stating the *BFI* majority's view that requiring direct and immediate control "is not mandated by the Act").

[419] Id. at 1614 ("The right to control . . . is probative of joint-employer status, as is the actual exercise of control, whether direct or indirect.").

[420] Id.

[421] Id.

[422] 85 FR 11184 (Feb. 26, 2020) (codified at 29 CFR 103.40).

[423] *Browning-Ferris Industries of California, Inc.* v. *NLRB,* 911 F.3d 1195, 1216 (D.C. Cir. 2018).

[424] NLRA Sec. 1.

[425] *BFI,* 362 NLRB at 1619 (Members Miscimarra and Johnson, dissenting). Moreover, because joint-employer status makes an otherwise neutral business primary for purposes of Sec. 8(b)(4) of the Act, the union that represents CleanCo's maintenance employees would not be limited to picketing CleanCo's headquarters but could lawfully picket all one hundred clients.

the majority's rule does not exceed the common law's boundaries, compelling policy considerations counsel against its promulgation and in favor of leaving the 2020 Rule in place. Because I would retain that rule, I dissent.

Background

In determining, under the Act, whether an employment relationship exists between an entity and employees directly employed by a second entity, common-law agency principles are controlling.[426] Under those principles, the Board will find that two separate entities are joint employers of employees directly employed by only one of them if the evidence shows that they share or codetermine those matters governing the employees' essential terms and conditions of employment.[427]

For many years, the Board, with court approval, held that a determination that two or more entities share or codetermine such matters requires proof that a putative joint employer has actually exercised substantial direct and immediate control over one or more essential terms and conditions of employment of another entity's employees. See *Summit Express, Inc.,* 350 NLRB 592, 592 n.3 (2007) (finding that the General Counsel failed to prove direct and immediate control and therefore dismissing joint-employer allegation); *Airborne Express,* 338 NLRB 597, 597 n.1 (2002) (holding that "the essential element" in a joint-employer analysis "is whether a putative joint employer's control over employment matters is direct and immediate") (citing *TLI, Inc.,* 271 NLRB 798, 798–799 (1984)); *Laerco Transportation,* 269 NLRB 324, 325–326 (1984) (dismissing joint-employer allegation where user employer's supervision of supplied employees was limited and routine); see also *NLRB* v. *CNN America, Inc.,* 865 F.3d at 748–751 (finding that the Board erred by failing to adhere to its "direct and immediate control" standard); *SEIU Local 32BJ* v. *NLRB,* 647 F.3d 435, 442–443 (2d Cir. 2011) (" 'An essential element' of any joint employer determination is 'sufficient evidence of immediate control over the

employees.' ") (quoting *Clinton's Ditch Co-op Co.* v. *NLRB,* 778 F.2d 132, 138 (2d Cir. 1985)). Under this precedent, an entity's unexercised contractual reservation of a right to control or indirect control/influence was insufficient to establish joint-employer status.

In 2015, a divided Board significantly lowered the bar for proving a joint-employer relationship in *BFI,* 362 NLRB at 1599. There, a Board majority retained the "share or codetermine" standard but eliminated the preexisting requirement of proof that a putative joint employer had exercised direct and immediate control over essential terms and conditions of employment. Id. at 1613–1614. The *BFI* majority created a new two-step standard. At step one, the inquiry was "whether there is a common-law employment relationship with the employees in question." Id. at 1600. If so, the analysis proceeded to a second step, where the Board was to determine "whether the putative joint employer possesses sufficient control over employees' essential terms and conditions of employment to permit meaningful collective bargaining." Id. In addition, the *BFI* majority held that a joint-employer relationship could be based solely on an unexercised contractual reservation of right to control and/or indirect control. In other words, the *BFI* majority expanded the joint-employer doctrine to potentially include in the collective-bargaining process an employer's independent business partner that has an indirect or merely potential impact on the employees' essential terms and conditions of employment, even where the business partner has not itself actually established any of those essential employment terms or collaborated with the undisputed employer in setting them.

The defining feature of the Board's *BFI* standard was its elimination of the preexisting requirement of proof that a putative joint employer actually exercised substantial direct and immediate control over the essential terms and conditions of another company's employees. The Court of Appeals for the District of Columbia Circuit (the D.C. Circuit) did not uphold that defining feature. It expressly left undecided whether indirect control or contractually-reserved-but-unexercised authority to control could, standing alone, establish joint-employer status. As the court stated, "because the Board relied on evidence that Browning-Ferris both had a 'right to control' and had 'exercised that control,' this case does not present the question whether the reserved right to control, divorced from

any actual exercise of that authority, could alone establish a joint-employer relationship." *Browning-Ferris Industries of California, Inc.* v. *NLRB,* 911 F.3d at 1213 (internal citation omitted). Similarly, the court said that "whether indirect control can be 'dispositive' is not at issue in this case because the Board's decision turned on its finding that Browning-Ferris exercised control 'both directly and indirectly.' " Id. at 1218.

After canvassing common-law agency principles, the D.C. Circuit upheld "as fully consistent with the common law the [*BFI*] Board's determination that both reserved authority to control and indirect control can be *relevant factors* in the joint-employer analysis." Id. at 1222 (emphasis added). Although the court held that contractually reserved control and indirect control can contribute to a joint-employer finding, it declined to reach the question of whether either one could independently establish joint-employer status.

The D.C. Circuit made several other important points that subsequently informed the 2020 Rule. First, the court made clear that the common law sets the outer limit of a permissible joint-employer standard under the Act, without suggesting in any way that the Board's standard must or should be coextensive with that outer limit. "The policy expertise that the Board brings to bear on applying the National Labor Relations Act to joint employers *is bounded by* the common-law's definition of a joint employer. The Board's rulemaking, in other words, *must color within the common-law lines* identified by the judiciary." Id. at 1208 (emphasis added). Hence, while it is clear that the Board is precluded from adopting a more expansive joint-employer doctrine than the common law permits, it may adopt a narrower standard that promotes the Act's policies. This is a point that was recognized by the Board majority in *BFI* itself. *BFI,* 362 NLRB at 1613 ("The common-law definition of an employment relationship establishes the outer limits of a permissible joint-employer standard under the Act."). Indeed, the Board, with court approval, has long made policy choices not to exercise the full extent of its jurisdiction, including as to particular classes of employment relationships.[428]

---

[426] *NLRB* v. *United Insurance Co. of America,* 390 U.S. 254, 256 (1968).

[427] *CNN America, Inc.,* 361 NLRB 439, 441 (2014) (citing *TLI, Inc.,* 271 NLRB 798, 798 (1984)), enf. denied in part 865 F.3d 740 (D.C. Cir. 2017). The "share or codetermine" standard was first stated by the United States Court of Appeals for the Third Circuit in *NLRB* v. *Browning-Ferris Industries of Pennsylvania, Inc.,* 691 F.2d 1117, 1123 (3d Cir. 1982). As the D.C. Circuit observed in its 2018 decision reviewing *BFI,* after the Third Circuit formulated the "share or codetermine" standard, the Board and the courts began coalescing around it. *Browning-Ferris Industries of California, Inc.* v. *NLRB,* 911 F.3d at 1201.

[428] See *Northwestern University,* 362 NLRB 1350, 1352 (2015) (declining to assert jurisdiction over Northwestern University football players who receive grant-in-aid scholarships, even assuming they are statutory employees, due to the nature and structure of the NCAA Division I Football Bowl Subdivision); *Brevard Achievement Center,* 342 NLRB 982, 983–985 (2004) (declining to exercise

Second, the D.C. Circuit made clear that, under the common law, the standard for determining independent-contractor status, with its emphasis on the right to control the manner and means of performance, is different from the joint-employer standard: "[T]he independent-contractor and joint-employer tests ask different questions. The independent-contractor test considers who, if anyone, controls the worker other than the worker herself. The joint-employer test, by contrast, asks how many employers control individuals who are unquestionably superintendent." 911 F.3d at 1214. In this regard, the court explained that "a rigid focus on independent-contractor analysis omits the vital second step in joint-employer cases, which asks, once control over the workers is found, *who* is exercising that control, *when,* and *how.*" Id. at 1215; see also *Redd* v. *Summers,* 232 F.3d 933, 937–938 (D.C. Cir. 2000) (expressing doubt that independent-contractor precedent is well suited to address issues of joint employment). Accordingly, "the vital second step" of a common-law joint-employer analysis does indeed focus on the *exercise* of control, including its form, frequency, and extent.

Third, the D.C. Circuit held that the *BFI* decision's treatment of the indirect-control factor contravened the common law. *Browning-Ferris Industries of California, Inc.* v. *NLRB,* 911 F.3d at 1221. Specifically, the court concluded that the *BFI* decision had "overshot the common-law mark" by failing to distinguish evidence of indirect control that bears on workers' essential terms and conditions of employment from evidence that simply documents the

routine parameters of company-to-company contracting. Id. at 1216. The court explained that, for example, it would be inappropriate to give any weight in a joint-employer analysis to the fact that Browning-Ferris had controlled the basic contours of a contracted-for service, such as by requiring four lines' worth of employee sorters plus supporting screen cleaners and housekeepers. Id. at 1220–2221.

Finally, and importantly, the court held that the Board had erred by failing to apply the second step of its two-step standard: whether the putative joint employer possesses sufficient control over employees' essential terms and conditions of employment to permit *meaningful* collective bargaining. The court rebuked the Board for "never delineat[ing] what terms and conditions of employment are 'essential,'" for adopting an "inclusive" and "non-exhaustive" approach to the meaning of "essential terms," and for failing to clarify what "meaningful collective bargaining" might require. Id. at 1221–1222. The court remanded the case to the Board for further proceedings consistent with the court's opinion.[429]

### The 2020 Joint-Employer Rule

Against this background, the Board in 2020 promulgated a joint-employer rule that was clear and consistent with common-law agency principles. The 2020 Rule provided much needed guidance to the regulated community. It adopted the universally accepted general formulation of the joint-employer standard that an entity may be considered a joint employer of a separate entity's employees only if the two entities share or codetermine the employees' essential terms and conditions of employment. The 2020 Rule then further defined that standard in a manner that eliminated the unjustified features introduced in *BFI.* The 2020 Rule explained that to show

that an entity shares or codetermines the essential terms and conditions of another employer's employees, "the entity must possess and exercise such substantial direct and immediate control over one or more essential terms or conditions of their employment as would warrant finding that the entity meaningfully affects matters relating to the employment relationship with those employees.' '' 85 FR at 11186 & 11236. The Board defined "substantial direct and immediate control" to mean "direct and immediate control that has a regular or continuous consequential effect on an essential term or condition of employment of another employer's employees." Id. at 11203–11205 & 11236. The 2020 Rule also specified that control is not "substantial" if it is "only exercised on a sporadic, isolated, or de minimis basis." Id. at 11236.

The 2020 Rule recognized that certain other forms of control and authority to control play an appropriately limited role in the joint-employer analysis. It deemed probative of joint-employer status evidence of an entity's indirect control over essential terms and conditions of employment of another employer's employees, the entity's contractually reserved but never exercised authority over the essential terms and conditions of employment of another employer's employees, and the entity's control over mandatory subjects of bargaining other than the essential terms and conditions of employment. Id. But those types of control could tend to support a finding of joint-employer status "only to the extent [they] supplement[ed] and reinforce[d] evidence of the entity's possession or exercise of direct and immediate control over a particular essential term and condition of employment." Id. They could not, standing alone, establish joint-employer status.

The Board also made clear that the 2020 Rule was not intended to immunize an entity from joint-employer status through use of an intermediary to exercise control, explaining that "[d]irect and immediate control exercised through an intermediary remains direct and immediate." Id. at 11209 (citing *Browning-Ferris Industries of California, Inc.* v. *NLRB,* 911 F.3d at 1217 ("[T]he common law has never countenanced the use of intermediaries or controlled third parties to avoid the creation of a master-servant relationship.")).

In response to the court's criticism of the Board's failure to define what constitutes "essential terms and conditions of employment" in *BFI,* the 2020 Rule defined a closed set of terms and conditions of employment: wages,

---

jurisdiction over disabled workers whose relationship with an employer is "primarily rehabilitative" as opposed to "typically industrial" because "Congress did not intend that the Act govern" the former); *Brown University,* 342 NLRB 483, 493 (2004) (dismissing representation petition based on the "belief that the imposition of collective bargaining on graduate students would improperly intrude into the educational process and would be inconsistent with the purposes and policies of the Act"), overruled on policy grounds by *Columbia University,* 364 NLRB 1080 (2016); *Siemons Mailing Service,* 122 NLRB 81 (1959) (describing Board's discretionary commerce standard).

In sum, even if the majority's final rule does not exceed the bounds of the common law, the Board possesses discretion to adopt, for sound policy reasons, a standard that excludes from joint-employer status entities that have never actually exercised control over the terms and conditions of employment of another employer's employees. Moreover, although my colleagues and I agree that the joint-employer standard is bounded by the common law, they point to no authority (nor can they) for the proposition that the Act *compels* the Board to extend joint-employer status to the outermost limits permissible under the common law.

[429] On remand, the Board found that retroactive application of any refined standard would be manifestly unjust. The Board therefore dismissed the complaint and amended the certification of representative to remove BFI as a joint employer. *Browning-Ferris Industries of California, Inc. d/b/a BFI Newby Island Recyclery,* 369 NLRB No. 139, slip op. at 1 (2020). Thereafter, a divided Board denied the union's motion for reconsideration. *Browning-Ferris Industries of California, Inc. d/b/a BFI Newby Island Recyclery,* 370 NLRB No. 86 (2021).

On further review, the D.C. Circuit found the Board's retroactivity analysis erroneous, granted the union's petition for review, vacated the Board's order dismissing the complaint and amending the certification of representative, and remanded the case to the Board for further proceedings consistent with the court's opinion. *Sanitary Truck Drivers & Helpers Local 350, International Brotherhood of Teamsters* v. *NLRB,* 45 F.4th 38 (D.C. Cir. 2022). The case is presently pending before the Board.

benefits, hours of work, hiring, discharge, discipline, supervision, and direction. 29 CFR103.40(b).[430] The 2020 Rule further specified how direct and immediate control would be determined with respect to each essential term, providing concrete examples. Id. § 103.40(c)(1) through (8). For example, with respect to hiring, the 2020 Rule provided that ''[a]n entity exercises direct and immediate control over hiring if it actually determines which particular employees will be hired and which employees will not. An entity does not exercise direct and immediate control over hiring by requesting changes in staffing levels to accomplish tasks or by setting minimal hiring standards such as those required by government regulation.'' Id. § 103.40(c)(4). And with respect to supervision, ''[a]n entity exercises direct and immediate control over supervision by actually instructing another employer's employees how to perform their work or by actually issuing employee performance appraisals,'' but it does not do so by providing ''instructions [that] are limited and routine and consist primarily of telling another employer's employees what work to perform, or where and when to perform the work, but not how to perform it.'' Id. § 103.40(c)(7).

Taken together, the features of the 2020 Rule were intended to ensure that an entity would be found to be a joint employer of another employer's employees if (and only if) it had played an active and substantial role in hiring, supervising, or directing those employees, in setting their work hours, wages or benefits, and/or in disciplining or discharging them. Of course, an entity could be found to be a joint employer if it had taken only one of these actions (either on its own or in collaboration with the employees' undisputed employer), but there was a substantiality requirement, a threshold of extent of control that had to be crossed. In this way, the Board addressed the court's concern that the Board had failed in *BFI* to ensure that the extent of the purported joint employer's control over the terms and conditions of employment of the direct employer's employees was sufficient to make that entity's participation in collective bargaining necessary for meaningful bargaining to take place.

The Board explained that the 2020 Rule was consistent with common-law agency principles and promoted the

Act's policies by imposing bargaining obligations only on entities that actually control essential working conditions and by establishing a ''discernible and predictable'' standard to guide regulated parties, stating as follows:

> The Board believes that a standard that requires an entity to possess and exercise substantial direct and immediate control over essential terms and conditions of employment is consistent with the purposes and policies of the Act . . . . The Act's purpose of promoting collective bargaining is best served by a joint-employer standard that places at the bargaining table only those entities that control terms and conditions that are most material to collective bargaining. Moreover, a less demanding standard would unjustly subject innocent parties to liability for others' unfair labor practices and coercion in others' labor disputes. A fuzzier standard with no bright lines would make it difficult for the Board to distinguish between arm's-length contracting parties and genuine joint employers. Accordingly, preserving the element of direct and immediate control over essential terms and conditions draws a discernible and predictable line, providing ''certainty beforehand'' for the regulated community.

85 FR 11205.

The Majority's Final Rule

The 2020 Rule was promulgated a mere three-and-a-half years ago, and since it took effect, the Board has applied it exactly once. See *Cognizant Technology Solutions U.S. Corp.,* 372 NLRB No. 108 (2023) (denying Google's request for review of a regional director's determination under the 2020 Rule that it is the joint employer of a subcontractor's employees based on its exercise of substantial direct and immediate control over their supervision, benefits, and hours of work). Nevertheless, my colleagues have plowed ahead with this rulemaking, even though ''[i]t is common knowledge that the Board's limited resources are severely taxed by undertaking a rulemaking process.'' [431] And they have done so despite the fact that one member of the current majority sharply criticized a prior Board majority for changing the joint-employer standard under strikingly similar circumstances.[432]

The final rule promulgated today makes extreme and troubling changes to Board law, including but not limited to the following revisions. The rule makes contractually reserved but unexercised control and indirect control not merely probative of joint-employer status (as did *BFI*), but independently sufficient to establish that status. It scraps what it characterizes as ''artificial control-based restrictions'' in the 2020 Rule.[433] And it jettisons the second step of *BFI*'s joint-employer standard, which required proof that a putative joint employer ''possesses sufficient control over employees' essential terms and conditions of employment to permit meaningful collective bargaining.'' 362 NLRB at 1600.

The final rule starts off mundanely enough, declaring in paragraph (a) of newly revised Section 103.40 of the Board's Rules & Regulations that an entity is an ''employer'' of particular employees ''if the employer has an employment relationship with those employees under common-law agency principles.'' Paragraph (b) provides that two employers of the same employees ''are joint employers'' if ''they share or codetermine those matters governing employees' essential terms and conditions of employment.''

Paragraph (c), which defines the ''share or codetermine'' standard, is where the trouble really starts. It provides that ''[t]o 'share or codetermine those matters governing employees' essential terms and conditions of employment' means for an employer to possess the authority to control (whether directly, indirectly, or both), or to exercise the power to control (whether directly, indirectly, or both), one or more of the employees' essential terms and conditions of employment.'' The effect of this subsection is dramatic. It mandates a finding of joint-employer status based on the *mere possession* of authority to control, directly *or indirectly,* a *single* essential term (*e.g.,* hours of work). The majority has eliminated any need for proof of actual exercise, much less substantial exercise, of control over employees' essential

---

[430] Citations in this paragraph to the Code of Federal Regulations refer to the regulations in place before the amendments made by the majority's final rule.

[431] ''The Standard for Determining Joint Employer Status,'' 83 FR 46681, 46688 (2018) (then-Member McFerran, dissenting).

[432] See *Hy-Brand Industrial Contractors, Ltd. & Brandt Construction Co.,* 365 NLRB No. 156, slip op. at 40 (2017) (Member Pearce and then-Member McFerran, dissenting) (''What is the justification for overruling *BFI* after just [two] years[?] . . . . [A]fter a mere [two] years, any accounting of *BFI*'s effects would be premature; indeed, before it was overruled today, *BFI* has been applied by the Board in only one other Board decision. The complete absence of relevant experience under *BFI* underscores the essentially reflexive nature of

today's exercise.''), vacated 366 NLRB No. 26 (2018).

[433] The majority states that ''the joint employer standard that [they] adopt today removes artificial control-based restrictions with no foundation in the common law that the Board has previously imposed in cases beginning in the mid-1980s discussed above, and in the 2020 Final Rule.'' In its 2022 Notice of Proposed Rulemaking (NPRM), the majority identified those control-based restrictions as ''restrictions requiring (1) that a putative joint employer 'actually' exercise control, (2) that such control be 'direct and immediate,' and (3) that such control not be 'limited and routine.''' 87 FR 54641, 54643.

terms. Moreover, paragraph (c) refers broadly to "authority to control," without limiting it to contractually reserved authority. A "user" business possesses authority to indirectly control the hours of work of employees supplied to it by a "supplier" employer merely by virtue of the fact that it decides when it is open for business. If that is sufficient to make "user" businesses joint employers of supplied employees, then paragraph (c) of revised § 103.40 makes *every* "user" business a joint employer.

The final rule's treatment of indirect control is similarly problematic. Given that possession or exercise of indirect control will establish a joint-employer relationship under § 103.40(b) and (c) of the final rule, it seems critically important for the majority to explain what constitutes "indirect control." They do not do so. The final rule identifies control exercised through an intermediary as an *example* of "indirect control," [434] but this necessarily implies that the exercise of "indirect control" is not *limited* to control exercised through an intermediary. What else might count as the exercise of indirect control? My colleagues do not say, but they take note of comments contending that certain circumstances should be regarded as demonstrating indirect control,[435] including that franchisors necessarily have indirect control because they "are the parties with meaningful profit margins that could be redistributed to the workforce during bargaining" and because most franchisees' revenue and cost variables "greatly constrain franchisees' practical ability to offset

[434] Under the 2020 Rule, control exercised through an intermediary could establish joint-employer status if it was otherwise sufficient. "Direct and immediate control exercised through an intermediary remains direct and immediate." 85 FR at 11209 (citing *Browning-Ferris Industries of California* v. *NLRB,* 911 F.3d at 1217 ("[T]he common law has never countenanced the use of intermediaries or controlled third parties to avoid the creation of a master-servant relationship.")). My colleagues and I disagree about whether to characterize control exercised through an intermediary as direct control or indirect control. In my view, an intermediary (*e.g.,* a supervisor employed by the undisputed employer) who operates as a mere conduit of the putative joint employer's commands functions as its agent. The putative joint employer there is exercising control even more directly than when it engages in collaborative decision-making with the undisputed employer, which is direct control. The majority's reclassification of control exercised through an intermediary as indirect control makes little sense. Moreover, because the majority does not limit "indirect control" to that example, they leave the door open to finding other kinds of indirect control. The important question, which my colleagues do not answer, is, what else will count as "indirect control"?

[435] Comments of Center for Law and Social Policy; Los Angeles County Federation of Labor AFL–CIO & Locals 396 and 848 of the IBT.

concessions to their workers." [436] The same commenter suggests that businesses that engage service contractors necessarily have indirect control because "service contractors rarely have room to grant wage increases without renegotiating their own contracts with clients and thus the clients effectively control the economic terms of employment for the contractors' employees." [437] Are these the kinds of circumstances that my colleagues have in mind as evidencing "indirect control"? We do not know because they do not say.[438]

Further, the final rule does not adequately "distinguish evidence of indirect control that bears on workers' essential terms and conditions from evidence that simply documents the routine parameters of company-to-company contracting." *Browning-Ferris Industries of California* v. *NLRB,* 911 F.3d at 1226. According to the majority, "limiting the list of essential terms and conditions of employment is responsive to the District of Columbia Circuit's request that the Board incorporate a limiting principle to ensure the joint-employer standard remains within common-law boundaries." [439] But

[436] Comment of Los Angeles County Federation of Labor AFL–CIO & Locals 396 and 848 of the IBT (internal citation and quotations omitted).

[437] Comment of Los Angeles County Federation of Labor AFL–CIO & Locals 396 and 848 of the IBT (internal citation and quotations omitted).

[438] In response to my criticism, the majority states that they "deci[ded] not to include an extensive list of examples of forms of indirect control that may be relevant to the joint-employer inquiry." I am not, however, criticizing my colleagues for failing to provide "an extensive list of examples." Rather, I observe that the majority does not identify *even one example* of such indirect control other than control exercised through an intermediary. Given that the majority makes indirect control sufficient to establish joint-employer status, this lack of guidance is a serious shortcoming. As with much else in the final rule, the majority leaves the fleshing out of "indirect control" to be determined case by case—and this leaves businesses affected by the new rule, and facing the complicated task of planning for its impact, utterly at sea.

Relatedly, my colleagues are wrong in asserting that the role I give (and the 2020 Rule gave) to indirect control somehow conflicts with the D.C. Circuit's opinion in *Browning-Ferris Industries of California* v. *NLRB.* In remanding that case to the Board to elucidate the distinction between indirect control that bears on essential employment terms and the routine parameters of business-to-business contracting, the court did not imply that indirect control could independently establish a joint-employer relationship. The court expressly withheld judgment on that issue. The court simply instructed the Board to explain the difference between control that is *relevant* to a joint-employer analysis and that which carries no weight at all.

[439] My colleagues say that their decision to close the set of "essential" terms and conditions of employment is *not* intended to address the D.C. Circuit's criticism of *BFI*'s failure to distinguish indirect control that bears on joint-employer status from routine aspects of company-to-company contracting but rather responds to the court's

closing the list of essential terms and conditions is not enough because routine components of company-to-company contracts may indirectly impact essential terms. For example, a widely used standard contract in the construction industry [440] includes a provision that makes the general contractor "responsible for initiating, maintaining, and supervising all safety precautions and programs in connection with the performance of the [c]ontract." That clause—a routine component of company-to-company contracting in the construction industry—evidences the general contractor's indirect control (at least) of "working conditions related to the safety and health of employees" of each of its subcontractors, an essential term and condition of employment under § 103.40(d)(7) of the final rule.[441]

Additionally, my colleagues perform some sleight of hand regarding the final rule's treatment of what was *BFI*'s second step: proof that "the putative joint employer possesses sufficient control over employees' essential terms and conditions of employment to permit meaningful collective bargaining." 362 NLRB at 1600. In the 2022 NPRM, my colleagues straightforwardly acknowledged that their proposed rule "d[id] not incorporate" *BFI*'s second step, dubiously declaring that "any required bargaining under the new standard will necessarily be meaningful." 87 FR at 54645 n. 26. Accordingly, they repudiated the *BFI* majority's recognition that in some cases, a putative joint employer's extent of control over the terms and conditions of employment of the employees of an undisputed employer will be

instruction to "explain which terms and conditions are 'essential' to permit 'meaningful collective bargaining,'" and to "clarify what 'meaningful collective bargaining' entails and how it works in this setting." *Browning-Ferris Industries of California, Inc.* v. *NLRB,* 911 F.3d at 1221–1222 (quoting *BFI,* 362 NLRB at 1600). But this clarification is at odds with their simultaneous claim that a closed set of terms and conditions heeds the D.C. Circuit's request for a limiting principle "to ensure the joint-employer standard remains within common-law boundaries." The D.C. Circuit's directive that the standard remain within common-law boundaries flows directly from its finding that *BFI* "overshot the common-law mark" by failing to distinguish between indirect control that bears on the joint-employer inquiry and the routine components of company-to-company contracting. Accordingly, I do not mischaracterize their position when I point out that closing the set of essential terms and conditions fails to provide the "legal scaffolding" the D.C. Circuit called for.

[440] AIA Document A201–2017 (cited in comment of Associated General Contractors of America).

[441] The majority also says that Sec. 103.40(f) of the final rule responds to the D.C. Circuit's instruction that the Board separate indirect control that bears on the joint-employer inquiry from routine components of company-to-company contracting. I address this claim below.

insufficient to warrant placing that entity at the bargaining table, and that in those circumstances, it would be contrary to the policies of the Act to find joint-employer status. 362 NLRB at 1610–1611; id. at 1614 (''The existence, *extent*, and object of a putative joint employer's control, of course, all may present material issues.'') (emphasis added). In the final rule, the majority takes a different route than they took in the NPRM, but they arrive at the same destination. The majority says that the final rule ''effectively incorporates the second step of the Board's joint-employer test set forth in *BFI*'' because the final rule (unlike the proposed rule) makes the list of ''essential'' terms and conditions of employment exhaustive. But *BFI*'s second step addresses the *extent* of a putative joint employer's control over essential terms and conditions. What constitutes essential terms and conditions pertains to what is controlled, *i.e.*, the *object* of control—and as *BFI* makes clear, extent of control and object of control present distinct issues in the joint-employer analysis. Plainly, the final rule does *not* ''incorporate[ ] the second step'' of the *BFI* standard, and this is made all the more apparent by newly revised § 103.40(e), which provides that merely ''[p]ossessing the authority to control is sufficient to establish status as a joint employer,'' and so is ''[e]xercising the power to control,'' without any requirement that there be a sufficient *amount* of control to permit meaningful collective bargaining.

My colleagues dismiss this concern by saying that § 103.40(a) of the final rule will prevent the rule from being applied overbroadly ''to encompass entities whose relationship to the performance of the work is clearly too attenuated.'' They say that my criticism of their rule ''elides the threshold significance of § 103.40(a), which requires a party seeking to demonstrate the existence of a joint-employment relationship to make an initial showing that the putative joint employer has a common-law employment relationship with particular employees.'' But it is my colleagues who have failed to explain how § 103.40(a) functions in the joint-employer analysis. They do not explain what, if any, limitations it imposes on joint-employer determinations. They do not convey that it establishes some minimum level of control (in terms of extent of control over a particular term or condition of employment or breadth of control across multiple terms or conditions) that must be reached before joint-employer status is found. But even accepting that some unstated minimum

quantum of authority to control is implicit in the threshold requirement of § 103.40(a), nothing in their rule enlightens the regulated community what that minimum quantum might be. Like ''indirect control,'' that is left to be determined case by case, with the majority here saying, in effect, ''trust us, we'll be reasonable,'' even though nothing in the text of the rule constrains the Board from drawing the line unreasonably. And my colleagues certainly do not suggest that § 103.40(a) implicitly sneaks an actual-exercise requirement in through the back door. Any hope in that regard is laid to rest by their insistence, in discussing § 103.40(c), that exercise of control is unnecessary under the common law. In short, my colleagues have not blunted my criticism of their abandonment of the actual-exercise requirement by pointing to § 103.40(a) and its nebulous threshold requirement.[442]

In short, the combined effect of all these features of the final rule results in a dramatic expansion of the Board's joint-employer doctrine compared with the 2020 Rule and even compared with the Board's holding in *BFI*. At least it will do so if the final rule survives one or more of the inevitable court challenges it is destined to face. A betting person might hesitate to put money on its chances because, as demonstrated below, the final rule is wrong as a matter of law and unadvisable as a matter of policy.

*Common-Law Agency Principles Do Not Compel or Even Support the Final Rule*

My colleagues repeatedly and emphatically declare that common-law agency principles, and therefore the Act itself, preclude the 2020 Rule and compel their final rule. Among the statements they make are the following:

• ''After carefully considering nearly 13,000 comments, the Board believes that it is necessary and appropriate to

rescind the 2020 rule, which was contrary to the Act insofar as it was inconsistent with the common law of agency.''

• ''[W]e believe that the Board is required to rescind the 2020 rule . . . .''

• ''[W]e rescind the 2020 rule because it is inconsistent with common-law agency principles and therefore inconsistent with the National Labor Relations Act.''

• ''[B]ecause we are bound to apply common-law agency principles, we are not free to maintain a definition of 'joint employer' that incorporates the restriction that any relevant control an entity possesses or exercises be 'direct and immediate.' ''

• ''The 2020 rule introduced control-based restrictions that are inconsistent with common-law agency principles.''

• ''[W]e are foreclosed from maintaining the joint-employer standard set forth in [the 2020 rule] because it is not in accordance with the common-law agency principles the Board is bound to apply in making joint-employer determinations.''

• ''[T]he Board has concluded that the actual-exercise requirement reflected in the 2020 rule is . . . contrary to the common-law agency principles that must govern the joint-employer standard under the Act and that the Board has no statutory authority to adopt such a requirement.''

A reader might reasonably expect the majority to follow up those assertions with citations to judicial decisions, involving the NLRA and other materially similar statutes, in which the courts have found joint-employer status based *exclusively* on a never-exercised contractual right to control and/or indirect control of an essential term and condition of employment. Such readers will be sorely disappointed. The majority fails to cite a single judicial decision, much less a body of court precedent rising to the level of establishing the common law, that bases a joint-employer finding solely on a never-exercised contractual reservation of right to control or on indirect control of employees' essential terms and conditions. As I will show, judicial precedent addressing joint-employer status under both the NLRA and materially similar statutes requires that control be actually exercised. And as the following discussion will demonstrate, so does Board precedent, with narrow exceptions. Accordingly, the majority is mistaken when they claim that requiring the exercise of substantial direct and immediate control to establish joint-employer status is inconsistent with ''prior Board and judicial decisions.''

---

[442] As noted above, the majority also denies that their rule fails adequately to distinguish evidence of indirect control that bears on the joint-employer inquiry from evidence that simply documents the routine parameters of company-to-company contracting, as mandated by the D.C. Circuit, by pointing to § 103.40(f) of the final rule. Sec. 103.40(f) provides that evidence of an entity's control over matters that are immaterial to the existence of an employment relationship under common-law agency principles and that do not bear on the employees' essential terms and conditions of employment is not relevant to the determination of whether the entity is a joint employer. In other words, § 103.40(f) is mostly just the inverse of Sec. 103.40(a) and, as such, furnishes no more guidance than does § 103.40(a). And to the extent that it is not the inverse of § 103.40(a), it is the inverse of § 103.40(b), which confirms that my colleagues do indeed take the position that by defining a closed set of essential terms and conditions, they have responded to the D.C. Circuit's mandate.

The 2020 Rule was not inconsistent with the majority of Board precedent addressing joint-employer status under the Act.

A survey of Board decisions addressing the issue of joint-employer status reveals that, with narrow exceptions, the Board has relied, at least in part, on the putative joint-employer's *actual* exercise of direct control over terms and conditions of employment. Accordingly, the majority's decision to make never-exercised authority to control or indirect control independently sufficient to establish joint-employer status represents a sharp break from Board precedent.

Contrary to my colleagues' suggestion, *Greyhound Corp.,* 153 NLRB 1488 (1965), does not support finding joint-employer status based exclusively on a never-exercised right to control or indirect control. There, the Board found that Greyhound was a joint employer of its cleaning contractor's employees based in part on Greyhound's actual exercise of substantial direct and immediate control over the employees' essential terms and conditions of employment. Specifically, the Board relied on the fact that Greyhound had actually engaged in ''detailed supervision'' of the contractor's employees on a day-to-day basis regarding the manner and means of their performance. Id. at 1496. The Board also relied on evidence that Greyhound had actually prompted the discharge of one of the contractor's employees whom Greyhound deemed unsatisfactory. Id. at 1491 n. 8. To be sure, the Board also gave some weight to provisions in the contract between Greyhound and the contractor, which granted Greyhound the right to specify the ''exact manner and means'' through which the employees' work would be accomplished, to control their wages, to set their schedules, and to assign employees to perform the work. Id. at 1495–1496. But the Board specifically stated that ''[t]he joint employer finding herein is premised on the common control *exercised* by Greyhound and [the cleaning contractor] over the employees.'' Id. at 1492 (emphasis added). And the Board explained that Greyhound had ''reserved to itself, both as a matter of express contractual agreement *and in actual practice,* rights over these employees which are consistent with its status as their employer along with [the cleaning contractor].'' Id. at 1495 (emphasis added). In short, *Greyhound* is consistent with both subsequent Board joint-employer precedent and the 2020

Rule. It does not support the majority's final rule.[443]

The majority mischaracterizes Board precedent during the two decades following *Greyhound,* implying that it reflects a ''traditional'' approach under which proof that an entity exercised control over the terms and conditions of employment of another employer's employees was unnecessary to establish joint-employer status.[444] The majority asserts that ''Board precedent from this time period generally did not require a showing that both putative joint employers actually or directly exercised control.'' But they fail to acknowledge that the Board has *never* based a joint-employer finding solely on ''indirect control,'' and most of the Board cases my colleagues cite as demonstrating a ''traditional'' reliance on a contractual reservation of right to control are limited to a single category of cases involving department stores with licensed departments.[445] These cases do not bear the weight the majority gives them.[446]

---

[443] In an earlier case related to *Greyhound,* the Supreme Court held that a federal district court lacked subject-matter jurisdiction to enjoin the Board from conducting a representation election based on the plaintiff's challenge to the Board's joint-employer determination in the representation proceeding. *Boire* v. *Greyhound Corp.,* 376 U.S. 473 (1964). Although the Court did not rule on the joint-employer issue, it did not criticize the Board's finding that Greyhound and the cleaning contractor constituted a joint employer ''because they had *exercised* common control over the employees.'' Id. at 475 (emphasis added).

[444] The issue here is not whether an unexercised contractual right of control and/or indirect control is or are relevant considerations in a joint-employer analysis. They are, as the 2020 Rule recognized. The issue is whether either one can independently establish joint-employer status.

[445] As these department-store cases demonstrate, licensed departments were seamlessly integrated with the department store as a whole, and employees of the licensee were indistinguishable from the department store's employees. See, *e.g., Spartan Department Stores,* 140 NLRB 608, 610 (1963) (observing that the agreement between the department store and the licensee was ''in furtherance of Spartan's intention of creating the appearance of a single, integrated department store''). Indeed, in one such case, the parties' contract expressly provided that employees in the licensed department ''shall be the employees of'' the department store. *Taylor's Oak Ridge Corp.,* 74 NLRB 930, 932 (1947).

[446] In the department-store cases, the Board did not purport to apply common-law agency principles, much less cite common-law cases finding joint-employer status based on reserved authority to control alone. When the Board stated any standard at all, it relied on whether the department store was in a position to influence the licensee's labor relations policies. See, *e.g., United Mercantile, Inc. d/b/a Globe Discount City,* 171 NLRB 830 (1968); *Buckeye Mart,* 165 NLRB 87 (1967), enfd. mem. 405 F.2d 1211 (6th Cir. 1969); *Value Village,* 161 NLRB 603 (1966). These cases do not support the majority's view that the common law compels a conclusion that contractually reserved authority to control is sufficient to make an entity a joint employer of another entity's

In fact, during the two decades following *Greyhound,* the Board regularly found no joint-employer status where the putative joint employer possessed some reserved contractual authority to control essential terms, and even where it actually exercised control but to too limited an extent to warrant a joint-employer finding. For example, in *Hychem Constructors, Inc.,* 169 NLRB 274, 276 (1968), the Board found no joint-employer status despite a putative employer's reserved right to approve wage increases and overtime, its policy of consulting on proposed layoffs, and its ''as yet unexercised prerogative to remove an undesirable . . . employee.'' Similarly, in *S. G., Tilden, Inc.,* 172 NLRB 752, 753 (1968), the Board found a franchisor was not a joint employer of its franchisees' employees despite its specification of the franchisees' hours of operation and its requirement that they adhere to certain pricing and housekeeping standards. Echoing the standard applied in the department-store cases, the Board in *S. G. Tilden* found ''no clear indication . . . that Respondent Tilden intended to, or in fact did, *exercise direct control* over the labor relations of [the franchisees].'' Id. (emphasis added); see also *Furniture Distribution Center, Inc.,* 234 NLRB 751, 751–752 (1978) (evidence that ''user'' business and ''supplier'' business conferred and jointly decided on the number of supplied employees and the number of hours those employees would work each week deemed insufficient to create a joint-employer relationship); *Cabot Corp.,* 223 NLRB 1388, 1389, 1390 n.10, 1392 (1976) (no joint-employer status despite putative joint employer reserving the right to inform direct employer of the specific

---

employees. Indeed, in *Buckeye Mart,* it was found that the department store (Buckeye) was *not* the joint employer of the employees of the licensee (Manley) despite possessing contractually reserved authority to require Manley to discharge employees that Buckeye deemed objectionable. 165 NLRB at 88 (''Although Buckeye may compel the discharge of any Manley employee . . . , Buckeye is not in a position to 'influence' Manley's labor policies and . . . is not a joint employer with Manley . . . .''). Accordingly, the majority's reliance on Board cases involving licensing relationships in the department-store industry is misplaced. The majority also cites two cases—*General Motors Corp. (Baltimore, MD),* 60 NLRB 81 (1945), and *Anderson Boarding & Supply Co.,* 56 NLRB 1204 (1944)—where the issue was whether an industrial facility was the joint employer of employees working in its cafeteria. In neither case did the Board mention the common law of agency, and even if the common law was implicit in its analysis, two cases do not amount to a ''traditional'' practice. Moreover, as the D.C. Circuit forcefully reminded the Board in *Browning-Ferris Industries of California, Inc.* v. *NLRB,* ''Congress has tasked the courts, and not the Board, with defining the common-law scope of 'employer.' '' 911 F.3d at 1208. The Board, as an administrative agency, has no power to do so.

work to be performed and the equipment and personnel used, maintaining the right to "inspect, test, approve, and disapprove of work and services," requiring all employees to follow its safety regulations, and retaining the right to remove employees it deemed incompetent), affd. sub nom. *International Chemical Workers Local 483* v. *NLRB,* 561 F.2d 253 (D.C. Cir. 1977); *Westinghouse Electric Corp.,* 163 NLRB 914, 914–915 (1967) (no joint-employer status despite putative joint employer's occasional direct supervision of supplier employer's employees, review of supplied employees' timesheets for auditing purposes, and reservation of the right to request removal of "disorderly, incompetent, or objectionable persons from working at the site . . . . [S]uch conduct is clearly consistent with that of a contractor seeking to police its subcontract."); *Space Services International Corp.,* 156 NLRB 1227, 1232–1233 (1966) (no joint-employer status where putative joint employer "[reserved] the right to require removal from the work of any employee it deems incompetent, careless, or insubordinate" and exercised this right on at least one occasion with respect to a management official). Accordingly, contrary to the majority's assertion, Board precedent prior to the 1984 joint-employer decisions in *TLI* and *Laerco Transportation* did not make indirect control independently sufficient to establish joint-employer status, and cases relying solely on contractually reserved authority to control do not apply a common-law test and therefore do not support the majority's claim that *TLI* and *Laerco* abandoned a "traditional, common-law based standard" for determining joint-employer status.[447]

Nor do the last forty years of relevant Board precedent support the majority's characterization of that period as marked by a radical departure from a prior "traditional" joint-employer standard. To begin, *TLI* and *Laerco Transportation* merely clarified the appropriate legal standard by echoing the United States Court of Appeals for the Third Circuit's articulation in *NLRB* v. *Browning-Ferris Industries of Pennsylvania, Inc.,* 691 F.2d at 1123: "The basis of the [joint-employer] finding is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer. Thus, the 'joint employer' concept recognizes that the business entities involved are in fact separate but that they *share* or co-determine those matters governing the essential terms and conditions of employment" (internal citations omitted) (emphasis in original). Importantly, the Third Circuit equated this "share or codetermine" standard with the exertion—*i.e.,* exercise—of significant control: "[W]here two or more employers *exert significant control* over the same employees—where from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of employment—they constitute 'joint employers' within the meaning of the NLRA." Id. at 1124. The Third Circuit's "share or codetermine" standard is consistent (with narrow exceptions) with the Board's pre-*TLI* and pre-*Laerco* joint-employer decisions. As shown below, it is also consistent with *TLI, Laerco,* and the Board's subsequent joint-employer decisions—until, of course, *BFI* took joint-employer doctrine in an entirely unprecedented direction. But it flatly contradicts the definition of that

standard that my colleagues adopt today.[448]

In *TLI, Inc.,* 271 NLRB at 798–799, the Board reversed a judge's finding of joint-employer status, noting that the putative joint employer did not *sufficiently* affect the terms and conditions of employment of the supplier employer's drivers: the "supervision and direction exercised by [the putative joint employer] on a day-to-day basis [was] both limited and routine." Id. at 799.[449] Similarly, in *Laerco Transportation,* 269 NLRB at 325, the Board found that the putative joint employer did not possess "sufficient indicia of control" over a supplier employer's drivers to create a joint-employer relationship. The Board found evidence that the putative joint employer gave drivers directions on which routes to follow and attempted to resolve personality conflicts to constitute merely "minimal and routine" supervision, and that most other terms and conditions of employment of the drivers were effectively controlled by their direct employer. Id. at 326. Thus, in *TLI* and *Laerco,* the Board faithfully applied the Third Circuit's standard—requiring "two or more employers [to] *exert significant control* over the same employees" in order to satisfy the "share or codetermine" standard and create a joint-employer relationship under the Act—to the facts of those cases, contrary to the majority's assertion that these decisions lacked "a clear basis in established common-law agency principles or prior . . . judicial decisions."

Subsequent joint-employer decisions were similarly consistent with both the

---

[447] For example, in *Floyd Epperson,* cited by the majority, the Board noted anecdotal evidence of the putative joint employer's indirect control over wages and discipline, but its joint-employer finding was largely based on evidence of direct and immediate supervision of the employees involved. 202 NLRB 23, 23 (1973), enfd. 491 F.2d 1390 (6th Cir. 1974). In *Lowery Trucking Co.,* also cited by the majority, the Board noted the putative joint employer's unexercised right to reject a supplier employer's driver, but it highlighted the putative joint employer's actual exercise of detailed supervision, participation in the hiring process, discharge of two drivers, and discipline of a third. 177 NLRB 13, 15 (1969), enfd. sub nom. *Ace-Alkire Freight Lines* v. *NLRB,* 431 F.2d 280 (8th Cir. 1970). Similarly, in *Carrier Corp.* v. *NLRB,* 768 F.2d 778 (6th Cir. 1985), the court of appeals relied in part on the putative joint employer's reserved authority to reject drivers that did not meet its standards and to direct the primary employer to remove drivers for improper conduct, but in finding that substantial evidence supported the Board's joint-employer finding, the court primarily relied on evidence that Carrier "exercised substantial day-to-day control over the drivers' working conditions" and

consulted with the undisputed employer over wages and benefits. Id. at 781; see also *International Chemical Workers Local 483* v. *NLRB,* 561 F.2d 253, 257 (D.C. Cir. 1977) (affirming Board's finding of no joint-employer status in part because the putative joint employer "did not have authority to, *and did not actually,* direct [the primary employer's] employees in the details of their work") (emphasis added). Moreover, most of the cases my colleagues rely on to support their claim that the Board adhered to a "traditional, common-law based" joint-employer standard prior to *TLI* and *Laerco* involved department stores with licensed departments, where, as explained above, the Board stated and applied a test that asked whether the store was in a position to influence the licensee's labor policies—and *Buckeye Mart* reveals the difference between that standard and a common-law based standard as my colleagues construe it.

[448] As noted above, the final rule incorporates the "share or codetermine" standard in newly revised Sec. 103.40(b). However, in Sec. 103.40(c), the final rule defines the "share or codetermine" standard to include indirect control of, and possession of a never-exercised authority to control, any essential term or condition of employment. This is not how the standard has been understood or applied historically, and it is contrary to the understanding of the very court that announced it, which defined the "share or codetermine" standard as a shared "exert[ion]" of "significant control" over a group of employees. *NLRB* v. *Browning-Ferris Industries of Pennsylvania,* 691 F.2d at 1124.

[449] The Board in *TLI* reached this conclusion notwithstanding the language of the applicable contract, which provided that the putative joint employer "will solely and exclusively be responsible for maintaining operational control, direction and supervision" over the supplier's drivers. Id. at 798. As explained above, this is consistent with the historical treatment of reserved authority to control as generally being insufficient to support joint-employer status absent evidence of substantial direct control. The Board also noted that the presence of the putative joint employer's representative at two bargaining sessions did not alter the outcome, as "there [was] no evidence that he demanded specific reductions or that he made particular proposals." Id. at 799.

Third Circuit's definition of the "share or codetermine" standard and, in general, the Board's pre-1984 joint-employer decisions. In *AM Property Holding Corp.,* 350 NLRB 998, 1001 (2007), the Board explained that it has "generally found supervision to be limited and routine where a supervisor's instructions consist primarily of telling employees what work to perform, or where and when to perform the work, but not how to perform the work." It further explained that "[i]n assessing whether a joint employer relationship exists, the Board does not rely merely on the existence of . . . contractual provisions [governing the right to approve hiring], but rather looks to the actual practice of the parties." Id. at 1000.

In *Airborne Express,* 338 NLRB 597 (2002), the Board adopted the judge's finding that there was no joint-employer relationship, based in part on evidence that the putative joint employer entered into contracts that explicitly afforded the independent contractors full and complete control over hiring, firing, discipline, work assignment, and other terms and conditions of employment. Id. at 605. The Board noted that "the essential element in this analysis is whether a putative joint employer's control over employment matters is direct and immediate." Id. at 597 n.1;[450] see also *Flagstaff Medical Center,* 357 NLRB 659, 667 (2011) ("[T]he evidence regarding Sodexho's role in hiring, discharging, disciplining, supervising, and evaluating housekeepers does not establish that Sodexho shared or codetermined essential terms and conditions of employment.").

During this time period, no appellate court criticized the Board's formulation of the joint-employer standard. As the *BFI* dissenters observed, if it were true that *TLI, Laerco,* and subsequent decisions departed without explanation from the Board's prior joint-employer precedent, *some* court of appeals would have taken issue: "It is simply impossible that all the courts of appeals would have missed this train wreck." *BFI,* 362 NLRB at 1633 (Members Miscimarra and Johnson, dissenting).

The final rule's reliance on independent-contractor precedent to

support their standard for determining joint-employer status is misplaced.

The majority's legal justification for abandoning the requirement that a putative joint employer actually exercise some control over at least one term or condition of employment of another employer's employees boils down to a misplaced reliance on broad statements in cases where the issue presented is whether certain individuals are employees or independent contractors. Based on a review of judicial decisions and compendiums of law addressing common-law principles pertinent to deciding that issue, my colleagues say that they are "not aware of any common-law judicial decision or other common-law authority directly supporting the proposition that, given the existence of a putative employer's contractually reserved authority to control, further evidence of direct and immediate exercise of that control is necessary to establish a common-law employer-employee relationship." They miss my point, however, by conflating separate and distinct points. The issue here is not whether actual exercise of control by a putative employer is required to make a worker an employee of that employer and not an independent contractor. The issue is whether a worker who is undisputedly an employee of one entity is jointly employed by a second entity. My colleagues acknowledge that these are distinct issues. They must do so, as the D.C. Circuit has emphatically rejected any attempt to equate them. See *Browning-Ferris Industries of California, Inc.* v. *NLRB,* 911 F.3d at 1213 ("Browning-Ferris cites no case in which we have applied an employee-or-independent-contractor test to resolve a question of joint employment, and we have found none.") Yet, immediately following the statement quoted above—which, again, is based on precedent that addresses the employee-or-independent-contractor issue—my colleagues leap to the conclusion that they are statutorily precluded from requiring actual exercise of control to establish that an entity is a joint employer. In other words, the majority acknowledges the distinction between the employee-or-independent-contractor issue and the joint-employer issue and erases the distinction practically in the same breath. To stay within the boundaries of the common law as regards joint-employer status, they should not—indeed, must not—promulgate a rule that permits that status to be predicated solely on a never-exercised contractual reservation of right to control and/or indirect control where judicial decisions in

joint-employer cases do not go that far—and as I explain below in the section after this one, they do not.

Moreover, my colleagues' reliance on independent-contractor precedent to set the standard for determining joint-employer status depends on equating "right to control" for purposes of deciding employee-or-independent-contractor issues with contractually reserved authority to control the terms and conditions of employment of another business's employees—but the equation does not hold. As the majority emphasizes, courts have explained that workers are employees rather than independent contractors if the putative employer possesses a right to control their manner and means of performance, regardless of whether that right is exercised. However, the independent-contractor cases make clear that in that context, a finding of "right to control" is a legal conclusion based on a totality-of-the-circumstances analysis applying twelve factors culled from the federal common law of agency to the facts of the case. See, *e.g., Community for Creative Non-Violence* v. *Reid,* 490 U.S. 730, 751–752 (1989) (listing the relevant factors).[451] And, as the Supreme Court recognized, "no one of these factors is determinative." Id. at 752. If, on balance, an analysis of the facts of a case in light of these multiple factors supports a finding that the hiring party has the right to control the manner and means of the worker's performance, then the hiring party is the worker's employer regardless of whether it exercises its right to control her manner and means of performance by directing the details of her work. In short, the "right to control manner and means of performance" under independent-contractor precedent is one thing, and a never-exercised contractual reservation of right to affect one or more essential terms and conditions of employment of another employer's employees is quite another. The majority simply errs in treating these two distinct legal doctrines as equivalent.[452]

---

[450] In *Airborne,* the Board said that about twenty years earlier, it had "abandoned its previous test in this area, which had focused on a putative joint employer's *indirect* control over matters relating to the employment relationship." Id. (emphasis in original). Frankly, I believe this statement mischaracterized the Board's earlier joint-employer precedent. As shown above, that precedent did not focus on indirect control. Those cases ascribed some significance to indirect control, but they did not find indirect control to be outcome-determinative absent evidence of direct control.

[451] Those factors are (1) the skill required; (2) the source of the instrumentalities and tools; (3) the location of the work; (4) the duration of the relationship between the parties; (5) whether the hiring party has the right to assign additional projects to the hired party; (6) the extent of the hired party's discretion over when and how long to work; (7) the method of payment; (8) the hired party's role in hiring and paying assistants; (9) whether the work is part of the regular business of the hiring party; (10) whether the hiring party is in business; (11) the provision of employee benefits; and (12) the tax treatment of the hired party. Id.

[452] One reason that judicial precedent distinguishing between independent contractors and employees is ill-suited to fully resolve joint-employer issues is that independent-contractor

Continued

This was made clear by the D.C. Circuit's opinion in *Browning-Ferris Industries of California* v. *NLRB*. As noted above, the court of appeals made clear that "a rigid focus on independent-contractor analysis omits the vital second step in joint-employer cases, which asks, once control over the workers is found, *who* is exercising that control, *when*, and *how*." 911 F.3d at 1215 (emphasis in original). As the court explained, "using the independent-contractor test exclusively to answer the joint-employer question would be rather like using a hammer to drive in a screw: it only roughly assists the task because the hammer is designed for a different purpose." Id. Today's final rule simply disregards the second step of the common-law joint-employer standard identified by the D.C. Circuit. It eliminates any requirement of actual exercise of control and thus renders immaterial "how" control is exercised (directly or indirectly) or "when" (never, rarely, occasionally, or frequently). Further, the D.C. Circuit's pointed decision to avoid answering whether a joint-employer finding could ever be based solely on an unexercised contractual reservation of authority to control, 911 F.3d at 1213, or on indirect control, id. at 1218, undermines my colleagues' assertion that the common-

cases *necessarily* involve exercise of control by the sole putative employer over the putative employee. That entity has engaged the worker (*i.e.*, hired her to perform work), has decided upon the compensation to be paid (*i.e.*, determined her wages), and has actually paid her that compensation. This is seen in *Singer Mfg. Co.* v. *Rahn*, 132 U.S. 518, 523 (1889), a case my colleagues rely on heavily to support their proposition that exercise of control is unnecessary under the common law, not only in the independent-contractor context but in the joint-employer context as well. In *Singer Mfg. Co.* v. *Rahn*, the Court held that a worker was an employee, not an independent contractor, based on the written terms of a contract between the worker and the company. There, the company engaged (*i.e.*, hired) an individual to sell its sewing machines and decided upon his compensation, which, along with other terms, was set forth in a contract between the two parties. To be sure, the Court's analysis focused on the terms of the contract, but to conclude that this compels the conclusion that joint-employer status likewise may be based solely on a never-exercised contractual right to control ignores that in the independent-contractor context, where there is only one alleged employer, that entity necessarily exercises direct control of at least two things that my colleagues and I agree constitute essential terms and conditions. Even if it exercises control of nothing else, it engages—*i.e.*, hires—the worker, and it compensates—*i.e.*, pays—the worker. Notably, it may do so and the individual thus hired and paid may *still* be an independent contractor, yet my colleagues would make a joint employer of businesses that *never* exercise direct control over *any* essential term or condition. Precedent like *Singer* does not support the proposition that a court (or the Board) must or should find that one entity is a joint employer of another entity's employees based exclusively on a never-exercised contractual reservation of right to control.

law of agency compels affirmative answers to those two questions.[453]

The final rule is inconsistent with the common-law joint-employer standard applied by the courts under other federal statutes.

The majority minimizes federal court precedent specifically analyzing joint-employer issues under materially similar federal statutes, *i.e.*, statutes that, like the NLRA, contain a definition of "employee" that may not be interpreted to exceed the boundaries established by common-law agency principles.[454] These statutes include Title VII of the Civil Rights Act of 1964,[455] the Age Discrimination in Employment Act,[456] and Section 504 of the Rehabilitation Act of 1973.[457] Applying common-law agency principles in these joint-employer cases, federal appellate courts have considered the extent to which a putative joint employer has *exercised* control over the essential terms and conditions of employment of another company's employees. Courts have considered a host of factors (*e.g.,* control exercised

[453] My colleagues cite a plethora of decisions (including state law cases more than a hundred years old), the overwhelming majority of which focus on independent contractor, workers' compensation, and tort liability matters. Although these cases are informative regarding the contours of the master-servant doctrine with respect to individuals alleged to have an employment relationship with a single entity, they have limited utility where workers are unquestionably employees of one entity, and the issue is whether a second entity jointly employs them. My view here is fully consistent with that of the D.C. Circuit in *Browning-Ferris Industries of California, Inc.* v. *NLRB*. As the court there stated, "Browning-Ferris's contention that the joint-employer and independent-contractor tests are virtually identical lacks any precedential grounding. Browning-Ferris cites no case in which we have applied an employee-or-independent-contractor test to resolve a question of joint employment, and we have found none." 911 F.3d at 1213.

[454] See, *e.g., Hurst* v. *McDonough,* 2022 U.S. App. LEXIS 9725 (10th Cir. Apr. 12, 2022); *Felder* v. *U.S. Tennis Assn.,* 27 F.4th 834 (2d Cir. 2022); *Perry* v. *VHS San Antonio, LLC,* 990 F.3d 918 (5th Cir. 2021); *Nethery* v. *Quality Care Investors, L.P.,* 814 Fed. Appx. 97 (6th Cir. 2020); *EEOC* v. *Global Horizons, Inc.,* 915 F.3d 631 (9th Cir. 2019); *Frey* v. *Hotel Coleman,* 903 F.3d 671 (7th Cir. 2018); *Garcia-Celestino* v. *Ruiz Harvesting, Inc.,* 843 F.3d 1276 (11th Cir. 2016); *Al-Saffy* v. *Vilsack,* 827 F.3d 85 (D.C. Cir. 2016); *Faush* v. *Tuesday Morning, Inc.,* 808 F.3d 208 (3d Cir. 2015); *Casey* v. *Dep't of Health & Human Services,* 807 F.3d 395 (1st Cir. 2015); *Butler* v. *Drive Automotive Industries of Am.,* 793 F.3d 404 (4th Cir. 2015).

[455] 42 U.S.C. 2000e *et seq.*

[456] 29 U.S.C. 621 *et seq.*

[457] 29 U.S.C. 794. In contrast, under the Fair Labor Standards Act, 29 U.S.C. 621 *et seq.*, the joint-employer doctrine is not limited by common-law agency principles. See, *e.g., Salinas* v. *Commercial Interiors, Inc.,* 848 F.3d 125, 137 (4th Cir. 2017) ("[T]he FLSA's definition of 'employee' encompass[es] a broader swath of workers than would constitute employees at common law.") (citing *Nationwide Mutual Ins. Co. of America* v. *Darden,* 503 U.S. 318, 326 (1992)).

over hiring, firing, and day-to-day supervision), drawing guidance from Supreme Court precedent distinguishing between independent contractors and employees, but tailoring the analysis to account for the joint-employer context, *i.e.*, workers who are undisputedly an employee of one employer but who may have a second, joint employer. Courts consider the totality of the circumstances, with no one factor being determinative, in ascertaining whether the putative joint employer has exerted a sufficient amount of control over the workers at issue to be deemed their joint employer. Generally speaking, they have emphasized the extent of the putative joint employer's active role in hiring and firing the workers at issue and in supervising their manner and means of performance.

Applying common-law principles, every circuit court that has decided joint-employer issues under statutes materially similar to the NLRA applies a significantly more demanding joint-employer standard than the one promulgated by my colleagues today.[458]

[458] The First Circuit examines fifteen factors, which "are to be weighed in their totality," with a stated emphasis on the extent to which the putative joint employer controls the manner and means by which the worker completes her tasks. *Casey,* 807 F.3d at 405 (finding no joint-employer relationship where the putative joint employer "did not exert such control over [the employee's] performance of her job duties as to establish an employment relationship"). The Second Circuit asks whether two or more entities "share significant control" over the same employees, examining thirteen non-exhaustive factors, with no single factor being decisive, and focusing on the extent to which control was exercised. *Felder,* 27 F.4th 843–844 (finding no joint-employer relationship despite fact that putative joint employer exercised control by preventing its subcontractor from referring a particular worker for assignment). The Third Circuit focuses on which entity paid workers' salaries, hired and fired them, and had control over their daily employment activities. *Faush,* 808 F.3d at 216 (holding that district court erred in granting summary judgment in favor of putative joint employer that had given employee assignments, directly supervised him, provided site-specific training, furnished necessary equipment and materials, and verified the number of hours he had worked on a daily basis). The Fifth Circuit applies a "hybrid" test that focuses on the right to hire, fire, supervise, and set work schedules, and on which entity paid the employee's salary, withheld taxes, provided benefits, and set the terms and conditions of employment. *Perry,* 990 F.3d at 928–929 (finding that hospital was not joint employer of physician supplied to it by professional association despite fact that hospital had exercised its "limited contractual right to 'fire' [him] by requesting that [the professional association] terminate his professional services agreement"). The Sixth Circuit asks whether two entities share or codetermine those matters governing essential terms and conditions of employment, examining a putative joint employer's exercise of its ability to hire, fire or discipline employees, affect their compensation and benefits, and direct and supervise their performance. *EEOC* v. *Skanska USA Building, Inc.,* 550 Fed. Appx. 253, 256 (6th Cir. 2013) (finding that general contractor was joint employer of

Not a single circuit has held or even suggested that an entity can be found to be the joint employer of another entity's employees based solely on a never-exercised contractual reservation of right to affect essential terms or on "indirect control," *i.e.,* conduct other than actually determining (alone or in collaboration with the undisputed employer) employees' essential terms and conditions of employment.[459]

Illustrative is *Felder* v. *U.S. Tennis Assn.,* 27 F.4th at 842–844. In that case, the Second Circuit articulated for the first time its standard for analyzing joint-employer status under Title VII. After surveying the legal landscape, the court explained that it will find a joint-employer relationship "when two or more entities, according to common law principles, share significant control of the same employee." Importantly, the court quoted with approval cases from other circuits requiring proof that the putative joint employer "exercise[d] significant control." [460] The court explained that, "[*b*]*ecause the exercise of control is the guiding indicator, . . .* any relevant factor may be considered so long as [it is] drawn from the

common law of agency" synthesized in *Community for Creative Non-Violence* v. *Reid,* 490 U.S. at 730. Id. at 844 (emphasis added). Broadly, those factors include whether the putative joint employer "'paid [the employees'] salaries, hired and fired them, and had control over their daily activities.'" Id. at 843 (quoting *Faush* v. *Tuesday Morning, Inc.,* 808 F.3d at 214 (3d Cir. 2015) (alteration in *Felder*)). Applying this standard, the *Felder* court held that a lower court had properly granted the putative joint employer's motion to dismiss the complaint because the plaintiff had failed to allege that the putative joint employer "would have exerted significant control" over his terms and conditions of employment had it not rejected a subcontractor's attempt to refer him to it. Id. at 845.

Similarly, in *Butler* v. *Drive Automotive Industries of America,* the Fourth Circuit explained that "the [joint-employer] doctrine's emphasis on determining which entities *actually exercise control* over an employee is consistent with Supreme Court precedent interpreting Title VII's definitions." 793 F.3d at 409 (emphasis added). See also *Adams* v. *C3 Pipeline Constr. Inc.,* 30 F.4th at 961 (10th Cir. 2021) ("Both entities are [joint] employers if they both exercise significant control over the same employees.") (internal quotation marks and citations omitted); *Whitaker* v. *Milwaukee County,* 772 F.3d 802, 810 (7th Cir. 2014) ("An entity other than the actual employer may be considered a 'joint employer' 'only if it exerted *significant* control' over' the employee.") (quoting *G. Heileman Brewing Co.* v. *NLRB,* 879 F.2d 1526, 1530 (7th Cir. 1989) (emphasis added);[461] *Gulino* v. *N.Y. State Educ. Dept.,* 460 F.3d 361, 379 (2d Cir. 2006) ("The *Reid* factors countenance a[n employment] relationship where the level of control is direct, obvious, and concrete, not merely indirect or abstract.").[462]

The standard promulgated today, which does not require proof of *any* exercise of control, is strikingly inconsistent with the standards applied by the federal courts of appeals when applying common-law agency principles to determine joint-employer status. As summarized above, federal appellate courts have repeatedly focused on the extent to which a putative joint employer has *exercised* control. In contrast, the standard my colleagues promulgate resembles the substantially easier-to-satisfy standard applicable under the Fair Labor Standards Act, where "economic reality . . . is to be the test of employment." *Goldberg* v. *Whitaker House Co-op., Inc.,* 366 U.S. 28, 33 (1961) (internal quotation marks omitted). "Because of the uniqueness of the FLSA, a determination of joint employment [under that statute] 'must be based on a consideration of the total employment situation and the economic realities of the work relationship.'" *In re Enterprise Rent-A-Car Wage & Employment Practices Litigation,* 683 F.3d 462, 469 (3d Cir. 2012) (quoting *Bonnette* v. *California Health & Welfare Agency,* 704 F.2d 1465, 1470 (9th Cir. 1983)). Application of a control-based test "would only find joint employment where an employer had direct control over the employee, but the FLSA designates those entities with sufficient *indirect* control as well." Id. at 469.

---

[459] The majority disputes this statement, citing *EEOC* v. *Global Horizons, Inc.,* 915 F.3d at 631. That case does not support my colleagues' position, for reasons explained below.

[460] The court in *Felder,* id. at 843–844, cited *Knitter* v. *Corvias Mil. Living, LLC,* 758 F.3d 1214, 1226 (10th Cir. 2014) (quoting *Bristol* v. *Bd. of Cnty. Comm'rs of Cnty. of Clear Creek,* 312 F.3d 1213, 1218 (10th Cir. 2002) ("Under the joint employer test, two entities are considered joint employer . . . if they both 'exercise significant control over the same employees.'")), and *Plaso* v. *IJKG, LLC,* 553 Fed. Appx. 199, 204 (3d Cir. 2015) (quoting *Graves* v. *Lowery,* 117 F.3d 723, 727 (3d Cir. 1997) ("[A] joint employment relationship exists when 'two entities exercise significant control over the same employees.'")).

subcontractor's elevator-operator employees because it had "supervised and controlled the operators' day-to-day activities without any oversight from [the subcontractor]," "routinely exercised its ability to direct and supervise the operators' performance," and "set the operators' hours and daily assignments"). The Seventh Circuit applies five factors: (1) the extent of the putative joint employer's control and supervision of the worker, including scheduling and manner and means of performance of work; (2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace; (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations; (4) method and form of payment and benefits; and (5) length of job commitment and/or expectations. *Frey,* 903 F.3d at 676. The Seventh Circuit explained that in applying its five-factor test, it "looks to see whether the putative employer exercised sufficient control." Id. at 678. The Ninth Circuit focuses on "the extent of control that one may exercise over the details of the work of the other," "with no one factor being decisive." *Global Horizons, Inc.,* 915 F.3d at 638. The Tenth Circuit applies the "share or codetermine" standard and looks to whether both entities "exercise[d] significant control." *Adams* v. *C3 Pipeline Constr. Inc.,* 30 F.4th 943, 961 (10th Cir. 2021).

[461] The majority dismisses the Seventh Circuit's decision in *Whitaker* because, they say, the court "drew its articulation of the [joint-employer] standard from a Board decision" applying *Laerco.* What my colleagues fail to acknowledge, however, is that the court adopted that standard as circuit law. Moreover, the Seventh Circuit in *Whitaker* did *not* rely on Board precedent for its holding that joint-employer status requires that an entity must exercise control to be deemed a joint employer. See *Whitaker,* 772 F.3d at 810–811 ("We . . . have held, however, 'that for a joint-employer relationship to exist, each alleged employer must *exercise* control over the working conditions of the employee, although the ultimate determination will vary depending on the specific facts of each case.' *Moldenhauer* v. *Tazewell-Pekin Consol. Commc'ns Ctr.,* 536 F.3d 640, 644 (7th Cir. 2008) (emphasis added). . . .").

[462] My colleagues' overly selective reading of the Title VII cases is unpersuasive. Despite their best

efforts, my colleagues' parsing of isolated words or phrases does not detract from the primary theme in the Title VII cases that exercise of control is the "guiding indicator." *Felder,* 27 F.4th at 844; id. at 847 ("Absent further allegations that the USTA *would have significantly controlled the manner and means of Felder's work* as a security guard, the complaint does not cross the line from speculative to plausible on the essential Title VII requirement of an employment relationship.") (emphasis added).

Additionally, my colleagues say that in some of the Title VII cases I cite above, the courts applied a standard that incorporates an "economic realities" test, and those cases cannot inform the Board's formulation of a joint-employer standard under the NLRA because Congress, in the Taft-Hartley Act, repudiated the "economic realities" test the Supreme Court applied in *NLRB* v. *Hearst Publications,* 322 U.S. 111 (1944). Once again, the majority is crossing its wires between independent-contractor law and joint-employer law. In *Hearst,* the Court applied an "economic realities" standard to determine employee-or-independent-contractor status under the NLRA. In Title VII cases, circuit courts apply an "economic realities" test to discern whether a putative joint employer actually exercised control over essential terms and conditions of employment of another employer's employees. See, *e.g., Perry* v. *VHS San Antonio, LLC,* 990 F.3d at 929 ("The economic-realities component of the 'hybrid economic realities/ common law control test' focuses on who paid the employee's salary, withheld taxes, provided benefits, and set the terms and conditions of employment."). Here again, my colleagues' insistence on basing a joint-employer standard on independent-contractor precedent leads them astray.

Notably, in contrasting the breadth of the FLSA's economic-realities standard with the common-law test, the Third Circuit quoted its earlier—and leading—decision on the joint-employer standard under the NLRA, writing that under the Act, "the alleged [joint] employer must exercise 'significant control.'" Id. at 468 (quoting *Browning-Ferris Industries of Pennsylvania,* 691 F.2d at 1124).[463]

As the preceding discussion demonstrates, in eliminating the requirement that a putative joint employer must be shown to have exercised substantial direct and immediate control over the essential terms and conditions of employment of another entity's employees, my colleagues have gone beyond the boundaries of the common law.[464] They

fail to support their repeated declarations that common-law agency principles compel the Board to adopt a standard that does not require proof that an entity *actually* exercised control over the employment terms and conditions of another employer's employees before it will be found to be their joint employer. This is fatal to the majority's final rule. In enacting the Taft-Hartley Act, Congress made clear that under the NLRA, the common law of agency is the controlling standard,[465] and " 'an agency regulation must be declared invalid, even though the agency might be able to adopt the regulation in the exercise of its discretion, if it was not based on the [agency's] own judgment but rather on the unjustified assumption that it was Congress' judgment that such [a regulation is] desirable' or required." *Transitional Hospitals Corp. of La.* v. *Shalala,* 222 F.3d 1019, 1029 (D.C. Cir. 2000) (quoting *Prill* v. *NLRB,* 755 F.2d 941, 948 (D.C. Cir. 1985)). Today's final rule is based on such an unjustified assumption.

The Final Rule Is Unsound as a Matter of Policy

In a couple of paragraphs, my colleagues do very briefly pay lip service to a backup position that, even assuming the 2020 Rule is permissible under the Act, they would rescind it and promulgate their final rule for policy reasons. In this regard, my colleagues assert that the final rule "advances the Act's purposes to ensure that, if they choose, all employees have the opportunity to bargain with those entities that possess the authority to control or exercise the power to control the essential conditions of their working lives," and that the final rule "may particularly benefit vulnerable employees who are overrepresented in workplaces where multiple firms possess or exercise control, including immigrants and migrant guestworkers, disabled employees, and Black employees and other employees of color." But these are mere conclusory remarks. My colleagues do not support their assertions; they dismiss commenters' weighty policy-based criticisms of the rule as "misdirected";

and they fail to grapple with the reality that their joint-employer standard is likely to frustrate collective bargaining and erect barriers to reaching collective-bargaining agreements. It is not clear to me how the vulnerable employees cited by my colleagues are benefited by a rule that makes it more difficult for their representatives to obtain a collective-bargaining agreement and, in turn, for them to gain the statutory protections afforded by such an agreement.

Even assuming for argument's sake that the final rule does not exceed the limits established by common-law agency principles and therefore is not impermissible under the Act, I would still dissent from my colleagues' decision to promulgate the final rule because the 2020 Rule better promotes the Act's policy of encouraging collective bargaining as a means to reduce obstacles to the free flow of commerce. It bears repeating that the common law sets the outer limit of a permissible joint-employer standard under the Act and that the Board may adopt a more demanding standard for policy reasons.[466] In my view, joint-employer status under the Act should be imposed only on entities that play a significant, active role in hiring, supervising, or directing another employer's employees, in setting their wages, benefits, or hours of work, and/or in disciplining or discharging them. Only upon such a showing should the Board find joint-employer status and, accordingly, impose on the joint employer a duty to bargain in good faith with a union representing the jointly employed employees. That approach, requiring proof of *exercise* of control, is reflected in the 2020 Rule.

In contrast, I believe that today's final rule, rather than making bargaining more "meaningful," will prove detrimental to productive collective

---

[463] Even under the economic-realities standard applicable under the FLSA, the Third Circuit in *Enterprise Rent-A-Car* held that Enterprise Holdings, Inc. was not a joint employer of the employees of its wholly owned subsidiaries (rental-car facilities), despite its potential impact on their essential terms and conditions of employment. Among other significant actions, the parent corporation recommended salary ranges for the subsidiaries' branch employees and provided a standard performance-review form, job descriptions, and best practices. Id. at 466. Each subsidiary had discretion to adopt or disregard the parent's recommended employment practices. In finding that such indirect influence did not render the parent a joint employer under the FLSA, the court emphasized that the record failed to show "that [the parent's] actions at any time amounted to mandatory directions rather than mere recommendations." Id. at 470.

[464] Contrary to my colleagues' assertion, the final rule's elimination of the actual-exercise requirement finds no support in *EEOC* v. *Global Horizons.* In that case, it was undisputed that two companies operating orchards (the "Growers") were joint employers of workers from Thailand supplied by Global Horizons under the federal H–2A guest worker program. 915 F.3d at 634 ("All parties agree that the Growers and Global Horizons were joint employers of the Thai workers with respect to orchard-related matters."). The only issue presented in *EEOC* v. *Global Horizons* was "whether the EEOC plausibly alleged that the Growers were also joint employers with respect to non-orchard related matters." Id. The court's analysis of that issue was shaped, as it had to have been, by federal regulations governing the H–2A guest worker program. First, under those regulations, an "employer" is required to provide H–2A guest workers certain benefits, including housing, meals, and transportation. "The H–2A program thus expands the employment relationship between an H–2A 'employer' and its workers to encompass housing, meals, and transportation, even though those matters would ordinarily fall outside the realm of the employer's responsibility." Id. at 640. Second, H–2A regulations define the term "employer" as an entity that, among other things, "has an employer relationship with respect to employees . . . as indicated by the fact that it *may* hire, pay, fire, supervise or otherwise control the work of any such employee." Id. (quoting 20 CFR 655.100(b)] (emphasis added). In other words, H–2A regulations define employer status with reference to *authority* to control essential terms and conditions of employment. It was in this unique context that the court stated that "[t]he power to control the manner in which housing, meals, transportation, and wages were provided to the

Thai workers, even if never exercised, is sufficient to render the Growers joint employers as to non-orchard-related matters." Id. at 641. Importantly, the court did not rely on a contractual reservation of right to control as the basis for its joint-employer finding. Rather, the court held that the Growers were joint employers by virtue of their regulatory obligations, and their "contractual delegation [of those duties to Global Horizons] did not absolve the Growers of their legal obligations as 'employers' under H–2A regulations." Id. at 640.

[465] See *NLRB* v. *United Insurance Co. of America,* 390 U.S. at 256.

[466] See *Browning-Ferris Industries of California* v. *NLRB,* 911 F.3d at 1208 ("The policy expertise that the Board brings to bear on applying the National Labor Relations Act to joint employers is bounded by the common-law's definition of a joint employer. The Board's rulemaking, in other words, must color within the common-law lines identified by the judiciary."). Additionally, the Board has authority to define the duty to bargain in good faith under Sec. 8(a)(5) and 8(d). See *Ford Motor Co.* v. *NLRB,* 441 U.S. 488, 496 (1979) ("It is thus evident that Congress made a conscious decision to continue its delegation to the Board of the primary responsibility of marking out the scope of the statutory language [of Sec. 8(a)(5) and 8(d)] and of the statutory duty to bargain."). This authority includes the authority to define that duty in the joint-employer context—provided, of course, that the Board stays within common-law limits—in such a way as to trigger a joint employer's bargaining obligation only upon its actual exercise of substantial direct and immediate control over the essential terms and conditions of employment of another entity's employees.

bargaining.[467] Imagine a scenario in which an undisputed employer has exercised complete control over every aspect of its employees' essential terms and conditions and that a second entity possesses, but has never exercised, a contractual reservation of right to codetermine the employees' wages. Under the majority's final rule, that second entity will be deemed a joint employer, but given that it has never *exercised* its contractually reserved authority, it makes little if any sense to seat it at the bargaining table. Doing so will have little if any benefit, while creating a substantial risk of frustrating agreement between the undisputed employer and the union because the interests of the undisputed employer and the second entity might well be in conflict.[468] What if the two employer-side entities were each to insist, in good faith, on different wage rates? What if an agreement were held up by the second entity's refusal to agree to wage proposals that were agreeable to the union and the undisputed employer? Would that prevent the formation of a collective-bargaining agreement? If not, is the second entity bound by the agreement's wage terms despite its refusal to agree to them? How will the rules of impasse and implementation upon impasse apply in this scenario? My colleagues fail to consider the implications of their final rule for collective bargaining.[469]

It is difficult to imagine a better recipe than today's final rule for injecting chaos into the practice and procedure of collective bargaining that the majority claims to promote. Accordingly, the final rule is contrary to the national labor policy Congress established, which is to "achiev[e] industrial peace by promoting *stable* collective-bargaining relationships." *Auciello Iron Works, Inc.* v. *NLRB,* 517 U.S. 781, 790 (1996) (emphasis added).[470] Moreover, collective bargaining was intended by Congress to be a process that could conceivably produce agreements. See, *e.g., NLRB* v. *Insurance Agents' International Union,* 361 U.S. at 485 (Congress intended collective bargaining to be "a process that look[s] to the ordering of the parties' industrial relationship through the formation of a contract."); *H.J. Heinz Co.* v. *NLRB,* 311 U.S. 514, 523 (1941) (The object of collective bargaining under the Act is "an agreement between employer and employees as to wages, hours and working conditions."). There is nothing stable about the collective-bargaining relationships the final rule will predictably create, and the final rule will frustrate rather than facilitate reaching agreements.[471]

Its predictable adverse effect on the practice and procedure of collective bargaining is far from the only policy-based objection to the final rule. I am also concerned about its impact on small businesses that, on their own, fall below the Board's discretionary jurisdiction thresholds. Under extant law, the Board combines the gross revenues of joint employers when applying its discretionary jurisdictional standards.[472] That historic practice was acceptable under the more rigorous joint-employer standard the Board applied both before and after *TLI* and *Laerco* and codified in the 2020 Rule. But now that my colleagues have lowered the bar, significantly greater numbers of small businesses never before subject to the Board's jurisdiction will be swept within it. As a result, they will be saddled with costs they can ill afford, particularly the expense of hiring an attorney to represent them in collective bargaining. I'm concerned that the final rule will impose significant economic hardships on these small entities, without any countervailing benefit to collective bargaining that would outweigh this burden.

Additionally, the final rule undermines Section 8(b)(4)'s protection of neutral employers against picketing and boycotts. That provision was designed to "shield[] unoffending employers and others from pressures in controversies not their own." *NLRB* v. *Denver Building Trades Council,* 341 U.S. 675, 692 (1951). By expanding the universe of joint employers to include entities that exercise an undefined indirect control or that merely possess but have never exercised authority to control, the final rule will convert heretofore neutral employers into primary employers, subjecting them to lawful picketing. This result will be particularly unjust where the labor dispute involves an essential term or condition of employment over which the joint employer has no control.[473]

---

[467] I do not agree that making it more difficult for parties to reach agreement through collective bargaining advances the concept of "meaningful" bargaining.

[468] See, *e.g.,* Comments of the National Waste and Recycling Association and the American Hospital Association.

[469] Federal courts have indicated that a non-signatory joint employer may be bound by a collective-bargaining agreement signed by the direct employer and a labor union representing the jointly-employed workers. See *Armogida* v. *Jobs with Justice, Inc.,* 2022 U.S. Dist. LEXIS 174658 at *13 (S.D. Ind. Sept. 26, 2022) ("[A] party may be bound by a labor contract by virtue of its status as a 'joint employer' with a signatory of the contract."); *Mason Tenders Dist. Council* v. *CAC of N.Y., Inc.,* 46 F. Supp. 3d 432, 438 n.11 (S.D.N.Y. 2014) ("Since joint employer status functions, in cases like the one at bar, to bind a *non-signatory* to the terms of an otherwise-operative collective bargaining agreement, the typical scenario would focus on whether that non-signatory . . . could properly be treated as a joint employer.") (emphasis in original); *Newmark & Lewis, Inc.* v. *Local 814, Teamsters,* 776 F. Supp. 102, 106 (E.D.N.Y. 1991) (federal court jurisdiction under LMRA Sec. 301 includes determining whether a non-signatory to a collective-bargaining agreement is contractually obligated to arbitrate under joint-employer theory); *Central States, Southeast & Southwest Areas Pension Fund* v. *International Comfort Products, LLC,* 787 F. Supp. 2d 696, 702 (M.D. Tenn. 2011) ("*J.E. Hoetger* makes it clear that § 301 of the LMRA binds a joint employer to the terms of a collective bargaining agreement signed by a co-joint employer. Phrased another way, § 301 creates an ongoing duty for a joint employer to abide by the terms of its employees' collective bargaining agreement, regardless of whether that employer signed the agreement.") (citing *Metropolitan Detroit Bricklayers District Council* v. *J.E. Hoetger & Co.,* 672 F.2d 580, 583 (6th Cir. 1982) ("We recognize that courts have generally held that [Sec. 301] creates federal jurisdiction only over parties to the contract being sued upon. However, since the primary issue in this case was whether Hoetger was a 'joint employer' such that it could be bound by the collective bargaining agreement, we conclude that the district court had jurisdiction under § 301(a) to decide this claim.")).

The possibility that a joint employer could be bound to a collective-bargaining agreement that it neither negotiated nor signed strongly counsels against the majority's decision to permit a joint-employer finding to be made absent any exercise of control whatsoever over the covered employees. Indeed, given that the final rule is to be applied retroactively, it is all but certain that countless employers—that have never been identified as a joint employer nor exercised any control over another employer's employees—will now be required to adhere to the terms of other parties' collective-bargaining agreements.

[470] See also *Colgate-Palmolive-Peet Co.* v. *NLRB,* 338 U.S. 355, 362 (1949) ("To achieve stability of labor relations was the primary objective of Congress in enacting the National Labor Relations Act.").

[471] It is evident that the final rule is likely to create significant delay for parties as they endeavor to reach final collective-bargaining agreements. For example, should a labor union insist on the participation of a putative joint employer that has never directly exercised any control over any essential term and condition of employment of another employer's employees, and that entity refuses to bargain based on its conviction that it is not a joint employer, bargaining between the undisputed employer and the union will be delayed while the union files an unfair labor practice charge and the issue is litigated to a final determination, possibly including litigation in the courts. It is self-evident that such delay to the collective-bargaining process could be substantial.

[472] See, *e.g., Central Taxi Service,* 173 NLRB 826, 827 (1968); *Checker Cab Co.,* 141 NLRB 583, 586–587 (1963), enfd. 367 F.2d 692 (6th Cir. 1966); see also *CID—SAM Management Corp.,* 315 NLRB 1256, 1256 (1995).

[473] My colleagues say that they "see little risk of enmeshing neutral employers in labor disputes" because "[w]hen more than one entity jointly employs particular employees, those entities are not neutral, and the prohibitions on secondary activity do not apply, regardless of what joint-employer standard is applied." Obviously, however, the point I am making and that my colleagues do not dispute is that, by eliminating the actual-exercise requirement, the majority's relaxed standard will
Continued

The majority's final rule will also discourage efforts to rescue failing businesses. Suppose a unionized company that supplies employees to ''user'' businesses is going under and seeks a buyer to acquire its assets. If that supplier is independent of the user businesses it supplies, the usual rules of successorship would apply. A prospective buyer would understand that if a majority of its post-acquisition workforce consists of former employees of the seller, it would have to recognize and bargain with the incumbent union (and it would also understand that it cannot discriminate in hiring to avoid that duty), but it would not have to assume the seller's collective-bargaining agreement, and it would be free to set its own initial terms and conditions of employment unilaterally. See *NLRB* v. *Burns International Security Services, Inc.,* 406 U.S. 272 (1972); *Fall River Dyeing & Finishing Corp.* v. *NLRB,* 482 U.S. 27 (1987). The Supreme Court created this framework based in part on the public policy of facilitating the rescue of ''moribund'' businesses. *Burns,* 406 U.S. at 287–288 (''A potential employer may be willing to take over a moribund business only if he can make changes . . . . Saddling such an employer with the terms and conditions of employment contained in the old collective-bargaining contract may make these changes impossible and may discourage and inhibit the transfer of capital.'').

All this changes, however, if user businesses are deemed joint employers of the supplier's employees, a scenario the final rule will make far more common. For the sake of simplicity, assume that only one such joint-employer user business exists. (In the real world, there would likely be multiple joint employers, upping the complications.) If a user business is a joint employer of the supplier's employees, it will likely be a joint employer of the supplier's successor's employees, and its ongoing duty to bargain bridging the two supplier employers would prevent the successor from setting initial terms and conditions of employment different from those of the predecessor. See *Whitewood Maintenance Co.,* 292 NLRB 1159, 1168–1169 (1989) (holding that contractor that substituted one subcontractor for another jointly employed both the old and new subcontractors' employees, so the new subcontractor could not set its own initial terms), enfd. 928 F.2d 1426 (5th Cir. 1991). Moreover, it is no answer to say that the user business could prevent this ''bridging'' by subcontracting the work performed by the supplier's employees to the employees of a different supplier because, as the joint employer of the employees of its existing supplier, it would have a duty to bargain with their union representative over that subcontracting decision and its effects. See *Fibreboard Paper Products Corp.* v. *NLRB,* 379 U.S. 203 (1964). Accordingly, by making scenarios like this far more likely than under the 2020 Rule, the majority's final rule will discourage attempts to rescue failing businesses.

In short, policy considerations militate against the majority's radical expansion of the joint-employer doctrine. Any purported benefit of eliminating the requirement that control actually be directly exercised is nominal at best and is outweighed by the detrimental consequences outlined above. In my view, retaining the 2020 Rule would better promote the policies of the Act and public policy generally. But in this section of my dissent, I have barely scratched the surface of the adverse consequences that predictably will flow from the final rule, consequences that commenters have brought to the Board's attention, to no avail. To these, I turn next.

### The Majority Fails Adequately To Respond to Public Comments

My colleagues briefly describe, but proceed to disregard as irrelevant, a variety of public comments regarding the new rule's likely impact on businesses generally and on those in specific sectors of the economy where the joint-employer issue frequently arises. For example, some commenters predict that the Board's new joint-employer standard will disincentivize conduct that tends to improve the workplace, like providing training sessions; undertaking safety and health initiatives; and developing corporate social responsibility programs, including diversity, equity, and inclusion initiatives. Others predict that the new rule will discourage larger companies from entering into contracts with smaller third parties to perform work, which would tend to harm business owners from underrepresented communities. Still others say that the new rule will make it more difficult for companies to seek temporary employees to address labor shortages or deal with fluctuating seasonal demand for labor.

What is the majority's response to these and other legitimate objections to their rule? My colleagues brush them aside, stating that ''insofar as the Act itself requires the Board to conform to common-law agency principles in adopting a joint-employer standard, these concerns seem misdirected.''

The majority similarly disregards the effects of the new rule on businesses in specific sectors of the economy. Although my colleagues express an awareness of ''commenters' concerns that the joint-employer standard we adopt in this final rule might have unwanted effects on their businesses,'' they conclude that there is ''no clear basis in the text or structure of the Act for exempting particular groups or types of employers from the final rule.'' More decisively, they believe ''that these concerns reflect considerations that, as a statutory matter, may [not] determine the Board's choice of a joint-employer standard.''

When the majority dismisses commenters' objections as ''misplaced'' or says that they may not determine the choice of a joint-employer standard ''as a statutory matter,'' they mean, of course, that the common law of agency, and therefore the Act itself, precludes the standard the Board implemented in the 2020 Rule and compels the standard they promulgate today. But as I have shown, they are mistaken: the final rule is *not* compelled by the common law of agency and the Act. Accordingly, the majority has no valid basis for refusing to respond to the substance of the comments and therefore has failed to fulfill its statutory duty under the Administrative Procedure Act to provide a reasoned response to these comments.[474]

Moreover, the question here is not whether the Board should craft industry-specific joint-employer standards or exceptions.[475] Rather, the point is that, in crafting a single, generally applicable joint-employer

---

[474] ''[I]n reviewing rules promulgated under the notice and comment rulemaking requirements of the Administrative Procedure Act, 5 U.S.C. 553 ('APA'), courts must assure that the agency has provided a reasoned explanation for its rule. In particular, a reasoned explanation for agency action must be based on a consideration of relevant factors . . . . [A]n agency decision may not be reasoned if the agency ignores vital comments regarding relevant factors, rather than providing an adequate rebuttal.'' *Western Coal Traffic League* v. *U.S.,* 677 F.2d 915, 927 (D.C. Cir. 1982) (citations omitted); see also *Alternate Fuels, Inc.* v. *Lujan,* 1992 U.S. Dist. LEXIS 15785 (D. Kan. Sept. 22, 1992) (''An agency should rebut vital relevant comments. The opportunity to comment is meaningless unless the agency responds to significant points raised by the public.'') (citations omitted).

[475] Indeed, the 2020 Rule does not include industry-specific carveouts.

---

render many more businesses joint employers despite them never having played any role in actually exercising control over any term or condition of employment of another employer's employees. By drawing such businesses into labor disputes not their own, the final rule diminishes Sec. 8(b)(4)'s protection against picketing and boycotts.

standard within the boundaries of the common law, the Board should—indeed, must—consider the substance of vital comments opposing as well as supporting the proposed rule. Having dismissed those comments on the erroneous ground that their hands are tied by the common law, my colleagues have conspicuously failed to do that here. And the legitimate objections to the proposed rule articulated in numerous major comments further persuade me that the final rule, in addition to being statutorily precluded, is unsound as a matter of policy.

One illustrative example is the negative impact of the rule on the construction industry. As several commenters note, due to the particular nature of this industry, multiple employers typically operate on a given project.[476] Multi-employer worksites are common in the construction industry, where a general contractor coordinates the work of multiple subcontractors, sometimes in multiple tiers. Each of these parties typically remains the sole employer of its own employees. But a general contractor must exert a degree of control over subcontractors and their employees to ensure that work on a given project meets efficiency, quality, and safety benchmarks. In fact, project owners routinely require general contractors to sign standard-form agreements, which obligate the general to reserve and exercise some level of control over their subcontractors' employees, arguably impacting essential terms and conditions of employment. Illustrative are several provisions in two standard contracts [477] widely used in the construction industry:

• "The Contractor shall enforce strict discipline and good order among the Contractor's employees and other persons carrying out the [w]ork. The Contractor shall not permit employment of unfit persons or persons not properly skilled in tasks assigned to them."

• "The Contractor shall be responsible for initiating, maintaining, and supervising all safety precautions and programs in connection with the performance of the [c]ontract."

• "Unless the Contract Documents instruct otherwise, [the general contractor] shall be responsible for the supervision and coordination of the [w]ork, including the construction

means, methods, techniques, sequences, and procedures utilized." [478]

Under the final rule, there is a significant risk that these and similar standard contract provisions will be found to vest in the general contractor reserved authority to control hiring, supervision, discipline, and discharge of its subcontractors' employees—not to mention authority to control "working conditions related to the safety and health of employees"—making the general contractor a joint employer of every single employee who performs work on the project.

This puts the final rule at odds with the Supreme Court's decision in *NLRB* v. *Denver Building & Construction Trades Council,* 341 U.S. at 689–690. There, the Court stated that "the fact that the contractor and subcontractor were engaged on the same construction project, and that the contractor had some supervision over the subcontractor's work, did not eliminate the status of each as an independent contractor *or make the employees of one the employees of the other.* The business relationship between independent contractors is too well established in the law to be overridden without clear language doing so" (emphasis added). My colleagues address *Denver Building Trades* by construing it narrowly, but this will not do. The Court held that the general contractor was not the joint employer of its subcontractor's employees simply because it exercised "some supervision over the subcontractor's work," but under the final rule, a general contractor will be the joint employer of its subcontractors' employees where it exercises *no* supervision over subcontractors' work but merely possesses a contractually reserved authority to affect subcontractors' employees' terms and conditions of employment. If *Denver Building Trades* precludes finding a general contractor a joint employer where it exercises *some* supervision over work performed by employees of the subcontractors, it must also preclude finding a general contractor a joint employer where it exercises *no* supervision over work performed by employees of the subcontractors. The final rule cannot be reconciled with *Denver Building Trades.*

The majority has similarly afforded insufficient attention to the impact of the final rule on the franchise industry. As numerous commenters note, the majority's rule compromises the viability of franchises nationwide in key

respects.[479] Unsurprisingly, commenters warn the Board that the rule's vast reach creates a significant risk that many franchisors will be held liable as joint employers of their franchisees' employees. For example, McDonald's LLC informs us that all its franchisees have unfettered discretion to hire, assign work, set wages, benefits, and schedules, and carry out day-to-day supervision. Yet McDonald's franchise system—typical of countless others—requires franchisees to adhere to strict brand standards. The majority says that "many forms of control that franchisors reserve to protect their brands or trade or service marks . . . will typically not be indicative of a common-law employment relationship," but they decline to "categorically state that all forms of control aimed at protecting a brand are immaterial to the existence of a common-law employment relationship." And it is entirely foreseeable that franchisors' monitoring of franchisees' cleanliness and hygiene protocols to protect brand standards would make franchisors joint employers of their franchisees' employees under either or both of two newly adopted essential employment terms: "work rules and directions governing the manner, means, or methods of work performance" and/or "working conditions related to the safety and health of employees." Commenters predict that franchisors will respond in one of two ways. Some will exert much greater control over their franchisees, effectively turning previously independent owners of franchisees into glorified managers; others will distance their franchisees by denying them guidance—particularly with respect to human resources—previously furnished, forcing franchisees to incur the expense of obtaining that guidance from other sources, *i.e.,* labor and employment attorneys. Both outcomes are bad. Many commenters also highlight the disproportionate impact that the final rule will have on members of minority groups.[480]

Several commenters warn the Board that the staffing industry will be

---

[476] See, *e.g.,* Comments of U.S. Chamber of Commerce; Associated Builders and Contractors; Associated General Contractors of America; U.S. Small Business Administration Office of Advocacy.

[477] AIA Document A201–2017 (cited in comment of Associated General Contractors of America).

[478] For additional examples of frequently used standard-form provisions, see Comment of Associated General Contractors of America.

[479] See, *e.g.,* Comments of International Franchise Association; Bicameral Congressional Signatories; Bipartisan Senators; U.S. Chamber of Commerce; U.S. Small Business Administration Office of Advocacy; McDonald's USA, LLC; McDonald's USA LLC Reply.

[480] See, *e.g.,* Comment of Bicameral Congressional Signatories (citing census data showing that 30.8 percent of franchise businesses are minority owned, compared to 18.8 percent of non-franchise businesses); Comment of International Franchise Association (predicting that the proposed rule, if enacted, would be especially harmful to minority, female, and LGBTQ franchise operators).

severely impaired by the final rule.[481] Staffing firms play a significant role in the economy by recruiting and hiring employees and placing them in temporary assignments with a wide range of clients on an as-needed basis.[482] Under the final rule, virtually every client of a staffing firm predictably will be the joint employer of that firm's supplied employees. The client will at least reserve authority to control and/or indirectly control at least one essential employment term, and probably more than one (*e.g.,* hours of work and scheduling; tenure of employment; possibly "work rules and directions governing . . . the grounds for discipline"). I have already described the deleterious consequences the final rule predictably will have in the user employer/supplier employer setting, and staffing firms are a subset of the broader "supplier employer" category. Those consequences, particularly the prospect of getting trapped in a contractual relationship from which it cannot readily extricate itself, will incentivize user businesses to avoid contracting with staffing firms altogether, whether or not those firms are unionized. Contracting with a firm whose employees are unrepresented is no guarantee of protection, since there's always the risk that those employees will choose representation. Rather than run the risk of incurring joint-employer status of a staffing firm's employees—a risk that the final rule increases dramatically—user businesses might well decide to bring their contracted-out work in-house, to the detriment of staffing firms generally and the broader economy. Moreover, where the costs to the (former) user business of bringing work in-house exceed the costs of contracting out that work, the impact may be felt by the (former) user businesses' own employees. As one commenter cautions, "[a]s in any case where a business is forced to incur unexpected costs, it will be forced to look for other ways to remain profitable. Often this leads to reduced headcount or other cost-saving measures that could impact workers." [483]

In addition, the final rule will negatively impact the healthcare sector.

As several commenters point out, the rule's unprecedented elevation of indirect control and reserved authority to control to dispositive status in the joint-employer analysis risks encroaching on a host of business relationships that hospitals rely on to provide lifesaving patient care.[484] For instance, since the onset of the Covid–19 pandemic, many hospitals have utilized contracted labor in the form of travel nurses to fill critical staffing gaps.[485] Travel nurses typically sign a contract with a staffing agency to occupy a temporary position at a hospital that can range in duration from several days to a few months.[486] Under the final rule, a hospital that maintains (or merely has the authority to maintain) work rules and schedules for travel nurses on its premises will be their joint employer and duty-bound to bargain with the union that represents nurses directly employed by the staffing agency. Moreover, travel nurses are required to comply with the health and safety policies of the hospital where they work, which may impose more stringent requirements than those mandated by law. Again, under the final rule, the maintenance of these policies will make the hospital the joint employer of those nurses. The problematic consequences are not difficult to imagine. Among other things, all the adverse consequences discussed above with respect to businesses in the user employer/supplier employer context apply here as well, and coming to grips with those takes time and costs money. As one commenter accurately observes, hospitals will be forced "to spend time and resources that could be devoted to patient care on administrative and management issues as it works to understand the scope of its joint employer liability [and] revises policies, practices, and contracts to address that liability . . . ." [487]

Furthermore, although my colleagues assert that the final rule is "unrelated to" the Board's 1989 health care rule, I

respectfully disagree. It is true that the text of the final rule does not directly impact bargaining units in any particular hospital. But a foreseeable consequence of the final rule will be a proliferation of bargaining units in hospitals, contrary to policy concerns embedded in the 1974 Health Care amendments.[488]

The net benefit of the final rule to unions in the healthcare sector is also questionable. As I explain above, the impact of the rule on collective bargaining is murky at best and disastrous at worst. With increasing regularity, representatives of businesses that have never exercised control over any essential term or condition of employment of other businesses' employees will crowd around the bargaining table with one another and the direct employer's representatives, and they will have competing interests and motives, complicating the prospects of securing an agreement. As one commenter observes, "[c]ollective bargaining is difficult enough when just one employer sits across the table and approaches issues and proposals with a unitary perspective. When a union must simultaneously bargain with two, three, or four employers whose interests and priorities do not align, finalizing an agreement will be orders of magnitude more difficult." [489] This observation applies to any industry but is particularly troubling in the healthcare space. The potential adverse consequences of the final rule on critical patient care warrant the most serious consideration,[490] and my colleagues do not give them that attention because, they say, it cannot be helped because the common law and the Act leave them no other choice. For reasons already explained, they are wrong.

---

[481] See, *e.g.,* Comments of American Staffing Association; U.S. Chamber of Commerce; American Hospital Association; FMI—Food Industry Association; National Association of Manufacturers; Clark Hill PLC.

[482] The importance of staffing firms to the health of the economy is difficult to overstate. As one commenter explains, they are crucial to ensuring that food is delivered to consumers in a timely fashion despite the persistence of significant supply chain disruptions. See Comment of FMI—Food Industry Association.

[483] See Comment of Clark Hill PLC.

[484] See, *e.g.,* Comments of U.S. Chamber of Commerce; American Hospital Association.

[485] See Bertha Coombs, *With travel nurses making $150 an hour, hospital systems are forced to innovate,* CNBC (Mar. 28, 2023), *https:// www.cnbc.com/2023/03/28/with-travel-nurses-making-150-an-hour-hospital-systems-innovate.html.*

[486] *What Is a Travel Nurse? Job Description and Salary,* St. Catherine University, *https:// www.stkate.edu/academics/women-in-leadership-degrees/what-is-a-travel-nurse#:~:text= Travel%20nurses%20sign %20a%20contract,a%20new %20destination%20and%20opportunity* (last visited Oct. 19, 2023).

[487] See Comment of American Hospital Association.

[488] See the Board's Second Notice of Proposed Rulemaking on Collective-Bargaining Units in the Health Care Industry, 53 FR 33900, 33909 (1988): "In view of Congressional concern in the health care amendments with the ability of health care institutions to deliver uninterrupted health services, it is relevant to consider whether multiple units increase costs to health care institutions so as to disrupt the stability of the institutions."

[489] Comment of American Hospital Association.

[490] The role of increased work stoppages, which will likely occur as a result of the rule, is easy to glean from recent events. See, *e.g., Nurses end nearly 10-month strike at Tenet Healthcare-owned hospital,* Dallas Morning News (Jan. 5, 2022), *https://www.dallasnews.com/business/local-companies/2022/01/05/nurses-end-nearly-10-month-strike-at-tenet-healthcare-owned-hospital/* (noting that a dozen inpatient behavioral health beds were closed due to staffing challenges presented by the strike).

The Majority Erroneously, and Unreasonably, Expands and Modifies the List of "Essential" Terms and Conditions of Employment

The Board should not make "working conditions related to the safety and health of employees" an essential term and condition of employment.

I disagree with several of the changes my colleagues make to the list of essential terms and conditions of employment, but the most problematic of the bunch is their decision to make "working conditions related to the safety and health of employees" a newly essential term and condition. Doing so is not compelled or supported by common-law agency principles, and it is unwise as a matter of policy. The majority fails to cite a single court case identifying working conditions related to employees' health and safety as an essential term and condition of employment.[491] Further, in light of the significant federal regulatory obligations in the area of workplace safety, cited by many commenters, the majority fails to explain why, in their view, an entity's exercise of control over or reservation of authority to control the workplace health and safety of another entity's employees should create joint-employer status.

The Occupational Safety and Health Act, 29 U.S.C. 654, obligates employers to protect the safety and health of not only their own employees but also the employees of other entities in the workplace. Under section 654:

(a) Each employer—

(1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees;

(2) shall comply with occupational safety and health standards promulgated under this chapter.

To be sure, an employer's duty under subsection (a)(1)—known as the general duty clause—is owed only to its own employees. However, subsection (a)(2) "does not limit its compliance directive to the employer's own employees, but requires employers to implement the Act's safety standards for the benefit of all employees in a given workplace,

even the employees of another employer." *Universal Construction Co.* v. *OSHRC,* 182 F.3d 726, 728 (10th Cir. 1999). In short, federal law *requires* employers to exert control over the workplace health and safety of workers employed by other employers—and in complying with its statutory and regulatory obligations, an employer might need to exercise discretion.[492]

Additionally, an employer/property owner who adopts certain safety rules to satisfy its general-duty obligation to its own employees under section 654(a)(1) is also likely to require others on its premises to abide by these safety rules, and doing so has been found not to create joint-employer status. *Knitter* v. *Corvias Military Living, LLC,* 758 F.3d at 1230 (finding no joint-employer status despite company's exercise of control over workplace safety because company "naturally would be concerned about [vendor's employees'] safety, even if only for liability purposes, just as they would for any employee or non-employee on premises."). Businesses are required by law to protect the safety of their own employees, and my colleagues say that measures required by law will not evidence joint-employer status—but the court's reasoning in *Knitter* exposes the inadequacy of that carveout. As the court points out, a business will apply its workplace safety measures to everyone on its property, for liability purposes if for no other reason, regardless of whether it is compelled to do so by statute or regulation. And by doing so it will become, under the final rule, the joint employer of everyone on its property that is employed by another entity.[493]

The majority's decision to make "working conditions related to the safety and health of employees" an essential term and condition of employment is also at odds with the Occupational Safety and Health Administration's guidance on the duties owed by employers on multi-employer worksites.[494] That guidance does not contemplate that one company is or becomes the joint employer of another company's employees by virtue of the control it possesses or exercises over workplace safety measures. OSHA's guidance identifies four types of employers on a multi-employer worksite: the creating employer, the exposing employer, the correcting employer, and the controlling employer. Id. The creating employer is an employer that caused a hazardous condition that violates an OSHA standard. The exposing employer is an employer whose own employees have been exposed to the hazard. The correcting employer is an employer who is engaged in a common undertaking, on the same worksite, as the exposing employer and is responsible for correcting the hazard. And the controlling employer is an employer who has general supervisory authority over the worksite, including the power to correct safety and health violations itself or require others to correct them. Each type of employer owes duties to employees. The extent of an employer's duties depends on its proper categorization, and an employer may have multiple roles. Id.

In *Universal Construction Co.* v. *OSHRC,* 182 F.3d at 726, the court held that a general contractor in the construction industry (Universal) was citable for hazardous conditions created by a subcontractor where only the subcontractor's employees had been exposed to the danger. The court explained that under 29 U.S.C. 654(a)(2), a general contractor—the controlling employer in the foregoing schema—is responsible for safety violations that it could reasonably have been expected to prevent or abate by reason of its supervisory capacity,

---

[491] In support of its position, the majority merely cites the general statement in the Restatement (Second) of Agency, section 2, that a servant is an agent employed by a master to perform service in his affairs whose "physical conduct in the performance of the service" is controlled by the master. That citation is insufficient to justify the majority's decision. And as numerous commenters point out, a variety of courts have rejected the notion that an entity's control over workplace safety tends to prove a joint-employer relationship. See, *e.g.,* Comment of New Civil Liberties Alliance and the Institute for the American Worker (citing cases).

[492] For example, a number of OSHA standards establish alternative methods by which an employer can satisfy its duties, which, as explained above, are owed to other entities' employees on a multi-employer worksite. See, *e.g.,* 29 CFR 1926.55 ("*Gases, vapors, fumes, dusts, and mists.* To achieve compliance with paragraph (a) of this section, administrative or engineering controls must first be implemented whenever feasible. When such controls are not feasible to achieve full compliance, protective equipment or other protective measures shall be used to keep the exposure of employees to air contaminants within the limits prescribed in this section."); 29 CFR 1926.652(c) ("*Design of support systems, shield systems, and other protective systems.* Designs of support systems, shield systems, and other protective systems shall be selected and constructed by the employer or his designee and shall be in accordance with the requirements of paragraph (c)(1); or, in the alternative, paragraph (c)(2); or, in the alternative, paragraph (c)(3); or, in the alternative, paragraph (c)(4) as follows: . . . ."). The fact that an employer has discretion in this regard arguably makes the majority's carveout for measures that are legally *required* inapplicable.

[493] Curiously enough, because the property owner (or lessee) would become an employer of everyone on its property directly employed by other employers, it would arguably incur the same duties

to them that it owes to its own directly employed employees under the Occupational Safety and Health Act and its implementing regulations! However, I doubt that the property owner would be heard to contend that its joint-employer status is negated the very instant it is created by virtue of the final rule's carveout for workplace safety measures compelled by law. Whether or not such an argument, strictly speaking, would be circular, it would certainly be given to rotation.

[494] See Occupational Safety and Health Administration, U.S. Department of Labor, CPL 02–00–124, OSHA Instruction: Multiemployer Citation Policy (Dec. 10, 1999), *https://www.osha.gov/enforcement/directives/cpl-02-00-124* (last visited Oct. 19, 2023).

regardless of whether it created the hazard or whether its own employees had been exposed to the hazard. Id. at 732. Under the final rule my colleagues promulgate today, which renders "working conditions related to the safety and health of employees" an essential term and condition of employment, a general contractor in Universal's shoes would become the joint employer of the employees directly employed by the "exposing employer" subcontractor—and possibly employees directly employed by every subcontractor on the project—if it exercised discretion in responding to the hazardous condition or went beyond the minimum required by law. This is not consistent with Supreme Court precedent. See *NLRB* v. *Denver Building & Construction Trades Council,* 341 U.S. at 689–690 ("[T]he fact that the contractor and subcontractor were engaged on the same construction project, and that the contractor had some supervision over the subcontractor's work, did not eliminate the status of each as an independent contractor or make the employees of one the employees of the other").[495]

Additionally, a number of commenters point out that treating "working conditions related to the safety and health of employees" as an essential term and condition of employment creates a perverse incentive for companies to avoid protecting the employees of other employers or to avoid maintaining safety standards or applying safety measures that are any more protective than legally-mandated minimums.[496] As stated by one commenter, "[p]lacing the regulated community in a position where they must choose between robust workplace health and safety standards contractually mandated and monitored on the one hand and, on the other hand, a potential joint employer classification over individuals whom all involved considered to be employees of only one employer, is bad public policy."[497]

These comments, which resonate with me, are not satisfactorily addressed by the majority.

Other changes to the list of essential terms and conditions invite mischief. I also disagree with the majority's decision to add "work rules and directions governing the manner, means, or methods of the performance of duties and the grounds for discipline" to the list of essential terms and conditions of employment. My concern is with the phrase "work rules . . . governing . . . the grounds for discipline," which brings to mind the Board's history of policy oscillation regarding the proper analysis of workplace rules that allegedly interfere with protected activity. See *Stericycle, Inc.,* 372 NLRB No. 113 (2023) (Member Kaplan, dissenting). The final rule's incorporation of this phrase invites unions to comb through a putative joint employer's manuals in search of ambiguous language, argue that workers employed by another entity (*i.e.,* supplied employees performing work for a putative-joint-employer user business) "could" reasonably interpret the language to interfere with protected activity, and rely on it to support a joint-employer finding. Such an argument would have legs regardless of whether the user employer actually applied its workplace rules to employees of a supplier employer because even if it did not (which seems unlikely), it would possess the authority to do so.

Finally, I believe that my colleagues' substitution of "hiring" and "discharge" as essential terms and conditions of employment under the 2020 Rule with "the tenure of employment, *including* hiring and discharge" (emphasis added) will be used to make general contractors in the construction industry joint employers per se. As is well known to those in the regulated community, a wide variety of unionized businesses in the construction industry employ a comparatively small complement of permanent employees, and then, when they are awarded a subcontract on a construction site, "staff up" from the union hiring hall with employees whose employment lasts only for the duration of the project for which they are hired. It could easily be argued that the general contractor, which ultimately determines the duration of each part of the construction project—every stage from excavation through interior finishing work—indirectly controls "the tenure of employment" of every employee hired

only for the duration of his or her employer's subcontracted part of the project, and is therefore the joint employer of every single one of those employees.[498]

For these reasons, I disagree with the majority's decision to rescind and revise the 2020 Rule's appropriate determination of the terms and condition of employment that should be considered "essential" for purposes of determining joint-employer status.

**The Final Rule Is Arbitrary and Capricious Under the Administrative Procedure Act**

The Administrative Procedure Act (APA), 5 U.S.C. 551 *et seq.,* establishes standards that federal agencies must follow when engaged in notice-and-comment rulemaking. Specifically, the APA prohibits administrative agencies from acting arbitrarily and capriciously. In this regard, the Supreme Court has explained that the APA requires the agency to "provide reasoned explanation for its action . . . . And of course the agency must show that there are good reasons for the new policy." *FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009) (internal citation omitted). More recently, the Supreme Court succinctly held that "[t]he APA's arbitrary-and-capricious standard requires that agency action be

---

[495] See Comment of Associated Builders and Contractors.

[496] See, *e.g.,* Comments of American Trucking Association and National Association of Manufacturers.

[497] See Comment of the American Trucking Associations. Indeed, in the 2015 *BFI* decision, the Board majority found the presence of a joint-employer relationship in part because the user employer noticed the supplier's employees committing several safety violations. The BFI official "witnessed two Leadpoint employees passing a pint of whiskey at the jobsite" and reported it. 362 NLRB at 1602. The facility in question used conveyor belts, a type of powered haulage, to move materials to be sorted for recycling. Id. at 1600. It is obvious that consuming alcohol near powered haulage is inherently hazardous. With all due respect to my colleagues,

I genuinely wonder whether a potential joint employer will flag blatant safety violations like this with as much urgency after this final rule takes effect.

[498] Contrary to my colleagues' assertion, my disagreement here is not "principally semantic." As I explained, the majority's inclusion of "the tenure of employment, *including* hiring and discharge" significantly broadens the potential scope of essential terms and conditions of employment compared to the 2020 Rule's more clearly defined set. The majority's statement that it refers to "the range of actions that determine or alter an individual's employment status" provides no further definition, and does not foreclose the possibility that this essential term could be used to make general contractors in the construction industry the joint employer of every single one of its subcontractors' employees. I leave it to those more deeply conversant with the workings of the construction industry to flesh out the implications of such a scenario. I will note, however, that under *John Deklewa & Sons,* 282 NLRB 1375, 1377–1378 (1987), enfd. sub nom. *Iron Workers, Local 3* v. *NLRB,* 843 F.2d 770 (3d Cir. 1988), employers that are party to a Sec. 8(f) collective-bargaining agreement can withdraw recognition from the union and change their employees' terms and conditions of employment upon the expiration of the 8(f) agreement. But a general contractor that, by virtue of its indirect control over "tenure of employment," becomes a joint employer of employees of subcontractors that are party to Sec. 8(f) agreements is not *itself* party to a Sec. 8(f) agreement. Would it stand in the shoes of its subcontractors? Or would the fact that it is not itself signatory to its subcontractors' 8(f) agreements disrupt the applicability of *Deklewa's* rules? Would *it* be permitted to withdraw recognition when the subcontractor's 8(f) agreement expires? Could it do so if the *subcontractor* does not withdraw recognition when the 8(f) agreement expires? I do not envy employers who will need to navigate such uncharted—and complicated—legal waters in light of my colleagues' final rule.

reasonable and reasonably explained.'' *FCC* v. *Prometheus Radio Project,* __U.S. __, 141 S. Ct. 1150, 1158 (2021). The final rule fails this test.

I have already pointed out one respect in which the final rule contravenes the APA—namely, that the final rule fails to respond to significant points urged in vital comments. But the reason it fails to do so portends a more fundamental problem for my colleagues' final rule. The majority has taken the position that common-law agency principles, and therefore the NLRA itself, *compel* the Board to rescind the 2020 Rule and to promulgate a final rule that does not require proof that an entity has exercised any control whatsoever before it may be found to be a joint employer of another entity's employees. For reasons explained at length above, that position is legally erroneous, and since it is the very foundation of the final rule—again, the rule barely mentions policy grounds—it renders the final rule arbitrary and capricious in its entirety. The majority misconstrues common-law agency principles applied in the joint-employer context, ignores judicial precedent addressing joint-employer status under statutes materially similar to the NLRA—*i.e.,* statutes that, like the NLRA, define ''employee'' in such a manner as to make the common law of agency govern the interpretation—and refuse to acknowledge that the Board, for policy reasons unique to the NLRA, may adopt a joint-employer standard that does not extend to the outermost limits of the common law. Because the majority erroneously deems the 2020 Rule statutorily precluded and their final rule statutorily compelled, they dismiss as ''misdirected'' the many public comments that point out the ways in which the proposed rule—implemented with minor changes in the final rule—would harm businesses and destabilize labor relations. For these reasons, the majority's final rule is neither reasonable nor reasonably explained.

Further, my colleagues fail adequately to justify their decision to engage in this rulemaking by claiming that the final rule, among other things, establishes ''a definite and readily available standard'' that will assist employers and labor organizations in complying with the Act and ''reduce uncertainty and litigation over the basic parameters of joint-employer status'' compared to determining that status through case-by-case adjudication. These claims are simply untrue. The final rule fails to achieve these things. It offers no greater certainty or predictability than adjudication, and it will not reduce litigation, because it expressly

contemplates that joint-employer status will be determined through adjudication under the common law, not under the provisions of the final rule, in most if not all cases. In this respect, it will also provide markedly less guidance to parties than did the 2020 Rule.

Absent any rule whatsoever, joint-employer status would be determined through case-by-case adjudication applying the common law of agency.[499] Rather than specify how common-law principles will be applied in determining joint-employer status, however, the final rule simply incorporates the common law of agency by reference in no fewer than three places. Section 103.40(a) of the final rule provides that ''an employer, as defined by Section 2(2) of the National Labor Relations Act (the Act), is an employer of particular employees, as defined by Section 2(3) of the Act, if the employer has an employment relationship with those employees under common-law agency principles.'' Section 103.40(e) of the final rule provides that ''[w]hether an employer possesses the authority to control or exercises the power to control one or more of the employees' terms and conditions of employment is determined under common-law agency principles.'' And Section 103.40(f) of the final rule provides that ''[e]vidence of an employer's control over matters that are immaterial to the existence of an employment relationship under common-law agency principles or control over matters that do not bear on the employees' essential terms and conditions of employment is not relevant to the determination of whether the employer is a joint employer.'' Determinations of joint-employer status under each of these provisions will require adjudication under the common law (which the majority has mischaracterized), since the final rule by its terms provides no other guidance. This is precisely how the determinations would be made if there were no rule at all.

The final rule is a step backward from the 2020 Rule in all this respects. As

noted above, the 2020 Rule specified the factors to be considered in making a joint-employer determination and explained how they relate to each other. This permitted parties to determine whether a joint-employer relationship would be found based on the text of the rule itself, without any need to resort to Restatements of Agency, precedent applying the common law, or any other source to make that determination because the 2020 Rule itself reflected (and remained within) the boundaries established by the common law. For all these reasons, the 2020 Rule indisputably provided parties with greater certainty and predictability than they would have if joint-employer status were decided by adjudication. The final rule, on the other hand, does not.

Although administrative agencies have the authority to revise or amend previously promulgated rules, the APA requires the agency to ''provide reasoned explanation for its action . . . . [and] show that there are good reasons for the new policy.'' *FCC* v. *Fox Television Stations, Inc.,* 556 U.S. at 515 (internal citation omitted). Here, the majority fails to acknowledge that today's final rule provides less guidance for the regulated community than did the 2020 Rule. Nor have they shown that there are ''good reasons'' for replacing a clear, well-defined, and comprehensive rule with one that simply sets employers, employees, and unions adrift in a sea of common-law cases, just as if there were no joint-employer rule at all. Most of all, they fail to show that there are good reasons for the final rule because their primary supporting rationale—that the final rule is compelled as a matter of law—is wrong, and their alternative supporting rationale—that the final rule is superior to the 2020 Rule as a matter of policy—is cursory at best and fails to reckon with the substance of vital comments that attack the rule on policy grounds. For all these reasons, the final rule is arbitrary and capricious.

The Majority's Final Regulatory Flexibility Analysis Is Arbitrary and Capricious

My colleagues err in asserting that their final joint-employer rule will not have a significant economic impact on a substantial number of small entities. In their view, ''[t]he only direct compliance cost for any of the 6.1 million American business firms (both large and small) with employees is reading and becoming familiar with the text of the new rule.'' They peg that familiarization cost at $227.98, representing their estimate of the cost of an hour-long review of the rule by a

---

[499] See *NLRB* v. *United Insurance Co. of America,* 390 U.S. at 256 (holding that the Board must ''apply general agency principles in distinguishing between employees and independent contractors under the Act''); *Browning-Ferris Industries of California* v. *NLRB,* 911 F.3d at 1214–1215 (''[E]mployee-or-independent-contractor cases can still be instructive in the joint-employer inquiry to the extent that they elaborate on the nature and extent of control necessary to establish a common-law employment relationship. Beyond that, a rigid focus on independent-contractor analysis omits the vital second step in joint-employer cases, which asks, once control over the workers is found, *who* is exercising that control, *when,* and *how.*'') (emphasis in original).

human resources specialist or labor relations specialist and an hour-long consultation between that specialist and an attorney. As the public comments make clear, the majority grossly underestimates the actual costs that small businesses will incur to familiarize themselves with the final rule. It is not clear how a human resources specialist will be able to read the rule, which nearly 63,000 words in length, in an hour, let alone comprehend the full ramifications of its changed legal standard in this complicated area of the law.

More importantly, my colleagues erroneously deem irrelevant (for purposes of a regulatory flexibility analysis) certain direct costs of compliance that the rule imposes on small businesses. The final rule will transform many small businesses that were not joint employers under the 2020 Rule into joint employers, with an entirely new duty to engage in collective bargaining. This will impose direct compliance costs in two ways. First, to determine whether they would be subject to that duty, small businesses will have to review their existing business contracts and practices to determine whether they possess any reserved authority to control or exercise any indirect control over any essential term and condition of employment of another business's employees, neither of which could alone establish joint-employer status under the 2020 Rule but either of which will make an entity a joint employer of another business's employees under the majority's final rule. Second, small businesses whose joint-employer status has been changed by the final rule and that contract with an employer whose employees are unionized will be required to participate in collective bargaining, as mandated by new Section 103.40(h).

The Regulatory Flexibility Act, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, 5 U.S.C. 601–612, "obliges federal agencies to assess the impact of their regulations on small businesses." *United States Cellular Corp.* v. *FCC,* 254 F.3d 78, 88 (D.C. Cir. 2001). Among other things, the Regulatory Flexibility Act requires that a federal agency issuing a rule under the Administrative Procedure Act publish an initial regulatory flexibility analysis, consider the comments received in response, and publish a final regulatory flexibility analysis (FRFA) when promulgating its final rule. See 5 U.S.C. 603, 604. An agency's FRFA must meet certain statutory requirements. It must state the purpose of the final rule and, if possible, the estimated number of small

businesses that it will affect. Additionally, each FRFA must summarize comments filed in response to the agency's initial regulatory flexibility analysis, along with the agency's assessment of those comments. Finally, each FRFA must include "a description of the steps the agency has taken to minimize the significant economic impact" that its rule will have on small businesses, "including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected." 5 U.S.C. 604(a)(6). An agency is excused from conducting a FRFA only if "the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." 5 U.S.C. 605(b).

Although the requirements of the Regulatory Flexibility Act are "purely procedural," *National Telephone Cooperative Assn.* v. *FCC,* 563 F.3d 536, 540 (D.C. Cir. 2009), the Administrative Procedure Act, 5 U.S.C. 553, prohibits agency actions that are arbitrary and capricious, and "the APA together with the Regulatory Flexibility Act require that a rule's impact on small businesses be reasonable and reasonably explained." Id. A regulatory flexibility analysis is, for APA purposes, part of an agency's explanation of its rule. Id. (citing *Small Refiner Lead Phase-Down Task Force* v. *EPA,* 705 F.2d 506, 539 (D.C. Cir. 1983)); see also *Thompson* v. *Clark,* 741 F.2d 401, 405 (D.C. Cir. 1984) ("[I]f data in the regulatory flexibility analysis—or data anywhere else in the rulemaking record—demonstrates that the rule constitutes such an unreasonable assessment of social costs and benefits as to be arbitrary and capricious, the rule cannot stand."). Further, the Regulatory Flexibility Act specifically provides for judicial review and authorizes a reviewing court to take corrective action, including remanding the rule to the agency and deferring enforcement of the rule against small entities (unless the court finds that continued enforcement of the rule is in the public interest). 5 U.S.C. 611(a)(4).

According to numerous commenters, the Board's initial regulatory flexibility analysis ignored significant direct compliance costs and drastically underestimated the costs that small businesses will incur to familiarize themselves with the rule.[500] My

colleagues fail to correct the defects identified by the commenters, and their assessment of the rule's costs is so unreasonable as to render their FRFA arbitrary and capricious.

In its FRFA, the majority acknowledges that the Regulatory Flexibility Act requires agencies to consider "direct compliance costs." But the majority asserts that "the RFA does not require an agency to consider speculative and wholly discretionary responses to the rule, or the indirect impact on every stratum of the economy," and it treats bargaining expenses as falling into this category. The majority is wrong on this point. The final rule will dramatically increase the number of entities that will be deemed joint employers by changing the status of entities that merely possess an unexercised contractual right to control one or more essential terms and conditions of employment of another company's employees, as well as entities that have exercised some amorphous "indirect control," a term the final rule neither defines nor cabins. Such entities, which were not joint employers under the 2020 Rule, now will be and, under Section 103.40(h), will be obligated to bargain with unions representing their business partners' employees. Reviewing existing contracts and practices is not a "discretionary response" to the rule because a business must determine whether it has a duty to bargain. And for those that have that duty, placing an agent at the bargaining table also will not be a "discretionary response" to the rule. They will have to participate in collective bargaining as set forth in Section 103.40(h) of the final rule, on pain of violating Section 8(a)(5) if they fail to do so. Good-faith bargaining for a collective-bargaining agreement can take months, even years, and can entail hundreds of hours of negotiations.[501] The cost of paying a representative to be at the table, bargaining in good faith, will be substantial. These compliance costs will be especially difficult to bear for small businesses that do not independently meet the discretionary monetary standards for the Board to assert jurisdiction but will become subject to its jurisdiction by virtue of the Board's

---

[500] See comments of the U.S. Small Business Administration Office of Advocacy, Wyoming

Bankers Association, National Federation of Independent Business; National Association of Convenience Stores; McDonald's USA, LLC, and The Colorado Bankers Association.

[501] One study found that it takes an average of 409 days for an employer and a union to reach a first contract. Robert Combs, *ANALYSIS: How Long Does It Take Unions to Reach First Contracts?* (Bloomberg Law News, June 1, 2021), available at *https://news.bloomberglaw.com/bloomberg-law-analysis/analysis-how-long-does-it-take-unions-to-reach-first-contracts* (last visited Oct. 19, 2023).

practice of combining gross revenues of joint employers for jurisdictional purposes. My colleagues err in ignoring these direct compliance costs for purposes of their FRFA.

In deeming these direct costs of compliance irrelevant, my colleagues cite a quartet of cases: *Mid-Tex Electric Cooperative, Inc.* v. *FERC,* 773 F.2d 327 (D.C. Cir. 1985); *White Eagle Cooperative Assn.* v. *Conner,* 553 F.3d 467 (7th Cir. 2009); *Cement Kiln Recycling Coalition* v. *EPA,* 255 F.3d 855 (D.C. Cir. 2001); and *Colorado State Banking Board* v. *Resolution Trust Corp.,* 926 F.2d 931 (10th Cir. 1991). These cases do not support the majority's position. In three of them, the court held that under the Regulatory Flexibility Act, an agency must consider direct compliance costs imposed by the rule on small entities subject to its regulation but need not consider the costs imposed on *unregulated* entities. See *Mid-Tex Electric,* 773 F.2d at 342 (holding that FERC need not consider indirect impact of its regulation, which governed electrical utilities, on those utilities' small wholesale and retail customers because the latter were not subject to the rule); *White Eagle Cooperative Assn.,* 553 F.3d at 478 (holding that USDA need not consider the indirect impact that a rule governing milk handlers would have on small milk producers not subject to the rule); *Cement Kiln Recycling Coalition,* 255 F.3d at 869 (rule more stringently regulated emissions for hazardous waste combustors; no need to consider indirect impact of the rule on generators of hazardous waste not subject to the rule). In the fourth case, *Colorado State Banking Board,* the court held that a federal agency had properly certified that the rule at issue, which authorized banks to operate failed savings and loans, imposed no direct compliance costs on regulated parties. 926 F.2d at 948. Here, in contrast, it is beyond dispute that small businesses subject to the Board's jurisdiction are governed by the final rule, unlike the challengers in *Mid-Tex Electric, White Eagle Cooperative Association,* and *Cement Kiln Recycling Coalition.* And unlike in *Colorado State Banking Board,* it is equally beyond dispute that the final rule, by converting small businesses that were not joint employers under the 2020 Rule into joint employers and imposing a bargaining obligation on them, will impose direct compliance costs on those entities as described above.

Unlike the inapposite cases on which the majority relies, *AFL–CIO* v. *Chertoff,* 552 F. Supp. 2d 999 (N.D. Cal. 2007), speaks directly to the issue at hand. In that case, the court issued a preliminary injunction against the Department of Homeland Security (DHS) based on serious concerns that it had violated the Regulatory Flexibility Act by failing to consider certain costs of compliance imposed on small businesses. As shown below, *AFL–CIO* exposes the inadequacy of my colleagues' FRFA analysis.

Before the district court was a final rule promulgated by DHS that defined "knowing" for purposes of the statutory prohibition on knowingly hiring or continuing to employ an unauthorized alien under the Immigration Reform and Control Act, 8 U.S.C. 1324a (IRCA). The rule provided that "knowing" includes constructive knowledge and that receipt of a no-match letter from the Social Security Administration could contribute to a finding of constructive knowledge. However, the rule included a safe-harbor provision that precluded DHS from relying on an employer's receipt of a no-match letter to prove constructive knowledge where the employer had taken certain steps. Specifically, the no-match letter could not be used to establish constructive knowledge if the employer checked its records for error within 30 days of receipt of the letter and, if no error was found, if it asked the employee to confirm her information and advised the employee to resolve the discrepancy with the Social Security Administration within 90 days of receipt of the letter. The Secretary of Homeland Security certified that the rule would not have a significant economic impact on a substantial number of small entities, and therefore DHS did not conduct a FRFA. Id. at 1012.

A consortium of unions and business groups moved for a preliminary injunction, contending among other things that the rule was promulgated in violation of the Regulatory Flexibility Act because DHS had failed to consider significant compliance costs that the rule imposed on small businesses. The court granted the plaintiffs' motion, finding that small businesses could "expect to incur significant costs associated [with] complying with the safe harbor rule." Id. at 1013. Those costs included the cost of dedicating human resources staff to track and resolve mismatches within the 90-day time limit, of hiring "legal and consultancy services" to help employers comply with the safe-harbor provision, and of training in-house counsel and human resources staff. Id. The court rejected DHS's claim that the safe-harbor provision would impose no costs on small entities because compliance was "voluntary":

It is true that the safe harbor rule does not mandate compliance. This Court's "concern, however, is with the practical effect . . . of the rule, not its formal characteristics." *Chamber of Commerce of the United States* v. *United States DOL,* 174 F.3d 206, 209 (D.C. Cir. 1999). Because failure to comply subjects employers to the threat of civil and criminal liability, the regulation is "the practical equivalent of a rule that obliges an employer to comply or to suffer the consequences; the voluntary form of the rule is but a veil for the threat it obscures." Id at 210. The rule as good as mandates costly compliance with a new 90-day timeframe for resolving mismatches. Accordingly, there are serious questions whether DHS violated the RFA by refusing to conduct a final flexibility analysis.

*AFL–CIO* v. *Chertoff,* 552 F. Supp. 2d at 1013–1014.

Here, the compliance costs imposed on small businesses by the majority's final rule are even more direct than some of the compliance costs imposed by the safe-harbor provision of the final rule at issue in *AFL–CIO.* Under the DHS rule, an employer would not have to assign human resources staff to deal with no-match letters within safe-harbor time limits until it actually received a no-match letter following the effective date of the rule. Accordingly, the costs of doing so were not imposed by issuance of the DHS rule without more. Under my colleagues' final rule, in contrast, the compliance costs described above *are* imposed by issuance of the rule without more. This is so because the final rule *immediately* makes joint employers of many small businesses that were not joint employers under the 2020 Rule. And these new joint employers include some that *immediately* incur a duty to bargain and are *immediately* exposed to unfair labor practice liability if they fail to comply with that duty. The majority is simply wrong in suggesting that the costs of determining whether that duty exists and of complying with it if it does are the result of discretionary choices.[502]

---

[502] My colleagues unpersuasively attempt to distinguish *AFL–CIO* v. *Chertoff* on the ground that the agency in that case made a "*procedural* error" (emphasis added) by certifying the rule as not having a significant impact on a substantial number of small entities instead of conducting an initial or final regulatory flexibility analysis. My colleagues point out that they have performed that analysis. But they concede that, in *AFL–CIO* v. *Chertoff,* the agency's error was its failure to consider direct compliance costs imposed by the rule at issue, and my colleagues commit the same error. They fail to acknowledge that their final rule imposes certain direct compliance costs on regulated entities. My colleagues incorrectly treat the costs of evaluating business contracts and practices and the expense of placing a bargaining representative at the table as "indirect costs" and deem them irrelevant to a regulatory flexibility analysis. It is immaterial whether one characterizes
Continued

Further, the majority underestimates the final rule's familiarization costs. In its FRFA, the majority estimates that small businesses will take "at most one hour to read the text of the rule and the supplementary information published in the **Federal Register**," and they unjustifiably assume that all small businesses *have* human resources or labor relations personnel to carry out this task. The majority also estimates that one hour will suffice for a consultation between a small employer and an attorney. Citing hourly wage figures from the Bureau of Labor Statistics (BLS), the majority assesses the total compliance costs to be between $208.60 and $227.98.

In my view, the majority's estimate is absurdly low. The length of time it would take an employer's representative to read the rule and its accompanying supplemental information and adequately absorb it, even with the assistance of an attorney, will surely exceed the two hours the majority

allocates to this complex endeavor. The final rule and its supplementary information is nearly 63,000 words long and replete with dense legal analysis that will challenge all but the most experienced specialist in traditional labor law, let alone non-specialist attorneys and small businesspersons.[503] As one commenter wrote in response to the proposed rule:

The Board claims businesses will only spend one hour reading the rulemaking and one hour speaking with counsel. These estimates are frankly astounding. The Proposed Rule is 70 pages long, and a final rule would likely be similar in length. [Wishful thinking.] Additionally, no legal counsel would require only one hour to analyze a contractual relationship or business operations and provide a legal and/or risk analysis for a business entity. Such analyses are comprehensive and do not take one hour whether a business has in-house counsel or must look to hire a firm. Risk analyses take several hours, if not days or weeks, to review a program, analyze it, and compile a report. Furthermore, program and/or operational changes may be needed to protect the business from any potential liability. This would involve even more time from counsel. All in all, businesses will assuredly take more than one hour to read the standard and one hour to speak with counsel.[504]

The majority also underestimates the cost to a small business of paying for a consultation. Citing the most recent BLS statistics, my colleagues say that the average hourly *wage* for an attorney is $78.74. But the average hourly wage earned by a lawyer is not the average rate that a client will be billed for an hour of a lawyer's services. The average *billable* rate for an hour of an attorney's services—*i.e.,* the rate at which a client is billed—is substantially higher. According to Clio's 2022 Legal Trends Report, the national average billable rate for a labor and employment attorney is currently $341.[505] Various surveys list even higher average billable rates nationwide. See, *e.g.,* Andrew Maloney,

*Associate Billing Rates Are Growing Faster Than Partner Rates,* THE AMERICAN LAWYER (Feb. 3, 2022), available at *https:// www.bloomberglaw.com/document/ X9IS07HG000000?jcsearch= hdi45mllfg#jcite* (last visited Oct. 19, 2023) (indicating that as of 2021, the average rate billed for legal services by partners was $728 per hour, and for legal services by associates, $535 per hour).[506]

To determine the amount to seek for awards of attorneys' fees, federal agencies—including the Board—refer to the Laffey Matrix, available at *http:// www.laffeymatrix.com/see.html,* which sets forth hourly rates for attorneys practicing civil law in the Washington, DC metropolitan area. See, *e.g., Newport News Shipbuilding & Dry Dock Co.* v. *Holiday,* 591 F.3d 219, 229 (4th Cir. 2009) (characterizing the Laffey Matrix as "a useful starting point to determine fees"); *NLRB* v. *Cobalt Coal, Ltd.,* 2018 U.S. Dist. LEXIS 183276, at *2 (W.D. Va. Oct. 25, 2018) (awarding the Agency attorneys' fees based on a modified version of the Laffey Matrix); *Frankl ex rel. NLRB* v. *HGH Corp.,* 2012 U.S. Dist. LEXIS 66761, at *18 (D. Haw. Apr. 23, 2012) (considering the Laffey Matrix but declining to apply it to determine rates for out-of-District attorneys). A cursory examination of the Laffey Matrix (and the other sources cited above) shows how out of sync the BLS-identified average wage rate for lawyers is with actual costs a small employer will incur to have an outside lawyer consult on a matter. For the most recent calendar year, the Laffey Matrix lists the hourly rate for an attorney with one to three years of legal experience as $413, and the hourly rate for a paralegal or law clerk as $225. The BLS average wage rate the majority relies on is just over one-third of the Laffey Matrix average billable rate for a *paralegal.* Even taking into consideration that billable-hour rates for attorneys who practice in the District of Columbia are higher than in many parts of the country, it is all but certain that the BLS wage rate of $78.74 is far less than small businesses will have to pay for an hour of legal

that error as "procedural" or "substantive" and equally immaterial whether an agency commits that error when certifying a rule as having no significant impact on a substantial number of small entities or when, as here, it conducts a FRFA and reaches the exact same conclusion. Simply put, by misclassifying direct costs as indirect costs, my colleagues have sidestepped their statutory obligation to give "a description of the steps the agency has taken to minimize the significant economic impact on small entities" imposed by their rule. 5 U.S.C. 604(a)(6).

There is also no merit to my colleagues' position that *AFL–CIO* v. *Chertoff* is distinguishable on the ground that the rule there exposed regulated parties to civil and criminal liability where here, they say, their rule does neither. More specifically, they say that "[b]eing a joint employer imposes a duty to bargain in good faith, but it is Sec. 8(a)(5) of the Act, and not the joint-employer rule, that imposes civil liability for refusing to bargain." That may be, but it misses the point, which is that the final rule dramatically expands the universe of entities that are exposed to civil liability under Sec. 8(a)(5). Moreover, even though Sec. 8(a)(5) is the ultimate source of potential liability, a statute—the IRCA, which makes it unlawful to knowingly employ an unauthorized alien—was similarly the ultimate source of liability in *AFL–CIO* v. *Chertoff.*

Further, my colleagues' position finds no support in the Board's statement in the 2020 Rule that "[u]nfair labor practice liability is the cost of not complying with the NLRA, not the cost of compliance with the Board's joint-employer rule." 85 FR 11230. The Board made that statement when rejecting certain public comments asserting that the 2020 Rule imposed direct costs insofar as "liability and liability insurance costs may increase for small entities [that are undisputed employers of the employees at issue] because they may no longer have larger entities [that were joint employers under *BFI* but would no longer be under the 2020 Rule] with which to share the cost of any NLRA backpay remedies ordered in unfair labor practice proceedings." A possible increase in the cost of liability insurance for undisputed employers was plainly an indirect (not to mention speculative) cost of the 2020 Rule. In contrast, by imposing a duty to bargain on businesses that heretofore have had no such duty, the majority's final rule imposes on those entities, necessarily and therefore directly, the unavoidable costs of collective bargaining.

[503] For two reasons, I am unpersuaded by my colleagues' attempt to justify their one-hour reading estimate by pointing to an estimate contained in the 2020 Rule's FRFA for the reading of that rule. First, the 2020 Rule returned Board law to the familiar and easy-to-understand pre-*BFI* standard. In contrast, the majority's final rule breaks new legal ground—going well beyond even *BFI*—and injects significant uncertainty into the joint-employer analysis. Second, in the 2020 rulemaking, the Board received no public comments that would have provided a basis for departing from the estimate contained in the 2018 NPRM's initial regulatory flexibility analysis. Here, in contrast, public comments indicate that my colleagues' estimate is unreasonably low.

[504] See Comment of Modern Economy Project.

[505] The full report is available at *https:// www.clio.com/wp-content/uploads/2022/09/2022-Legal-Trends-Report-16-02-23.pdf* (last visited Oct. 19, 2023). Billable-hour rates broken down by practice area appear on page 72 of the report.

[506] Contrary to my colleagues' assertion, the Maloney article contains an adequate explanation of the methodology used: "ELM [*i.e.,* ELM Solutions, a legal analytics company and source of the data used by the author] uses anonymized legal spend data from law firms' e-billing and time management software to compile national average billing rates for partners, associates and paralegals, as well as rate data for specific markets, practices and types of matters. ELM said all the data in the report is derived 'from the actual rates charged by law firm professionals as recorded on invoices submitted and approved for payment.' "

services.[507] And it is also all but certain that an attorney will need far more than one hour to analyze, and help her client understand, the impact of the final rule on her client's business.

For these reasons, the majority's FRFA is arbitrary and capricious.

Conclusion

For all the above reasons, I dissent from the majority's decision to promulgate the final rule.

# VIII. Other Statutory Requirements

## A. The Regulatory Flexibility Act

The Regulatory Flexibility Act of 1980 (RFA), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, 5 U.S.C. 601–612, requires an agency promulgating a final rule to prepare a Final Regulatory Flexibility Analysis (FRFA) when the regulation will have a significant impact on a substantial number of small entities. An agency is not required to prepare a FRFA if the Agency head certifies that the rule will not have a significant economic impact on a substantial number of small entities. 5 U.S.C. 605(b). Although the Board believed that this rule would not have a significant economic impact on a substantial number of small entities, in the NPRM the Board issued its Initial Regulatory Flexibility Analysis (IRFA) to provide the public the fullest opportunity to comment on the proposed rule. See 87 FR 54659. The Board solicited comments from the public that would shed light on potential compliance costs that may result from the rule that it had not identified or anticipated.

The RFA does not define either "significant economic impact" or "substantial number of small entities." [508] Additionally, "[i]n the absence of statutory specificity, what is 'significant' will vary depending on the economics of the industry or sector to be regulated. The agency is in the best position to gauge the small entity impacts of its regulations." [509] After reviewing the comments, the Board continues to believe that the only cost of compliance with the rule is reviewing and understanding the substantive changes to the joint-employer standard. Given that low cost, detailed below, the Board finds that this final rule will not have a significant economic impact on any small entity. Nevertheless, the Board publishes this FRFA to acknowledge and respond to the comments received in response to the proposed rule.

1. Statement of the Need for, and Objectives of, the Rule

The final rule establishes the standard for determining, under the NLRA, whether a business is a joint employer of a group of employees directly employed by another employer. This rule is necessary to explicitly ground the joint-employer standard in established common-law agency principles and provide guidance to parties covered by the Act regarding their rights and responsibilities when more than one statutory employer possesses the authority to control or exercises the power to control employees' essential terms and conditions of employment.

The guidance furnished by the final rule will enable regulated parties to determine in advance whether their actions are likely to result in a joint-employer finding, which may result in a duty to bargain collectively, exposure to what would otherwise be unlawful secondary union activity, and unfair labor practice liability. Accordingly, a final rule setting forth a comprehensive and detailed standard is important to businesses covered by the NLRA, employees of those businesses, and labor organizations that represent or seek to represent those employees. The final rule accomplishes these objectives by defining critical elements of the joint-employer standard and by enumerating the factors that will determine whether an entity is a joint employer.

2. Statement of the Significant Issues Raised by the Public Comments in Response to the Initial Regulatory Flexibility Analysis, a Statement of the Assessment of the Agency of Such Issues, and a Statement of any Changes Made in the Proposed Rule as a Result of Such Comments

a. Response to Comments Concerning the Direct Cost of Compliance

The only direct compliance cost for any of the 6.1 million American business firms (both large and small) with employees is reading and becoming familiar with the text of the new rule. That cost is too low to be considered "significant" within the meaning of the RFA. NPRM, 87 FR at 54662 (estimating compliance costs of $151.51 to small employers and $99.64 to small labor unions).[510]

Some commenters address the direct compliance costs that the Board estimated in its IRFA. Some of those comments criticize the Board's assumption that reviewing the rule would only require one hour of reading time for a human resources specialist and that understanding the rule would only require a one-hour consult with an attorney.[511] One comment argues that the one hour of reading time does not account for reviewing the materials referenced in the proposed rule, such as the Restatement of Agency, which would be necessary to determine whether an entity is a joint employer.[512] Yet, without any empirical evidence to demonstrate that reading the text of the rule or meeting with an attorney to gain greater understanding of the rule would require more than one hour, the Board declines to change its estimates of the length of time it will take to do so. To the extent that comments are arguing that it will take longer than one hour for an attorney to analyze the application of

---

[507] The Laffey Matrix is a useful but imperfect guide as it primarily focuses on the costs of civil rights and environmental litigation in the Washington, DC metropolitan area, not labor and employment counseling nationwide. Nevertheless, this database and others like it (including the Fitzpatrick Matrix, which the Department of Justice uses to calculate attorneys' fees and is available at *https://www.justice.gov/usao-dc/page/file/1189846/download*) provide useful data points illustrating the inadequacy of the majority's estimates. Relatedly, the majority notes that "[w]hile some commenters asserted that the wage rates for an attorney were at least $300/hour, none of the comments provided any evidence to which the Board could cite." I believe that by identifying relevant sources of average billable rates nationwide, I have refuted my colleagues' contention that small businesses would be able to secure a lawyer for about $78.74 per hour.

[508] 5 U.S.C. 601.

[509] U.S. Small Business Administration (SBA) Office of Advocacy, A Guide for Government Agencies: How to Comply with the Regulatory Flexibility Act (SBA Guide) 18 (Aug. 2017), *https://www.sba.gov/sites/default/files/advocacy/How-to-Comply-with-the-RFA-WEB.pdf*.

[510] As stated in the Board's IRFA, this minimal compliance cost does not increase for the small number of businesses that are alleged to be joint employers in Board proceedings. 87 FR 54661. Such allegations are not a consequence of the rule, but a consequence of members of the public filing charges that initiate Board investigations. In any event, they are rare. Between 2018 and 2021, only 0.15% of all 6.1 million American businesses were alleged to be joint employers in Board proceedings.

[511] Comments of Independent Bakers Association; Job Creators Network; Modern Economy Project; National Association of Convenience Stores; U.S. Chamber of Commerce. The U.S. Chamber of Commerce also asserts that large business firms will need even more time to read and review the rule and that a larger number of managers and professionals will be involved in the review, but the comment does not explain why this is so, which additional job classifications would be involved in reviewing the rule, how much more time would be required, or how many additional employees would have to read the rule. See comments of U.S. Chamber of Commerce.

[512] Comments of Freedom Foundation.

the rule to an employer's workforce,[513] that is an issue of indirect cost, which is not considered under the RFA but will be discussed below.

The dissent also disagrees with our estimate of one hour to read the rule, but it does not support its assertion that such a determination is arbitrary or unreasoned. The estimate is consistent with the familiarization time estimated in prior Board rules. In 2018, the Board's IRFA estimated that a labor compliance employee at a small employer could review the rule— approximately 60,185 words—in "at most one hour." 83 FR 46695. Receiving no evidence contradicting this estimate, the Board's FRFA contained the same estimate. 85 FR 11234. No public comments have provided any empirical basis for an assertion that one hour would be insufficient to read this final rule (including preamble), which is approximately 61,476 words. Moreover, one hour is an average estimated amount of reading time for the approximately 6,119,657 entities the Board assumes would be subject to the rule. As discussed below, the Board has reason to believe that many small employers will not read the rule at all because they do not have any business relationships that would make this rule applicable to them, and others with a history of joint-employment relationships may spend more time reviewing the rule. One hour is simply a reasonable average.

In addition to criticizing the amount of time the Board estimates it will take to read and understand the rule, several commenters assert that the Board's estimate of the cost of a human resources specialist and an attorney are too low.[514] These commenters, however, provide no cost estimates for a human resources specialist.[515] The current rule uses the figure from the Department of Labor's Bureau of Labor Statistics (BLS) for a labor relations specialist, even though some small businesses may not have such a credentialed and experienced employee, because the national average wage rate for that position is comparable to that of all

private sector employees. The average hourly wage for a labor relations specialist was last reported at $42.05; the average hourly wage for a private industry employee was last reported at $41.03.[516]

Some commenters argue, without any evidence, that the cost of legal counsel is at least $300 per hour.[517] The dissent attempts to buoy this argument, criticizing the Board for using the most recent data from the BLS. For each of the alternative methods that the dissent suggests, it does not explain why those sources are so superior to the BLS as to render the majority's analysis arbitrary and capricious. The Bloomberg article claims to have compiled national average billing rates but only cites rates in atypically expensive markets—New York, Washington, DC, Chicago, and San Francisco—and provides little information on its survey subjects and research methodology. The Clio Legal Trends Report claims that the 1,168 consumers surveyed are representative of the U.S. population but does not provide any evidence of that or make the same claim for the 1,134 legal professionals who responded to the survey. In fact, in its detailed methodology, it acknowledges that the only customers included were paid subscribers to Clio, not those using a free trial or the Academic Access Program. Further, the report excluded data from customers who opted out of aggregate reporting. Finally, even though the dissent references the Laffey Matrix, which is guided by "the reasonably hourly rate prevailing *in the community* for similar work," it also acknowledges that the rate is only applicable to attorneys in the D.C. area. *Laffey* v. *Nw. Airlines, Inc.,* 572 F. Supp. 354, 371 (D.D.C. 1983), aff'd in part, rev'd in part, 746 F.2d 4 (D.C. Cir. 1984). It is not arbitrary or capricious for the Board to rely on the national average attorney wage rates calculated by a federal agency with responsibility for compiling data on national labor costs.

Another commenter argues that the Board should have included the cost of hiring an unknown number of management consultants in order to comply with the rule.[518] And yet another comment presumes that compliance with the proposed rule

could require hiring a dedicated staffer, who would cost thousands of dollars per year.[519] Other commenters fault the Board for undervaluing a small business owner's time at just $151.51 per hour and for not taking into account the "full opportunity cost of lost overhead and profit contribution entailed by the diversion of labor from normal productive activity" to reading the rule.[520]

None of these comments justify changes to the Board's initial assumptions regarding the job classifications that will be involved in reading the final rule or the cost of that time. None of the comments provide evidence that the Board could use to reevaluate its estimated costs, which are derived from wage and benefit figures provided by the Department of Labor's BLS.

Comments regarding the "full opportunity cost of lost overhead and profit contribution entailed by the diversion of labor from normal productive activity" misunderstand the Board's calculus. The Board does not assume that these job functions are already being performed by a small business's owner or employees. That is why the Board identifies the time spent reading and consulting about the rule as an additional cost of compliance rather than assuming that keeping abreast of changes in employment and labor law is already a part of a human resources specialist's or in-house counsel's job function. However, these comments have persuaded the Board to add to its assessment of direct compliance costs an additional hour of time for a human resources or labor relations specialist to meet with the attorney, rather than assuming that the one-hour consult is already part of that human resources or labor relations specialist's job function. That addition is reflected in Section VI.A.5 below.

Other comments generally assert that the Board's estimated compliance costs are inaccurate, and a new assessment of costs is required.[521] They provide no detail or evidence to support their assertions.

### b. Response to Comments Concerning Indirect or Speculative Cost of Compliance

The remaining comments regarding the Board's estimated compliance costs

---

[513] Comments of Modern Economy Project; National Association of Convenience Stores; Rachel Greszler.

[514] Comments of Independent Bakers Association; Job Creators Network Foundation; Modern Economy Project; National Association of Convenience Stores; U.S. Chamber of Commerce.

[515] The dissent calls the assumption that all businesses have human resources or labor relations personnel to read the rule "unjustifiable." This is the same assumption, however, that the Board made in its 2018 IRFA and reaffirmed in its 2020 FRFA. Compare 83 FR 46695 with 85 FR 11234. The Board has received no public comments suggesting that the assumption is unreasonable.

[516] Compare Occupational Employment and Wages, May 2022, 13–1075 Labor Relations Specialists, found at *https://www.bls.gov/oes/current/oes131075.htm* (last visited Oct. 19, 2023), with Employer Costs for Employee Compensation—June 2023, found at *https://www.bls.gov/news.release/pdf/ecec.pdf* (last visited Oct. 19, 2023).

[517] Comments of Independent Bakers Association; Rachel Greszler; U.S. Chamber of Commerce.

[518] Comments of U.S. Chamber of Commerce.

[519] Comment of SBA Office of Advocacy.

[520] Comments of National Association of Convenience Stores; U.S. Chamber of Commerce.

[521] Comments of Colorado Bankers Association; National Association of Insurance and Financial Advisors; RaceTrac, Inc.; Restaurant Law Center; Rio Grande Foundation; U.S. Black Chambers, Inc.

concern indirect or speculative costs that are not direct costs of the rule.

*Avoidance Costs.* The majority of the remaining comments focus on the cost associated with avoiding a joint-employer relationship.[522] For example, two commenters argue that the proposed rule increases the "price" for an employer to avoid joint-employer status because businesses that structured their relationships to avoid joint-employer liability under the 2020 rule will have to change existing policies, procedures, and contracts to achieve the same end under this final rule.[523] Some commenters fear that the proposed rule will cause larger businesses to cancel contracts with smaller entities to avoid joint-employer status and the liability that comes with it.[524] Other commenters count as compliance costs the cost of regularly hiring legal counsel to ensure that any change in supplier or contracts does not inadvertently create a joint-employer relationship.[525] In the building industry, one commenter notes, there are several potential joint-employment relationships between builders and a multitude of subcontracted businesses that vary by jobsite.[526] The increased number of business relationships at play, the commenter states, will make it more costly to obtain legal counsel to determine which entities will be classified as joint employers under the final rule.

Other comments focus on the possibility that larger companies and franchisors will provide less support to smaller companies, subcontractors, and franchisees to avoid liability for the smaller entities' labor violations.[527] These commenters predict that the proposed rule will result in a decrease in entrepreneurial opportunities for small businesses and contractors,[528] which would result in economic inefficiencies as larger businesses and general contractors would supplant the work of smaller ones and no longer focus on their core competencies.[529]

Conversely, one commenter notes, the proposed rule could result in a franchisor seeking to exert more control over its franchises. For example, in response to a single franchisee unionizing or engaging in collective bargaining, the franchisor could impose a standardized minimum wage at all its franchise locations.[530]

*Potential Legal Expenses.* Commenters also assert that the proposed rule will increase an employer's exposure to allegations of unfair labor practices, which will in turn increase insurance and legal costs for small businesses.[531] Some commenters believe the costs will come from new or increased liability under the new rule.[532] Other comments focus on the supposed vagueness of the proposed rule, arguing that it increases the likelihood of litigation over whether a business is a joint employer. Accordingly, these comments argue that the Board should have included as a compliance cost the cost of participating in a Board case.[533] In support of this position, two comments note that, after *Browning-Ferris* issued, some franchisors claimed to experience a significant increase in joint-employer claims across all spectrums of the law and some franchisees incur increased costs because they were compelled to seek outside guidance through attorneys or other consultants on matters in which the franchisor used to assist.[534] Some commenters also note that every contract their companies enter into will need additional legal scrutiny for its possible exposure to a joint-employer finding [535] or to determine whether they are required to be a party to another business's collective-bargaining process.[536]

*Potential Costs If Entities Are Joint Employers Under the New Rule.* If a party is determined to be a joint employer, it will have to allocate time and resources to collective bargaining and other costs associated with unionization efforts and elections, some commenters assert.[537] The dissent also contemplates reviewing existing business contracts and participating in collective bargaining as direct compliance costs. Another commenter adds that unions will seek to exploit collective bargaining with franchisors to impose higher wages on small business franchisees.[538] Yet another comment states that the Board failed to consider costs associated with revising or outsourcing training materials, such as training regarding operational best practices, guidance on employee handbooks or other personnel policies, and sample policies or best practices regarding workplace civil rights issues.[539]

Respectfully, neither the dissent nor the foregoing comments raises direct economic impacts under the RFA. How a small entity structures its business relationships is discretionary. The rule sets forth no requirement that employers embrace or avoid joint-employer status. It merely brings the Board's test for determining joint-employer status back in line with the common law, as interpreted by the District of Columbia Circuit in *Browning-Ferris Industries of California, Inc.* v. *NLRB,* 911 F.3d 1195 (D.C. Cir. 2018). If a regulated entity chooses to reevaluate its contractual or business relationships in light of the rule's return to the common-law standard, that is a choice within its discretion, but it is not a direct compliance cost of the rule. Similarly, if an entity chooses to accept or dispute an allegation of joint-employer status in litigation or elsewhere, that is a discretionary choice. It is not required to do so under the rule. Moreover, the implications of that choice are entirely speculative. No commenter provided any quantifiable evidence demonstrating that a joint-employer finding inevitably increases costs on small businesses.

Our conclusion that the RFA requires agencies to consider only direct compliance costs finds support in the RFA, its caselaw, and guidance from the SBA's Office of Advocacy. The RFA does not require an agency to consider speculative and wholly discretionary responses to the rule, or the indirect impact on every stratum of the economy. Section 603(a) of the RFA states that if an IRFA is required, it "shall describe the impact of the

---

[522] Comments of Elizabeth Boynton; Job Creators Network Foundation; Modern Economy Project; National Association of Convenience Stores.

[523] Comments of Colorado Bankers Association; U.S. Chamber of Commerce.

[524] Comments of Modern Economy Project; Rio Grande Foundation; SBA Office of Advocacy; U.S. Chamber of Commerce.

[525] Comments of Elizabeth Boynton; Goldwater Institute; Independent Electrical Contractors; One Energy; Reid Stores, Inc. d/b/a Crosby's.

[526] Comments of NAHB.

[527] Comments of IFA; Job Creators Network Foundation; McDonald's USA, LLC; National Association of Convenience Stores; NFIB; Rachel Greszler; SBA Office of Advocacy; U.S. Black Chambers, Inc.

[528] Comments of IFA; Independent Bakers Association; Job Creators Network Foundation; McDonald's USA, LLC; Modern Economy Project; National Association of Convenience Stores; NFIB; Rachel Greszler; SBA Office of Advocacy; U.S. Black Chambers, Inc.

[529] Comments of NFIB; SBA Office of Advocacy.

[530] Comments of U.S. Black Chambers, Inc.

[531] Comments of Job Creators Network Foundation; National Association of Convenience Stores; NFIB; SBA Office of Advocacy; U.S. Chamber of Commerce.

[532] Comments of Colorado Bankers Association; Rio Grande Foundation; SBA Office of Advocacy.

[533] Comments of Goldwater Institute; Independent Electrical Contractors; Independent Lubricant Manufacturers Association; Modern Economy Project; One Energy; Reid Stores Inc. d/b/a Crosby's; U.S. Chamber of Commerce.

[534] Comments of IFA; Rachel Greszler.

[535] Comments of Independent Lubricant Manufacturers Association; Modern Economy Project.

[536] Comments of Elizabeth Boynton.

[537] Comments of Elizabeth Boynton; Rachel Greszler.

[538] Comments of NFIB.

[539] Comments of Modern Economy Project.

proposed rule on small entities." 5 U.S.C. 603(a). Although the term "impact" is undefined, its meaning can be gleaned from Section 603(b), which recites the required elements of an IRFA. One such element is "a description of the projected *reporting, recordkeeping and other compliance requirements* of the proposed rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record." 5 U.S.C. 603(b)(4) (emphasis added). Section 604 further corroborates the Board's conclusion, as it contains an identical list of requirements for a FRFA (if one is required). 5 U.S.C. 604(b)(4).

The courts, too, have recognized that the statute only requires that the regulatory agency consider the direct burden that compliance with a new regulation will likely impose on small entities. *See Mid-Tex Electric Cooperative, Inc.* v. *FERC,* 773 F.2d 327, 342 (D.C. Cir. 1985) ("[I]t is clear that Congress envisioned that the relevant 'economic impact' was the impact of compliance with the proposed rule on regulated small entities."); accord *White Eagle Cooperative Assn.* v. *Conner,* 553 F.3d 467, 478 (7th Cir. 2009); *Colorado State Banking Board* v. *Resolution Trust Corp.,* 926 F.2d 931, 948 (10th Cir. 1991).

Additional support for confining the regulatory analysis to direct compliance costs is found in an authoritative guide published by the SBA Office of Advocacy. The SBA Guide explains that "other compliance requirements" under section 603 include the following examples:

(a) capital costs for equipment needed to meet the regulatory requirements; (b) costs of modifying existing processes and procedures to comply with the proposed rule; (c) lost sales and profits resulting from the proposed rule; (d) changes in market competition as a result of the proposed rule and its impact on small entities or specific submarkets of small entities; (e) extra costs associated with the payment of taxes or fees associated with the proposed rule; and (f) hiring employees dedicated to compliance with regulatory requirements.

SBA Guide at 37. These are all direct, compliance-based costs.

In the IRFA, the Board noted that the only identifiable compliance cost imposed by the proposed rule is reviewing and understanding the substantive changes to the joint-employer standard. 87 FR at 54659. Otherwise, there will be no "reporting, recordkeeping and other compliance requirements" for these small entities. See 5 U.S.C. 603(b)(4), 604(b)(4). The

same is true of the final rule. The final rule imposes no mandatory capital costs or mandatory costs of modifying existing processes, results in no lost sales or profits, and creates no appreciable changes in market competition. See SBA Guide at 37. Lastly, there are no costs associated with taxes or fees and no costs for additional employees dedicated to compliance, as no compliance requirements exist. See id.

Consistent with these principles, the Board rejects the view that it must include as direct compliance costs employers' discretionary responses to the rule, as suggested by the comments discussed above. See *Mid-Tex Electric Cooperative,* 773 F.2d at 343 ("Congress did not intend to require that every agency consider every indirect effect that any regulation might have on small businesses in any stratum of the national economy."). "[R]equir[ing] an agency to assess the impact on all of the nation's small businesses possibly affected by a rule would be to convert every rulemaking process into a massive exercise in economic modeling, an approach we have already rejected." *Cement Kiln Recycling Coalition* v. *EPA,* 255 F.3d 855, 869 (D.C. Cir. 2001) (citing *Mid-Tex Electric Cooperative,* 773 F.2d at 343). The rule does not require contracting parties to alter their arrangements now or in the future. It therefore cannot be said that actions taken by employers to avoid a joint-employer relationship, or any costs associated with those actions or passed on to other entities because of that attempt at avoidance, is a direct cost of compliance with the rule.

Commenters also ask the Board to count as a direct compliance cost of the rule the cost of actions that other entities might take in response to the rule without any indication that those actions are required for compliance with the rule. These comments about what larger companies or franchisors might do to avoid joint-employer liability are speculative and too attenuated to be incorporated into the Board's analysis of compliance costs with the rule. Many of these concerns are not even specific to joint-employer relationships. For example, the costs associated with opposing unionization efforts, participating in Board elections, and bargaining with employees' duly elected representatives can exist even where no joint-employer relationship does.

The dissent takes issue with our citations to four cases, which were also cited in the FRFA of the 2020 rule: *Mid-Tex Electric Cooperative, White Eagle Cooperative Assn., Cement Kiln Recycling Coalition,* and *Colorado State*

*Banking Board,* and instead suggests that *AFL–CIO* v. *Chertoff,* 552 F. Supp. 2d 999 (N.D. Cal. 2007) is more instructive. The problem with the dissent's objection to these cases is twofold. First, it mischaracterizes their use: the rule cites these cases because they hold that the RFA only requires an agency to consider the direct burden that compliance imposes on small entities, not every indirect effect that regulation might have on any other business, regardless of size and whether the entity is directly regulated by the rule. Compare 83 FR 46695 and 85 FR 11229 with 87 FR 54662.

Second, the dissent's reliance on *Chertoff* is misplaced because, in that case, the agency made a procedural error by certifying the rule instead of conducting an initial or final regulatory flexibility analysis. 552 F. Supp. 2d at 1013.[540] The agency's rationale was that the rule did not place any new burdens on the employer or impose any new or additional costs because its new safe harbor procedure was voluntary. Id. But the court took exception with the agency's refusal to consider the direct compliance costs raised by the plaintiffs. Id. Here, no such procedural error exists because the Board has conducted an initial and final regulatory flexibility analysis, considered and engaged with all comments regarding the rule's direct compliance costs, and found no evidence, only unsupported argument, contradicts its findings.[541]

c. Response to Comments Concerning Potential Conflicts With Other Federal Laws

Some comments contend that the Board has failed to identify all relevant

---

[540] Contrary to the dissent, it is material, if not dispositive, that *Chertoff*'s holding is limited to finding procedural error in DHS's failure to conduct a regulatory flexibility analysis. In the context of a motion for a preliminary injunction, the court in *Chertoff* held only that, "there are serious questions whether DHS violated the RFA" by failing "to conduct a final flexibility analysis" that evaluated possible direct costs. 552 F. Supp. 2d at 1013. The Court never decided whether the proffered costs were actually direct costs under the Regulatory Flexibility Act.

[541] Moreover, the agency's argument in *Chertoff* that there were no compliance costs because the rule was voluntary is distinct from the voluntary nature of the joint employer rule. In that case, an employer's failure to voluntarily comply with the regulation's safe harbor procedure could have exposed the employer to criminal and civil liability. But the Board has no authority to impose criminal liability, and the joint-employer rule imposes no civil liability. Being a joint employer imposes a duty to bargain in good faith, but it is Sec. 8(a)(5) of the Act, and not the joint-employer rule, that imposes civil liability for refusing to bargain. As the Board noted in the 2020 joint-employer rule, "[u]nfair labor practice liability is the cost of not complying with the NLRA, not a cost of compliance with the Board's joint-employer rule." 85 FR 11230.

rules and regulations that may ''conflict with the proposed rule,'' as section 603(b)(5) of the RFA requires, but those comments do not specifically identify any potential conflicts.[542] One commenter argues that the proposed rule directly undermines the Lanham Act's requirements that franchisors maintain control over the use of their marks and would penalize franchisors who maintain that control by labeling them joint employers.[543] Another asserts that businesses will now need to reconcile the differences between how the Board and the Internal Revenue Service view employer relationships.[544] And other comments argue that the proposed rule conflicts with the federal law requiring prime contractors to have indirect and reserved control over their subcontractors' compliance with federal laws such as the Occupational Safety and Health Act, the Fair Labor Standards Act, the Davis-Bacon Act, and the prohibition of discrimination in hiring administered by the Department of Labor's Office of Federal Contract Compliance Programs.[545] These comments further argue that these required terms, which are also present in many third-party contracts, should be considered routine and not indicative of a joint-employer relationship.

According to the SBA Guide, at 40, rules are conflicting when they impose two conflicting regulatory requirements on the same classes of industry.[546] None of the comments demonstrate a conflict under this definition. The comments do not cite the purportedly conflicting authorities (such as the Federal Acquisition Regulation or the Internal Revenue Code). In any event, it is axiomatic that the same term may have different meanings in different statutes, based on each law's text, purpose, and legislative history.[547] As we state above,

the rule applies only to the NLRA,[548] and commenters have not shown that, to the extent they exist, any dissimilar requirements would not be workable. Finally, because the final rule does not mandate that employers structure their business relationships in any particular manner, the final rule does not directly expose regulated entities to conflicting obligations. While entities may choose to rearrange their business relationships to avoid joint-employer status, that is distinct from a regulation obligating entities to engage in a particular business relationship.

3. Response of the Agency to any Comments Filed by the Chief Counsel for Advocacy of the Small Business Administration in Response to the Proposed Rule, and a Detailed Statement of any Change Made to the Proposed Rule in the Final Rule as a Result of the Comments

The SBA Office of Advocacy submitted a comment that expresses four main concerns: that the proposed rule is so ambiguous and broad that it does not provide guidance on how to comply or avoid joint-employer liability, and that the Board should resolve purported conflicts with existing federal requirements, reassess the cost of compliance with the proposed rule, and consider significant alternatives that would accomplish the objectives of the NLRA while minimizing the economic impacts to small entities as required by the RFA.

As discussed in Section II.B above, the final rule heeds the SBA Office of Advocacy's request for more specific guidance in three ways: (1) § 103.40(d) of the final rule provides an exhaustive list of the seven categories of terms and conditions of employment that will be considered essential for the joint-employer inquiry; (2) § 103.40(e) of the final rule clarifies that, to establish joint-employer status, the common-law employer must possess exercised or unexercised authority to control, or exercise the power to control indirectly, such as through an intermediary, an *essential* term or condition of employment; and (3) § 103.40(f) of the final rule clarifies that evidence of an entity's control over matters that are immaterial to the existence of an employment relationship under common-law agency principles *and* that do not bear on the employees' essential terms and conditions of employment is not relevant to the determination of joint-employer status.

Contrary to the SBA Office of Advocacy's second criticism, the final

rule does not contain any conflicts with existing federal requirements. The SBA Office of Advocacy's first asserted conflict is with federal requirements that require prime contractors to have indirect and reserved control over their subcontractor's terms and conditions of employment, such as wages, safety, hiring, and firing, which is discussed in Section VI.A.2.c. above. The SBA Office of Advocacy's second asserted conflict is that the proposed rule may conflict with a recent Presidential initiative to bolster the ranks of underserved small business contractors by discouraging mentorship and guidance from larger prime contractors.[549] The NLRB strongly supports efforts to increase diversity and inclusion in federal contracting. The SBA Office of Advocacy's comment, however, does not identify any way in which the final rule would prohibit larger contractors from offering mentorship and guidance to smaller contractors from underserved populations. Nor does it comment explain, as it implicitly suggests, how a larger contractor's provision of mentorship and guidance to a smaller contractor could create a joint-employer relationship under the rule.

The SBA Office of Advocacy's comment also asserts that the Board has underestimated the compliance costs of the final rule. However, the comment did not identify any direct compliance costs that the Board has overlooked and only mentioned indirect or speculative costs, which were raised by other commenters and addressed by the Board in Section VI.A.2.b above.

Finally, the comment twice encourages the Board to consider significant alternatives that would accomplish the objectives of the statute while minimizing the economic impacts on small entities, as required by the RFA, but provides no suggestions to that end. Consistent with the RFA's mandate, the Board has considered such alternatives in Section VI.6 below.

4. Description and Estimate of Number of Small Entities to Which the Rule Applies

In order to evaluate the impact of the proposed rule, the Board first identified the entire universe of businesses that could be impacted by a change in the joint-employer standard. According to the United States Census Bureau, there were 6,140,612 business firms with

---

[542] Comments of Goldwater Institute; IFA; National Association of Insurance and Financial Advisors; SBA Office of Advocacy.

[543] Comments of IFA.

[544] Comments of Elizabeth Boynton.

[545] Comments of Goldwater Institute; SBA Office of Advocacy.

[546] SBA Guide, at 40.

[547] *Yates* v. *United States,* 574 U.S. 528, 537 (2015) (''Ordinarily, a word's usage accords with its dictionary definition. In law as in life, however, the same words, placed in different contexts, sometimes mean different things.''); *Environmental Defense* v. *Duke Energy Corp.,* 549 U.S. 561, 574 (2007) (''We also understand that '[m]ost words have different shades of meaning and consequently may be variously construed, not only when they occur in different statutes, but when used more than once in the same statute or even in the same section.' '') (quoting *Atlantic Cleaners & Dyers, Inc.* v. *United States,* 286 U.S. 427, 433 (1932)). For example, the term ''employee'' has different meanings under the NLRA and the Fair Labor Standards Act. See supra fn. 338.

[548] See supra fn. 340.

[549] Press Release, The White House, Statements and Releases, FACT SHEET: Biden-Harris Administration Announces Reforms to Increase Equity and Level the Playing Field for Underserved Small Business Owners, (Dec. 2, 2021).

employees in 2020.[550] Of those, the Census Bureau estimates that about 6,119,657 were firms with fewer than 500 employees.[551] While this final rule does not apply to employers that do not meet the Board's jurisdictional requirements, the Board does not have the data to determine the number of excluded entities (nor were data or comments received on this particular issue).[552]

The final rule will only be applied as a matter of law when businesses are alleged to be joint employers in a Board proceeding. Therefore, the frequency with which the issue comes before the Board is indicative of the number of entities of any size most directly impacted by the final rule. A review of the Board's representation petitions and unfair labor practice charges provides a basis for estimating the frequency with which the joint-employer issue comes before the Agency. Between January 1, 2013, and December 31, 2017, the five-year period before the Board began rulemaking on this issue, joint-employer relationships were only alleged in 1.39% of the Board's cases. 83 FR 46693; 85 FR 11232. Accounting for repetitively alleged joint-employer relationships in these cases, the Board identified 823 separate joint-employer relationships involving an estimated 1,646 employers, .028% of all 5.9 million business firms, large and small, 83 FR 46693, which the Board deemed "very few employers," 83 FR 46695.

Using the same methodology, the current majority found that, during the four-year period between January 1, 2018 and December 31, 2021, a total of 75,343 representation and unfair labor practice cases were initiated with the Agency. In 772 of those filings, the representation petition or unfair labor practice charge asserted a joint-employer relationship between at least two employers, which accounts for 1.02% of the Board's cases.[553] Accounting for repetitively alleged joint-employer relationships in these filings, the Board has identified 467 separate alleged joint-employer relationships involving an estimated 934 employers.[554] Accordingly, the joint-employer standard most directly impacted approximately .015% of all 6,140,612 business firms (including both large and small businesses) over the four-year period. And, the Board is unaware of any cases between 2018 and

2021 that were determined by contractually reserved or indirectly exercised control, and no public comments have directed us to one.

This data belies the dissent's assertion that this rule will make "many" small businesses joint employers for the first time or "dramatically increase" the number of entities deemed joint employer since the new standard is so closely aligned with the pre-rulemaking standard, under which a similar number of employers were alleged as joint employers. In fact, since a large share of our joint-employer cases involve two large employers, the Board expects that an even lower percentage of small businesses have been and will be most directly impacted by the Board's application of the rule.

As discussed in the NPRM, irrespective of an Agency proceeding, the rule may be more relevant to certain types of small employers because their business relationships involve the exchange of employees or operational control.[555] 87 FR at 54660. In addition, labor unions, as organizations representing or seeking to represent employees, will be impacted by the Board's change in its joint-employer standard. Thus, the Board identified the following five types of small businesses or entities as those most likely to be impacted by the rule: contractors/subcontractors; temporary help service suppliers; temporary help service users; franchisees; and labor unions.[556]

(1) Businesses commonly contract with vendors to receive a wide range of services that may satisfy their primary business objectives or solve discrete problems they are not qualified to address. And there are seemingly unlimited types of vendors that provide these types of contract services. Businesses may also subcontract work to vendors to satisfy their own contractual obligations—an arrangement common to the construction industry. Businesses that contract to receive or provide services often share workspaces and sometimes share control over workers, rendering their relationships subject to application of the Board's

---

[550] U.S. Department of Commerce, Bureau of Census, 2020 Statistics of U.S. Businesses ("SUSB") Annual Data Tables by Enterprise Employment Size, *https://www.census.gov/data/tables/2020/econ/susb/2020-susb-annual.html* (from downloaded Excel Table entitled "U.S. & States, 6-digit NAICS" found at *https://www2.census.gov/programs-surveys/susb/tables/2020/us_state_6digitnaics_2020.xlsx*. "Establishments" refer to single location entities—an individual "firm" can have one or more establishments in its network. The Board has used firm-level data for this IRFA because establishment data is not available for certain types of employers discussed below. Census Bureau definitions of "establishment" and "firm" can be found at *https://www.census.gov/programs-surveys/susb/about/glossary.html* (last visited June 2, 2023).

The proposed rule references the Census Bureau's 2019 Statistics of U.S. Businesses ("SUSB") data tables, the most recent data available at the time of publication. Because the 2020 SUSB data tables are now available, the FRFA uses that updated data. However, the changes are not statistically significant, as the joint-employer standard will continue to most directly impact the same percentage of businesses large and small.

[551] The Census Bureau does not specifically define small business but does break down its data into firms with 500 or more employees and those with fewer than 500 employees. See U.S Department of Commerce, Bureau of Census, 2020 SUSB Annual Data Tables by Enterprise Employment Size, *https://www.census.gov/data/tables/2020/econ/susb/2020-susb-annual.html* (from downloaded Excel Table entitled "U.S. & States, 6-digit NAICS"), found at *https://www2.census.gov/programs-surveys/susb/tables/2020/us_state_6digitnaics_2020.xlsx*. Consequently, the 500-employee threshold is commonly used to describe the universe of small employers. For defining small businesses among specific industries, the standards are defined by the North American Industry Classification System (NAICS), which we set forth below.

[552] Pursuant to 29 U.S.C. 152(6) and (7), the Board has statutory jurisdiction over private sector employers whose activity in interstate commerce exceeds a minimal level. *NLRB v. Fainblatt*, 306 U.S. 601, 606–607 (1939). To this end, the Board has adopted monetary standards for the assertion of jurisdiction that are based on the volume and character of the business of the employer. In general, the Board asserts jurisdiction over employers in the retail business industry if they have a gross annual volume of business of $500,000 or more. *Carolina Supplies Cement Co.*, 122 NLRB 88 (1959). But shopping center and office building retailers have a lower threshold of $100,000 per year. *Carol Management Corp.*, 133 NLRB 1126 (1961). The Board asserts jurisdiction over nonretailers generally where the value of goods and services purchased from entities in other states is at least $50,000. *Siemons Mailing Service*, 122 NLRB 81 (1959). See also supra fn. 104.

The following employers are excluded from the NLRB's jurisdiction by statute: federal, state and local governments, including public schools, libraries, and parks; Federal Reserve banks, and wholly owned government corporations, 29 U.S.C.

152(2); employers that employ only agricultural laborers, those engaged in farming operations that cultivate or harvest agricultural commodities or prepare commodities for delivery, 29 U.S.C. 152(3); and employers subject to the Railway Labor Act, such as interstate railroads and airlines, 29 U.S.C. 152(2).

[553] This includes initial representation case petitions (RC petitions) and unfair labor practice charges (CA cases) filed against employers.

[554] Since a joint-employer relationship requires at least two employers, we have estimated the number of employers by multiplying the number of asserted joint-employer relationships by two. Some of these filings assert more than two joint employers, but, on the other hand, some of the same employers are named multiple times in these filings. Additionally, this number is certainly inflated because the data do not reveal those cases where a joint-employer relationship exists but the parties' joint-employer status is not in dispute.

[555] The Board acknowledges that there are other types of entities and/or relationships between entities that may be affected by this change in the joint-employer rule. Such relationships include but are not limited to lessor/lessee and parent/subsidiary. However, the Board does not believe that entities involved in these relationships will be impacted more than the entities discussed below.

[556] Comments received in response to the 2022 IRFA did not reveal any other categories of small entities that would likely take a special interest in a change in the standard for determining joint-employer status under the Act or indicate that there is a unique burden for entities in these categories. 85 FR 11234.

joint-employer standard. The Board does not have the means to identify precisely how many businesses are impacted by contracting and subcontracting within the United States or how many contractors and subcontractors would be small businesses as defined by the SBA.[557]

(2) Temporary help service suppliers (NAICS #561320) are primarily engaged in supplying workers to supplement a client employer's workforce. To be defined as a small business temporary help service supplier by the SBA, the entity must generate receipts of less than $34 million annually.[558] In 2017, there were 14,343 temporary service supplier firms in the United States.[559] Of these temporary service supplier firms, 13,384 had receipts of $29,999,999 or less. Since the Board cannot determine how many of the 117 firms with receipts between $30 million and $34,999,000 fall below the $34 million annual receipt threshold, it assumes that these are all small businesses as defined by the SBA. Therefore, for purposes of this FRFA, the Board assumes that 13,501 temporary help service supplier firms (94.1% of total) are small businesses.

(3) Entities that use temporary help services to staff their businesses are widespread throughout many industries. The Census Bureau's 2020 Annual Business Survey revealed that of the 2,687,205 respondent firms with paid employees, 94,930 of those firms obtained staffing from temporary help services in that calendar year.[560] This survey provides the only gauge of employers that obtain staffing from temporary help services, and the Board is without the means to estimate what portion of those are small businesses as defined by the NAICS. For that reason, and because no other comments were received on this topic, the Board assumes for purposes of this FRFA that all users of temporary services are small businesses.

(4) Franchising is a method of distributing products or services in which a franchisor lends its trademark or trade name and a business system to a franchisee, which pays a royalty and often an initial fee for the right to conduct business under the franchisor's name and system.[561] Franchisors generally exercise some operational control over their franchisees, which potentially renders the relationship subject to application of the Board's joint-employer standard. The Board explained in the NPRM that it does not have the means to identify precisely how many franchisees operate within the United States or how many are small businesses as defined by the SBA. The Census Bureau's 2020 Annual Business Survey revealed that, of the 130,492 firms that operated a portion of their business as a franchise, 125,989 had fewer than 500 paid employees.[562] Based on this available data and the fact that the 500-employee threshold is commonly used to describe the universe of small employers, we assume that 125,989 (96.5% of total) are small businesses.

(5) Labor unions, as defined by the NLRA, are entities "in which employees participate and which exist for the purpose . . . of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."[563] By defining which employers are joint employers under the NLRA, the final rule impacts labor unions generally, and more directly impacts those labor unions that organize in the specific business sectors discussed above. The SBA's small business standard for "Labor Unions and Similar Labor Organizations" (NAICS #813930) is $16.5 million in annual receipts.[564] In 2017, there were 13,137 labor union firms in the U.S.[565] Of these firms, at least 12,964 labor union firms (98.6% of total) had receipts of under $15 million and are definitely small businesses according to SBA standards. Since the Board cannot determine how many of the 49 labor union firms with receipts between $15 million and $19,999,999 fall below the $16.5 million annual receipt threshold, it assumes that these are all small businesses as defined by the SBA. For the purposes of the IRFA, the Board assumes that 13,013 labor union firms (99% of total) are small businesses.

Based on the foregoing, the Board assumes that 13,501 temporary help supplier firms, 125,989 franchise firms, and 13,013 union firms are small businesses; and it further assumes that all 94,930 temporary help user firms are small businesses. Therefore, among these four categories of employers that are most interested in the final rule, 247,433 business firms are assumed to be small businesses as defined by the SBA. The Board believes that all these small businesses, and also those businesses regularly engaged in contracting/subcontracting, have a general interest in the rule and would be impacted by the compliance costs, discussed below, related to reviewing and understanding the rule. But, as previously noted, employers will only be most directly impacted when they are alleged to be a joint employer in a Board proceeding. Given the Board's historic filing data, this number is very small relative to the number of small employers in these five categories.

Throughout the IRFA, the Board requested comments or data that might improve its analysis, 87 FR at 54659–61, but no additional data was received regarding the number of small entities to which the rule will apply.[566]

[557] Though the Board has previously solicited input on the number of contractors and subcontractors that qualify as small businesses, 83 FR 46694 fn. 56, 85 FR 11234, 87 FR 54660, it has received no responsive comments.

[558] 13 CFR 121.201. Between the publication of the NPRM and the final rule, changes in the Small Business Size Regulations increased the total number of potentially affected entities by 166 firms across all five categories. Though that change is statistically insignificant, the Board chose to include the most updated figures in this FRFA.

[559] The Census Bureau only provides data about receipts in years ending in 2 or 7, so the 2017 data is the most recent available information regarding receipts. See U.S Department of Commerce, Bureau of Census, 2017 SUSB Annual Data Tables by Establishment Industry, NAICS classification #561320, *https://www2.census.gov/programs-surveys/susb/tables/2017/us_6digitnaics_rcptsize_2017.xlsx.*

[560] U.S. Department of Commerce, Bureau of Census, 2020 Annual Business Survey— Characteristics of Businesses, *https://www.census.gov/data/tables/2020/econ/abs/2020-abs-characteristics-of-businesses.html* (from downloaded Excel Table entitled "Type(s) of Workers Employed by Sector, Sex, Ethnicity, Race, and Veteran Status," found at *https://data.census.gov/cedsci/table?q=ab1900%2a&tid=ABSCB2019.AB1900CSCB01&hidePreview=true&nkd=QDESC–B20*).

[561] See International Franchising Establishments FAQs, found at *https://www.franchise.org/faqs-about-franchising.*

[562] U.S. Department of Commerce, Bureau of Census, 2020 Annual Business Survey— Characteristics of Businesses, *https://www.census.gov/data/tables/2020/econ/abs/2020-abs-characteristics-of-businesses.html* (from downloaded Excel Table entitled "Businesses Operated as a Franchise by Sex, Ethnicity, Race, Veteran Status, and Employment Size of Firm," found at *https://data.census.gov/cedsci/table?q=ab1900%2a&tid=ABSCB2019.AB1900CSCB04&hidePreview=true&nkd=QDESC–B06*).

[563] 29 U.S.C. 152(5).

[564] 13 CFR 121.201.

[565] See U.S Department of Commerce, Bureau of Census, 2017 SUSB Annual Data Tables by Establishment Industry, NAICS classification #722513, *https://www2.census.gov/programs-surveys/susb/tables/2017/us_6digitnaics_rcptsize_2017.xlsx.*

[566] Job Creators Network Foundation argues that the proposed rule is so vague and amorphous that the Board could not possibly identify all business that would be impacted. Rachel Greszler objects to the Board's determination that the issue of whether two entities were joint employers only involved 934 employers, or 0.15% of all business firms, over the four-year period. However, neither commenter provided any concrete data for the Board to consider.

5. Description of the Projected Reporting, Recordkeeping and Other Compliance Requirements of the Rule, Including an Estimate of the Classes of Small Entities That Will be Subject to the Requirement and the Type of Professional Skills Necessary for Preparation of the Report or Record

The RFA requires an agency to consider the direct burden that compliance with a new regulation will likely impose on small entities.[567] Thus, the RFA requires the Agency to determine the amount of ''reporting, recordkeeping and other compliance requirements'' imposed on small entities.[568] In providing its FRFA, an agency may provide either a quantifiable or numerical description of the effects of a rule or alternatives to the rule, or ''more general descriptive statements if quantification is not practicable or reliable.'' [569]

The Board concludes that the final rule imposes no capital costs for equipment needed to meet the regulatory requirements; no direct costs of modifying existing processes and procedures to comply with the final rule; no lost sales and profits resulting from the final rule; no changes in market competition as a result of the final rule and its impact on small entities or specific submarkets of small entities; no extra costs associated with the payment of taxes or fees associated with the final rule; and no direct costs of hiring employees dedicated to compliance with regulatory requirements.[570] The final rule also does not impose any new information collection or reporting requirements on small entities.

Small entities, with a particular emphasis on those small entities in the five categories with special interest in the final rule, will be interested in reviewing the rule to understand the restored common-law joint-employer standard. We estimate that a human resources or labor relations specialist at a small employer who undertook to become generally familiar with the proposed changes may take at most one hour to read the text of the rule and the supplementary information published in the **Federal Register**.[571] It is also

possible that a small employer may wish to consult with an attorney, which we estimated to require one hour as well.[572] Using the Bureau of Labor Statistics' estimated wage and benefit costs, we have assessed these labor costs to be between $208.60 and $227.98.[573]

As to the impact on unions, the Board anticipates they may also incur costs from reviewing the rule. The Board believes a union would consult with an attorney, which is estimated to require no more than one hour of attorney time costing $169.11 because, like labor compliance professionals or employer labor-management attorneys, union counsels would already be familiar with the pre-2020 standard for determining joint-employer status under the Act and common-law principles.[574]

The Board does not find the estimated $227.98 cost to small employers and the estimated $169.11 cost to unions to review and understand the rule to be significant within the meaning of the RFA. In making this finding, one important indicator is the cost of compliance in relation to the revenue of the entity or the percentage of profits affected.[575] Other criteria to be considered are the following:

—Whether the rule will cause long-term insolvency, *i.e.*, regulatory costs that may reduce the ability of the firm to make future capital investment, thereby severely harming its competitive ability, particularly against larger firms;
—Whether the cost of the proposed regulation will (a) eliminate more than 10 percent of the businesses' profits; (b) exceed one percent of the gross revenues of the entities in a particular sector, or (c) exceed five percent of the labor costs of the entities in the sector.[576]

The minimal cost to read and understand the rule, $227.98 for small employers and $169.11 for small unions, will not generate any such significant economic impacts.

In the NPRM, the Board requested comments from the public that would shed light on any potential compliance costs, 87 FR 54659, and considered those responses in the comments section above.

6. Description of the Steps the Agency Has Taken To Minimize the Significant Economic Impact on Small Entities Consistent With the Stated Objectives of Applicable Statutes, Including a Statement of the Factual, Policy, and Legal Reasons for Selecting the Alternative Adopted in the Final Rule and Why Each One of the Other Significant Alternatives to the Rule Considered by the Agency Which Affect the Impact on Small Entities was Rejected

Pursuant to 5 U.S.C. 604(a)(6), agencies are directed to examine ''why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.'' In the NPRM, the Board requested comments identifying any other issues and alternatives that it had not considered. See 87 FR 54651, 54662. Two commenters suggest that the Board consider alternatives but do not provide any suggestions.[577] Several comments suggest that the Board withdraw the proposed rule and leave in place the 2020 rule, an alternative that the Board

[567] See *Mid-Tex Electric Cooperative,* 773 F.2d at 342 (''[I]t is clear that Congress envisioned that the relevant 'economic impact' was the impact of compliance with the proposed rule on regulated small entities.'').

[568] See 5 U.S.C. 604(a)(4).

[569] 5 U.S.C. 607.

[570] See SBA Guide at 37.

[571] Data from the BLS indicates that employers are more likely to have a human resources specialist (BLS #13–1071) than to have a labor relations specialist (BLS #13–1075). Compare Occupational

Employment and Wages, May 2022, 13–1075 Labor Relations Specialists, found at *https://www.bls.gov/oes/current/oes131075.htm,* with Occupational Employment and Wages, May 2022, 13–1071 Human Resources Specialists, found at *https://www.bls.gov/oes/current/oes131071.htm* (last accessed July 3, 2023).

[572] In the NPRM, the Board asserted that an experienced labor relations specialist or labor relations attorney would not expend more than an hour to read and understand the rule, which returns to the pre-2020 standard and incorporates the common-law definition of ''employer'' that already applies in most jurisdictions throughout the nation. Therefore, the Board's initial direct compliance costs were one hour of time for the human resources or labor relations specialist to read the rule and one hour of an attorney's time for a consultation. The Board did not receive any comments that provided evidence or support for the assertion that employers or labor relations attorneys would need any additional time to read and understand the final rule. However, the comments persuaded the Board to add an additional hour of time for an employer's human resources or labor relations specialist to attend the attorney's consultation.

[573] For wage figures, see May 2021 National Occupancy Employment and Wage Estimates, found at *https://www.bls.gov/oes/current/oes_nat.htm.* The Board has been administratively informed that BLS estimates that fringe benefits are approximately equal to 40 percent of hourly wages. Thus, to calculate total average hourly earnings, BLS multiplies average hourly wages by 1.4. In May 2021, average hourly wages for labor relations specialists (BLS #13–1075) were $42.05. The same figure for a lawyer (BLS #23–1011) is $78.74. Accordingly, the Board multiplied each of those wage figures by 1.4 and added two hours for the labor relations specialist and one hour for the lawyer to arrive at its estimate.

These average hourly wages, which are based on the BLS's May 2022 figures released on April 25, 2023, are $5 to $7 higher than those reported in the IRFA when the most updated BLS figures were from May 2020. See 83 FR 54662. The increase is not statistically significant. While some commenters asserted that the wage rates for an attorney were at least $300/hour, none of the comments provided any evidence to which the Board could cite. Therefore, the Board continues to rely on the BLS wage figures.

[574] The Board's revised compliance cost for unions covers the cost of a one-hour consultation between the union's labor relations specialist and legal counsel, which totals $169.11 per the formula described in fn. 573 above.

[575] See SBA Guide at 18.

[576] Id. at 19.

[577] Comments of McDonald's USA, LLC; SBA Office of Advocacy.

considered and rejected for reasons stated in the NPRM and reiterated above.[578] One comment suggests simply modifying the 2020 rule by, for example, broadening the list of terms and conditions of employment that may demonstrate joint-employer status.[579] Or, in the alternative, the comment suggests that the Board could leave the rule untouched and examine its application through subsequent caselaw, which would reveal any deficiencies in the standard.[580] As discussed in Section IV.K above, the Board has considered each of these alternatives, and several others, and has provided a detailed rationale for rejecting the status quo and revising the joint-employer standard through the rulemaking process.

In the NPRM, the Board considered exempting certain small entities and explained why such an exemption would be contrary to judicial precedent and impracticable.[581] Two commenters suggested that the Board reconsider an exemption but did not address the Board's previously stated concerns with such an exemption or provide any further detail on how such an exemption would function.[582] Accordingly, the Board again rejects this exemption as impractical because such a large percentage of employers and unions would be exempt under the SBA definitions, thereby substantially undermining the purpose of the final rule. Moreover, as this rule often applies to relationships involving a small entity (such as a franchisee) and a large enterprise (such as a franchisor), exemptions for small businesses would decrease the application of the rule to larger businesses as well, potentially undermining the policy behind this rule. Additionally, given the very small direct cost of compliance, it is likely that the burden on a small business of determining whether it fell within a particular exempt category would exceed the burden of compliance. Further, Congress gave the Board very broad jurisdiction, with no suggestion that it wanted to limit coverage of any part of the Act to only larger employers.[583] As the Supreme Court has noted, "[t]he [NLRA] is federal

legislation, administered by a national agency, intended to solve a national problem on a national scale."[584] As such, this alternative is contrary to the objectives of this rulemaking and of the NLRA.

The purpose of considering alternatives is to determine whether they could minimize the compliance burdens on small businesses. SBA Guide at 36. But an agency may select a course that is more economically burdensome than a proposed alternative if there is evidence that the proposed alternative would not accomplish the objectives of the statute. See *AML International* v. *Daley*, 107 F. Supp. 2d 90, 105 (D. Mass. 2000). None of the alternatives proffered and considered accomplish the objectives of issuing this rule while minimizing the familiarization cost on small businesses. Accordingly, the Board believes that promulgating this final rule is the best regulatory course of action.

## B. Paperwork Reduction Act

In the NPRM, the Board explained that the proposed rule would not impose any information collection requirements. Accordingly, the proposed rule is not subject to the Paperwork Reduction Act (PRA), 44 U.S.C. 3501–3521. See 87 FR 54662–63. No substantive comments were received relevant to the Board's analysis of its obligations under the PRA

## C. Congressional Review Act

The provisions of this rule are substantive. Therefore, the Board will submit this rule and required accompanying information to the Senate, the House of Representatives, and the Comptroller General as required by the Small Business Regulatory Enforcement Fairness Act (Congressional Review Act or CRA), 5 U.S.C. 801–808.[585]

Pursuant to the CRA, the Office of Information and Regulatory Affairs will designate this rule as a "major rule" because it will have an effect on the economy of more than $100 million during the year it takes effect. 5 U.S.C. 804(2)(A). Accordingly, the rule will become effective no earlier than 60 days after its publication in the **Federal Register**.

## Final Rule

This rule is published as a final rule.

## List of Subjects in 29 CFR Part 103

Jurisdictional standards, Election procedures, Appropriate bargaining units, Joint Employers, Remedial Orders.

For the reasons stated in the preamble, the National Labor Relations Board amends 29 CFR part 103 as follows:

## PART 103—OTHER RULES

■ 1. The authority citation for part 103 continues to read as follows:

**Authority:** 29 U.S.C. 156, in accordance with the procedure set forth in 5 U.S.C. 553.

## Subpart D—[Removed and Reserved]

■ 2. Remove and reserve subpart D, consisting of § 103.40.
■ 3. Add subpart E, consisting of § 103.40, to read as follows:

## Subpart E—Joint Employers

**§ 103.40   Joint employers.**

(a) An employer, as defined by section 2(2) of the National Labor Relations Act (the Act), is an employer of particular employees, as defined by section 2(3) of the Act, if the employer has an employment relationship with those employees under common-law agency principles.

(b) For all purposes under the Act, two or more employers of the same particular employees are joint employers of those employees if the employers share or codetermine those matters governing employees' essential terms and conditions of employment.

(c) To "share or codetermine those matters governing employees' essential terms and conditions of employment" means for an employer to possess the authority to control (whether directly, indirectly, or both), or to exercise the power to control (whether directly, indirectly, or both), one or more of the employees' essential terms and conditions of employment.

(d) "Essential terms and conditions of employment" are

(1) Wages, benefits, and other compensation;

(2) Hours of work and scheduling;

(3) The assignment of duties to be performed;

(4) The supervision of the performance of duties;

(5) Work rules and directions governing the manner, means, and methods of the performance of duties and the grounds for discipline;

(6) The tenure of employment, including hiring and discharge; and

---

[578] See, e.g., comments of U.S. Chamber of Commerce.

[579] Comments of U.S. Chamber of Commerce.

[580] Id.

[581] 87 FR 54662.

[582] Comments of IFA; Rachel Greszler.

[583] However, as mentioned above, there are standards that prevent the Board from asserting authority over entities that fall below certain jurisdictional thresholds. This means that extremely small entities outside of the Board's jurisdiction will not be affected by the final rule. See 29 CFR 104.204.

[584] *NLRB* v. *Natural Gas Utility District of Hawkins County, Tennessee,* 402 U.S. 600, 603–604 (1971) (quotation omitted).

[585] Several comments note that the proposed rule did not include a CRA analysis. See comments of Colorado Bankers Association; Elizabeth Boynton; National Association of Convenience Stores; U.S. Chamber of Commerce. Such an analysis is included in final rules rather than in proposed ones. See 5 U.S.C. 801–808.

(7) Working conditions related to the safety and health of employees.

(e) Whether an employer possesses the authority to control or exercises the power to control one or more of the employees' essential terms and conditions of employment is determined under common-law agency principles. For the purposes of this section:

(1) Possessing the authority to control one or more essential terms and conditions of employment is sufficient to establish status as a joint employer, regardless of whether control is exercised.

(2) Exercising the power to control indirectly (including through an intermediary) one or more essential terms and conditions of employment is sufficient to establish status as a joint employer, regardless of whether the power is exercised directly.

(f) Evidence of an entity's control over matters that are immaterial to the existence of an employment relationship under common-law agency principles and that do not bear on the employees' essential terms and conditions of employment is not relevant to the determination of whether the entity is a joint employer.

(g) A party asserting that an employer is a joint employer of particular employees has the burden of establishing, by a preponderance of the evidence, that the entity meets the requirements set forth in paragraphs (a) through (f) of this section.

(h) A joint employer of particular employees

(1) Must bargain collectively with the representative of those employees with respect to any term and condition of employment that it possesses the authority to control or exercises the power to control, regardless of whether

that term or condition is deemed to be an essential term and condition of employment under this section for the purposes of establishing joint-employer status; but

(2) Is not required to bargain with respect to any term and condition of employment that it does not possess the authority to control or exercise the power to control.

(i) The provisions of this section are intended to be severable. If any paragraph of this section is held to be unlawful, the remaining paragraphs of this section not deemed unlawful are intended to remain in effect to the fullest extent permitted by law.

Dated: October 20, 2023.

**Roxanne L. Rothschild,**

*Executive Secretary, National Labor Relations Board.*

[FR Doc. 2023–23573 Filed 10–26–23; 8:45 am]

**BILLING CODE 7545–01–P**