## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

|  |  |  |
|---|---|---|
| _____ | ) | |
| SERVICE EMPLOYEES INTERNATIONAL UNION, | ) ) ) | |
| *Petitioner*, | ) ) | |
| v. | ) | Case No. 23-1309 |
| NATIONAL LABOR RELATIONS BOARD, | ) ) | **NOT YET SCHEDULED** |
| *Respondent*. | ) ) ) | **FOR ORAL ARGUMENT** |
| _____ | ) | |

### MOTION TO INTERVENE OF EMPLOYER GROUPS

Pursuant to Rule of Appellate Procedure 15(d) and D.C. Circuit Rule 15(b), Chamber of Commerce of the United States of America, American Hotel and Lodging Association, Associated Builders and Contractors, Associated General Contractors of America, Coalition for Democratic Workplace, International Franchise Association, Longview Chamber of Commerce, National Association of Convenience Stores, National Retail Federation, Restaurant Law Center, Texas Association of Business, and Texas Restaurant Association (together, the "Employer Groups") timely move to intervene as respondents in this action seeking review of the final rule published by the National Labor Relations Board ("NLRB") titled *Standard for Determining Joint Employer Status*, 88 Fed. Reg. 73,946 (Oct. 27, 2023), codified at 29 C.F.R. § 103.40 ("Rule").

The Employer Groups easily satisfy the standards for both intervention as of right and permissive intervention, for at least two reasons. First, the Employer Groups intend to seek dismissal of the Service Employees International Union's ("SEIU") petition for review for lack of jurisdiction on the ground that the proper venue to hear rulemaking challenges like this one is federal district court. The Employer Groups are already plaintiffs in a pending suit in the Eastern District of Texas that seeks review of the same Rule, and the NLRB has argued there that this Court has jurisdiction. Thus, if the Employer Groups do not intervene as respondents in this action, no party will raise arguments explaining why this Court lacks jurisdiction and why jurisdiction instead properly lies in federal district court.

Second, in the event this Court exercises jurisdiction, the Employer Groups will urge the Court to reject SEIU's arguments to expand the scope of the Rule. The Employer Groups are challenging the Rule in the Eastern District of Texas on materially different grounds from a materially different perspective than SEIU (the only petitioner). As the Employer Groups have argued in that court, the Rule conflicts with the NLRA's common-law-based legal framework, and replaces a clear standard under which the Employer Groups' members have tailored their business relationships with an arbitrary and uncertain one that will disrupt those relationships with untenable consequences. SEIU, by contrast, filed this action seeking to expand

2

the scope of the Rule, which would directly and adversely affect the interests of the Employer Groups.

Because the Employer Groups have a substantial interest in this litigation and in advocating for the Court to dismiss SEIU's petition for review or otherwise reject SEIU's arguments to expand the scope of the Rule, this Court should grant the motion to intervene.

## BACKGROUND

For decades, the NLRB drew from the common law a straightforward standard for deciding whether firms were "joint employers" under the National Labor Relations Act. Firms were considered joint employers if they exercised direct, immediate, and substantial control over the same employees' essential terms and conditions of employment. In 2015, the NLRB abruptly announced a new test, allowing a joint employer finding whenever a firm exercised "indirect" or a "reserved right" to control another firm's employees. This Court held that the NLRB "overshot the common-law mark," and vacated the 2015 test. *See Browning-Ferris Indus. of Cal., Inc. v. NLRB*, 911 F.3d 1195, 1216 (D.C. Cir. 2018).

In response to this Court's decision, the NLRB in 2020 promulgated a new rule that addressed the Court's admonitions and largely reinstated the longstanding common-law-based joint employer standard. *See Joint Employer Status Under the National Labor Relations Act*, 85 Fed. Reg. 11,184 (Feb. 26, 2020), codified at 29

C.F.R. § 103.40 ("2020 Rule"). SEIU filed a lawsuit challenging that 2020 Rule—and notably did so in the United States District Court for the District of Columbia rather than in this Court. *See SEIU v. NLRB*, Case No. 21-cv-2443-RC (D.D.C). That action is currently being held in abeyance.[1]

In 2022, a newly constituted NLRB proposed to rescind and replace the 2020 Rule with the Rule that is the subject of this action. In late October 2023, the NLRB promulgated the new Rule and vacated the 2020 Rule. The new Rule greatly expands collective bargaining obligations by providing that firms are joint employers if they exercise merely reserved or indirect control over even a single essential term or condition of employment.

SEIU filed its petition for review of the Rule in this Court on November 6, 2023. Four days earlier, however, SEIU had publicly called the Rule "welcome and necessary," and voiced opposition to "any effort to nullify the Board's Rule." *See* Exhibit A, Joint Letter of SEIU, International Brotherhood of Teamsters, and AFL-CIO to United States House of Representatives 1, 3 (November 2, 2023).

On November 9, 2023, the Employer Groups filed a lawsuit in the United States District Court for the Eastern District of Texas seeking to set aside as unlawful

---

[1] The Chamber of Commerce of the United States of America and the International Franchise Association moved to intervene, but the motion has not been fully briefed nor ruled on given the abeyance. The NLRB has never tried to dismiss the suit on jurisdictional grounds.

both the new Rule and the NLRB's rescission of the 2020 Rule. *See* Exhibit B, Compl., *Chamber of Com. of the U.S. of Am. v. NLRB*, Case No. 6:23-cv-00553-JCB (E.D. Tex. Nov. 9, 2023), ECF No. 1. The Employer Groups also sought summary judgment on their claims. The NLRB subsequently moved to transfer the Employer Groups' lawsuit to this Court and consolidate the case with SEIU's petition for review. *See* Exhibit C, Mot. to Transfer, *Chamber of Com. of the U.S. of Am. v. NLRB*, Case No. 6:23-cv-00553-JCB (E.D. Tex. Nov. 20, 2023), ECF No. 25. That motion (which the Employer Groups oppose), along with the Employer Groups' motion for summary judgment, remains pending.

## ARGUMENT

### I.     The Employer Groups May Intervene as of Right.

Federal Rule of Appellate Procedure 15(d) allows a party to intervene in a proceeding to review agency action if a motion for leave to intervene is timely and "contain[s] a concise statement of the interest of the moving party and the grounds for intervention." Fed. R. App. P. 15(d). "[I]ntervention in the court of appeals is governed by the same standards as in the district court." *Massachusetts Sch. of Law at Andover, Inc. v. United States*, 118 F.3d 776, 779 (D.C. Cir. 1997) (emphasis omitted). Under Federal Rule of Civil Procedure 24(a), a party has a right to intervene if it "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical

matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2); *see Deutsche Bank Nat'l Tr. Co. v. FDIC*, 717 F.3d 189, 192 (D.C. Cir. 2013). In the context of agency rulemaking, the relevant "transaction" is the agency's rule and the relevant "property" is the subject of that rule. *Fund For Animals, Inc. v. Norton*, 322 F.3d 728, 735 (D.C. Cir. 2003). These requirements are satisfied here.

The Employer Groups seek to intervene as respondents in this case for two reasons. First, they seek dismissal of the petition for review for lack of jurisdiction. Such an interest in challenging this Court's original jurisdiction is a "weighty" one given the Court's "independent obligation to assure itself of its own jurisdiction." *Acree v. Republic of Iraq*, 370 F.3d 41, 50 (D.C. Cir. 2004), *abrogated on other grounds by Republic of Iraq v. Beaty*, 556 U.S. 848, 856 (2009); *see also Miller v. Woods*, 185 F.2d 499, 500 (D.C. Cir. 1950) (affirming intervenor's motion to dismiss for lack of jurisdiction). Indeed, due to their pending parallel challenge to the Rule in the Eastern District of Texas, the Employer Groups have a special interest in seeking dismissal of the petition for review. As the NLRB recognized in its motion to transfer, allowing this case to proceed in a different court "creates the possibility of duplicative and conflicting decisions." Exhibit C at 14. Duplicative litigation in this Court would "benefit neither the intervenors, the Government, nor the courts." *In re Brewer*, 863 F.3d 861, 871-873 (D.C. Cir. 2017).

Second, the Employer Groups will oppose SEIU's arguments seeking to expand the scope of the Rule in the event this Court exercises jurisdiction over the petition for review.  Nonparties "who allege that they have suffered injury from the same or very similar wrongful acts as those complained of by the original plaintiffs" are ordinarily eligible to intervene as a matter of right.  *In re Brewer*, 863 F.3d at 872-873.  The Employer Groups' members are directly and adversely affected by the Rule and the rescission of the 2020 Rule:  They participate in business arrangements, such as franchising and contracting, that are likely to expose them to joint-employer liability under the Rule, and therefore stand to suffer significant harm from the NLRB's actions.  They will be further harmed if the Court agrees with SEIU that the scope of the Rule should be expanded.

Moreover, with respect to both grounds for intervention, it is clear that the Employer Groups' interests are not adequately represented by any existing party to this case.  This Court has held that adequate representation is not an onerous standard; rather, "a movant ordinarily should be allowed to intervene unless it is clear that the party will provide adequate representation."  *See Crossroads Grassroots Pol'y Strategies v. FEC*, 788 F.3d 312, 321 (D.C. Cir. 2015) (internal quotation marks omitted).  As noted, neither SEIU (which filed its petition for review in this Court) nor the NLRB (which now takes the position that this Court has

exclusive jurisdiction over NLRB rulemaking challenges) will challenge this Court's jurisdiction.

In addition, while both the Employer Groups and SEIU challenge the Rule, they do so from opposite directions. The Employer Groups are contending in federal district court that the Rule should be set aside as unlawful in its entirety as *too* expansive and that the 2020 Rule should be *reinstated*. Yet SEIU has called for expanding the Rule *even further*, and has separately sought *recission* of the 2020 Rule in a pending lawsuit in the United States District Court for the District of Columbia. *See SEIU v. NLRB*, Case No. 21-cv-2443-RC (D.D.C). The NLRB, which will defend the rule, obviously does not adequately represent the Employer Groups' interests. Indeed, the Employer Groups' participation is necessary to ensure true adversity of interests in light of SEIU's public support for the Rule.

Finally, the Employer Groups have Article III standing to intervene because they have substantial interests that are likely to be adversely affected by this litigation. Because the Employer Groups "satisf[y] Rule 24(a)," they "also meet Article III's standing requirement." *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003). As noted, because the Employer Groups' members are entities regulated by the Rule, their standing is "self-evident." *Fund For Animals*, 322 F.3d at 733-734; *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("[T]here is ordinarily little question" that person has standing where he "is himself

an object of" a challenged governmental regulation.).  The Employer Groups also "ha[ve] standing to intervene on their [members'] behalf."  *Military Toxics Project v. EPA*, 146 F.3d 948, 954 (D.C. Cir. 1998).  The outcome of the petition for review implicates an expansive array of regulatory obligations of the Employer Groups' members, and will impose substantial costs on them if the Court agrees with SEIU that the scope of the Rule should be expanded.  *See* 88 Fed. Reg. at 73,987 (Member Kaplan Dissent) (discussing likelihood of "harmful" economic impact of Rule on regulated entities); *see, e.g.*, *DIRECTV, Inc. v. FCC*, 110 F.3d 816, 829 (D.C. Cir. 1997) ("[S]tanding *** may be established by reference *** to lost *** profits.").

## II.    Alternatively, the Employer Groups Should Be Granted Permissive Intervention.

Although the Employer Groups are entitled to intervene as of right, they at a minimum satisfy the requirements for permissive intervention under Rule 24(b), which requires only that a proposed intervenor have "a claim or defense that shares with the main action a common question of law or fact."  Fed. R. Civ. P. 24(b)(1)(B). "Rule 24(b) *** provides basically that anyone may be permitted to intervene if his claim and the main action have a common question of law or fact," *Nuesse v. Camp*, 385 F.2d 694, 704 (D.C. Cir. 1967), absent any indication of prejudice or delay.

The Employer Groups easily satisfy these requirements for all the reasons noted above.  They seek to intervene to challenge this Court's jurisdiction or, in the event this Court exercises jurisdiction, oppose SEIU's arguments to expand the

scope of the Rule.   Both grounds for intervention necessarily share common questions of law and fact with the main action.   The motion is also timely, and intervention will not prejudice or delay any party.

## CONCLUSION

For the foregoing reasons, the Court should grant the Employer Groups' motion to intervene as respondents.

Dated: December 4, 2023

Stephanie A. Maloney
Jordan L. Von Bokern
U.S. Chamber Litigation Center
1615 H Street, N.W.
Washington, D.C. 20062

*Counsel to Chamber of Commerce of
the United States of America*

Maury Baskin
Littler Mendelson
815 Connecticut Avenue, N.W.
Suite 400
Washington, D.C. 20006

*Counsel to Associated Builders and
Contractors and International
Franchise Association*

Angelo I. Amador
Restaurant Law Center
2055 L Street, N.W.
Suite 700
Washington, D.C. 20036

*Counsel to the Restaurant Law Center*

Respectfully submitted,

 */s/ Pratik A. Shah*
Pratik A. Shah
James E. Tysse
James C. Crowley
Margaret O. Rusconi
AKIN GUMP STRAUSS HAUER
  & FELD LLP
2001 K Street, NW
Washington, D.C. 20006
(202) 887-4000
pshah@akingump.com

*Counsel to Chamber of Commerce of
the United States of America, American
Hotel and Lodging Association,
Associated Builders and Contractors,
Associated General Contractors of
America, Coalition for a Democratic
Workplace, International Franchise
Association, Longview Chamber of
Commerce, National Association of
Convenience Stores, National Retail
Federation, Restaurant Law Center,
Texas Association of Business, and
Texas Restaurant Association*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Chamber of Commerce of the United States of America, American Hotel and Lodging Association, Associated Builders and Contractors, Associated General Contractors of America, Coalition for Democratic Workplace, International Franchise Association, Longview Chamber of Commerce, National Association of Convenience Stores, National Retail Federation, Restaurant Law Center, Texas Association of Business, Texas Restaurant Association hereby states as follows:

### 1.    Chamber of Commerce of the United States of America

Chamber of Commerce of the United States of America ("U.S. Chamber") is a non-profit, tax-exempt organization incorporated in the District of Columbia. The U.S. Chamber has no parent corporation, and no publicly held company has 10% or greater ownership of the organization.

### 2.    American Hotel and Lodging Association

American Hotel and Lodging Association ("AHLA") is the national association representing all segments of the U.S. lodging industry.  AHLA has no parent companies, and no publicly held company has 10% or greater ownership of the organization.

### 3.    Associated Builders and Contractors

Associated Builders and Contractors ("ABC") hereby identifies the following (1) parent companies and (2) publicly held corporations with an ownership interest

of 10 percent of more in ABC:  None.

### 4.    Associated General Contractors of America

Associated General Contractors of America ("AGC") hereby identifies the following (1) parent companies and (2) publicly held corporations with an ownership interest of 10 percent of more in AGC:  None.

### 5.    Coalition for Democratic Workplace

Coalition for Democratic Workplace ("CDW") hereby identifies the following (1) parent companies and (2) publicly held corporations with an ownership interest of 10 percent of more in CDW:  None.

### 6.    International Franchise Association

International Franchise Association ("IFA") hereby identifies the following (1) parent companies and (2) publicly held corporations with an ownership interest of 10 percent of more in IFA:  None.

### 7.    Longview Chamber of Commerce

Longview Chamber of Commerce ("Longview Chamber") is a non-profit, tax-exempt organization incorporated in Texas.  The Longview Chamber does not have a parent corporation, and no publicly held company has 10% or greater ownership of the organization.

### 8. National Association of Convenience Stores

National Association of Convenience Stores ("NACS") is an international trade association that represents both the convenience and fuel retailing industries with more than 1,300 retail and 1,600 supplier company members. The United States convenience industry has more than 150,000 stores across the country and had more than $906 billion in sales in 2022. NACS has no parent corporation, and no publicly held corporation has a 10% or greater ownership in NACS.

### 9. National Retail Federation

National Retail Federation ("NRF") hereby identifies the following (1) parent companies and (2) publicly held corporations with an ownership interest of 10 percent of more in NRF: None.

### 10. Restaurant Law Center

Restaurant Law Center ("RLC") hereby states that it is a non-profit, tax-exempt organization incorporated in the District of Columbia with no parent corporation and no publicly held company with 10% or greater ownership in it.

### 11. Texas Association of Business

Texas Association of Business ("TAB") states that it is a non-profit, tax-exempt organization incorporated in Texas. TAB does not have a parent corporation, and no publicly held company has 10% or greater ownership of the organization.

12. **Texas Restaurant Association**

Texas Restaurant Association ("TRA") hereby identifies the following (1) parent companies and (2) publicly held corporations with an ownership interest of 10 percent of more in TRA:  None.

Dated: December 4, 2023

Respectfully submitted,

*/s/ Pratik A. Shah*
Pratik A. Shah
James E. Tysse
James C. Crowley
Margaret O. Rusconi
AKIN GUMP STRAUSS HAUER
  & FELD LLP
2001 K Street, NW
Washington, D.C. 20006
(202) 887-4000
pshah@akingump.com

Stephanie A. Maloney
Jordan L. Von Bokern
U.S. Chamber Litigation Center
1615 H Street, N.W.
Washington, D.C. 20062

*Counsel to Chamber of Commerce of
the United States of America*

Maury Baskin
Littler Mendelson
815 Connecticut Avenue, N.W.
Suite 400
Washington, D.C. 20006

*Counsel to Associated Builders and
Contractors and International
Franchise Association*

Angelo I. Amador
Restaurant Law Center
2055 L Street, N.W.
Suite 700
Washington, D.C. 20036

*Counsel to Restaurant Law Center*

*Counsel to Chamber of Commerce of
the United States of America, American
Hotel and Lodging Association,
Associated Builders and Contractors,
Associated General Contractors of
America, Coalition for Democratic
Workplace, International Franchise
Association, Longview Chamber of
Commerce, National Association of
Convenience Stores, National Retail
Federation, Restaurant Law Center,
Texas Association of Business, and
Texas Restaurant Association*

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

Pursuant to D.C. Circuit Rules 27(a)(4) and 28(a)(1)(A)-(B), Chamber of Commerce of the United States of America, American Hotel and Lodging Association, Associated Builders and Contractors, Associated General Contractors of America, Coalition for Democratic Workplace, International Franchise Association, Longview Chamber of Commerce, National Association of Convenience Stores, National Retail Federation, Restaurant Law Center, Texas Association of Business, Texas Restaurant Association submit this certificate.

**Parties, Intervenors, and Amici:** The following provides the current parties, proposed intervenors, and amici in this action:

*Petitioner*:  Service Employees International Union

*Respondent*:  National Labor Relations Board

*Movant-Intervenors*:  Chamber of Commerce of the United States of America, American Hotel and Lodging Association, Associated Builders and Contractors, Associated General Contractors of America, Coalition for Democratic Workplace, International Franchise Association, Longview Chamber of Commerce, National Association of Convenience Stores, National Retail Federation, Restaurant Law Center, Texas Association of Business, Texas Restaurant Association

**Action Under Review:**  Standard for Determining Joint Employer Status issued by the National Labor Relations Board and published in the Federal Register on October 27, 2023, at Volume 88, pages 73,946 through 74,018.

**Related Cases**:  The Employer Groups challenged the Rule in the U.S. District Court for the Eastern District of Texas.  *See Chamber of Commerce v. NLRB*, Case No. 6:23-cv-00553-JCB (E.D. Tex.).

SEIU challenged a related rule in the U.S. District Court for the District of Columbia.  *See SEIU v. NLRB et al.*, Case No. 21-cv-2443-RC (D.D.C. filed Sept. 17, 2021).

/s/ *Pratik A. Shah*
Pratik A. Shah

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies:

1.      The foregoing motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 2,139 words, excluding the exempted portions, as provided in Fed. R. App. P. 32(f).  As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

2.      This foregoing motion complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5)-(6) because it was prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

*/s/ Pratik A. Shah*
Pratik A. Shah

## CERTIFICATE OF SERVICE

I certify that on December 4, 2023, I caused the foregoing Motion To Intervene of Employer Groups to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the CM/ECF system.  All participants in the case are registered CM/ECF users and will be served by the CM/ECF system.

/s/ *Pratik A. Shah*
Pratik A. Shah

# EXHIBIT A

November 2, 2023

Dear Representative:

On behalf of the 12.5 million workers represented by the AFL-CIO, the 2 million workers represented by SEIU, and the 1.2 million workers represented by the International Brotherhood of Teamsters, we write to urge you to support the National Labor Relations Board's ("NLRB" or "the Board") recent final rule addressing joint-employer status under the National Labor Relations Act ("NLRA" or "the Act"). This important rule will ensure that workers have a real voice at the bargaining table when multiple companies control their working conditions. **Accordingly, the undersigned unions strongly oppose any effort to nullify or weaken the rule, whether by legislation or resolution under the Congressional Review Act.**

The rule, published on October 27, 2023, rescinds the Trump NLRB's 2020 joint-employer rule and replaces it with an updated standard that is based on well-established common-law principles and consistent with recent D.C. Circuit decisions identifying critical flaws in the Trump NLRB's approach to this issue.[1] The Board's updated rule is welcome and necessary because the Trump rule was harmful to workers' organizing efforts, inconsistent with the governing legal principles, and against the policies of the Act.

The crux of this issue is simple - when workers seek to bargain collectively over their wages, hours and working conditions, every entity with control over those issues must be at the bargaining table. The Act protects and encourages collective bargaining as a means of resolving labor disputes.[2] Collective bargaining cannot serve that purpose if companies with control over the issues in dispute are absent from the bargaining table. The Trump rule offered companies a roadmap to retain *ultimate* control over key aspects of workers' lives - like wages and working conditions - while avoiding their duty to bargain. This standard left workers stranded at the bargaining table and unable to negotiate with the people who could actually implement proposed improvements.

Companies are adopting business structures specifically designed to maintain control over the workers who keep their businesses running while simultaneously disclaiming any responsibility for those workers under labor and employment laws. Such businesses often insert second and third-level intermediaries between themselves and their workers. These companies seek to have it both ways – to control the workplace like an employer but dodge the legal responsibilities of an employer. This phenomenon is often called workplace "fissuring."

---

[1]  *See Sanitary Truck Drivers & Helpers Loc. 350, Int'l Bhd. of Teamsters v. NLRB*, 45 F.4th 38, 47 (D.C. Cir. 2022) (finding that reserved and indirect control must be considered in joint-employer analysis); *Browning-Ferris Indus. of California, Inc. v. NLRB*, 911 F.3d 1195, 1209

(D.C. Cir. 2018) (finding that joint employer analysis is not limited to direct and immediate control). [2]

  29 U.S.C. § 151.

Fissured workplaces, sometimes involving staffing firms, temp agencies, or subcontractors, often leave workers unable to raise concerns, or collectively bargain with, the entity that actually controls their workplace. In such arrangements, multiple entities may share control over a worker's terms of employment. For example, if employees of a subcontractor were to unionize and bargain only with the subcontractor, it might simply refuse to bargain over certain issues because its contract with the prime contractor governs those aspects of the work (*e.g.*, pay, hours, safety, etc.). This harms workers because the entity that effectively determines workplace policy is not at the bargaining table, placing workers' desired improvements out of reach.

The way to ensure that workers can actually bargain with each entity that controls their work is to readily identify such entities as "joint employers." The Act requires joint employers to collectively bargain with employees over working conditions that they control. But the Trump NLRB's joint employer rule was designed to help companies with such control escape bargaining. The rule's standard for finding a joint employment relationship was unrealistic and overly narrow. It conditioned a company's joint employer status on proof that it actually *exercised substantial direct and immediate control*, discounting its *reserved or indirect* power to control a small list of working conditions. This conflicts with the governing common law principles, which make clear that a company's power to control working conditions must bear on its employer status (and thus its bargaining responsibilities under the Act) regardless of whether it has formally exercised that power.[1] The new final rule correctly rescinded the Trump rule.

Critics of the new rule claim that its joint employer standard will outright destroy certain business models or dramatically change operations. Opponents claim, for example, that companies will be required to bargain over issues they have no control over, or will be automatically liable for another entity's unfair labor practices. This is simply untrue and a further attempt to leave workers with no opportunity to bargain with controlling entities. The final rule makes it clear that a joint employer's bargaining obligations extend *only* to those terms and conditions within its control. And current Board law - unchanged by the rule - only extends unfair labor practice liability to a joint employer if it knew or should have known of another employer's illegal action, had the power to stop it, and chose not to.[4]

Similarly, critics claim that the new standard imposes blanket joint employer status on parties to certain business models like franchises, temp agencies, subcontractors, or staffing firms. This is also untrue. The rule does not proclaim that all franchisors are now joint employers with their franchisees, or that any company using workers from a temp agency is automatically their employer. The particular business model used by parties in any case is not determinative. Instead, the Board looks at every case individually, and grants companies a full and fair

---

[1] *See supra* note 1. [4]

  *See Capitol EMI Music*, 311 NLRB 997, 1000 (1993).

opportunity to explain the underlying business relationship and dispute whether they control the relevant workers' essential terms and conditions of employment. The Board conducts a fact-specific, case-by-case analysis that considers whether the putative joint employer controls essential terms and conditions of employment.

Make no mistake, the Board's rule may well result in the employees of a staffing firm, for example, being treated also as employees of the firm's client, but *only if the client controls the employees' terms and conditions of employment*. That is the only way workers can meaningfully bargain at work. But even in that situation, the workers are deemed employees *only for purposes of the NLRA and collective bargaining, and the client would be obligated to bargain only about the terms it controls*. It would still be up to workers to choose whether they want to organize a

union and collectively bargain with their employer or employers. Nothing in the NLRB's rule alters employers' responsibilities under any other state or federal law (*e.g.*, tax laws, wage and hour laws, or workplace safety laws) or requires any changes to business structures. But it does make clear their responsibility under the NLRA to show up at the bargaining table.

The new rule is clear and commonsense: there is no bargaining obligation for an entity that cannot control workplace policies or working conditions. And for good reason - their presence at the bargaining table would be pointless. Workers have no interest in bargaining with a company that lacks the power to implement the workplace improvements they seek.

This rule simply invokes a more realistic joint employer standard on par with the standard enforced during the Obama administration, allowing a company's indirect or reserved control over working conditions to be sufficient for finding joint employer status. Workers' right to collectively bargain cannot be realized if the entity that has the power to change terms and conditions of employment is absent from the bargaining table.

For the reasons explained above, the undersigned unions oppose any effort to nullify the Board's rule. In particular, we urge Congress to oppose efforts to nullify the rule under the Congressional Review Act ("CRA"). Here, a successful CRA disapproval resolution would be particularly harmful: it would revert the NLRB's joint employer standard to the Trump Board's 2020 rule, which stymies workers at the bargaining table. And further, as explained above, at least one federal appeals court has strongly suggested that provisions of the 2020 rule are inconsistent with the NLRA, so litigation would likely invalidate that rule as well. This would create confusion for the workers, unions, and employers regulated by the NLRB. Not only could the two standards be nullified, leaving the Board's joint employer analysis in limbo, but the NLRB's ability to address that limbo would be unclear due to CRA limitations.

The CRA provides that once a disapproval resolution is passed, the underlying agency cannot issue a subsequent rule in "substantially the same form" as the disapproved rule unless it is specifically authorized by a subsequent law. Thus, if the Board's new rule is nullified under the CRA, and the prior Trump rule is invalidated by federal courts, the NLRB would be limited in issuing a clarifying rule. To avoid confusion and ensure stability for workers, unions, and employers, Congress must steer clear of using the CRA to address the joint employer standard.

For these reasons, we ask that you support the NLRB's joint employer rule and oppose any effort to weaken or nullify the clarified standard.

Sincerely,

  

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA;
AMERICAN HOTEL AND LODGING
ASSOCIATION; ASSOCIATED BUILDERS
AND CONTRACTORS; ASSOCIATED
GENERAL CONTRACTORS OF AMERICA;
COALITION FOR DEMOCRATIC
WORKPLACE; INTERNATIONAL
FRANCHISE ASSOCIATION; LONGVIEW
CHAMBER OF COMMERCE; NATIONAL
ASSOCIATION OF CONVENIENCE
STORES; NATIONAL RETAIL
FEDERATION; RESTAURANT LAW
CENTER; TEXAS ASSOCIATION OF
BUSINESS; and TEXAS RESTAURANT
ASSOCIATION,

                    Plaintiffs,

          v.

NATIONAL LABOR RELATIONS BOARD;
LAUREN MCFERRAN, Chair; MARVIN
KAPLAN, Board Member; GWYNNE
WILCOX, Board Member; and DAVID
PROUTY, Board Member,

                    Defendants.

Civil Action No.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Chamber of Commerce of the United States of America, American Hotel and

Lodging Association, Associated Builders and Contractors, Associated General Contractors of

America, Coalition for a Democratic Workplace, International Franchise Association, Longview

Chamber of Commerce, National Association of Convenience Stores, National Retail Federation,

Restaurant Law Center, Texas Association of Business, and Texas Restaurant Association allege and state as follows:

## INTRODUCTION

1.     On October 27, 2023, the National Labor Relations Board, over a strong dissent, promulgated a new rule titled Standard for Determining Joint Employer Status, 88 Fed. Reg. 73,946, codified at 29 C.F.R. § 103.40 ("Joint Employer Rule").

2.     The Rule is as destabilizing as it is unlawful.  It displaces widely accepted common-law standards governing the scope of employment relationships, establishes entirely new tests of employer liability, reconfigures relationships among legally separate entities, erases distinctions between contractors and employers, and threatens billions of dollars in liability and costs.

3.     These sweeping changes were not made in response to any new law, judicial decision, or factual circumstances.  Instead, the Board rammed them through because—it says— the 90-year-old National Labor Relations Act ("NLRA") has been misinterpreted for most of its existence.  The Board's newfound interpretation, moreover, conveniently "requires" reversal of a rule the Board promulgated just three years ago.

4.     The Board's decision to repeal and replace its previous rule suffers from three crucial errors.  First, the Board's interpretation of who is a "joint employer" under the NLRA is overbroad and directly contradicts the established common-law definition that limits joint employment to relationships of actual and substantial control.  The new Rule imposes joint-and-several liability on virtually every entity that hires contractors subject to routine parameters, defines the terms of those contracts, or collaborates with a third party of any kind in

achieving common goals that have an incidental or indirect effect on the third party's employees. Nothing in the NLRA or common law compels the Board's approach.

5.    Second, the Board abandons one of the most important limiting principles in the NLRA: to be an employer, let alone a joint employer, one must possess sufficient control over workers' essential terms and conditions of employment to permit meaningful collective bargaining. The new Rule includes no such limit.

6.    Third, the Rule replaces a clear standard, under which employers have tailored their business arrangements, with an arbitrary and uncertain standard that threatens chaos and indeterminacy in national labor relations across major industry sectors.

7.    Plaintiffs and their members do not oppose regulations that require employers to meet their collective-bargaining obligations under the NLRA.  In fact, Plaintiffs have long supported the development of a clear joint-employment standard.  But the Board's new Rule jettisons the common-law boundaries that define the NLRA and harms the workers, labor unions, and employers the Board purports to protect.

8.    In short: the Joint Employer Rule transgresses the NLRA and is otherwise unlawful under the Administrative Procedure Act ("APA").  So too is the Board's rescission of its previous rule on the flawed premise that it is contrary to common-law principles.  The Court should vacate the Board's rescission of the previous rule and its promulgation of the new Joint Employer Rule, and enjoin the Board from enforcing its new Rule.

## JURISDICTION AND VENUE

9.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 5 U.S.C. §§ 701-706 (APA).

10.     The Court has the authority to grant the requested declaratory and injunctive relief under the APA, 5 U.S.C. §§ 702, 705-706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

11.     Plaintiffs have associational standing to bring this suit on behalf of their various members.  To begin, Plaintiffs' members are directly and adversely affected by the Board's Joint Employer Rule and thus have standing to sue in their own right.  Specifically, Plaintiffs' member-employers participate in business arrangements such as franchising and contracting that are more likely to expose them to joint-employer liability under the Rule.  Those employer members face a greater risk of union campaigns, enforcement actions, and litigation relating to collective bargaining.  Those employers will also experience substantial compliance costs as they modify their business and other practices to account for those risks.

12.     The Rule also conflicts with each Plaintiff's policy objectives, and challenging the Rule is germane to each Plaintiff's purpose.  Neither the claims asserted nor the relief requested requires Plaintiffs' individual members to participate in the suit.

13.     Venue is proper in this district under 28 U.S.C. § 1391(e)(1).  Plaintiff Longview Chamber of Commerce is located in Longview, Texas, and several other Plaintiffs have members located in the Eastern District of Texas.

**PARTIES**

14.     Plaintiff Chamber of Commerce of the United States of America ("U.S. Chamber") is the world's largest business federation, with approximately 300,000 members, including members in the Eastern District of Texas.  Among other things, the U.S. Chamber represents the interests of its member-employers in employment and labor-relations matters—including matters arising under the NLRA—as part of its overall mission to advocate for policies designed to help

businesses create jobs and grow the national economy.  In advancing its mission, the Chamber seeks to preserve the ability of its members to enter into contracting relationships, joint ventures, or franchise agreements, and to acquire subsidiaries or interests in other businesses, without incurring liability for workplace issues that the Chamber's members do not actually control.

15.     Plaintiff American Hotel and Lodging Association ("AHLA") is the national association representing all sectors and stakeholders in the U.S. lodging industry, including owners, REITs, chains, franchisees, management companies, independent properties, suppliers, and state associations.  AHLA strives to be an indispensable resource serving, supporting, and advocating on behalf of the American hospitality industry to build a vibrant and united hospitality industry that powers America's economy.  For decades, AHLA has been following the Board's activity and keeping members informed about relevant policy changes.

16.     Plaintiff Associated Builders and Contractors ("ABC") is a national construction industry trade association representing more than 22,000 members.  Founded on the merit shop philosophy, ABC and its 68 chapters help members develop people, win work, and deliver that work safely, ethically, and profitably for the betterment of the communities in which ABC and its members operate. ABC's membership represents all specialties within the U.S. construction industry and primarily comprises firms that perform work in the industrial and commercial sectors. As set forth in ABC's bylaws, ABC's mission is to protect and promote free and open competition in the construction industry.  This mission includes protecting ABC's member contractors from harmful labor regulations such as the new Joint Employer Rule.

17.     Plaintiff Associated General Contractors of America ("AGC") is the nation's largest and most diverse trade association in the commercial construction industry, now representing more than 27,000 member companies, including over 6,800 general contractors, 9,100 specialty

contractors, and 11,600 service providers and suppliers to the industry through a nationwide network of chapters in all 50 states (including 11 chapters in Texas), the District of Columbia, and Puerto Rico.  AGC represents both union- and open-shop employers engaged in building, heavy, civil, industrial, utility, and other construction for both public and private property owners and developers.  AGC's mission is to serve our nation's construction professionals, and therefore the public interest, by promoting the skill, integrity, and responsibility of those who build America.

18.     Plaintiff Coalition for Democratic Workplace ("CDW") represents hundreds of employer associations, individual employers, and other organizations that together represent millions of businesses of all sizes.  CDW's members employ tens of millions of workers across the country in nearly every industry.  Its purpose is to combat regulatory overreach by the Board that threatens the wellbeing of employers, employees, and the national economy.

19.     Plaintiff International Franchise Association ("IFA") is the world's oldest and largest organization representing franchising worldwide.  IFA represents all aspects of the franchise business model, with approximately 1,200 franchise brands and 10,000 franchise business owners in addition to approximately 600 industry suppliers who support the franchise sector.  For over 60 years, IFA has worked through its government relations, public policy, media relations, and educational programs to advocate for the protection, promotion, and enhancement of franchising and the approximately 790,000 franchise establishments that support nearly 8.4 million direct jobs, $825.4 billion of economic output for the U.S. economy, and almost three percent of the gross domestic product.  IFA members include franchise companies in over 300 different industries, individual franchisees, and companies that support franchising in marketing, technology solutions, development, operations, and more.  As set forth in IFA's bylaws, IFA's

mission is to protect, promote, and enhance franchising.  This mission includes protecting the franchise sector from harmful labor regulations such as new Rule at issue here.

20.    Plaintiff Longview Chamber of Commerce is the leading advocacy organization in Gregg County, Texas representing the interests of business.  Its members include over 1,000 businesses and professional organizations in Gregg County and 11 adjacent counties (the "Longview Trade Area").  Its mission is to engage in and promote projects that have a positive economic impact on the Longview Trade Area, serving its members and their 50,000+ employees.

21.    Plaintiff National Association of Convenience Stores ("NACS") is an international trade association representing the convenience store industry with more than 1,500 retail and 1,600 supplier companies as members, the majority of which are based in the United States.  NACS advocates for the interests of the industry on a regular basis before the executive, legislative and judicial branches of government.  NACS regularly comments on labor laws and regulations including by submitting comments to the NLRB, the Department of Labor, and Congressional committees with jurisdiction over labor policy.

22.    Plaintiff National Retail Federation ("NRF") is the world's largest retail trade association—representing discount and department stores, home goods and specialty stores, Main Street merchants, grocers, wholesalers, chain restaurants, and Internet retailers from the United States and more than 45 countries.  For over a century, NRF has been a voice for every retailer and every retail job, educating, inspiring, and communicating the powerful impact retail has on local communities and global economies.

23.    Plaintiff the Restaurant Law Center ("RLC") is a public policy organization affiliated with the National Restaurant Association, the largest foodservice trade association in the world. The RLC routinely advocates on matters of labor-relations policy and represents the

interests of its members in labor and workforce matters before courts and regulatory agencies.  It is the only independent foodservice membership organization created specifically for this purpose. RLC members include corporate-owned foodservice establishments, franchisees, and independent operators.

24.     Plaintiff Texas Association of Business ("TAB") is the state chamber of commerce for Texas and the largest general business association in the state.  TAB represents member companies—large and small—to create a policy, legal, and regulatory environment that allows them to thrive in business.

25.     Plaintiff Texas Restaurant Association ("TRA") is a non-profit organization that regularly advocates for and educates its members on legal issues, legislation, labor and employment law, and other issues relating to the regulation of the restaurant industry.  The TRA is the leading business association for Texas's restaurant and foodservice industry, which spans over 55,000 locations throughout the state, employing a workforce of over 1.4 million—roughly 12% of the state's employment.  The TRA represents a diverse group of businesses, operators, employees, suppliers, educators, and students across the state, including members in the Eastern District of Texas.  TRA members include single-location family-run restaurants, multinational franchise operations, and every iteration between.

26.     Defendant NLRB is an independent federal agency in the Executive Branch and is subject to the APA.  The Board is headquartered in Washington, D.C.

27.     Defendant Lauren McFerran is the Chairman of the Board.  Chairman McFerran is sued in her official capacity.

28.     Defendant Marvin Kaplan is a Member of the Board.  Member Kaplan is sued in his official capacity.

29.     Defendant Gwynne Wilcox is a Member of the Board.  Member Wilcox is sued in her official capacity.

30.     Defendant David Prouty is a Member of the Board.  Member Prouty is sued in his official capacity.

## BACKGROUND

31.     Congress enacted the NLRA in 1935 to promote stable collective-bargaining relationships.  29 U.S.C. §§ 151 *et seq.*  To that end, the Act gives employees the right to unionize, prohibits employers and labor unions from violating workers' right to free association, and imposes obligations on employers to bargain collectively with employee representatives.

32.     When the NLRA applies, failing to bargain can expose an employer to suits for injunctive relief and monetary penalties.  And failing to comply with collective-bargaining agreements can expose an employer to suits as well.

33.     Sometimes two entities can be considered an employer, or "joint employer," of particular employees—making each employer obligated to bargain collectively with those employees.  But the NLRA does not define the term "joint employer."  The Act instead requires the Board and courts to determine the existence of such a relationship by reference to the common law.  *See NLRB v. Town & Country Elec., Inc.*, 516 U.S. 85, 94-95 (1995) (noting definition of "employer" under NLRA is governed by "common-law agency principles").

34.     For decades, the Board drew from the common law a straightforward framework: firms were "joint employers" if they exercised "direct," "immediate," and "substantial" control over the same employees' essential terms of employment.  The Board also ensured that putative joint employers had enough control over employees' essential terms and conditions of employment to permit meaningful collective bargaining.

35.     But in 2015, the Board abruptly changed the test.  The Board decided through adjudication that "compelling policy reasons" warranted a different approach.  *Browning-Ferris Indus. of Cal., Inc.*, 362 NLRB 1599, 1600, 1612 (2015).  The Board thus announced a new framework, allowing a "joint employer" finding whenever a firm exercised "indirect" control over the terms of employment for another firm's employees, or even just a "reserved right" to control the same.

36.     The D.C. Circuit held the Board "overshot the common-law mark" and thus reversed in part, holding that the Board (i) "provided no blueprint for what counts as 'indirect' control," (ii) "failed to differentiate between those aspects of indirect control relevant to status as an employer, and those quotidian aspects of common-law third-party contract relationships," and (iii) "never delineated what terms and conditions" of employment the two firms needed to control to make collective bargaining "meaningful."  *Browning-Ferris Indus. of Cal., Inc. v. NLRB*, 911 F.3d 1195, 1216, 1220-1222 (D.C. Cir. 2018).  Although the court found that indirect and reserved control could be relevant to determining joint employer status, it declined to decide whether indirect or reserved control alone would be sufficient to establish such status.

37.     In response to the D.C. Circuit's decision, the Board promulgated a new rule that addressed the court's admonitions and largely reinstated the longstanding joint-employer standard.  *See* Joint Employer Status Under the National Labor Relations Act, 85 Fed. Reg. 11,184 (Feb. 26, 2020), codified at 29 C.F.R. § 103.40 ("2020 Rule").

38.     The 2020 Rule provided that an entity is "a joint employer of a separate employer's employees only if the two employers share or codetermine the employees' essential terms and conditions of employment."  29 C.F.R. § 103.40(a).  And it included an exhaustive list of discrete "[e]ssential terms and conditions of employment" drawn from the common law—namely, wages,

benefits, hours of work, hiring, discharge, discipline, supervision, and direction. *Id.* § 103.40(b). Under this standard, "[e]vidence of the entity's indirect control over essential terms and conditions of employment" was "probative," but not dispositive. *Id.* § 103.40(a). Rather, to "establish" joint employer status, the 2020 Rule required that "the entity must possess and exercise such substantial direct and immediate control" with "a regular or continuous consequential effect on an essential term or condition of employment" so as to permit "meaningful[]" collective bargaining. *Id.* § 103.40(a), (d).

39.     But the rule did not last long.  In 2022, a newly constituted Board proposed to rescind and replace the 2020 Rule.  In October 2023, the Board did just that when it promulgated the new Joint Employer Rule and vacated the 2020 Rule.  *See* Standard for Determining Joint Employer Status, 88 Fed. Reg. 73,946, codified at 29 C.F.R. § 103.40.  And the Board did so on the premise that the NLRA and common law *required* the Board to reverse course.

40.     As relevant here, the Board's new Rule provides that firms are "joint employers" if they "possess the authority to control (whether directly, indirectly, or both)" or "exercise the power to control (whether directly, indirectly, or both), one or more of the employees' essential terms and conditions of employment."  The upshot is that reserved or indirect control over a single essential term of employment, even if never exercised, suffices to make a firm an "employer" of another firm's employees.

41.     The Rule also discards the former limiting principle that, to establish joint employer status, it is necessary to show that "the putative joint employer possesses sufficient control over employees' essential terms and conditions of employment to permit meaningful collective bargaining."  *Browning Ferris*, 362 NLRB at 1600.

11

42.     The Rule is set to go into effect on December 26, 2023.  But given the sea change it brings about, affected entities already feel the Rule's effects.  Indeed, as explained further below, many face business-altering decisions.

## CLAIMS FOR RELIEF

43.     The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.

44.     The APA further provides that "final agency action for which there is no other adequate remedy in a court" is "subject to judicial review."  5 U.S.C. § 704.

45.     Under the APA, courts "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "unsupported by substantial evidence."  5 U.S.C. § 706(2)(A), (C), (E).

46.     The Board's rescission of the 2020 Rule and its promulgation of the Joint Employer Rule are "final agency action" within the meaning of the APA.

## COUNT I —AGENCY ACTION CONTRARY TO LAW
### AGAINST ALL DEFENDANTS

47.     Plaintiffs re-allege and incorporate by reference each of the preceding paragraphs and allegations.

48.     Under the longstanding common-law principles incorporated into the NLRA, a joint-employer relationship has two main requirements: (1) the joint employer must exert direct, immediate, and substantial control over the employees' essential terms and conditions of

employment, and (2) the joint employer's control is different from, and more substantial than, the control a firm has over a common-law independent contractor.

49.     The Board's new Joint Employer Rule rides roughshod over both.

50.     First, the Rule *mandates* a "joint employer" finding whenever a firm has the mere "authority" to control a single essential term of employment, even if never exercised.  The Rule also explicitly makes "indirect" control alone sufficient.  And the Rule allows a firm to be declared a "joint employer" even when the control available to that firm is de minimis, sporadic, or isolated. Yet none of those principles is permitted, let alone required, by the common-law precedent that defines the NLRA's terms.  *See Adams & Assocs., Inc. v. NLRB*, 871 F.3d 358, 378 (5th Cir. 2017) (unexercised, reserved control was "insufficient to establish a joint-employer finding, absent evidence that the right was ever exercised").

51.     Second, the Rule obscures the formerly clear dividing line between employees, on the one hand, and independent contractors, on the other.  The Rule permits standards formerly used to determine whether a worker is an independent contractor or an employee (i.e., whether a worker has an employer at all) to determine joint employer status (i.e., whether a worker has a *second* employer in addition to her indisputable employer).  In particular, by permitting indirect and reserved control alone to qualify a firm as a joint employer, and by offering a list of capacious and vague categories (such as "work rules and directions" and "safety and health") to define the relevant aspects of a joint employer's "control," the rule fails to differentiate the truly "essential" terms and conditions of employment from the "quotidian aspects of common-law third-party contract relationships."  *Browning-Ferris*, 911 F.3d at 1220.

52.     The Rule is unlawful for yet another reason: the structure and purpose of the NLRA require an employer to possess enough control over employees' essential terms and conditions of

employment such that collective bargaining between the two is "meaningful." Yet the Rule abandons that condition. It does not require putative joint employers to have control over all or even most of the employees' traditional mandatory subjects of bargaining; control over just one is enough. And even then, the Rule renders irrelevant the extent of control necessary to make informed decisions and tradeoffs at the bargaining table.

53. In addition, the Board's decision to rescind the 2020 Rule on the premise that the rule is *inconsistent* with longstanding common-law principles is contrary to law because the 2020 Rule is *consistent* with those principles.

54. Thus, the Board's rescission of the 2020 Rule and its promulgation of the new Joint Employer Rule are contrary to law.

## COUNT II —ARBITRARY AND CAPRICIOUS AGENCY ACTION
## AGAINST ALL DEFENDANTS

55. Plaintiffs re-allege and incorporate by reference each of the preceding paragraphs and allegations.

56. The APA "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). "[R]easonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions." *Michigan v. EPA*, 576 U.S. 743, 753 (2015).

57. The Board's sudden about-face here—vacating a vastly different rule the Board promulgated just three years ago—fails that test. To start, the Board ignored the many practical problems and real-world disruption created by the Joint Employer Rule, claiming relevant comments were "misdirected"—and that its hands were tied—given its newfound interpretation

of the NLRA.  But the Board was wrong to conclude that the NLRA *compelled* this reversal, and the problems it ignored are significant.

58.     Take the Rule's effects on some major industries as examples:

a.     *Restaurants*.  A significant portion of the restaurant industry operates on the franchise model.  Under that model, franchisees retain direct and immediate control of the day-to-day operation of their businesses and employees (such as who to hire or fire, business hours, setting wages and schedules), while franchisors set standards to maintain brand uniformity and consistency (such as how workers dress and how food is prepared).  But the Rule makes no effort to distinguish these normal (and, as discussed further below, sometimes required) contractual controls from those indicative of joint employment.  As the dissent recognized, the result is "significant risk that many franchisors will be held liable as joint employers of their franchisees' employees."  88 Fed. Reg. at 74,001 (Kaplan, M., dissenting).  This will likely lead to one of two responses: either franchisors "will exert much greater control over their franchisees, effectively turning previously independent owners of franchisees into glorified managers;" or franchisors "will distance their franchisees by denying them guidance" previously given, "forcing franchisees to incur the expense of obtaining that guidance" elsewhere.  *Id.*  Indeed, Plaintiffs' members have reported that the new Rule already has created massive uncertainty and a dramatic rise in operational risk-management costs at many franchise restaurants.

b.     *Construction*.  Given the nature of construction, there are usually multiple entities operating on any given project.  "Each of these parties typically remains the sole employer of its own employees.  But a general contractor must exert a degree of control over subcontractors and their employees to ensure that work on a given project meets efficiency, quality, and safety benchmarks."  88 Fed. Reg. at 74,001 (Kaplan, M., dissenting).  In fact, many general contractors

must sign standard-form agreements, obligating them "to reserve and exercise some level of control over their subcontractors' employees." *Id.* Under the Board's new Rule, such forms could make general contractors a "joint employer" for every employee working on the project. The general contractors could then be subject to any enforcement actions under the NLRA against a subcontractor, be pulled into labor disputes without the protections from secondary boycotts normally accorded to neutral third parties, or be forced to respond to the union-organizing campaigns of any subcontractor's employees. In sum, the Rule will disrupt long-established operational methods by which construction service providers work together to build America, and will clearly have a harmful effect on both small and large businesses in the construction industry—many of which are members of the construction-industry Plaintiff associations.

    c. *Retail*. Like members of the restaurant industry, members of the retail industry often operate on a franchise model and will thus suffer the harms described above. But retailers also have reason to worry that normal contract relationships will create joint-employer liability where there was none before. Retailers regularly contract with other companies for a wide range of services, such as janitorial support, lawn care, health and safety inspections, and temporary work. When they do, retailers often give the other companies' employees directions on health and safety procedures. Retailers also might implement formal training and impose conduct requirements so the other companies' public-facing employees behave in a manner that avoids disturbances for customers or other workers. Under the new Rule, these routine measures could make retailers the "joint employers" for these other companies' employees. Those retailers, in turn, could be pulled into labor disputes between the contracted companies and those companies' employees, despite having no role in establishing the workers' essential terms and conditions of employment.

d.      *Hospitality*.  Like the industries described above, the hospitality industry is largely built on the franchise model, and many industry participants rely on a host of contractors and vendors to support operations.  The many small businesses that make up the industry rely on clear rules delineating who is a "joint employer."  Yet the new Joint Employer Rule throws clarity to the wayside, forcing hotels and the like to reconsider every vendor and contract agreement they sign.  Some may choose not to contract at all.  Others may change policies, to the detriment of employees and the public alike.

e.      *Healthcare*.  The healthcare industry will fare no better.  It too depends on contracted labor—often to fill staffing gaps for nurses and other critical-care workers.  Those contracted workers "typically sign a contract with a staffing agency to occupy a temporary position at a hospital that can range in duration from several days to a few months."  88 Fed. Reg. at 74,002 (Kaplan, M., dissenting).  Under the new Rule, though, "a hospital that maintains (or merely has the authority to maintain) work rules and schedules" for those workers "will be their joint employer"—making the hospital "duty-bound to bargain with the union" that represents the workers "directly employed" by the staffing agency.  *Id.*  A hospital's health and safety policies will have the same effect.  Simply put, the Rule will force hospitals "to spend time and resources that could be devoted to patient care on administrative and management issues as it works to understand the scope of its joint employer liability [and] revises policies, practices, and contracts to address that liability[.]"  *Id.* (first alteration in original).

59.     The new Rule has an especially pernicious effect on the franchise business model generally and the approximately 800,000 franchised businesses operating across hundreds of industries in addition to those noted above.  Franchising is a method of marketing goods and services that depends upon the existence of the franchisor's control over a trademark, other

intellectual property, and often some other commercially desirable interest sufficient to induce franchisees to pay to participate in the franchisor's system by distributing goods or services under the franchisor's trademark or name.

60.   Maintaining brand standards through control over their trademarks allows franchisors to maintain the uniformity and quality of product and service offerings and, in doing so, to protect their trade names, trademarks, service marks, the goodwill associated with these trademarks, and most importantly, the consumer. This likewise benefits franchisees, by allowing them to rely on the experience, reputation, recognized brand, and goodwill of the franchisor in building their own independent business.  Brand standards also help protect consumers by allowing them the ability to know they are dealing with a reputable business that offers a quality product. Because the essence of franchising is the collective use of marks that represent the source and quality of goods and services to the consuming public, action taken to control the uniformity and quality of product and service offerings under those marks is an explicit requirement of federal trademark law.  *See* 15 U.S.C. § 1064(5)(A) (mark may be cancelled "[a]t any time . . . on the ground that the registrant (A) *does not control, or is not able legitimately to exercise control over, the use of such mark*") (emphasis added).

61.   A franchisor's exercise of control over brand standards is not day-to-day management over the business operations of its franchisees. Yet under the new Rule, joint-employer status may be established merely by the indirect or reserved (even if unexercised) control over a broad range of matters, including wages, benefits, and other compensation; hours of work and scheduling; the assignment of duties to be performed; supervision of the performance of duties; work rules and directions governing the manner, means, and methods of performance; grounds for discipline; hiring and firing of employees; and working conditions relating to

employee health and safety.  By enumerating an overbroad list of "essential terms and conditions of employment," the Rule threatens to turn a franchisor's routine exercise of control to ensure the maintenance of brand standards into indicia of joint employment under the NLRA.  This in turn will harm franchisees, as franchisors, facing the threat of joint employer liability, either: (a) scale back on the support, services, and advice they supply to their franchisees; or (b) exert more control over their franchisees to protect themselves, essentially transforming franchisees from independent business owners to middle managers.

62.     The Rule effectively puts franchisors in the virtually impossible position of either: (a) risking forfeiture of their intellectual property in the form of their marks by exerting too little control over their brand standards; or (b) incurring joint employer liability under the NLRA by exerting or reserving too much control.  The Board seeks to elevate (its view of) the goals of federal labor law—and its own authority—over the goals of federal law governing trademarks and franchising which Congress has expressly set forth in the Lanham Act and elsewhere, thus penalizing conduct Congress required franchisors to take under separate federal law.

63.     The new Rule's breadth also poses problems for collective bargaining more generally.  Collective bargaining involves negotiating tradeoffs among competing employer and employee interests.  Yet under the Joint Employer Rule, firms with no meaningful interest and no real leverage will find themselves at the bargaining table.  And the number of firms at any single table will increase dramatically.  As the dissent put it: "It is difficult to imagine a better recipe than [the new Joint Employer Rule] for injecting chaos into the practice and procedure of collective bargaining that the majority claims to promote."  88 Fed. Reg. at 73,999.

64.     The Board cast all these concerns aside by claiming that its hands were tied.  But as explained above and in Member Kaplan's dissent, the Board "misapprehends common-law

agency principles in holding that those principles *compel* the Board to rescind its 2020 Rule . . . and replace it with a joint-employer standard not seen anywhere else in the law."  88 Fed. Reg. at 73,987 (Kaplan, M., dissenting).  Because the Board "fail[ed] to engage in any real policy-based choice," the Board's actions must be set aside because its view is not "compelled by the common law and hence the only permissible construction of the Act."  *Id.*

65.    Finally, the new Rule is unreasonable because it fails to articulate a comprehensible standard with meaningful guidance to regulated parties.  As Member Kaplan points out in dissent, the Rule "expressly contemplates that joint-employer status will be determined through adjudication under the common law, not under the provisions" of the Rule—which is exactly what would happen with no rule at all.  88 Fed. Reg. at 74,005.

66.    The Board's claim that its new Rule is reasonable because it establishes "a definite, readily available standard" that will "assist employers and labor organizations in complying with the Act" and "reduce uncertainty and litigation over the basic parameters of joint-employer status" is a farce.  88 Fed. Reg. at 73,957.  The Rule creates more uncertainties than it solves.

67.    The Board's rescission of the 2020 Rule and its promulgation of the new Rule are therefore arbitrary and capricious as well.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiffs respectfully request that this Court:

1.    Declare unlawful and set aside the Board's rescission of the 2020 Rule and promulgation of the Joint Employer Rule;

2.    Declare that the Board's rescission of the 2020 Rule and promulgation of the Joint Employer Rule are arbitrary and capricious;

3.      Enjoin the Board from enforcing its Joint Employer Rule against Plaintiffs'

        members;

4.      Award Plaintiffs their costs and reasonable attorney's fees; and

5.      Grant such other and further relief as the Court deems just and proper.

Dated:  November 9, 2023

Stephanie A. Maloney
   D.C. Bar No. 1044276 (*pro hac vice* to be filed)
Jordan L. Von Bokern
   D.C. Bar No. 1032962 (*pro hac vice* to be filed)
U.S. Chamber Litigation Center
1615 H Street, N.W.
Washington, DC 20062-2000
Telephone: (202) 463-5337
smaloney@uschamber.com
jvonbokern@uschamber.com

*Attorneys for the Chamber of Commerce of the United States of America*

Maury Baskin
   D.C. Bar No. 248898 (*pro hac vice* to be filed)
Littler Mendelson
815 Connecticut Avenue, N.W.
Suite 400
Washington, D.C. 20006
Telephone:  (202) 842-3400
Facsimile:  (202) 842-0011
mbaskin@littler.com

*Counsel to Associated Builders and Contractors and International Franchise Association*

Angelo I. Amador
   D.C. Bar No. 480031 (*pro hac vice* to be filed)
Restaurant Law Center
2055 L Street, N.W.
Suite 700
Washington, D.C. 20036
Telephone: (202) 331-5913

*Counsel for the Restaurant Law Center*

Respectfully submitted,

/s/ *Laura P. Warrick*
Laura P. Warrick
   Texas Bar No. 24079546
Akin Gump Strauss Hauer & Feld LLP
2300 N. Field Street, Suite 1800
Dallas, TX 75201
Telephone:  (214) 969-4770
Facsimile:  (214) 969-4343
lwarrick@akingump.com

Pratik A. Shah (Lead Attorney)
   D.C. Bar No. 497108 (*pro hac vice* to be filed)
James E. Tysse
   D.C. Bar No. 9787522 (*pro hac vice* to be filed)
James C. Crowley
   D.C. Bar No. 208946 (*pro hac vice* to be filed)
Margaret O. Rusconi
   D.C. Bar No. 1719371 (*pro hac vice* to be filed)
Akin Gump Strauss Hauer & Feld LLP
2001 K Street, N.W.
Washington, D.C. 20006
Telephone:  (202) 887-4000
Facsimile:  (202) 887-4288
pshah@akingump.com
jtysse@akingump.com
jcrowley@akingump.com
mrusconi@akingump.com

*Counsel to Plaintiffs Chamber of Commerce of the United States of America, American Hotel and Lodging Association; Associated Builders and Contractors; Associated General Contractors of America; Coalition for a Democratic Workplace; International Franchise Association; Longview Chamber of Commerce; National Association of Convenience Stores; National Retail Federation; Restaurant Law Center; Texas Association of Business; and Texas Restaurant Association*

JS 44   (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Chamber of Commerce of the United States of America, et al.

**(b)** County of Residence of First Listed Plaintiff   Washington, D.C.
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Laura P. Warrick, Akin Gump Strauss Haue & Feld LLP
2300 N. Field Street, Suite 1800, Dallas TX 75201
(214) 969-4770

## DEFENDANTS

National Labor Relations Board, et al.

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [x] 2  U.S. Government Defendant
- [ ] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | | [ ] 820 Copyrights | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | | [ ] 830 Patent | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | [ ] 840 Trademark | [ ] 460 Deportation |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 740 Railway Labor Act | **SOCIAL SECURITY** | [ ] 485 Telephone Consumer Protection Act |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | | | [ ] 790 Other Labor Litigation | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 791 Employee Retirement Income Security Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | | [ ] 895 Freedom of Information Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | **FEDERAL TAX SUITS** | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [x] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
5 U.S.C. §§ 701-706; 28 U.S.C. §§ 2201-2202
Brief description of cause:
The NLRB's rescission of the 2020 Joint Employer Rule and promulgation of a new Rule are contrary to law and arbitrary and capricious.

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   [ ] Yes   [x] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE
Nov 9, 2023

SIGNATURE OF ATTORNEY OF RECORD
/s/ Laura P. Warrick

**FOR OFFICE USE ONLY**

RECEIPT #_____   AMOUNT_____   APPLYING IFP_____   JUDGE_____   MAG. JUDGE_____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.(a)   Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)   County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)   Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.   Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked.  (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.   Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.   Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: Nature of Suit Code Descriptions.

**V.   Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.   Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.   Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.   Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

|  |  |  |
|---|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Case No. 6:23-cv-00553-JCB |
| v. | ) ) ) | |
| NATIONAL LABOR RELATIONS BOARD, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

**DEFENDANTS' MOTION TO TRANSFER TO THE D.C. CIRCUIT
FOR LACK OF SUBJECT-MATTER JURISDICTION**

TABLE OF CONTENTS

BACKGROUND ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 5

    I.   Jurisdiction to review the Final Rule lies exclusively in the courts of appeals. .................. 5

        A.  The NLRA channels review of final Board orders into the courts of appeals. ............... 6

        B.  Supreme Court and appellate precedent hold that ambiguities in direct-review statutes are construed in favor of circuit-court jurisdiction, absent a firm indication that Congress wanted a matter heard in district court. ............................................................................... 8

        C.  The NLRA's judicial-review provision should be construed to cover final orders enacting rules concerning unfair labor practices. ............................................................. 12

    II.  This case should be transferred to the D.C. Circuit to cure the want of jurisdiction. ........ 15

CONCLUSION ................................................................................................................ 16

TABLE OF AUTHORITIES

Cases                                                                                      Page(s)

*AFL-CIO v. NLRB*,
   466 F. Supp. 3d 68 (D.D.C. 2020) ............................................................... 12

*Am. Fed'n of Labor v. NLRB*,
   308 U.S. 401 (1940) ....................................................................................... 7

*American Federation of Labor & Congress of Industrial Organizations v. NLRB*,
   57 F.4th 1023 (D.C. Cir. 2023) .............................................................. 12, 13

*Atorie Air, Inc. v. FAA*,
   942 F.2d 954 (5th Cir. 1991) ...................................................................... 10

*Bennett v. Spear*,
   520 U.S. 154 (1997) ....................................................................................... 7

*Boire v. Greyhound Corp.*,
   376 U.S. 473 (1964) ....................................................................................... 7

*Bokat v. Tidewater Equip. Co.*,
   363 F.2d 667 (5th Cir. 1966) ....................................................................... 7

*California Energy Comm'n v. Dep't of Energy*,
   585 F.3d 1143 (9th Cir. 2009) ..................................................................... 11

*Citizens Awareness Network, Inc. v. United States*,
   391 F.3d 338 (1st Cir. 2004) ........................................................................ 9

*City of Rochester v. Bond*,
   603 F.2d 927 (D.C. Cir. 1979) ............................................................... 10, 14

*Florida Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985) .................................................................................... 8, 9

*Gen. Elec. Uranium Mgmt. Corp. v. U.S. Dep't of Energy*,
   764 F.2d 896 (D.C. Cir. 1985) ............................................................... 10, 14

*Gunn v. Minton*,
   568 U.S. 251 (2013) ....................................................................................... 5

*Harrison v. PPG Indus., Inc.*,
   446 U.S. 578 (1980) ................................................................................ 11, 14

*Investment Company Institute v. Board of Governors of the Federal Reserve System*,
  551 F.2d 1270 (D.C. Cir. 1977) ........................................................................ 9, 10

*JTB Tools & Oilfield Servs., L.L.C. v. United States*,
  831 F.3d 597 (5th Cir. 2016) ................................................................................ 11

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
  511 U.S. 375 (1994) ................................................................................................ 5

*Leedom v. Kyne*,
  358 U.S. 184 (1958) ................................................................................................ 7

*Liaw Su Teng v. Skaarup Shipping Corp.*,
  743 F.2d 1140 (5th Cir. 1984) .............................................................................. 16

*Ligon v. LaHood*,
  614 F.3d 150 (5th Cir. 2010) .......................................................................... 10, 11

*Loan Syndications & Trading Ass'n v. SEC*,
  818 F.3d 716 (D.C. Cir. 2016) ................................................................................ 9

*Mansfield, C. & L.M. Ry. Co. v. Swan*,
  111 U.S. 379 (1884) ................................................................................................ 5

*Myers v. Bethlehem Shipbuilding Corp.*,
  303 U.S. 41 (1938) .................................................................................................. 7

*N. Am. Soccer League v. NLRB*,
  613 F.2d 1379 (5th Cir. 1980) ................................................................................ 3

*N.Y. Republican State Comm'n v. SEC*,
  70 F. Supp. 3d 362 (D.D.C. 2014) ........................................................................ 10

*N.Y. Republican State Comm'n v. SEC*,
  799 F.3d 1126 (D.C. Cir. 2015) .............................................................................. 9

*Nat. Res. Def. Council v. Abraham*,
  355 F.3d 179 (2d Cir. 2004) .................................................................................. 10

*Nat'l Fed. of the Blind v. DOT*,
  827 F.3d 51 (D.C. Cir. 2016) .................................................................................. 9

*Nat'l Parks & Conservation Ass'n v. FAA*,
  998 F.2d 1523 (10th Cir. 1993) ............................................................................ 10

*Nat'l Parks Conservation Ass'n v. EPA*,
  991 F.3d 681 (5th Cir. 2021) ................................................................................ 16

*Nebraska Public Power Dist. V. United States*,
  590 F.3d 1357 (Fed. Cir. 2010) ................................................................ 9

*Nw. Airlines, Inc .v. Goldschmidt*,
  645 F.2d 1309 (8th Cir. 1981) ................................................................ 10

*Oil, Chem. & Atomic Workers Union v. Occupational Safety & Health Admin.*,
  145 F.3d 120 (3d Cir. 1998) .................................................................... 11

*Owner-Operators Indep. Drivers Ass'n of Am., Inc. v. Skinner*,
  931 F.2d 582 (9th Cir. 1991) .................................................................. 15

*PPG Indus., Inc. v. Harrison*,
  587 F.2d 237 (5th Cir. 1979) .................................................................. 11

*Republic Aviation Corp. v. NLRB*,
  324 U.S. 793 (1945) ................................................................................ 3

*San Diego Air Sports Ctr., Inc. v. FAA*,
  887 F.2d 966 (9th Cir. 1989) .................................................................. 14

*Sima Prods. Corp. v. McLucas*,
  612 F.2d 309 (7th Cir. 1980) ............................................................ 10, 14

*Southland Mower Co. v. U.S. Consumer Product Safety Comm'n*,
  600 F.2d 12 (5th Cir. 1979) .................................................................... 16

*Texas v. United States*,
  328 F. Supp. 3d 662 (S.D. Tex. 2018) ................................................... 13

*U.S. Steel Corp. v. EPA*,
  595 F.2d 207 (5th Cir. 1979) .................................................................. 11

*United Farm Workers v. Adm'r, EPA*,
  592 F.3d 1080 (9th Cir. 2010) ................................................................. 9

*Wyndham Associates v. Bintliff*,
  398 F.2d 614 (2d Cir. 1968) ................................................................... 16

Statutes

5 U.S.C. §§ 701-706 ....................................................................................... 5

28 U.S.C. § 1331 ............................................................................................. 5

28 U.S.C. § 1391(e)(1) .................................................................................... 5

28 U.S.C. § 1631 .................................................................................. 1, 6, 15

28 U.S.C. § 2112 ...................................................................................... passim

29 U.S.C. § 152(2) ........................................................................................ 3, 6

29 U.S.C. §§ 151-69 ........................................................................................... 1

29 U.S.C. § 156 ............................................................................................... 2, 8

29 U.S.C. § 157 .................................................................................................. 2

29 U.S.C. § 158 ............................................................................................... 2, 3

29 U.S.C. § 159 ............................................................................................... 2, 7

29 U.S.C. § 160 ....................................................................................... passim

29 U.S.C. § 160(j) .............................................................................................. 7

29 U.S.C. § 161(2) ............................................................................................. 7


Regulations

*Joint Employer Status Under the National Labor Relations Act*,
    85 Fed. Reg. 11,184 (Feb. 26, 2020) .......................................................... 4

*Representation-Case Procedures*,
    84 Fed. Reg. 69,524 (Dec. 18, 2019) ........................................................ 12

*Standard for Determining Joint Employer Status*,
    88 Fed. Reg. 73,946 (to be codified at 29 C.F.R. § 103.40) ....................... 1, 3, 4, 13


Other Authorities

H.R. Rep. 74-972 ............................................................................................... 8

S. Rep. 74-573 ................................................................................................... 8

Defendants National Labor Relations Board, *et al.* (collectively, "the Board") move pursuant to 28 U.S.C. § 1631 to transfer this case to the United States Court of Appeals for the District of Columbia Circuit. This Court lacks subject-matter jurisdiction over the Complaint for Declaratory and Injunctive Relief filed by Plaintiffs Chamber of Commerce of the United States of America, *et al*. (collectively, "Plaintiffs") because review of the National Labor Relations Board ("NLRB") rule at issue here must occur in a United States court of appeals. And because that very same rule is the subject of a pending petition for review filed in the D.C. Circuit, this case should be transferred to that court of appeals pursuant to 28 U.S.C. § 2112.

## **BACKGROUND**

This case is a facial challenge to a final rule issued by the Board on October 27, 2023. *See* Standard for Determining Joint Employer Status, 88 Fed. Reg. 73,946 (to be codified at 29 C.F.R. § 103.40) ("Final Rule").[1] The Rule establishes a standard for determining whether two or more employers are a joint employer under the National Labor Relations Act ("NLRA" or "the Act"),[2] and will now take effect on February 26, 2024.[3]

The core substantive guarantee of the NLRA is contained in Section 7, which protects most private-sector employees' rights "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid

---

[1] Compl. ¶ 8, ECF No. 1.

[2] 29 U.S.C. §§ 151-69.

[3] Press Release, NLRB, Board Extends Effective Date of Joint-Employer Rule to February 26, 2024 (Nov. 16, 2023), https://www.nlrb.gov/news-outreach/news-story/board-extends-effective-date-of-joint-employer-rule-to-february-26-2024.

or protection."[4] The NLRB is an independent federal agency created by Congress in 1935 to administer the NLRA. The agency's adjudicatory and rulemaking functions are vested in a five-seat Board, which "is empowered . . . to prevent any person from engaging in any unfair labor practice."[5] While the Board has historically tended to effectuate and interpret the NLRA through case-by-case adjudication, Section 6 gives it the authority to engage in rulemaking "in the manner prescribed by [the Administrative Procedure Act] . . . as may be necessary to carry out the provisions of this Act."[6]

Generally, the Board handles two types of disputes. First, when a question arises whether employees wish to be represented for collective bargaining—typically by a labor union—Section 9 of the Act empowers the Board to investigate and, if necessary, resolve the matter by issuing an appropriate certification.[7] If a union is designated or selected to be the exclusive representative of a unit of employees, the employer and the union are required by statute "to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment."[8]

Second, through cases brought by the NLRB's General Counsel under Section 10 of the Act, the NLRA regulates the relationship between employees, their employers, and unions. Section 8 of the Act prohibits both employers and unions from committing a number of general or specific unfair labor practices that interfere with the exercise of Section 7 rights. Examples of

---

[4] 29 U.S.C. § 157. Section 7 also protects employees' "right to refrain from any or all such activities." *Id.*

[5] 29 U.S.C. § 160(a).

[6] 29 U.S.C. § 156.

[7] 29 U.S.C. § 159.

[8] 29 U.S.C. § 158(d).

employer unfair labor practices include, *inter alia*, failing to bargain in good faith with employees' representatives, threatening employees with reprisals for engaging in union activity, and engaging in a host of other behaviors identified by the Board as violative of "the Act's general prohibitory language."[9]

By operation of these statutory provisions, an entity's status as an employer determines whether it has a duty to bargain with a properly designated or selected union and whether it may be held liable for unfair labor practices. Thus, accurately identifying whether an entity qualifies as an employer is critically important. The NLRA defines an "employer" as "any person acting as an agent of an employer, directly or indirectly,"[10] and goes on to define the term employee to "include any employee, and shall not be limited to the employees of a particular employer, unless [the Act] explicitly states otherwise."[11] Employer status is often clear and undisputed, particularly when only one possible employing entity is involved. But in many workplaces, it is commonplace for more than one entity to control, or possess the right to control, certain critical aspects of the employment relationship under which employees perform their labor.[12] In such scenarios, "[t]he existence of a joint employer relationship depends on the control which one employer exercises, or potentially exercises, over the labor relations policy of the other."[13]

---

[9] *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 798 (1945); *see* 29 U.S.C. § 158(a).

[10] 29 U.S.C. § 152(2).

[11] *Id*. § 152(3).

[12] *See, e.g.*, Standard for Determining Joint Employer Status, 88 Fed. Reg. 73,946, 73,980 (Oct. 27, 2023) (referring to comments received during the rulemaking which "note that modern business practices often result in multiple firms sharing control over aspects of employees' terms and conditions of employment").

[13] *N. Am. Soccer League v. NLRB*, 613 F.2d 1379, 1382 (5th Cir. 1980).

In 2020, the Board issued a rule that limited joint-employer status to employers that exercised direct and immediate control over terms and conditions of employment;[14] that rule is currently subject to legal challenge.[15] The Final Rule challenged in the instant litigation rescinds and replaces the 2020 rule, and broadens the standard to determine a joint-employer relationship. The Final Rule, like the 2020 rule, applies in both the representation-case and unfair-labor-practice-case contexts, rendering certain individual employers jointly liable for unfair labor practices and obligated to recognize and bargain with a union.[16] In the new Rule, the Board explains it will "give determinative weight to the existence of a putative joint employer's authority to control essential terms and conditions of employment, whether or not such control is exercised, and without regard to whether any such exercise of control is direct or indirect, such as through an intermediary."[17] The Board further determined that its 2020 rule is "contrary to the common-law agency principles that must govern the joint-employer standard under the Act and that the Board has no statutory authority to adopt such a requirement."[18]

On November 6, 2023, the Service Employees International Union (SEIU) filed a Petition for Review of the Final Rule in the United States Court of Appeals for the D.C. Circuit (Case No. 23-1309).[19] On November 9, Plaintiffs filed their Complaint in the instant case, in which they

---

[14] Joint Employer Status Under the National Labor Relations Act, 85 Fed. Reg. 11,184 (Feb. 26, 2020).

[15] *SEIU v. NLRB et al.*, 21-cv-02443 (D.D.C). Prior to any party taking positions on jurisdiction or the underlying merits, the court stayed that litigation based on the Board's stated intent to revisit the 2020 rule. *See* Minute Order Granting Plaintiff's and Defendant's Joint Motion to Stay, dated Jan. 6, 2022. The case currently remains stayed until January 10, 2024. Minute Order Granting Unopposed Motion for Further Extension of Litigation Stay, dated Nov. 16, 2023.

[16] 88 Fed. Reg. at 73,957; 85 Fed. Reg. at 11,188.

[17] 88 Fed. Reg. at 73,948.

[18] *Id.*

[19] *See* Defs.' Notice of Related Case, ECF No. 15.

request that the Court declare the Final Rule unlawful and enjoin the Board from enforcing it against their members.[20]

## ARGUMENT

Plaintiffs allege that this Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 5 U.S.C. §§ 701-706 (the Administrative Procedure Act).[21] They further allege that venue is proper in this district under 28 U.S.C. § 1391(e)(1), based on claimed connections to the Eastern District of Texas.[22] But Section 10(f) of the NLRA directs judicial review of any final unfair-labor-practice "order"—a term that, as explained below, courts have deemed broad enough to encompass rules issued after notice and comment—to the circuit courts of appeals, not the district courts.[23] Accordingly, because this case may only be brought as a petition for review in a circuit court of appeals, Plaintiffs are in the wrong court. However, the interest of justice counsels for transfer rather than dismissal, and pursuant to 28 U.S.C. § 2112, these proceedings must be transferred to the D.C. Circuit for likely consolidation with the SEIU's challenge to the same Final Rule.

### I.    Jurisdiction to review the Final Rule lies exclusively in the courts of appeals.

Federal courts have limited jurisdiction and possess "only that power authorized by Constitution and Statute."[24] The rule that a federal court may not proceed where it lacks subject-matter jurisdiction "is inflexible and without exception."[25] Consequently, a court's initial task in

---

[20] Compl. ¶¶ 20, 21.

[21] Compl. ¶ 9.

[22] Compl. ¶ 13.

[23] 29 U.S.C.§ 160(f).

[24] *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).

[25] *Mansfield, C. & L.M. Ry. Co. v. Swan*, 111 U.S. 379, 382 (1884).

any action is to ascertain whether its jurisdiction extends to the issue in question, including whether the matter must be raised before an alternate forum. Under 28 U.S.C. § 1631, if the court concludes jurisdiction is lacking, it "shall" transfer the action to another court where the action could have been brought "if it is in the interest of justice."[26] The transferred action should then proceed as if it had been filed in the proper court.[27]

Although the text of the NLRA's rulemaking provision, Section 6, does not address where judicial review of final Board rules should occur, Section 10 channels review of final Board orders to the courts of appeals. Moreover, precedent from the Supreme Court, Fifth Circuit, and other federal courts requires that ambiguities in direct-circuit-review statutes be construed in favor of circuit-court jurisdiction. As explained below, applying these precedents to the ambiguities in Section 10 leads to the conclusion that review of final Board rules—at least those involving unfair labor practices—must occur in the courts of appeals.

### A.   The NLRA channels review of final Board orders into the courts of appeals.

Through the enactment of the NLRA in 1935, Congress determined that the Board would have exclusive authority to prevent "any person" from engaging in unfair labor practices and that the courts of appeals would have exclusive jurisdiction to review final Board orders.[28] The NLRA's direct-review provision is codified in Section 10(f), which reads in relevant part:

> Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia . . .[29]

---

[26] 28 U.S.C. § 1631.

[27] *Id.*

[28] 29 U.S.C. §§ 152(2), 160(f).

[29] 29 U.S.C. § 160(f).

And a corollary provision in Section 10(e) empowers the Board "to petition any court of appeals of the United States" to enforce its orders.[30]

In addition to vesting the courts of appeals with jurisdiction over final agency action, Congress also severely circumscribed district court involvement in the NLRA's statutory scheme. District courts have jurisdiction over NLRA matters in just two narrow and specific categories of cases, neither of which is applicable here (enforcement of subpoenas and *pendente lite* injunctions).[31] Indeed, even the Board's representation-case orders (denoted in the NLRA as "certifications"[32]) are not reviewable in the courts of appeals unless and until those certifications become the basis for final Board orders in an unfair-labor-practice case.[33] In short, review of final Board action involving unfair labor practices is lodged exclusively in the circuit courts.[34]

The textual requirements of Section 10(f) are met here, as the Final Rule is a "final order of the Board"[35] and denies "relief sought" by various Plaintiffs in their comments during the rulemaking process. But Plaintiffs may claim that Section 10(f) does not apply to rulemakings, and indeed the NLRA does not expressly answer that question. The grant of the Board's rulemaking power in Section 6 provides no guidance as to the jurisdictional locus of judicial

---

[30] 29 U.S.C. § 160(e).

[31] *See* 29 U.S.C. §§ 160(j), 161(2); *accord Bokat v. Tidewater Equip. Co.*, 363 F.2d 667, 673 (5th Cir. 1966) ("District Courts . . . have a very very minor role to play in this statutory structure"). Importantly, each of those conferrals of district-court jurisdiction may be invoked only by the NLRB itself.

[32] *See* 29 U.S.C. § 159(c), (d).

[33] *Am. Fed'n of Labor v. NLRB*, 308 U.S. 401, 408-09 (1940); *see also Boire v. Greyhound Corp.*, 376 U.S. 473, 476-77 (1964). There are certain extraordinary exceptions to that rule, not relevant here. *See, e.g.*, *Leedom v. Kyne*, 358 U.S. 184, 190 (1958) (permitting district court review where a complete "absence of jurisdiction [in] the federal courts [would] mean a sacrifice or obliteration of a right which Congress has created") (quoting reference omitted).

[34] *See generally Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 48, 51 (1938).

[35] *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (discussing the hallmarks of finality).

review. That section simply states: "[t]he Board shall have authority from time to time to make, amend, and rescind, in the manner prescribed by the Administrative Procedure Act [subchapter II of chapter 5 of title 5], such rules and regulations as may be necessary to carry out the provisions of [the NLRA]."[36] Nor does the NLRA otherwise define or address the term "order" as used in Section 10(f). Its legislative history does not speak to the matter.[37] As explained below, we therefore apply the relevant interpretive canons to confirm the conclusion that Section 10(f), with its limitation on judicial review exclusively in the courts of appeals, applies to rulemaking.

> ### B. Supreme Court and appellate precedent hold that ambiguities in direct-review statutes are construed in favor of circuit-court jurisdiction, absent a firm indication that Congress wanted a matter heard in district court.

In *Florida Power & Light Co. v. Lorion*,[38] the Supreme Court announced a presumption favoring circuit-court review where an agency's organic statute's direct-review provision so provides. In that case, the Court considered certain "problematic" and "vexing" ambiguities in the statutory sections governing review of final orders issued by the Nuclear Regulatory Commission.[39] The Court held that where the application of a direct-review statute channels review of an agency's actions to the circuit courts, but is ambiguous in its scope, direct review in the circuit courts is appropriate absent a "firm indication" that Congress intended otherwise.[40] To determine congressional intent, the Court sought "guidance in the statutory structure, relevant

---

[36] 29 U.S.C. § 156.

[37] See, e.g., S. Rep. 74-573 (1935), reprinted in 2 NLRB, LEGISLATIVE HISTORY OF THE NATIONAL LABOR RELATIONS ACT, 1935, at 2300, 2305 (1949); H.R. Rep. 74-972 (1935), reprinted in 2 LEGISLATIVE HISTORY OF THE NATIONAL LABOR RELATIONS ACT, 1935, at 2956, 2960 (same).

[38] 470 U.S. 729 (1985).

[39] *Id.* at 736.

[40] *Id.* at 745.

legislative history, congressional purposes expressed in the choice of [statutorily described process for] review, and general principles respecting the proper allocation of judicial authority to review agency orders."[41] In harmony with the *Lorion* presumption, the First Circuit has instructed that "jurisdictional statutes should be construed so that agency actions will always be subject to initial review in the same court, regardless of the procedural package in which they are wrapped."[42]

Given this precedent, it is now considered "blackletter administrative law that, absent countervailing indicia of congressional intent, statutory provisions for direct review of orders encompass challenges to rules."[43] Indeed, "absent contrary congressional intent, a statutory provision creating a right of direct judicial review in the court of appeals of an administrative 'order' authorizes such review of any agency action that is otherwise susceptible of review on the basis of the administrative record alone."[44]

Consistent with this presumption "interpret[ing] ambiguities in direct-review statutes in favor of appellate jurisdiction,"[45] federal courts have, without hesitation, interpreted generalized direct-review statutes broadly to encompass most final agency actions.[46] For example, in *Investment Company Institute v. Board of Governors of the Federal Reserve System* ("*Investment*

---

[41] *Id*. at 737.

[42] *Citizens Awareness Network, Inc. v. United States*, 391 F.3d 338, 347 (1st Cir. 2004).

[43] *N.Y. Republican State Comm'n v. SEC*, 799 F.3d 1126, 1129-30 (D.C. Cir. 2015) ("*NYRSC II*"); *Nat'l Fed. of the Blind v. DOT*, 827 F.3d 51, 55 (D.C. Cir. 2016); *see also* 33 Charles A. Wright & Charles H. Koch, Jr., Federal Practice & Procedure § 8299 (2006) (internal quotation omitted).

[44] *NYRSC II*, 799 F.3d at 1131; *see also Nat'l Fed. of the Blind*, 827 F.3d at 55.

[45] *Loan Syndications & Trading Ass'n v. SEC*, 818 F.3d 716, 720 (D.C. Cir. 2016).

[46] *Id.*; *United Farm Workers v. Adm'r, EPA*, 592 F.3d 1080, 1083–84 (9th Cir. 2010) (same); *Nebraska Public Power Dist. V. United States*, 590 F.3d 1357, 1367 (Fed. Cir. 2010) ("When there is a question whether judicial review was meant to be in district courts or courts of appeals, that ambiguity is resolved in favor of court of appeals review") (collecting cases).

*Company*"),[47] the D.C. Circuit construed the term "order" within a judicial-review provision to

encompass rulemaking.[48] Since *Investment Company*, the D.C. Circuit and other circuit courts

have exercised direct review of agency rules promulgated under multiple other statutes that

contained similar direct appellate review authority.[49]

     Consistent with *Lorion* and the other caselaw cited above, the Fifth Circuit has generally

interpreted direct-review statutes as broadly as Congressional intent would allow. For example,

in cases interpreting the term "order" in the Federal Aviation Act ("FAA"), the Fifth Circuit has

afforded the term an "expansive construction."[50] In so doing, the court has "focused on both the

finality of the [agency] action and the adequacy of the record to support judicial review."[51] The

court thus has interpreted "order" under the FAA to encompass all agency decisions which are

---

[47] 551 F.2d 1270 (D.C. Cir. 1977).

[48] *Id*. at 1278 ("the purposes underlying [the direct-review provision] will best be served if 'order' is interpreted to mean any agency action capable of review on the basis of the administrative record").

[49] *N.Y. Republican State Comm'n v. SEC*, 70 F. Supp. 3d 362, 370-71 (D.D.C. 2014) ("*NYRSC I*"), *aff'd*, *NYRSC II*, 799 F.3d at 1129-30 (Investment Advisers Act of 1940); *Gen. Elec. Uranium Mgmt. Corp. v. U.S. Dep't of Energy*, 764 F.2d 896, 903 & n.37 (D.C. Cir. 1985) (Waste Act of 1982); *City of Rochester v. Bond*, 603 F.2d 927, 932-35 (D.C. Cir. 1979) (Federal Aviation Act and Communications Act of 1934); *Nat'l Parks & Conservation Ass'n v. FAA*, 998 F.2d 1523, 1526-28 (10th Cir. 1993) (Federal Aviation Act); *Nw. Airlines, Inc .v. Goldschmidt*, 645 F.2d 1309, 1314 (8th Cir. 1981) (following *Investment Company*); *Sima Prods. Corp. v. McLucas*, 612 F.2d 309, 312–14 (7th Cir. 1980) (relying extensively on *Investment Company* to review regulation promulgated under the Federal Aviation Act); *see also Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 193-94 (2d Cir. 2004) (reasoning that "[r]ulemaking proceedings do not ordinarily necessitate additional factfinding by a district court to effectuate the review process," such that a direct-review provision covering rules properly covered agency actions delaying regulatory effective dates).

[50] *Atorie Air, Inc. v. FAA*, 942 F.2d 954, 960 (5th Cir. 1991) (citing *San Diego Air Sports Ctr., Inc. v. FAA*, 887 F.2d 966, 968 (9th Cir. 1989)); *accord Ligon v. LaHood*, 614 F.3d 150, 154 (5th Cir. 2010).

[51] *Atorie Air*, 942 F.2d at 960.

final because an obligation is imposed or a legal relationship is fixed.[52]

The Fifth Circuit has taken a similar approach in cases determining jurisdiction to review various actions of the Environmental Protection Agency, exercising direct review where a sufficient record exists for appellate consideration. Specifically, the court has held that where there was no need for fact finding because the challenged agency regulation was "based on a substantial record" and will "have general effect in the specified areas," the challenge should proceed in circuit court.[53]

More recently, in *JTB Tools & Oilfield Servs., L.L.C. v. United States*,[54] the Fifth Circuit, relying upon decisions by the D.C. Circuit and Third Circuit, found that provisions of the OSH Act vesting exclusive jurisdiction in the courts of appeals over agency actions "necessarily" granted "exclusive jurisdiction to review *inaction* as well."[55]

Thus, although the Fifth Circuit has not squarely faced the present issue of whether direct-review provisions referring to "orders" encompass agency rules, its case law accords with the standard adopted by other circuits—i.e., that review properly lies in the courts of appeals

---

[52] *See id.*; *Ligon*, 614 F.3d at 154.

[53] *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 212 (5th Cir. 1979). The Fifth Circuit considered the adequacy of the administrative record in another pre-*Lorion* case, *PPG Indus., Inc. v. Harrison*, and concluded that the agency action's "skeletal record" was not suitable for appellate review. 587 F.2d 237, 244 (5th Cir. 1979). However, the Supreme Court reversed that decision as unsupported by legislative intent. *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 587-89 (1980) (finding "any other final action" is "expansive language" that should be read broadly, not narrowly, absent contrary legislative history); *see also id.* at 593 ("The most obvious advantage of direct review by a court of appeals is the time saved compared to review by a district court, followed by a second review on appeal."). Courts continue to consider "judicial economy" and the adequacy of the record in construing the scope of direct-review statutes. *E.g.*, *California Energy Comm'n v. Dep't of Energy*, 585 F.3d 1143, 1148-50 (9th Cir. 2009).

[54] 831 F.3d 597 (5th Cir. 2016).

[55] *Id.* at 600 (emphasis added) (quoting and relying on *Oil, Chem. & Atomic Workers Union v. Occupational Safety & Health Admin.*, 145 F.3d 120, 122–23 (3d Cir. 1998), which in turn relied on *Action on Smoking & Health v. Dep't of Labor*, 28 F.3d 162, 163–64 (D.C. Cir. 1994)).

where the scope of the review provision is ambiguous, and there is neither a need for further fact-finding nor countervailing considerations firmly evincing a contrary congressional intent.

### C.  The NLRA's judicial-review provision should be construed to cover final orders enacting rules concerning unfair labor practices.

Consistent with the above principles, the D.C. Circuit has found that Section 10(f) of the NLRA is broad enough to encompass review of regulations. In *American Federation of Labor & Congress of Industrial Organizations v. NLRB ("AFL-CIO")*,[56] that court construed Section 10(f) as "provid[ing] direct review in federal appellate courts of at least some 'final order[s] of the Board.'"[57] The rule in question there—Representation-Case Procedures, 84 Fed. Reg. 69,524 (Dec. 18, 2019)—exclusively concerned the Board's processing of representation cases under Section 9 of the Act. The circuit court explained that when Congress enacted the NLRA, Congress spoke of "orders" as shorthand for final agency action, including rules.[58]

The district court, in the underlying proceeding, construed Section 10(f) to find that "what is being directed to the court of appeals for direct-review per the text of the statute is NLRB actions concerning the 'unfair labor practice in question'—a textual reference that strongly suggests that the provision is only triggered when some kind of unfair labor practice is at issue."[59] The circuit court agreed, finding that "[t]he statutory phrase defining appellate-court venue options by reference to '*the* unfair labor practice *in question*,' a specific iteration of a broader category, implies that the overall provision's object is that category—unfair

---

[56] 57 F.4th 1023 (D.C. Cir. 2023).

[57] *Id*. at 1031(quoting 29 U.S.C. § 160(f)).

[58] *Id.* (citing cases).

[59] *AFL-CIO v. NLRB*, 466 F. Supp. 3d 68, 84 (D.D.C. 2020).

labor practices—which does not include NLRA rules regarding representation elections."[60] Although the D.C. Circuit found that rules that solely govern representation cases must be challenged first in district courts, it also clarified that Board final orders (including rules) pertaining to unfair labor practices should be directly reviewed in the courts of appeals.[61] Thus, "subsection 10(f) communicates that what is being directed to the court of appeals for the purpose of direct review is NLRB final orders (and, per binding precedent, *rules*) *concerning unfair labor practices*."[62]

  This Court should follow the same reasoning as the D.C. Circuit to establish that Section 10(f) review is controlling as to the Final Rule.[63] *Investment Company*, *Lorion*, and these cases' progeny make clear that Section 10(f) requires that review of any final NLRB action pertaining to unfair labor practices, including rulemakings, should occur at the circuit-court level. The Final Rule satisfies that straightforward rubric because it alters the substantive law of bargaining obligations and derivative liability, thus affecting the adjudication of unfair labor practices under Section 8(a). Indeed, the Final Rule applies "for all purposes under the Act"[64] and will determine the extent to which separate entities may be found jointly and severally liable for the commission of unfair labor practices by the other. Plaintiffs concede this, averring in multiple instances that the Final Rule sets forth a test "of employer liability" and "imposes joint-and-several liability" including in "suits for injunctive

---

[60] *AFL-CIO*, 57 F.4th at 1032 (emphasis in original).

[61] *Id.* at 1031.

[62] *Id.* at 1032 (cleaned up and emphasis added).

[63] As the Southern District of Texas noted in *Texas v. United States*, 328 F. Supp. 3d 662, 730 (S.D. Tex. 2018), "[d]ue to its location and resulting docket, the D.C. Circuit has long been looked to in the field of administrative law."

[64] 88 Fed. Reg. at 73,982, 74,017.

relief and monetary penalties."[65] Thus, the connection between the Board's joint-employer

doctrine and adjudication of unfair-labor-practice cases is undisputed.

Several features of the instant proceeding confirm that reading Section 10(f) to

encompass review of the Final Rule is the proper interpretation. Initially, the administrative

record in this case is aptly suited for appellate review. There is no need for the discovery and trial

functions that characterize district-court proceedings; summary judgment will be based entirely

on the administrative record.

Further, allowing this challenge to proceed in this district court, as preferred by Plaintiffs,

while the SEIU's challenge proceeds in the D.C. Circuit, creates the possibility of duplicative

and conflicting decisions on the Final Rule, which is exactly what 28 U.S.C. § 2112 seeks to

avoid, as discussed further in Section II, below.[66] This problem underscores the very reason for

construing direct-review provisions broadly instead of narrowly: "the purposes of special review

statutes—coherence and economy—are best served if courts of appeals exercise their exclusive

jurisdiction over final agency actions."[67] Holding in this case that Section 10(f) does not apply to

the Final Rule would conflict with the broad reading that the Fifth Circuit has given direct-

review provisions channeling judicial review of agency actions to the courts of appeals. It would

"encourage circumvention of Congress's particular jurisdictional assignment. It would also result

---

[65] Compl. ¶ 32; *see also id.* ¶¶ 11, 14, 32, 58(a)-(e), 61, 62.

[66] *See generally Harrison v. PPG Indus., Inc.*, 446 U.S. at 593 ("The most obvious advantage of direct review by a court of appeals is the time saved compared to review by a district court, followed by a second review on appeal"); *see also Gen. Elec. Uranium Mgmt. Corp. v. U.S. Dep't of Energy*, 764 F.2d 896, 903 (D.C. Cir.1985) ("exclusive jurisdiction in the court of appeals avoids duplicative review and the attendant delay and expense involved") (collecting cases).

[67] *Sima Prod. Corp. v. McLucas*, 612 F.2d 309, 313 (7th Cir. 1980) (citing *City of Rochester v. Bond*, 603 F.2d 927, 936 (D.C. Cir. 1979)); *accord San Diego Air Sports Center, Inc. v. FAA*, 887 F.2d at 968 (9th Cir. 1989).

in fractured judicial review of agency decisions, with all of its attendant confusion, delay, and expense."[68]

The explicit text of Section 10(f) should be followed. That section mandates that judicial review of the Final Rule—as a final Board order pertaining to unfair labor practices—occur in the courts of appeals, rather than the district courts. The adequacy of the record to be considered on review, the lack of a need to develop facts independent of that record, and delay-avoidance considerations reinforce the correctness of that conclusion.

## II. This case should be transferred to the D.C. Circuit to cure the want of jurisdiction.

As demonstrated above, Plaintiffs have brought this action in the wrong court because jurisdiction to hear this suit lies in the courts of appeals under Section 10(f) of the Act. Nonetheless, under Section 1631, where this Court lacks jurisdiction, it "shall" transfer an action to another court when doing so "is in the interest of justice."[69] Defendants submit that the interest of justice warrants transfer, as opposed to dismissal, because transfer would expedite resolution of Plaintiffs' claims and avoid any prejudice to Plaintiffs.

This case should be transferred to the D.C. Circuit, as mandated by 28 U.S.C. § 2112. (Section 2112 procedures apply because this case should have originated in the circuit court of appeals, not district court, as explained in Section I, above.) Under Section 2112(a)(1), the agency is required to file the administrative record in the circuit in which a challenge to the administrative action is initially filed—which in this case is the D.C. Circuit, where the SEIU filed a challenge filed to this Final Rule on November 6, 2023.[70] And under Section 2112(a)(5),

---

[68] *Owner-Operators Indep. Drivers Ass'n of Am., Inc. v. Skinner*, 931 F.2d 582, 589 (9th Cir. 1991).

[69] 28 U.S.C. § 1631.

[70] *See* Defs.' Notice of Related Case, ECF No. 15.

all other courts in which challenges are filed—such as this Court—"shall transfer those proceedings to the court in which the record is so filed." Accordingly, a straightforward application of this statute mandates transfer to the D.C. Circuit.[71]

Consolidating these matters in one court not only promotes efficiency but also aligns with the broader interest of streamlining the adjudication process, and ensuring a single, comprehensive, and cohesive determination of the issues related to the joint-employer standard.[72]  Indeed, inconsistent results would create a lack of clarity for the public—including both unions and employers—in determining unfair-labor-practice liability under the Act. As the interest of justice requires that this case be transferred, and under Section 2112, venue is only proper in the D.C. Circuit, this Court should transfer the instant case to that court.

## CONCLUSION

For the reasons provided, the Board respectfully requests that this Court transfer this case to the D.C. Circuit Court of Appeals. A proposed order is attached.

---

[71] *Southland Mower Co. v. U.S. Consumer Product Safety Comm'n*, 600 F.2d 12, 14 (5th Cir. 1979) (noting Section 2112 enacted "a mechanical, first filing approach" to determining venue); *accord Nat'l Parks Conservation Ass'n v. EPA*, 991 F.3d 681, 684 (5th Cir. 2021) (noting that the Fifth Circuit employ[s] a first-filed rule "much like that set forth in § 2112, when faced with a competing challenge to the same administrative action in another court of appeals").

[72] *See, e.g.*, *Nat'l Parks Conservation Ass'n*, 991 F.3d at 684 (noting the need "to avoid the risk of conflicting decisions from continuing parallel litigation"); *Liaw Su Teng v. Skaarup Shipping Corp.*, 743 F.2d 1140, 1149 (5th Cir. 1984) (noting the "possible detriment of inconsistent results" were the case to be litigated in parallel in two distinct fora); *Wyndham Associates v. Bintliff,* 398 F.2d 614, 619 (2d Cir. 1968) (stating that "[t]here is a strong policy favoring the litigation of related claims in the same tribunal in order that . . . inconsistent results can be avoided.").

Respectfully submitted,

KEVIN P. FLANAGAN
*Deputy Assistant General Counsel*
(No official bar number in Maryland)
Tel: (202) 273-2938
kevin.flanagan@nlrb.gov

/s/ Christine Flack
CHRISTINE FLACK
*Supervisory Attorney*
(No official bar number in Maryland)
Tel: (202) 273-2842
christine.flack@nlrb.gov

TYLER J. WIESE
*Senior Attorney*
Minnesota Bar No. 0329601
Tel: (952) 703-2891
tyler.wiese@nlrb.gov

SHAWNNELL T. BARNETT
*Attorney*
DC Bar No. 1531575
Tel: (202) 316-6397
shawnnell.barnett@nlrb.gov

ELISABETH H. CAMPBELL
*Attorney*
NYS Bar Reg. No. 5935325
Tel: (202) 273-0121
elisabeth.campbell@nlrb.gov

National Labor Relations Board
Contempt, Compliance, and Special Litigation Branch
1015 Half St. SE
Washington, DC 20003
Fax: (202) 273-4244

*Attorneys for Defendants*

Dated: November 20, 2023

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 20, 2023, I filed the foregoing document with this Court using the CM/ECF filing system, and a copy is being served on the ECF Filers electronically by the Notice of Docket activity.

/s/ Christine Flack
CHRISTINE FLACK
*Supervisory Attorney*
(No official bar number in Maryland)
Tel: (202) 273-2842
Fax: (202) 273-4244
christine.flack@nlrb.gov

18

## <u>CERTIFICATE OF CONFERENCE</u>

Pursuant to the meet and confer requirement in Local Rule CV-7(h), the undersigned certifies that on November 13, 2023, the undersigned, joined by Deputy Associate General Counsel Dawn Goldstein, and attorneys Shawnell Barnett and Elisabeth Campbell, attended a video conference call with Plaintiff's counsel, Pratik Shah, James Tysse, James Crowley, and Margaret Rusconi. The undersigned informed Plaintiffs counsel of Defendants' intent to file the instant Motion to Transfer and stated their position regarding jurisdiction and transfer of this case. The undersigned sought Plaintiffs position on consent to transfer to the D.C. Circuit, Plaintiffs' counsel declined, and the parties were unable to reach agreement.

/s/ Christine Flack
CHRISTINE FLACK
*Supervisory Attorney*
(No official bar number in Maryland)
Tel: (202) 273-2842
Fax: (202) 273-4244
christine.flack@nlrb.gov

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

|  |  |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL LABOR RELATIONS BOARD, *et al.*, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )   Civil Case No. 6:23-cv-00553-JCB <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## **[PROPOSED] ORDER**

Before the Court is Defendants' Motion to Transfer to the D.C. Circuit for Lack of Subject-Matter Jurisdiction. Upon due consideration, it is hereby ORDERED that Defendants' Motion to Transfer is GRANTED. This matter is hereby transferred in the interest of justice to the United States Court of Appeals for the District of Columbia Circuit pursuant to 28 U.S.C. § 1631. The clerk is directed to transmit the original file and a certified copy of this Order to that court.

SO ORDERED.


Date: _____               _____

J. Campbell Barker
U.S. District Judge

1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

|  |  |  |
|---|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | | Civil Case No. 6:23-cv-00553-JCB |
| v. | | |
| NATIONAL LABOR RELATIONS BOARD, *et al.*, | | |
| Defendants. | | |

**[PROPOSED] ORDER**

Before the Court is Defendants' Motion to Transfer to the D.C. Circuit for Lack of

Subject-Matter Jurisdiction. Upon due consideration, it is hereby ORDERED that Defendants'

Motion to Transfer is GRANTED. This matter is hereby transferred in the interest of justice to

the United States Court of Appeals for the District of Columbia Circuit pursuant to 28 U.S.C.

§ 1631. The clerk is directed to transmit the original file and a certified copy of this Order to that

court.

SO ORDERED.